**EXHIBIT A**

**Revised Perkins Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| _____ | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| Perkins & Marie Callender's, LLC, *et al.*,[1] | ) | Case No. 19-11743 (KG) |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
| _____ | ) | **Re: Docket No. 33 & 118** |

### ORDER (A) APPROVING AND AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' PERKINS BUSINESS ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF

Upon the *Debtors' Motion for Entry of an Order (A) Approving and Authorizing Sale of Substantially All of the Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* (the "**Motion**") [Docket No. 33][2] of the above-captioned debtors (collectively, the "**Debtors**"), and the *Supplement* related thereto (the "**Supplement**") [Docket No. 118], for entry of an order (this "**Order**"), pursuant to Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014, and Local Rules 2002-1 and 6004-1, (i) authorizing the sale of the Perkins Business (the "**Sale**") free and clear of liens, claims, encumbrances, and other interests; (ii)

---

[1]     The Debtors, together with the last four digits of each Debtor's federal tax identification number, are:  Perkins & Marie Callender's, LLC (2435); Perkins & Marie Callender's Holding, LLC (3381); Marie Callender Pie Shops, LLC (1620); MC Wholesalers, LLC (2420); PMCI Promotions, LLC (7308); MCID, Inc. (2015); Wilshire Beverage, Inc. (5887); FIV, LLC (9288); P&MC's Real Estate Holding LLC (8553); and P&MC's Holding Corp. (2225).  The mailing address for the Debtors is 6075 Poplar Avenue, Suite 800, Memphis, Tennessee 38119-4709.

[2]     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion, the Supplement, or the Asset Purchase Agreement (as defined herein), as applicable.

approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto; and (iii) granting related relief; and an auction having been commenced on September 9, 2019 (the "**Auction**") with respect to the Sale of the Perkins Business in accordance with the Bid Procedures following the receipt of more than one Qualified Bid for such assets; and Huddle House, Inc. (together with any Buyer Designee, the "**Buyer**") having been selected as the Successful Bidder at the Auction; and the Court having reviewed and considered the Motion and the Supplement; and the Court having held a hearing with respect to the Sale on September [17], 2019 (the "**Sale Hearing**"); and upon all of the proceedings had before the Court; and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion and the relief requested in this Order; and due and sufficient notice of the Auction, the Sale Hearing and the relief sought herein having been given under the particular circumstances and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion with respect to the Sale of the Perkins Business to the Buyer is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and upon the record of the Sale Hearing and these Chapter 11 Cases, and after due deliberation and sufficient cause appearing therefore and no further notice being required,

**IT IS FOUND, CONCLUDED AND DETERMINED THAT:**

**I.     Jurisdiction, Final Order and Statutory Predicates**

A.     This Court has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of the Debtors' Chapter 11 Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2

B.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order and the prompt consummation of the transactions and transfers contemplated under the Asset Purchase Agreement, and expressly directs entry of judgment as set forth herein.

C.      The statutory predicates for the relief requested in the Motion are Bankruptcy Code sections 105(a), 363(b), (f), (m), and 365 and Bankruptcy Rules 2002(a)(2), 6004(a)-(c), (e), (f), and (h), 6006(a), (c), and (d), 9007 and 9014.

D.      The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

E.      To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such.

F.      Good and sufficient notice of the Motion and the relief requested therein have been afforded to all known interested persons and entities, including, but not limited to the following parties (the "**Notice Parties**"): (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to the agent under the Debtors' Prepetition Bank of America Credit Agreement; (iv) counsel to the agent under the DIP Credit Agreement; (v) counsel to the Stalking Horse Purchaser; (vi) the Interested Parties identified by Houlihan Lokey ("**Houlihan Lokey**") and any other entity known by Houlihan Lokey to have

3

expressed an interest in a sale transaction; (vii) all counterparties to any of the Debtors' contracts or leases; (viii) all known holders of known claims against and equity interests in the Debtors; (ix) all affected federal, state and local governmental regulatory and taxing authorities, including the Internal Revenue Service; (x) all parties that have filed and not withdrawn requests for notices pursuant to Bankruptcy Rule 2002; and (xi) to the extent not already included above, all parties in interest listed on the Debtors' creditor matrix.

G.     In accordance with the provisions of the *Order (A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notices and Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief* [Docket No. 141] (the "**Bidding Procedures Order**"), the Debtors have served the Potential Assumption and Assignment Notice, the Amended Potential Assumption and Assignment Notice, and any Supplemental Assumption and Assignment Notices (collectively, the "**Assumption and Assignment Notices**") upon the relevant counterparties informing such counterparties:  (i) that the Debtors seek to assume and assign to the Buyer all or some of the Assigned Contracts (as defined in the Asset Purchase Agreement), effective as of the Closing Date (as defined in the Asset Purchase Agreement); and (ii) of the proposed Cure Costs, if any, for all such Assigned Contracts.  Pursuant to Bankruptcy Rule 6006(c), the Court finds that the service of such Assumption and Assignment Notices was good, sufficient and appropriate under the circumstances, and was effected in compliance with the Bidding Procedures Order, and that no further notice need be given in respect of establishing the Cure Costs for the Assigned Contracts.  The counterparties thereto have had an opportunity to object to the Cure Costs set

4

forth in the Assumption and Assignment Notices and the Buyer's showing of adequate assurance of future performance pursuant to Bankruptcy Code sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B).

H.     As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, Bidding Procedures, Auction, Sale Hearing, Sale and assumption and assignment of the Assigned Contracts (including all applicable objection deadlines with respect to Cure Costs) has been provided in accordance with Bankruptcy Code sections 102(1), 363 and 365 and Bankruptcy Rules 2002, 6004, 6006 and 9014.  The Debtors also have complied with all obligations to provide notice of the Bidding Procedures, Auction, the Sale Hearing, Sale and assumption and assignment of the Assigned Contracts (including all applicable objection deadlines with respect to any Cure Costs) required by the Bidding Procedures Order. The notices described in paragraphs F, G, H, J and K herein were good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, Bidding Procedures, Auction, Sale Hearing, Sale, or assumption and assignment of the Assigned Contracts (including all applicable objection deadlines with respect to any Cure Costs) is required.

I.     The Debtors have articulated good and sufficient reasons for the Court to grant the relief requested in the Motion regarding the Sale.

J.     The Sale Notice served by the Debtors on the Notice Parties, which was also published in the National Edition of USA Today and posted on the case website maintained by the Debtors' claims and noticing agent, provided all interested parties with timely and proper notice of the Auction, Sale, and Sale Hearing.

RLF1 22040405v.1

K.      The Assumption and Assignment Notices provided the counterparties with proper notice of the potential assumption and assignment of the Assigned Contracts and any Cure Costs relating thereto, and the procedures set forth therein with regard to any such Cure Costs to satisfy Bankruptcy Code section 365 and Bankruptcy Rule 6006.

L.      The disclosures made by the Debtors concerning the Motion, the Auction, the Sale, and the Sale Hearing, were good, complete and adequate.

## II.      Good Faith of the Buyer

A.      Based on the record established at the Sale Hearing, the Buyer is purchasing the Acquired Assets (as defined in the Asset Purchase Agreement) in good faith and is a good faith buyer for value within the meaning of Bankruptcy Code section 363(m), and is therefore entitled to the full protection of Bankruptcy Code section 363(m) and any other applicable or similar bankruptcy and non-bankruptcy law with respect to all of the Acquired Assets and the relief provided for in this Order, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia:* (a) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (b) the Buyer complied in good faith in all respects with the provisions of the Bidding Procedures Order and the Bidding Procedures applicable to it; (c) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (d) all payments to be made by the Buyer, all releases and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (e) the Buyer has not violated Bankruptcy Code section 363(n) by any action or inaction, and no common identity of directors or controlling stockholders exists between the Buyer and the Debtors; (f) the Buyer did not in any way induce or cause the Chapter 11 filing of the Debtors; (g) the Buyer has not acted in a collusive manner with any person; and (h) the negotiation and execution of the final purchase agreement (together with any

6

schedules, exhibits and any other documents or instruments related thereto, as the same may be amended and in effect from time to time, the "**Asset Purchase Agreement**," which is attached hereto as **Exhibit A**, and which is based upon the stalking horse asset purchase agreement attached to the Motion) and any other agreements or instruments related thereto were at arms' length, in good faith, and without collusion or fraud, and at all times each of the Buyer and the Debtors were represented by competent counsel of their choosing. Neither the Buyer, nor any of its affiliates, successors, assigns, or their respective members or shareholders is an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code.

III.    **Highest or Best Offer**

A.    The Debtors solicited offers and noticed the Auction in accordance with the provisions of the Bidding Procedures Order and Bidding Procedures. The Bidding Procedures were non-collusive, formulated and implemented in good faith, were substantively and procedurally fair to all parties, and obtained the highest and best value for the Acquired Assets for the Debtors and their estates and creditors. On September 9, 2019, the Debtors held the Auction in which Qualified Bidders were invited to participate. The Debtors received three Qualified Bids for the Acquired Assets and, at the conclusion of the Auction, deemed the bid submitted by the Buyer as the highest or otherwise best offer for the Acquired Assets. A modified bid submitted by the Stalking Horse Purchaser was declared the Back-Up Bid. The Auction was duly noticed, the sale process was conducted in a non-collusive manner and in compliance in all respects with the Bidding Procedures and the Bidding Procedures Order, the Debtors afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets, and all interested parties have been afforded a full, fair and reasonable opportunity to object or be heard with respect to the Sale and the relief granted by this Order.

7

B.      The Debtors and their professionals have, under the circumstances, adequately and appropriately marketed the Acquired Assets in compliance in all respects with the Bidding Procedures and the Bidding Procedures Order.  The Asset Purchase Agreement constitutes the highest or best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Asset Purchase Agreement and the Sale were negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors nor the Buyer, nor their respective agents, officials, personnel, representatives, and advisors have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under Bankruptcy Code section 363(n).  The terms and conditions of the Asset Purchase Agreement, including the consideration to be realized by the Debtors pursuant to the Asset Purchase Agreement, are fair and reasonable, and the transactions contemplated by the Asset Purchase Agreement are in the best interests of the Debtors' estates.  The Debtors' determination that the Asset Purchase Agreement constitutes the highest or best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

C.      The Asset Purchase Agreement represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of these Chapter 11 Cases.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer.

D.      Approval of the Sale and the Asset Purchase Agreement and the consummation of the transactions contemplated hereby and thereby is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

8

E.       The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

## IV.     No Fraudulent Transfer

A.       The consideration provided by the Buyer pursuant to the Asset Purchase Agreement is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia and any other applicable law.  The Asset Purchase Agreement was not entered into for the purposes of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia and any other applicable law.  The Buyer is not a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates and there is no continuity between the Buyer and the Debtors.

B.       The consideration provided by the Buyer for the Acquired Assets pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia (including the Uniform Voidable Transactions Act, Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act) and any other applicable law, and the Sale may not be avoided under Bankruptcy Code section 365(n) or under any other law of the United States, any state, territory, possession or the District of Columbia (including the Uniform Voidable Transactions Act, Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act) or any other applicable law.

9

## V.    Legal, Valid Transfer

A.    The consummation of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts, is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Asset Purchase Agreement.

B.    The Debtors have full corporate power and authority to execute and deliver the Asset Purchase Agreement and all other documents contemplated thereby, and, other than entry of this Order, no further consents or approvals are required for the Debtors to consummate the transactions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement.

## VI.    Free and Clear

A.    Prior to the Closing Date, the Debtors were the sole and lawful owners of the Acquired Assets.  The transfer of the Acquired Assets to the Buyer will be as of the Closing Date a legal, valid, and effective transfer of such assets, and on the Closing Date will vest the Buyer with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Liens (as defined in the Bankruptcy Code), Claims (as defined in the Bankruptcy Code), Encumbrances (as defined in the Asset Purchase Agreement) and other Interests (as defined below), including, without limitation and for the avoidance of doubt, all Liens, Claims, Encumbrances and interests asserted under any theory of successor or transferee liability or any similar theory under applicable state, provincial or federal law or otherwise (such interests, the "**Interests**"), in each case whether known or unknown, mature or inchoate, filed or unfiled,

10

scheduled or unscheduled, allowed or disallowed, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, statute or otherwise, other than the Permitted Encumbrances and the Assumed Liabilities as and to the extent set forth under the Asset Purchase Agreement, with all such Liens, Claims, Encumbrances and Interests to attach to the net cash proceeds of the Sale when received by the Debtors with the same priority, validity, force and effect as such Liens, Claims, Encumbrances and Interests had in the Acquired Assets, subject to the escrow arrangements set forth in the Asset Purchase Agreement and herein and any claims and defenses the Debtors, their estates or other parties may possess with respect thereto.

B.    Not transferring the Acquired Assets free and clear of all Liens, Claims, Encumbrances and Interests, including, without limitation, all Liens, Claims, Encumbrances and Interests based on any successor or transferee liability or any similar theory under applicable state, provincial or federal law or otherwise, would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Acquired Assets other than pursuant to a transfer that is free and clear of all Liens, Claims, Encumbrances and Interests of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

C.    The Buyer and its affiliates, successors and assigns are not and will not be liable to any agent, broker, person or firm or purporting to act on behalf of either the Debtors or the Buyer for any commission, broker's fee, or finder's fee with respect to the Sale and the transactions contemplated by the Asset Purchase Agreement or the other Transaction Documents.

## VII.    Section 363(f) Is Satisfied

A.    The Debtors may sell the Acquired Assets free and clear of all Liens, Claims, Encumbrances and Interests (including, for the avoidance of doubt, all Liens, Claims, Encumbrances and Interests asserted under any theory of successor or transferee liability or any similar theory under applicable state, provincial or federal law or otherwise), other than the Permitted Encumbrances and the Assumed Liabilities as and to the extent set forth in the Asset Purchase Agreement, because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(l)-(5) has been satisfied.  Those holders of Liens, Claims, Encumbrances or Interests who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2).  Those holders of the Liens, Claims, Encumbrances or Interests who did object and whose objection was not resolved or withdrawn fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Liens, Claims, Encumbrances or Interests, if any, attach to the net cash proceeds of the Sale as described herein attributable to the Acquired Assets in which such holder alleges a Lien, Claim, Encumbrance or Interest, in the same order of priority, with the same validity, force and effect that such Lien, Claim, Encumbrance or Interest therein had prior to the Sale, subject to any claims and defenses the Debtors, their estates or other parties may possess with respect thereto.

B.    The Debtors have, to the extent necessary, satisfied the requirements of Bankruptcy Code section 363(b)(1).

## VIII.   No Successor Liability

A.    The Buyer and its affiliates, successors and assigns shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Liens, Claims, Encumbrances or Interests, including under any theory of successor or transferee liability, de-

12

facto merger, or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as transferee or successor or otherwise, asserted or unasserted, liquidated or unliquidated, of any kind, nature, or character whatsoever, including, without limitation, with respect to any of the following: (a) any foreign, federal, state or local revenue, pension, ERISA, tax (including, without limitation, the Internal Revenue Code of 1986, as amended), labor, employment (including the Worker Adjustment and Retraining Notification Act of 1988), antitrust, environmental, or other law, rule, or regulation; (b) any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine, or under any product warranty liability law or doctrine; (c) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, collective bargaining agreements, or other similar agreement to which the Debtors are a party; (d) any welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (e) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, or obligations that might otherwise arise from or pursuant to, among others, (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988 (the "**WARN Act**"), (vii) the Age Discrimination in Employment Act, as amended, of 1967, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Multiemployer Pension Plan Amendments Act of 1980, (xi) state and local discrimination laws, (xii) state and local unemployment compensation laws or other similar state

13

and local laws, (xiii) state workers' compensation laws, and (xiv) any other state, local, or federal employee benefit laws, regulations, or rules or other state, local, or federal laws, regulations, or rules relating to wages, benefits, employment, or termination of employment with any or all Debtors or any predecessors; (f) any liability to any employee of a Debtor, in connection with, salaries, wages, benefits, vacation, expenses or other compensation or remuneration or in connection with any workers' compensation or other employee health, accident, disability, or safety claims; (g) any Franchise Agreements (as defined in the Asset Purchase Agreement) or any applicable franchise law; (h) any mortgages, deeds of trust and security interests; (i) any bulk sales or similar law; and (j) any acts or omissions of any Debtor in the conduct of the Business or arising under or related to the Acquired Assets.  Neither the Buyer nor its affiliates, successors or assigns shall be deemed to be holding themselves out as a continuation of the Debtors based on the Sale, the Asset Purchase Agreement or this Order. Neither the Buyer nor any of its affiliates, successors or assigns is a successor to any of the Debtors or their estates, and none of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts amounts to a consolidation, merger, or *de facto* merger of the Buyer or any of its affiliates, successors, or assigns with or into any of the Debtors.

B.      The Buyer has not merged or consolidated with or into the Debtors and is not a mere or substantial continuation of the Debtors or the enterprises of the Debtors.  Without limiting the foregoing, the Buyer is not a successor employer (including as described under ERISA and COBRA and applicable regulations thereunder or any other law) to any Debtor, including, without limitation, with respect to any Benefit Plan and any collective bargaining agreements.  Neither the Buyer nor any of its affiliates, successors, or assigns are, and none of

14

them shall be deemed or considered to be, liable for any acts or omissions of any Debtor in the conduct of the Business arising under or related to the Acquired Assets other than as set forth in the Asset Purchase Agreement, in each case by any law or equity, and the Buyer or its affiliates, successors or assigns have not assumed nor are they in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except as otherwise set forth in the Asset Purchase Agreement.

C.      Without limiting the generality of the foregoing, none of the Buyer, its affiliates, successors, or assigns and their respective present or contemplated members or shareholders, or the Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, recoupment or otherwise, directly or indirectly, any Claims relating to any U.S. federal, state, provincial or local income tax liabilities, that the Debtors may incur in connection with consummation of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts, or that the Debtors have otherwise incurred prior to the consummation of the transactions contemplated by the Asset Purchase Agreement.

D.      The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby (by paying the Purchase Price and assuming the Assumed Liabilities) if the sale of the Acquired Assets to the Buyer, and the assumption and assignment of the Assigned Contracts to the Buyer, were not (except and only to the extent expressly provided in the Asset Purchase Agreement with respect to the Permitted Encumbrances and the Assumed Liabilities) free and clear of all Liens, Claims, Encumbrances and Interests of any kind or nature whatsoever, or if the Buyer would, or in the future could

15

(except and only to the extent expressly provided in the Asset Purchase Agreement with respect to the Permitted Encumbrances and the Assumed Liabilities), be liable for any of such Liens, Claims, Encumbrances and Interests.

**IX.    Assumptions and Assignment of Executory Contracts and Unexpired Leases**

A.    The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Asset Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

B.    Except as otherwise provided for in this Order or another order of the Bankruptcy Court or as mutually agreed upon between the Buyer and the relevant counterparty, the amounts set forth on the Assumption and Assignment Notices are the sole amounts necessary under Bankruptcy Code sections 365(b)(l)(A) and (B) and 365(f)(2)(A) to cure all monetary defaults and pay all actual pecuniary losses under the Assigned Contracts (the "**Cure Costs**").

C.    Pursuant and subject to the terms of the Asset Purchase Agreement and this Order, the Buyer will as of the Closing Date: (i) cure, or provide adequate assurance of cure, of any default under any of the Assigned Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(A) and 365(b)(2)(A); and (ii) provide compensation or adequate assurance of compensation to each counterparty for any actual pecuniary loss to such counterparty resulting from a default prior to the Closing Date under any of the Assigned Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(B) and 365(f)(2)(B).

D.    The Buyer has provided adequate assurance of future performance under the Assigned Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

**X.    Compelling Circumstances for an Immediate Sale**

16

A.      To enhance the Debtors' liquidity and to maximize the amount of funding available to provide for a timely exit from these Chapter 11 Cases, it is essential that the sale of the Acquired Assets occur within the time constraints set forth in the Asset Purchase Agreement. Time is of the essence in consummating the Sale.

B.      Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price under the Asset Purchase Agreement, the proposed sale of the Acquired Assets to the Buyer constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

XI.     **Not a Sub Rosa Plan**

A.      The Sale does not constitute a *de facto* or *sub rosa* plan of reorganization or liquidation because it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors, (iii) circumvent Chapter 11 safeguards, including those set forth in Bankruptcy Code sections 1125 and 1129, or (iv) classify claims or equity interests.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

I.      **General Provisions**

1.      The relief requested in the Motion with respect to the Perkins Business is granted and approved, and the Sale of the Acquired Assets to the Buyer contemplated by the Asset Purchase Agreement is approved as set forth in this Order.

2.      This Court's findings of fact and conclusions of law, set forth in the Bidding Procedures Order, are incorporated herein by reference.

3.      All objections to the Motion with respect to the sale of the Perkins Business and the related relief requested in the Motion that have not been withdrawn, waived, adjourned, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and

all reservations of rights included therein, are hereby overruled on the merits or have been otherwise satisfied or adequately provided for.

**II.    Approval of the Asset Purchase Agreement**

4.    The Asset Purchase Agreement and all ancillary documents, including, without limitation, the Bill of Sale, Assignment and Assumption Agreement, the Amended and Restated Foxtail Agreement, the Transition Services Agreement, the Estate Transition Services Agreement, and any amendments, supplements and modifications thereto, and all of the terms and conditions thereof, are hereby approved.

5.    Pursuant to Bankruptcy Code section 363(b), the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale of the Acquired Assets to the Buyer pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, (ii) close the Sale as contemplated by the Asset Purchase Agreement and this Order, and (iii) execute and deliver, perform under, consummate, implement and close the Asset Purchase Agreement, together with all other Transaction Documents and any additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement and such ancillary documents.

6.    The terms and provisions of the Asset Purchase Agreement, the other Transaction Documents and this Order shall be binding in all respects upon the Debtors and their respective affiliates, successors and assigns, their estates and their creditors, all holders of equity interests in any Debtor, all holders of any Claims, Liens, Encumbrances and Interests, whether known or unknown, all counterparties, the Buyer, all successors and assigns of the Buyer, any other bidders for the Acquired Assets, including the Stalking Horse Purchaser, trustees, if any,

RLF1 22040405v.1

subsequently appointed in any of the Debtors' Chapter 11 Cases or upon a conversion to Chapter 7 under the Bankruptcy Code of any of the Debtors' cases, and any affected third parties including, but not limited to, all persons asserting any Liens, Claims, Encumbrances or Interests on the Acquired Assets to be sold to the Buyer pursuant to the Asset Purchase Agreement.  This Order, the Asset Purchase Agreement and the other Transaction Documents shall inure to the benefit of the Debtors, their estates, their creditors, the Buyer, and their respective successors and assigns.

### III.    Transfer of the Acquired Assets

7.    Pursuant to Bankruptcy Code sections 105(a), 363(b), 363(f), 365(b) and 365(f), the Debtors are authorized to transfer the Acquired Assets to the Buyer on the Closing Date and consummate the Sale in accordance with, and subject to the terms and conditions of, the Asset Purchase Agreement, and to transfer and assign all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance with and subject to the terms and conditions of the Asset Purchase Agreement.  The Acquired Assets (including the Assigned Contracts) shall be transferred to the Buyer (or any Buyer Designee) upon and as of the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such Acquired Assets (including the Assigned Contracts) free and clear of all Liens, Claims, Encumbrances and Interests, including, for the avoidance of doubt, all Liens, Claims, Encumbrances and Interests asserted under any theory of successor or transferee liability or any similar theory under applicable state, provincial or federal law or otherwise (other than the Permitted Encumbrances and the Assumed Liabilities as and to the extent set forth under the Asset Purchase Agreement).  Upon the Closing, the Buyer (or any Buyer Designee) shall take title to and possession of the Acquired Assets subject only to the Permitted Encumbrances and the Assumed Liabilities as expressly and to the extent set forth in the Asset Purchase Agreement;

19

*provided, however*, that the Buyer shall not be relieved of liability with respect to such Permitted Encumbrances and the Assumed Liabilities, including any obligations first arising under the Assigned Contracts from and after the Closing Date.  All such Liens, Claims, Encumbrances and Interests shall attach solely to the net cash proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Acquired Assets, subject to the escrow arrangements contemplated by the Asset Purchase Agreement and hereunder, any claims and defenses the Debtors, their estates or other parties may possess with respect thereto.

8.      The sale of the Acquired Assets to the Buyer, and the assumption and assignment of the Assigned Contracts to the Buyer (or any Buyer Designee), shall be, except as otherwise provided in the Asset Purchase Agreement with respect to the Permitted Encumbrances and the Assumed Liabilities, free and clear of all Liens, Claims, Encumbrances and Interests of any kind or nature whatsoever, including, for the avoidance of doubt, all Liens, Claims, Encumbrances and Interests asserted under any theory of successor or transferee liability or any similar theory under applicable state, provincial or federal law or otherwise.

9.      The Debtors and their respective officers, employees and agents are authorized to take any and all actions necessary, appropriate or requested by the Buyer to perform, consummate, implement and close the Sale, including, without limitation, executing, acknowledging and delivering such deeds, assignments, conveyances and other assurance, documents and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying and confirming to the Buyer, or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Asset Purchase Agreement.  The Debtors are further authorized to pay, without further order of this Court, whether before, at or after the Closing

20

Date, all fees, costs and expenses that are required to be paid in order to consummate the Sale or perform their obligations under the Asset Purchase Agreement, as the case may be, pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement.

10.     Except only as expressly and to the extent provided by the Asset Purchase Agreement with respect to the Permitted Encumbrances and the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including, without limitation, all debt security holders, equity security holders, foreign, federal, state and local governmental, tax and regulatory authorities, lenders, customers, vendors, suppliers, franchisees, employees, benefit plan participants and beneficiaries, trade and other creditors, litigation claimants and other persons, holding Liens or Encumbrances on, Claims affecting, or Interests in, all or any portion of the Acquired Assets and/or the Debtors (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), including, without limitation, the non-debtor party or parties to each Assigned Contract, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting, continuing, or otherwise pursuing any Liens, Claims, Encumbrances, Interests or seeking to collect, offset, or recover on account of any such Liens, Claims, Encumbrances or Interests or any other cause of action or any process or other act against the Buyer or its affiliates, successors, assigns, employees, professionals, and their respective present or contemplated members or shareholders and their respective property or the Acquired Assets, arising under or out of, in connection with, or in any way relating to, the Debtors, the Debtors' predecessors or insiders, the Acquired Assets, the ownership, sale or operation of the Acquired Assets prior to Closing or the transfer of the Debtors' interests in the Acquired Assets to the Buyer, including, without limitation, Liens, Claims, Encumbrances or Interests based on any successor or transferee liability under any

21

theory, whether based in law, equity, or otherwise, under state, provincial, federal, or any other law, or rights or claims based on setoff, a right of subrogation, or recoupment of any kind for any obligation of any of the Debtors as against any obligation due to Buyer, or its affiliates, successors, assigns, employees, professionals, or their respective present or contemplated members or shareholders or their respective property, including the Acquired Assets.

11.     On the Closing Date, each holder of a Claim, Lien, Interest or Encumbrance is authorized and directed to execute such documents and take all other actions as may be deemed by the Buyer to be necessary or desirable to release its Claims, Liens, Interests or Encumbrances on the Acquired Assets, as provided for herein, as such Liens, Claims, Interests or Encumbrances may have been recorded or may otherwise exist.  Following the Closing, no holder of any Liens, Claims, Encumbrances and Interests shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Liens, Claims, Encumbrances and Interests, or based on any action the Debtors may take in the Chapter 11 Cases.

12.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to the Buyer in accordance with the terms of the Asset Purchase Agreement and this Order.

13.     All persons and entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the Buyer or its assignee at the Closing.

14.     If any person or entity which has filed statements or other documents or agreements evidencing Liens, Claims, Encumbrances or Interests on all or any portion of the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for

22

filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens and easements, and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all Liens and Encumbrances, which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, the Debtors are hereby authorized and directed, and the Buyer is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

15.     The Debtors are hereby authorized to conduct the Sale without the necessity of complying with any state or local transfer laws or requirements.

16.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, provincial, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby authorized and empowered to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

17.     Following the Closing, the Debtors or the Buyer are authorized to execute and file a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, Liens, Claims, Encumbrances, Interests, and Excluded Liabilities in the Acquired Assets of any kind or nature whatsoever.  On the Closing

Date, this Order will be construed, and constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Buyer.  On the Closing Date, this Order also shall be construed, and constitute for any and all purposes, a complete and general assignment of all right, title and interest of the Debtors and each bankruptcy estate to the Buyer (or any Buyer Designee) in the Assigned Contracts.

18.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license or similar grant relating to the operation of the Acquired Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement, including the Sale and the assumption and assignment of the Assigned Contracts.

**IV.     Executory Contracts and Unexpired Leases**

19.     Subject to payment of the applicable Cure Cost, if any, the Debtors are authorized to (a) assume and assign the Assigned Contracts to the Buyer free and clear of all Liens, Claims, Interests and Encumbrances of any kind or nature whatsoever and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Buyer.  With respect to each Assigned Contract, the payment of the applicable Cure Costs shall (a) effect a cure of all defaults (monetary and non-monetary) existing thereunder as of the Closing Date with respect to Assigned Contracts, (b) compensate the applicable counterparty for any actual pecuniary loss resulting from such default, and (c) together with the assumption of the Assigned Contract by the Buyer, constitute adequate assurance of future performance thereof.  As to any Assigned Contract, the Buyer shall be deemed to have assumed such Assigned Contract as of the Closing Date and, pursuant to Bankruptcy Code section 365(f), the assignment by the Debtors of such Assigned Contracts shall

24

not be a default thereunder. Unless objected to prior to the deadline set forth in the Assumption and Assignment Notice, for each Assigned Contract listed therein, the Cure Cost set forth in such notice is hereby fixed and determined to be the dollar amount set forth in such notice as the Cure Cost and any counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost at any time.

20.     Pursuant to the terms of the Asset Purchase Agreement and this Order, the Buyer has until the Determination Date to amend the Execution Date Contract Schedule (as defined in the Asset Purchase Agreement) by adding or removing Contracts or Leases. Any Contract or Lease that remains on the Execution Date Contract Schedule as of the Closing Date, and that is not a Disputed Contract, shall be assumed by the Debtors and assigned to the Buyer as part of the Sale. Other than with respect to Disputed Contracts, all Contracts and Leases that are not on the Execution Date Contract Schedule as of the Determination Date shall not be considered an Assigned Contract or Acquired Asset and shall be deemed "Rejected Contracts" under the Asset Purchase Agreement.

21.     Upon objection by the non-debtor counterparty to any Assigned Contract to the Cure Costs asserted by the Debtors with respect thereto or in the event of an other dispute with the counterparty thereto as to the assumption or assignment of said Assigned Contract that has not been resolved to the mutual satisfaction of the Buyer, the Debtors, and said counterparty prior to the Determination Date (such contract, a "**Disputed Contract**"), unless the Buyer designates such Disputed Contract as a "Rejected Contract," then the Debtors and the Buyer shall use reasonable efforts to settle such objection or litigate such objection under procedures approved or proscribed by the Bankruptcy Court. In the event that a dispute regarding the Cure Costs with respect to an Assigned Contract has not been resolved as of the Closing Date, the

RLF1 22040405v.1

Buyer shall nonetheless remain obligated to consummate the Sale in accordance with the Asset Purchase Agreement. Upon the written permission of the counterparty to the Disputed Contract and the Debtors (or as ordered by the Court), the Determination Date may be extended to the Extended Contract Period at no cost or Liability to Sellers as defined in section 2.5(a) of the APA during which time the Buyer shall have the option to assume such Contract or to designate the Disputed Contract as a Rejected Contract. For the avoidance of doubt, if the Buyer does not assume the Disputed Contract by the end of the Extended Contract Period, such Disputed Contract shall be deemed a Rejected Contract and Buyer shall not be responsible for the Cure Costs associated with such Disputed Contract. Any Cure Costs associated with any Disputed Contract which becomes an Assigned Contract shall be paid in accordance with the terms of the Asset Purchase Agreement and this Order.

22.     Within one (1) Business Day of the Closing Date, or as soon as practicable thereafter, the Debtors shall file with the Bankruptcy Court a notice which shall include (i) the Closing Date, (ii) a list of Contracts and Leases assumed and assigned as part of the Sale and (iii) a list of Contracts and Leases that are Disputed Contracts and are subject to the Extended Contract Period.

23.     If prior to or following the Closing, (a) it is discovered that a Contract or Lease should have been listed on the Execution Date Contract Schedule but was not listed thereon (any such Contract or Lease, a "**Previously Omitted Contract**"), the Debtors shall use commercially reasonable efforts to promptly deliver to Buyer, or make available at Buyer's request, a true, correct and complete copy of all such Previously Omitted Contracts (including amendments and modifications thereto). On or after the Closing, but in any event prior to the Extended Contract Period, Buyer shall have the right (but not the obligation) in its sole and absolute discretion to

26

have any Previously Omitted Contract assumed and assigned to Buyer (for no additional consideration), and upon any assumption and assignment of such Previously Omitted Contract to Buyer, such Contract shall become an Assigned Contract, effective as of the Closing Date, and any Cure Costs associated with such Assigned Contract shall be paid in accordance with the terms of the Asset Purchase Agreement and this Order.  The Debtors shall provide not less than 14 days' notice to any such contract counterparty to provide adequate time to object to any proposed Cure Amounts.  Any Previously Omitted Contract not assumed and assigned to Buyer pursuant to this paragraph shall be deemed a Rejected Contract.

24.    With respect to any Assigned Contract subject to a Supplemental Assumption and Assignment Notice, if no objection is received by the applicable objection deadline set forth on such Supplemental Assumption and Assignment Notice (which time period shall not be less than 14 days, unless otherwise ordered by the Court or agreed to by the Debtors and the applicable counterparty), then the Assigned Contract shall be deemed assumed and assigned to the Buyer pursuant to this Order.  To the extent a non-debtor Contract or Lease counterparty objects to the Cure Costs asserted by the Debtors with regard to any Contract or Lease on such Supplemental Assumption and Assignment Notice, such objection shall be resolved in accordance with paragraph 21 above.  Unless objected to prior to the deadline set forth in any Supplemental Assumption and Assignment Notice, for each Assigned Contract listed therein, the Cure Cost set forth in such notice is hereby fixed and determined to be the dollar amount set forth in such notice as the Cure Cost and any counterparty shall be prohibited from challenging, objecting or denying the validity and finality of the Cure Cost at any time.

25.    Upon the Debtors' assignment of Assigned Contracts to the Buyer and the payment of Cure Costs by the Buyer, if applicable, no default (monetary or non-monetary) shall

27

exist under any Assigned Contracts, and no counterparty to any Assigned Contracts shall be permitted to declare or enforce a default by any Debtor or the Buyer or otherwise take action against the Buyer as a result of any Debtor's financial condition, change of control, bankruptcy or failure to perform any of its obligations under the relevant Assigned Contract. Any provisions in any Assigned Contract that prohibits or conditions the assignment of such Assigned Contract or allows the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect pursuant to Bankruptcy Code section 365(f).   All other requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts have been satisfied, and such assumption and assignment shall not constitute a default thereunder.   To the extent not inconsistent with applicable law, the failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Buyer's right to enforce every term and condition of the Assigned Contract.   Upon the Closing and the payment of the required Cure Cost, if any, in accordance with Bankruptcy Code sections 363 and 365, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under each Assigned Contract.

26.    Upon the payment of the Cure Costs payable with respect to any Assigned Contract, if any, the Buyer shall be deemed to be substituted for the relevant Debtor as a party to such Assigned Contract as of the Closing Date and the Debtors shall be relieved, pursuant to Bankruptcy Code section 365(k), from any further liability under such Assigned Contract.

27.     Upon the assignment of any Assigned Contract to the Buyer as provided herein, such Assigned Contract shall remain in full force and effect, and no default shall exist thereunder nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

28.     Other than as expressly provided under the Asset Purchase Agreement, there shall be no rent accelerations, assignment fees, deposits, increases or any other fees charged to the Buyer, its affiliates, successors, assigns and their respective present or contemplated members or shareholders or the Debtors as a result of the assumption and assignment of the Assigned Contracts.

29.     Pursuant to Bankruptcy Code sections 105(a), 363 and 365 of the Bankruptcy Code, all counterparties to Assigned Contracts are forever barred, estopped and permanently enjoined from (i) raising or asserting against the Debtors, their estates, the Buyer, or any of their respective affiliates, successors, assigns and their respective present or contemplated members or shareholders, or the property of any of them, any default existing as of Closing or any counterclaims, defense, setoff, recoupment or any other Liens, Claims, Interests or Encumbrances asserted or assertable against the Debtors; and (ii) imposing or charging against the Buyer or its affiliates, successors, assigns and their respective present or contemplated members or shareholders, any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts existing or effective as of the Closing Date, or arising by reason of the Closing.  No counterparty under any Assigned Contract may terminate any such Assigned Contract, nor shall the Buyer's rights and obligations under such Assigned Contracts be adversely affected in any way, by reason of any default under such Assigned Contract prior to Closing.  Any party that may have had the right to consent to the

29

assignment of an Assigned Contract is deemed to have consented to such assignment for purposes of Bankruptcy Code sections 365(c)(l)(B) and 365(e)(2)(A)(ii) and otherwise if such party failed to file a timely objection to the assumption and assignment of such Assigned Contract.

30.    All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other entity to effectuate the applicable transfers in connection with the Sale of the Acquired Assets.  Subject to the Asset Purchase Agreement, notwithstanding anything to the contrary in the Motion, the Bidding Procedures Order or any previously filed notices, the Contract and Lease procedures set forth in these paragraphs 19-30 shall govern.

31.    No party to a contract that has been rejected by any of the Debtors and that is any way related to the Acquired Assets shall have a claim against the Buyer, its affiliates, successors, assigns and their respective present or contemplated members or shareholders in connection with the Sale, whether under the Bankruptcy Code or any other statutory or non-statutory federal, state, local law or otherwise.

## V.    Application of Sale Proceeds

32.    Upon the Closing of the Sale, all Cash Consideration paid or payable to any of the Debtors shall be allocated as set forth on Schedule A attached hereto; *provided, that,* for the avoidance of doubt, such Cash Consideration shall first be allocated to the Specified Adjustment Escrow, established in accordance with the terms of the Asset Purchase Agreement and the Specified Adjustment Escrow agreement contemplated thereby (the "**Specified Adjustment Escrow Agreement**"), in an amount equal to $2,000,000, with any distribution therefrom being governed by the Asset Purchase Agreement and the Specified Adjustment Escrow Agreement.

30

**VI.    No Successor Liability**

33.    Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter, all persons and entities (and their successors and assigns) are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its affiliates, successors, assigns, and their respective present or contemplated members or shareholders or the Acquired Assets, with respect to (a) any Lien or Encumbrance on, or Claim affecting, or Interest in, the Acquired Assets arising prior to the Closing of the Sale; (b) all claims for successor liability or similar theories under applicable state, provincial or federal law or otherwise with respect to the Acquired Assets; or (c) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

34.    Under no circumstances shall the Buyer (or its affiliates, successors and assigns) be deemed a "successor" of or to the Debtors or their estates by reason of any theory of law or equity, and effective upon the Closing Date, the Buyer (or its affiliates, successors and assigns) shall not assume, or be deemed to assume, or in any way be responsible for any Liens, Claims, Encumbrances or Interests with respect to the Debtors and/or their estates, the Acquired Assets or otherwise, other than the Assumed Liabilities and Permitted Encumbrances as expressly and to the extent set forth under the Asset Purchase Agreement.  Without limiting the generality of the foregoing, and except as to the Assumed Liabilities and Permitted Encumbrances as expressly and to the extent set forth under the Asset Purchase Agreement, the Buyer and its affiliates, successors and assigns shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Liens, Claims, Encumbrances or Interests, including

31

under any theory of successor or transferee liability, de-facto merger, or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as transferee or successor or otherwise, asserted or unasserted, liquidated or unliquidated, of any kind, nature, or character whatsoever, including, without limitation, with respect to any of the following: (a) any foreign, federal, state or local revenue, pension, ERISA, tax (including, without limitation, the Internal Revenue Code of 1986, as amended), labor, employment (including the WARN Act), antitrust, environmental, or other law, rule, or regulation; (b) any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine, or under any product warranty liability law or doctrine; (c) any employment or labor agreements, consulting agreements, severance arrangements, collective bargaining agreements, change-in-control agreements, or other similar agreement to which any Debtor is a party; (d) any welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (e) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, or obligations that might otherwise arise from or pursuant to, among others, (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the WARN Act, (vii) the Age Discrimination in Employment Act, as amended, of 1967, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Multiemployer Pension Plan Amendments Act of 1980, (xi) state and local discrimination laws, (xii) state and local unemployment compensation laws or other similar state and local laws, (xiii) state workers' compensation laws,

and (xiv) any other state, local, or federal employee benefit laws, regulations, or rules or other state, local, or federal laws, regulations, or rules relating to wages, benefits, employment, or termination of employment with any or all Debtors or any predecessors and (f) any liability to any employee of a Debtor, in connection with, salaries, wages, benefits, vacation, expenses or other compensation or remuneration or in connection with any workers' compensation or other employee health, accident, disability, or safety claims; (g) any Franchise Agreements or any applicable franchise law; (h) any mortgages, deeds of trust and security interests; (i) any bulk sales or similar law; and (j) any acts or omissions of any Debtor in the conduct of the Business or arising under or related to the Acquired Assets. Neither the Buyer nor any of its affiliates, successors or assigns is holding itself out to the public as a continuation of any of the Debtors. Neither the Buyer nor any of its affiliates, successors or assigns is a successor to any of the Debtors or their estates, and none of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts amounts to a consolidation, merger, or *de facto* merger of the Buyer or any of its affiliates, successors and assigns with or into any of the Debtors.

35.    The Buyer has not merged with or into the Debtors and is not a mere or substantial continuation of the Debtors or the enterprises of the Debtors. Without limiting the foregoing, the Buyer is not a successor employer (including as described under ERISA and COBRA and applicable regulations thereunder or any other law) to any Debtor, including, without limitation, with respect to any Benefit Plan or any collective bargaining agreement. Neither the Buyer nor any of its affiliates, successors, or assigns are, and none of them shall be deemed or considered to be, liable for any acts or omissions of any Debtor in the conduct of the Business arising under or related to the Acquired Assets other than as and to the extent set forth

33

in the Asset Purchase Agreement, in each case by any law or equity, and the Buyer has not assumed nor is it in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except as otherwise and to the extent set forth in the Asset Purchase Agreement.

36.    Except for the Permitted Encumbrances and the Assumed Liabilities as expressly and to the extent set forth in the Asset Purchase Agreement, the Buyer and its affiliates, successors and assigns shall not have any liability for any Claim of the Debtors, any obligation of the Debtors or any Liens, Claims, Encumbrances and Interests arising under or related to any of the Acquired Assets. Without limiting the generality of the foregoing, and except for the Permitted Encumbrances and the Assumed Liabilities as expressly and to the extent set forth in the Asset Purchase Agreement, the Buyer and its affiliates, successors and assigns shall not be liable for any Claims against the Debtors or any of their predecessors or affiliates solely by virtue of the acquisition of the Acquired Assets.  By virtue of the Sale, the Buyer and its affiliates, successors and assigns shall not, and shall not be deemed or considered to: (i) be the successor of, or successor to, any Seller; (ii) be a successor employer (including as described under ERISA and COBRA and applicable regulations thereunder or any other law) to any Seller, including with respect to any Benefit Plan or any collective bargaining agreement; (iii) have, *de facto* or otherwise, merged with or into any Seller; (iv) be a mere continuation or substantial continuation of any Seller or the enterprise(s) of any Seller; or (v) be liable for any acts or omissions of any Seller in the conduct of the Business or arising under or related to the Acquired Assets other than as expressly and to the extent set forth in the Asset Purchase Agreement, in each case by any law or equity, and the Buyer and its affiliates, successors and assigns have not assumed nor are they in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except with respect to the Permitted Encumbrances and the Assumed Liabilities as and to the

34

extent set forth in the Asset Purchase Agreement.  The Buyer and its affiliates, successors and assigns shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets prior to the Closing.

37.    The substantial consideration given by the Buyer under the Asset Purchase Agreement shall constitute valid and valuable consideration for the release of any potential claims against the Successful Bidder and its affiliates, successors and assigns for successor liability or similar theories under applicable state, provincial or federal law or otherwise with respect to the Acquired Assets, which release shall be deemed to have been given in favor of the Buyer and its affiliates, successors and assigns by all holders of Liens, Claims, Interests or Encumbrances against the Debtors or with respect to the Acquired Assets.

**VII.    Good Faith**

38.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer without collusion and in good faith, as that term is defined in Bankruptcy Code section 363(m), and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts).  The Buyer is a good faith buyer within the meaning of Bankruptcy Code section 363(m) and, as such, is entitled to the full protections of Bankruptcy Code section 363(m).

39.     As a good faith purchaser of the Acquired Assets, the Buyer has not entered into an agreement with any other potential bidders at the Auction, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Acquired Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Buyer, and the Sale may not be avoided, pursuant to Bankruptcy Code section 363(n).

## VIII.   No Fraudulent Transfer

40.     The consideration provided by the Buyer for the Acquired Assets pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia (including the Uniform Voidable Transactions Act, Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act) and any other applicable law, and the Sale may not be avoided under Bankruptcy Code section 365(n) or under any other law of the United States, any state, territory, possession or the District of Columbia (including the Uniform Voidable Transactions Act, Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act) or any other applicable law.

## IX.    Other Provisions

41.     Upon the closing of the Sale, the Debtors and their estates, predecessors, successors and assigns shall be deemed to have waived any and all actions related to, and released, the Buyer and its affiliates, successors, assigns, employees, professionals, and their respective present and contemplated members and shareholders and their respective property (including, without limitation, the Acquired Assets) from any and all Liens, Claims,

36

Encumbrances and Interests of the Debtors or their estates and any and all claims or causes of action of any kind, whether known or unknown, now existing or hereafter arising, asserted or unasserted, mature or inchoate, contingent or non-contingent, liquidated or unliquidated, material or nonmaterial, disputed or undisputed, and whether imposed by agreement, understanding, law, equity, or otherwise, related to or arising out of the Chapter 11 Cases, the Asset Purchase Agreement, the other Transaction Documents (as defined in the Asset Purchase Agreement), the formulation, preparation, negotiation, investigation, execution, delivery, implementation or consummation of the Asset Purchase Agreement and the other Transaction Documents and the transactions contemplated by the Asset Purchase Agreement and the other Transaction Documents, the entry into and consummation of the Sale and the assumption and assignment of the Assigned Contracts, the Cure Costs, or any other contract, instrument, release, agreement, settlement or document created, modified, amended, terminated or entered into in connection with the Asset Purchase Agreement, except to the extent expressly assumed or provided under the Asset Purchase Agreement or this Order, including any rights and remedies thereunder.

42.     Buyer agrees to comply with the terms of the Debtors' existing privacy policy (as disclosed to Buyer) with respect to "personally identifiable information" as that term is defined in section 101(41A) of the Bankruptcy Code and used in section 363(b)(1)(B) of the Bankruptcy Code.

43.     Nothing in the Motion, the Asset Purchase Agreement, this Order, the Bidding Procedures Order, any Assumption and Assignment Notice, or any other list or schedule of assumed contracts, assumed and assigned contracts, or cure amounts (including, without limitation, any other provision that purports to be preemptory or supervening) shall be deemed to permit or otherwise effect a sale, assignment, or any other transfer at this time of (a) any

37

insurance policies that have been issued by ACE American Insurance Company, Federal Insurance Company, or any of their respective affiliates, predecessors or successors (collectively, the "**Chubb Companies**") that provide insurance coverage, proceeds, or benefits relating thereto at any time to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto (collectively, the "**Chubb Insurance Contracts**"), and/or (b) any rights, benefits, claims, rights to payments and/or recoveries under such Chubb Insurance Contracts unless and until a further order is entered by this Court at a subsequent hearing, or is submitted to the Court by agreement of the Debtors, the Successful Bidder, the Prepetition Secured Parties, and the Chubb Companies, with the rights of the parties fully preserved pending entry of such further order.

44.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and the Debtors and the Buyer are authorized to close the Sale immediately upon entry of this Order.

45.     As provided in the Asset Purchase Agreement, this Order approved and provides for the transfer to the Buyer of the Avoidance Actions (as defined in the Asset Purchase Agreement).

46.     No bulk sales law or any similar law of any state, provincial or other jurisdiction applies in any way to the Sale.

47.     The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or on the interests of the Buyer and its affiliates, successors and assigns.

38

48.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

49.      The automatic stay pursuant to Bankruptcy Code section 362 is hereby lifted with respect to the Debtors to the extent necessary, without further order of this Court, to (i) allow the Buyer to deliver any notice provided for in the Asset Purchase Agreement or any ancillary documents and (ii) allow the Buyer to take any and all actions permitted under the Asset Purchase Agreement and any ancillary documents in accordance with the terms and conditions thereof.

50.      Nothing in this Order shall modify or waive any closing conditions or termination rights in the Asset Purchase Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

51.      To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion filed in these Chapter 11 Cases, the terms of this Order shall govern.  For the avoidance of doubt, the terms of any plan of reorganization or liquidation, or any order of this Court confirming such plans or any other order in these Chapter 11 Cases, including any order entered upon or after any conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or otherwise, submitted to this Court or any other court for confirmation or sanction shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of the Asset Purchase Agreement or this Order or the rights of Buyer and its affiliates, successors and assigns thereunder or hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Asset Purchase Agreement or this Order. The provisions of this Order and the Asset Purchase Agreement and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered confirming or

39

consummating any chapter 11 plan of the Debtors, or which may be entered converting these Chapter 11 Cases from chapter 11 to chapter 7 of the Bankruptcy Code, and the terms and provisions of the Asset Purchase Agreement as well as the rights and interests granted pursuant to this Order and the Asset Purchase Agreement shall continue in these Chapter 11 Cases or any superseding case and shall be specifically performable and enforceable against and binding upon the Debtors, their estates and the Buyer and their respective successors and permitted assigns, including any trustee, responsible officer or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, and the Asset Purchase Agreement shall not be subject to rejection or avoidance under any circumstances.

52.     The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement is authorized and approved in its entirety.

53.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Asset Purchase Agreement, all amendments thereto and any releases, waivers and consents hereunder and thereunder, and each of the agreements executed in connection therewith to which any of the Debtors are a party or which has been assigned by the Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to any of the foregoing.

54.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure,

as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order and the prompt consummation of the transactions and transfers contemplated under the Asset Purchase Agreement, and accordingly: (i) the terms of this Order shall be immediately effective and enforceable upon its entry; (ii) the Debtors are not subject to any stay of this Order or in the implementation, enforcement or realization of the relief granted in this Order; and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

Dated:  September __, 2019
       Wilmington, Delaware

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

**Asset Purchase Agreement**

*Execution Version*

ASSET PURCHASE AGREEMENT

DATED AS OF SEPTEMBER 10, 2019

BY AND AMONG

HUDDLE HOUSE, INC.,

PERKINS & MARIE CALLENDER'S HOLDING, LLC

AND

CERTAIN SUBSIDIARIES OF PERKINS & MARIE CALLENDER'S HOLDING, LLC

# TABLE OF CONTENTS

## ARTICLE 1

### DEFINITIONS

1.1   Definitions ................................................................................................................... 2

1.2   Cross Reference of Other Definitions ........................................................................ 19

1.3   Other Definitions and Interpretive Matters ............................................................... 21

## ARTICLE 2

### PURCHASE AND SALE

2.1   Purchase and Sale ...................................................................................................... 23

2.2   Excluded Assets ......................................................................................................... 25

2.3   Assumed Liabilities ................................................................................................... 27

2.4   Excluded Liabilities ................................................................................................... 28

2.5   Assignment and Assumption of Contracts ................................................................. 29

2.6   Foxtail Sale ................................................................................................................ 33

2.7   Estate Transition ........................................................................................................ 33

2.8   Further Assurances ..................................................................................................... 33

## ARTICLE 3

### PURCHASE PRICE

3.1   Consideration ............................................................................................................. 34

3.2   Specified Liabilities Adjustment ............................................................................... 34

3.3   Post-Closing Adjustment ........................................................................................... 36

3.4   Allocation of Purchase Price ..................................................................................... 37

3.5   Pre-Closing Accounts Receivable .............................................................................. 38

3.6   Withholding ............................................................................................................... 38

## ARTICLE 4

### CLOSING AND DELIVERIES

4.1   Closing Date............................................................................................................... 38

4.2   Buyer's Deliveries ..................................................................................................... 39

4.3   Sellers' Deliveries ...................................................................................................... 40

# ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF SELLERS

5.1     Organization and Good Standing ................................................................................ 41

5.2     Authority; Validity; Consents .................................................................................... 41

5.3     Subsidiaries ............................................................................................................... 42

5.4     No Conflict ................................................................................................................ 42

5.5     Real Property ............................................................................................................. 42

5.6     Environmental Matters .............................................................................................. 43

5.7     Title to Acquired Assets ............................................................................................ 44

5.8     Taxes ......................................................................................................................... 45

5.9     Legal Proceedings ..................................................................................................... 45

5.10    Compliance with Legal Requirements; Permits ....................................................... 45

5.11    Labor Matters ............................................................................................................ 46

5.12    Employee Benefits ..................................................................................................... 47

5.13    Sellers' Intellectual Property ..................................................................................... 49

5.14    Contracts ................................................................................................................... 50

5.15    Sufficiency of Assets ................................................................................................ 50

5.16    Insurance ................................................................................................................... 51

5.17    Brokers or Finders ..................................................................................................... 51

5.18    Undue Influence ........................................................................................................ 51

5.19    Financial Statements ................................................................................................. 51

5.20    Undisclosed Liabilities .............................................................................................. 52

5.21    Absence of Certain Changes ..................................................................................... 52

5.22    Suppliers and Franchisees ......................................................................................... 54

5.23    Products; Warranties; Food Laws; Regulatory Matters ............................................ 54

5.24    Interests of Affiliates ................................................................................................. 55

5.25    Credit Support ........................................................................................................... 55

5.26    Franchise Matters ...................................................................................................... 56

5.27    Powers of Attorney .................................................................................................... 57

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

| 6.1 | Organization and Good Standing | 57 |
|---|---|---|
| 6.2 | Authority; Validity; Consents | 57 |
| 6.3 | No Conflict | 58 |
| 6.4 | Availability of Funds | 58 |
| 6.5 | Litigation | 58 |
| 6.6 | Brokers or Finders | 58 |
| 6.7 | Qualification | 58 |
| 6.8 | Information | 58 |

# ARTICLE 7

## ACTIONS PRIOR TO THE CLOSING DATE

| 7.1 | Access and Reports | 59 |
|---|---|---|
| 7.2 | Operations Prior to the Closing Date | 60 |
| 7.3 | Cooperation | 62 |
| 7.4 | Bankruptcy Court Matters | 63 |
| 7.5 | Sellers Update of Disclosure Schedules; Notice of Developments; Buyer Update of Disclosure Schedules | 63 |
| 7.6 | Limitations | 64 |
| 7.7 | Inventory | 64 |

# ARTICLE 8

## ADDITIONAL AGREEMENTS

| 8.1 | Taxes | 64 |
|---|---|---|
| 8.2 | Payments Received; Mail and Other Communications | 65 |
| 8.3 | Assigned Contracts: Adequate Assurance and Performance | 66 |
| 8.4 | Employee Matters | 66 |
| 8.5 | Post-Closing Books and Records and Personnel | 69 |
| 8.6 | Representations and Warranties Exclusive | 70 |
| 8.7 | Casualty Loss | 70 |
| 8.8 | Covenant to Change Names | 70 |

# ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

9.1    Accuracy of Representations ................................................................................ 71

9.2    Sellers' Performance ......................................................................................... 71

9.3    No Order ............................................................................................................ 71

9.4    Consents ............................................................................................................ 71

9.5    Sellers' Deliveries ........................................................................................... 71

9.6    Sale Order ......................................................................................................... 71

9.7    Assigned Contracts ........................................................................................... 72

9.8    Material Adverse Effect .................................................................................... 72

9.9    Releases and Termination Statements .............................................................. 72

# ARTICLE 10

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

10.1    Accuracy of Representations ............................................................................. 72

10.2    Buyer's Performance ......................................................................................... 72

10.3    No Order ............................................................................................................ 72

10.4    Buyer's Deliveries ............................................................................................ 72

10.5    Sale Order ......................................................................................................... 72

# ARTICLE 11

## TERMINATION

11.1    Termination Events ........................................................................................... 73

11.2    Effects of Termination ...................................................................................... 74

# ARTICLE 12

## GENERAL PROVISIONS

12.1    Survival ............................................................................................................. 75

12.2    Confidentiality .................................................................................................. 75

12.3    Public Announcements ...................................................................................... 75

12.4    Notices .............................................................................................................. 75

12.5    Waiver ............................................................................................................... 76

12.6    Entire Agreement; Amendment ................................................................. 77

12.7    Assignment .............................................................................................. 77

12.8    Severability ............................................................................................. 77

12.9    Expenses ................................................................................................. 77

12.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver......... 77

12.11   Counterparts ........................................................................................... 78

12.12   Parties in Interest; No Third Party Beneficiaries; No Amendment ............... 78

12.13   Remedies................................................................................................. 78

12.14   Specific Performance for Post-Closing Covenants....................................... 79

12.15   Debt Financing Party Arrangements.......................................................... 79

12.16   Sellers' Representative; Reliance ............................................................... 80

12.17   Limitations on Damages ........................................................................... 82

12.18   Non-Recourse .......................................................................................... 82

12.19   Joinder.................................................................................................... 82

**SCHEDULES**

Schedule 1.1(a)         Corporate Assets
Schedule 1.1(b)         Sellers' Knowledge Parties
Schedule 1.1(c)         Foxtail Inventory
Schedule 1.1(d)         Foxtail Equipment
Schedule 1.1(e)         Foxtail Assigned Contracts
Schedule 1.1(f)         Foxtail Permits
Schedule 1.1(g)         Foxtail Intellectual Property
Schedule 1.1(h)         Foxtail Telecommunications
Schedule 1.1(i)         Other Foxtail Assets
Schedule 1.1(j)         Permitted Encumbrances
Schedule 2.1(e)         Permits
Schedule 2.1(l)         Telecommunications
Schedule 2.1(n)         Other Acquired Assets
Schedule 2.2(o)         Other Excluded Assets
Schedule 2.2(p)         Bank Accounts
Schedule 2.3(d)         Assumed Liabilities
Schedule 2.3(i)         Assumed Benefits
Schedule 2.4(b)         Credit Liabilities
Schedule 2.5(a)         Assigned Contracts
Schedule 2.5(c)         Shared Contracts
Schedule 5.1            Jurisdictions
Schedule 5.2            Required Consents
Schedule 5.3            Subsidiaries
Schedule 5.4            No Conflict
Schedule 5.5(a)         Owned Real Property
Schedule 5.5(b)         Leased Real Property
Schedule 5.6            Environmental Matters
Schedule 5.8            Taxes
Schedule 5.9            Legal Proceedings
Schedule 5.10(b)        Compliance with Legal Requirements
Schedule 5.10(c)        Permits
Schedule 5.11(b)        Labor Matters
Schedule 5.11(d)        Terminated Employees
Schedule 5.11(e)        Labor Matters
Schedule 5.11(f)        Employees
Schedule 5.11(g)        Employee Settlements; Actions
Schedule 5.12(a)        Benefit Plans
Schedule 5.12(b)        Benefit Plans
Schedule 5.12(f)        Benefit Plans
Schedule 5.13(a)        Intellectual Property
Schedule 5.13(b)        Unregistered Trademarks
Schedule 5.13(c)        Business Software
Schedule 5.13(d)        Intellectual Property
Schedule 5.13(f)        Third-Party Licenses
Schedule 5.14           Material Contracts

| | |
|---|---|
| Schedule 5.15 | Sufficiency of Assets |
| Schedule 5.16 | Insurance |
| Schedule 5.20 | Undisclosed Liabilities |
| Schedule 5.21 | Absence of Changes |
| Schedule 5.22(a) | Suppliers |
| Schedule 5.22(b) | Franchisees |
| Schedule 5.23(a) | Products; Warranties; Food Laws; Regulatory Matters |
| Schedule 5.23(d) | Products; Warranties; Food Laws; Regulatory Matters |
| Schedule 5.24 | Interests of Affiliates |
| Schedule 5.26(a) | Franchise Matters |
| Schedule 5.26(b) | Franchise Disputes |
| Schedule 7.2 | Operations Prior to the Closing Date |
| Schedule 8.4(a) | Listed Employees |
| Schedule 8.4(e) | Buyer Benefit Plans |
| Schedule 9.4 | Consents |

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption Agreement |
| Exhibit B | Form of Bill of Sale |
| Exhibit C | Final Arbiter Procedures |
| Exhibit D | Sample Specified Adjustment Calculation |
| Exhibit E | Form of Sale Order |
| Exhibit F | Specified Adjustment Escrow Agreement |
| Exhibit G | Form of Amended and Restated Foxtail Supply Agreement |
| Exhibit H | Form of Transition Services Agreement |
| Exhibit I | Form of Estate Transition Services Agreement |
| Exhibit J | Form of Joinder |

### ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "*Agreement*"), dated as of September 10, 2019 (the "*Execution Date*"), is made and entered into by and among Huddle House, Inc., a Georgia corporation ("*Buyer*"), Perkins & Marie Callender's Holding, LLC, a Delaware limited liability company (the "*Company*"), and the Additional Sellers (together with the Company, "*Sellers*" and each entity individually a "*Seller*"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in <u>Article 1</u>.

### RECITALS

**WHEREAS**, Sellers are engaged (i) in the franchise, ownership and operation of "Perkins" branded family dining restaurants and bakeries (the "*Perkins Business*"), (ii) the franchise, ownership and operation of "Marie Callender's" branded family dining restaurants and bakeries (the "*MC Business*"), and (iii) the business of manufacturing and supplying to restaurants, supermarket in-store bakeries, and branded food companies premium baked goods, mixes, and syrups, including pies, muffin batters, cookies, brownies, pancake mixes and syrups, from (a) the facility located at 6880 Fairfield Business Drive, Fairfield, Ohio 45014 (the "*Ohio Facility*") and (b) the facility located at 170 East Rincon Street, Corona, California 92879 (the "*California Facility*", and together with the Ohio Facility, the "*Foxtail Facilities*" and, such business, together with the warehousing and related services provided to such business at the Corona Storage Facilities and the Fairfield Storage Facility, the "*Foxtail Business*");

**WHEREAS**, on August 5, 2019 (the "*Petition Date*"), Sellers and the MC Sellers (collectively, the "*Debtors*") filed a voluntary petition for relief (the "*Bankruptcy Case*") pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

**WHEREAS**, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, Sellers desire to sell to Buyer all of the Acquired Assets, and Buyer desires to purchase from Sellers all of the Acquired Assets, and Sellers desire to assign, and Buyer desires to assume, all of the Assumed Liabilities, in each case upon the terms and conditions hereinafter set forth;

**WHEREAS**, Buyer is not acquiring, and Sellers and the MC Sellers are retaining or selling to a third party, the MC Business and the Foxtail Business (collectively, the "*Excluded Business*") and assets and liabilities associated therewith, which assets and liabilities are, subject to the terms and conditions herein, Excluded Assets and Excluded Liabilities under this Agreement;

**WHEREAS**, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Order, free and clear of any and all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, Sellers' ability to consummate the transactions contemplated by this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

**WHEREAS**, the applicable board of managers, managing member, or similar governing body of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

### DEFINITIONS

1.1    Definitions.  For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"*Accounting Principles*" means, collectively, GAAP applied in a manner consistent with (a) the Financial Statements and (b) the accounting methods, policies, practices, principles and procedures, with consistent classifications, judgments and methodologies, used for purposes of determining the respective amounts in the Sample Specified Adjustment Calculation.

"*Accounts Receivable*" means, with respect to each Seller, (a) all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that have not been billed, chattel paper, notes and other rights to payment, in each case with respect of services rendered or products delivered to customers of the Business by such Seller prior to the Closing, and (b) any other miscellaneous accounts receivable of such Seller relating to the Business and attributable to products or services sold prior to the Closing by the Business, in each case, calculated, in the case of clauses (a) and (b), in accordance with the Accounting Principles.

"*Action*" means any legal action, suit, petition, plea, charge, claim, demand, arbitration, audit, complaint, grievance, summons, litigation, mediation, suit, proceeding (including any civil, criminal, or administrative proceeding), prosecution, contest, hearing, audit, examination or investigation commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"*Additional Sellers*" means:

(i)    Perkins & Marie Callender's, LLC, a Delaware limited liability company;

(ii)    Marie Callender Pie Shops, LLC, a California limited liability company;

(iii)    MC Wholesalers, LLC, a California limited liability company;

(iv)    PMCI Promotions, LLC, a Colorado limited liability company;

(v)      MCID, Inc., an Idaho corporation;

(vi)     Wilshire Beverage, Inc., a Texas corporation;

(vii)    FIV, LLC, a Delaware limited liability company; and

(viii)   P&MC's Holding Corp., a Delaware corporation.

"*Affiliate*" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934.

"*Assignment and Assumption Agreement*" means the Assignment and Assumption Agreement in substantially the form attached hereto as **Exhibit A**.

"*Avoidance Action*" means any claim, right or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Acquired Assets or the Business.

"*Bankruptcy Code*" means Title 11 of the United States Code, Sections 101 *et seq.*

"*Bid Deadline*" has the meaning set forth in the Bidding Procedures.

"*Bidding Procedures*" means bid procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"*Bidding Procedures and Sale Motion*" Sellers' motion seeking entry of the Bidding Procedures Order and the Sale Order filed with the Bankruptcy Court on August 5, 2019 [Docket No. 33].

"*Bidding Procedures Order*" means the Order of the Bankruptcy Court approving the Bidding Procedures.

"*Bill of Sale*" means the Bill of Sale in substantially the form attached hereto as **Exhibit B**.

"*Business*" means the Perkins Business; provided, that in no event shall the Foxtail Business or the MC Business be deemed part of the "Business".

"*Business Day*" means any day of the year on which national banking institutions in New York, New York and Wilmington, Delaware are open to the public for conducting business and are not required or authorized to close.

"*Buyer*" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee designated by Buyer pursuant to the terms of this Agreement.

"*Buyer Designee*" means Buyer or any other Persons designated by Buyer to purchase any of the Acquired Assets pursuant to the terms of this Agreement.

"***Carve Out Escrow***" means the escrow account established pursuant to the Carve Out Escrow Agreement.

"***Carve Out Escrow Agreement***" means an escrow agreement by and among Sellers and Escrow Agent for the disbursement of the amounts paid by Buyer pursuant to Section 4.2(a)(v).

"***Claim***" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, against any Seller.

"***Closing Date***" means the date and time as of which the Closing occurs as set forth in Section 4.1.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Contract***" means any agreement, contract, obligation, promise, undertaking, lease (including any Franchise Agreements and Leases), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (in each case, whether written or oral), and any amendments, modifications or supplements thereto.

"***Copyrights***" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"***Corona Storage Facilities***" means each of (a) that certain warehouse facility located at 2324 Fleetwood Drive, Riverside, California, 92509, where Lineage Logistics, LLC ("***Lineage***") provides warehousing and related services to the Foxtail Business, as described in that certain letter agreement between Lineage and Perkins & Marie Callender's, LLC, d/b/a Foxtail Foods, dated July 31, 2018 and (b) that certain warehousing arrangement pursuant to which AWC Packaging provides warehousing and related services to the California Facility.

"***Corporate Assets***" means (a) the Corporate Headquarters, (b) any Equipment, Inventory or other tangible assets located at the Corporate Headquarters, and (c) any assets set forth on Schedule 1.1(a).

"***Corporate Headquarters***" means Sellers' corporate campus located at 6075 Poplar Ave., in Memphis, Tennessee.

"***Cure Cap***" means, as of the Closing, an amount equal to (a) $4,400,000, *less* (b) the estimated Cure Costs set forth on the Execution Date Contract Schedule for any Contract that is deleted from Schedule 2.5(a) pursuant to the provisions of Section 2.5(a) or Section 2.5(d).

"***Credit Support***" means all guaranties, letters of credit, reimbursement agreements, bonds, deposits, prepayments amounts and other credit or contractual assurances of a comparable nature made or issued by or for the account of any Seller for the benefit of a counterparty under the Assigned Contracts or otherwise in connection with the Business.

4

"***Cure Costs***" means all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court.

"***Cure Notice***" means, with respect to each Assigned Contract, the notice submitted by Sellers to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth the Cure Cost amount with respect thereto as calculated by Sellers.

"***Deeds***" means the deeds transferring title to the Owned Real Property, each of which shall be a quitclaim deed or the equivalent in the applicable jurisdictions.

"***DIP Credit Agreement***" means that certain superpriority secured debtor-in-possession credit agreement to be entered into on or shortly after the Petition Date, in substantially the form filed with the Bankruptcy Court on the Petition Date, by and among Sellers and certain other affiliates of Sellers party thereto, Bank of America, N.A., in its capacity as administrative agent, and the lenders from time to time party thereto, as the same may be amended, restated, supplemented or otherwise modified, together with all annexes, exhibits and schedules thereto.

"***Disclosure Schedules***" means the Disclosure Schedules attached hereto, dated as of the Execution Date, delivered by Sellers to Buyer in connection with the execution of this Agreement and as may be amended, restated, modified or updated in accordance with the terms hereof.

"***Documents***" means all of the documents of, generated by, used in, held for use in, or necessary for the operation of the Business.

"***Employees***" means all employees of Sellers and their Affiliates who primarily provide services to the Business as of the Execution Date as well as any additional persons who provide services to the Business as permitted by Section 7.2 during the period from the Execution Date through and including the Closing Date.

"***Encumbrance***" means (a) to the extent permitted by applicable Legal Requirements, any "interest" under Section 363(f) of the Bankruptcy Code and, without limiting this section (a), (b) any mortgage, deed of trust, pledge, security interest, lien, charge, hypothecation, option, right of first offer or first refusal, restrictive covenant, right of way, easement, encroachment, title defect, preemptive right, conditional sale or other title retention agreement or any other encumbrance.

"***Environmental Laws***" means any and all current Legal Requirements concerning or relating to the protection of worker/occupational health from exposure to Hazardous Substances or pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, discharge, Release, control, or cleanup of, or exposure to, Hazardous Substances.

"***Equipment***" means all furniture, fixtures, equipment, computers, machinery, tools, molds, vehicles, apparatus, appliances, implements, telephone systems, management

information systems (including all proprietary software and hardware related thereto), signage, supplies and all other tangible personal property of every kind and description, and improvements and tooling with respect thereto, in each case, that are primarily used in, held for use in, or necessary for the operation of the Business and located at the Leased Real Property (including the Corporate Headquarters), including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents with respect thereto, and including all warranties of the vendor applicable thereto.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means any trade or business, whether or not incorporated, that, together with Sellers, is or would be considered a "single employer" within the meaning of Section 414(b) or (c) of the Code.

"***Escrow Agent***" means U.S. Bank National Association or such other escrow agent mutually acceptable to Sellers and Buyer.

"***Estimated Wind Down Expenses***" means any and all administrative costs and expenses of Sellers, including any sales tax, payroll costs and expenses (including payroll taxes with respect thereto), accrued vacation expenses, and any other employee Liabilities, in each case, that Sellers have incurred or incur during the Bankruptcy Cases (whether before, on, or after the Closing) or otherwise expect to incur in connection with winding down their respective bankruptcy estates, excluding any such costs and expenses that are assumed or included as Assumed Liabilities.

"***Excluded Accounts Receivable***" means (a) any Accounts Receivable of the Excluded Business and (b) any Accounts Receivable of the Business to the extent not included in the Final Specified Net Adjustment.

"***Fairfield Storage Facility***" means that certain warehouse facility where Merchants Cold Storage ("***MCS***") provides warehousing and related services to the Foxtail Business, as described in that certain letter arrangement between MCS and Perkins & Marie Callender's, LLC d/b/a Foxtail Foods, dated June 27, 2017.

"***FDD***" means the franchise disclosure documents (including documents prepared as "Franchise Disclosure Documents," "FDDs," or other pre-contractual information statements) prepared in accordance with the FTC Rule (or its predecessor), or any applicable franchise law, and all variations of such forms which have been approved for use or used by Sellers in any jurisdiction requiring the filing and/or approval of the Franchise Agreement, franchise offering, and/or such franchise disclosure documents.

"***Final Arbiter Procedures***" means those guidelines and procedures set forth in **Exhibit C**.

"***Final Specified Net Adjustment***" means the Specified Net Adjustment as finally determined pursuant to the terms hereof.

6

"*Final Order*" means an Action taken or Order issued by the applicable Governmental Authority as to which: (a) no request for stay of the Action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (b) no petition for rehearing or reconsideration of the Action or Order, or protest of any kind, is pending before the Governmental Authority, and the time for filing any such petition or protest is passed; (c) the Governmental Authority does not have the Action or Order under reconsideration or review on its own motion, and the time for such reconsideration or review has passed; and (d) the Action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Code, may be filed relating to such order, shall not cause such order not to be a Final Order.

"*FLSA*" means Fair Labor Standards Act of the United States Department of Labor, and any state or local laws governing wages, hours, and/or overtime pay.

"*Food Laws*" means the Federal Food, Drug, and Cosmetic Act, the FDA Food Safety Modernization Act, the Federal Meat Inspection Act and Poultry Product Inspection Act, all acts and/or rules and regulations amending or supplementing the foregoing, as well as any applicable Legal Requirements regulating or related to food or alcohol.

"*Foxtail Assets*" means all of Sellers' direct or indirect right, title and interest in, to or under the following properties, rights, Claims and assets of the Foxtail Business (but excluding, for the avoidance of doubt, any Corporate Assets):

(a)    all inventory of any kind or nature, merchandise and goods whether or not prepaid, and any prepaid deposits for any of the same, including raw materials, produce, dairy, work-in-process, finished goods or products, packaging materials and labels, and other stores, supplies, disposables and consumables, in each case, (i) to the extent exclusively used in or exclusively held for use in the operation of the Foxtail Business, (ii) located at the California Facility or the Ohio Facility, (iii) stored or otherwise maintained at the Corona Storage Facility or the Fairfield Storage Facility or (iv) otherwise set forth on Schedule 1.1(c);

(b)    all furniture, fixtures, equipment, computers, machinery, tools, molds, vehicles, apparatus, appliances, implements, telephone systems, management information systems (including all proprietary software and hardware related thereto), signage, supplies and all other tangible personal property of every kind and description, and improvements and tooling with respect thereto, including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents with respect thereto, and including all warranties of the vendor applicable thereto, in each case, to the extent, and solely to the extent, (i) exclusively used in or exclusively held for use in the operation of the Foxtail Business, (ii) located at the Foxtail Facilities, or (iii) otherwise set forth on Schedule 1.1(d);

(c)     subject to <u>Section 2.5(c)</u>, all of Sellers' respective rights under Contracts exclusively related to the Foxtail Business or set forth on <u>Schedule 1.1(e)</u>, in each case, including all Claims or Actions with respect thereto;

(d)     the real property leases for the Foxtail Facilities, the Corona Storage Facility and the Fairfield Storage Facility, in each case, together with all interests (if any) of Sellers in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)     subject to <u>Section 2.5(c)</u>, all approvals, permits, licenses, franchises, waivers, filings, consents, certificates, notices, qualifications, authorizations, registrations and clearances and pending applications therefor of Sellers exclusively used in or exclusively held for use in the operation of the Foxtail Business or set forth on <u>Schedule 1.1(f)</u>;

(f)     all Copyrights, Patents, Trademarks and Trade Secrets, in each case, that are identified on <u>Schedule 1.1(g)</u>;

(g)     all accounts receivable exclusively arising under or exclusively related to the Foxtail Business;

(h)     all Pre-Paid Expenses exclusively arising under or related to the Foxtail Business;

(i)     all goodwill, customer and referral relationships, other intangible property and all privileges, set-offs, indemnification rights, causes of action, actions, Claims and demands and rights of any kind as against others (whether by contract or otherwise), in each case, to the extent exclusively relating to, arising from or associated with the Foxtail Business;

(j)     all documents and other books and records (financial, accounting, personnel files and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, proprietary software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, to the extent exclusively arising under or exclusively relating to the Foxtail Business;

(k)     all rights, remedies and benefits of Sellers exclusively arising under or exclusively relating to the Foxtail Business, including rights, remedies and benefits arising out of express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent exclusively relating to the operation of the Foxtail Business or other tangible Foxtail Assets described in this definition (and in any case, any component thereof), and all claims and causes of action arising or existing therefrom;

(l)     all Claims, rights, causes of action of any Seller arising under Chapter 5 of the Bankruptcy Code and any underlying state law claims exclusively relating

to the other Foxtail Assets or the Foxtail Business against any person or entity (including trade vendors, suppliers, employees or customers) who is a party to a Contract set forth on Schedule 1.1(e);

(m)    all telephone, telex and telephone facsimile numbers and other directory listings, in each case, to the extent (i) exclusively related to or exclusively associated with the Foxtail Facility or the Foxtail Business or (ii) listed on Schedule 1.1(h);

(n)    all rights and interests of any Seller in the names "Foxtail" or "Foxtail Foods," including any derivatives thereof, together with all goodwill associated therewith and all rights to sue for and receive damages or other relief in respect of any past infringement or other violation of any rights thereto;

(o)    all assets, if any, listed on Schedule 1.1(i) (regardless of whether such assets are covered by any of the foregoing); and

(p)    with respect to any Buyer Benefit Plan exclusively relating to the Foxtail Business (i) that is funded by a trust (other than a so-called "rabbi trust"), the assets of such related trust; (ii) that is funded by an insurance policy, the related insurance policy (to the extent transferable); and (iii) to the extent applicable and subject to conformity with Legal Requirements, the administrative service agreements and other contracts, files and records in respect thereof.

"*Franchise Agreement*" means any franchise, master franchise, license, development, master developer and similar agreement or contract, and all amendments, addendums and supplements thereto, pursuant to which the Company or any Seller indirectly or directly grant to any Franchisee the right or license (or option) to develop, establish, or operate (or solicit and support others who develop, establish or operate) any of the Business's establishments.

"*Franchisee*" means a Person who is a party to a Franchise Agreement with respect to the Business.

"*FTC Rule*" means the Federal Trade Commission trade regulation rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," 16 C.F.R. Section 436.1 et seq.

"*GAAP*" means generally accepted accounting principles in the United States applied in a manner consistent with the Financial Statements.

"*Governmental Authority*" means any United States federal, state or local, municipal, or any foreign government, governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction, including, for the avoidance of doubt, the Bankruptcy Court.

"*Governmental Authorization*" means any approval, consent, license, Permit, Order, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"***Hazardous Substance***" means any substance, material or waste (including chemicals, compounds, mixtures, pollutants and contaminants) (a) to the extent such materials are prohibited, limited or regulated by the Environmental Laws as "hazardous", "acutely hazardous", "toxic" or "dangerous"; (b) petroleum or any fraction thereof, or petroleum products, (c) natural gas, (d) asbestos and asbestos-containing materials, (e) radioactive material, (f) urea formaldehyde, g) polychlorinated biphenyls, (h) hazardous or toxic fungus, mold or mycotoxins or (i) lead or lead-containing paint or plumbing.

"***Improvements***" means the buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to and/or demised under any lease of, or other contract or agreement for the use of, the Real Property.

"***Indebtedness***" means, at any time and with respect to any Person, without duplication: (a) all indebtedness of such Person for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property, assets, business, securities or services, including all Seller notes and "earn-out" payments (other than, in the case of Sellers, Trade Payables); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of any Seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person under leases which have been recorded as capital leases in accordance with GAAP on the Financial Statements; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (g) all vendor financing arrangements; (h) all obligations of such Person under interest rate or currency swap transactions or commodity hedges (valued at the termination value thereof); (i) all Indebtedness of others referred to in clauses (a) through (h) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person, through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iii) otherwise to assure a creditor against loss in respect of such Indebtedness; (j) all Indebtedness referred to in clauses (a) through (i) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness and (k) for clauses (a) through (j) above, all accrued interest thereon, if any, and any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayments of such Indebtedness on the Closing Date to the extent paid on the Closing Date.

"***Intellectual Property***" means all Copyrights, Patents, Trademarks and Trade Secrets, in each case, that are owned by Sellers and primarily used in, held for use in, or necessary for the operation of the Business, including, for the avoidance of doubt, the Intellectual Property set forth on <u>Schedules 5.13(a)</u> and <u>(b)</u>, and all of the foregoing relating to any recipes,

specifications, formulas, manufacturing processes or delivery processes relating to the products of the Business (including products produced by the Foxtail Business).

"*Inventory Value*" means the value of the Inventory for the Business as of the Closing and determined in accordance with the Accounting Principles.

"*IRS*" means the United States Internal Revenue Service.

"*KEIP*" means the Key Employee Incentive Program approved by the Bankruptcy Court.

"*Knowledge*" means, with respect to any matter in question, in the case of Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(b), as of the Execution Date following inquiry to such individuals' direct reports.

"*Leased Real Property*" means the real property leased, subleased or licensed by Sellers, as tenant, subtenant or licensee (including the Corporate Headquarters), which is used in, held for use in, or necessary for the operation of the Business or on which any buildings, other structures, facilities or Improvements that constitute Acquired Assets are located, in each case, excluding the California Facility and the Corona Storage Facility (each such real property lease, sublease or license, a "*Lease*," and, collectively, the "*Leases*").

"*Legal Requirement*" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"*Liability*" means any indebtedness, liabilities or obligations of any kind or nature whatsoever (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), including all fines, costs and expenses relating thereto (including all fees, disbursements and expenses of legal counsel, experts, engineers and consultants and costs of investigation).

"*Liquor Consent*" means all filings, consents authorizations or approvals that are required to be submitted to or obtained from any Governmental Authority relating to the sale of alcohol by the Business.

"*Material Adverse Effect*" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, state of facts or occurrences) (a) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on the Business, its condition (financial or otherwise), the results of operations of the Business, the Acquired Assets or the Assumed Liabilities, taken as a whole, or (b) that does or would reasonably be expected to materially prevent, impair or delay the ability of any Seller to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement; provided, however, that, in the case of clause (a) above, the following (or the effect of any of the following) shall not be deemed in themselves, either alone or in combination, to constitute, and none of the following shall be taken into account

in determining whether there has been or would be, a Material Adverse Effect: (i) the fact of the commencement of the Bankruptcy Cases, any events of default under any Indebtedness necessitating the commencement of such cases (including any events of default under the Prepetition Bank of America Credit Agreement) or any actions taken in the Bankruptcy Cases in furtherance of the transactions contemplated herein, (ii) any national, international or any foreign or domestic regional economic, financial, military or political conditions (including changes therein) or events in general, including the results of any primary or general elections and acceptance or rejection thereof, (iii) any congressional, regulatory or administrative hearings or testimony, (iv) any change in any financial, debt, credit, capital or banking markets or conditions (including any disruption thereof), (v) any change in interest, currency or exchange rates or the price of any commodity, security or market index, (vi) any change in Legal Requirements, Orders, or other accounting regulations, principles, or standards, including changes or proposed changes in Legal Requirements, Orders, GAAP or other accounting regulations, principles, or standards, or any changes or proposed changes in interpretations or enforcement thereof, (vii) any change in the industries in which Sellers operate, (viii) any change in the price or trading volume of any securities or indebtedness of Sellers, (ix) any change in, or failure of Sellers to meet, or the publication of any report regarding, any internal or public projections, forecasts, budgets or estimates of or relating to Business or the Acquired Assets for any period, including with respect to revenue, earnings, cash flow or cash position (it being agreed that the facts and circumstances giving rise to such failure that are not otherwise described in this clause (ix) may be taken into account in determining whether there has been a Material Adverse Effect), (x) any threatened or pending strikes, slowdowns, lockouts or work stoppages, (xii) the general public awareness of Sellers' intention or desire to enter into this Agreement or a similar agreement and the process leading to the execution or announcement of this Agreement, (xiii) any Action arising from or relating to this Agreement or the transactions contemplated by this Agreement, including the execution, announcement, performance or existence of this Agreement, the identity of the parties hereto or any of their respective Affiliates, representatives or financing sources, the taking or not taking of any action to the extent required by this Agreement or the pendency or contemplated consummation of the transactions contemplated by this Agreement, the compliance by Sellers with the terms of this Agreement, including the taking of any action required by this Agreement or the failure to take any action restricted by this Agreement, (xiv) any the occurrence, escalation, outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts, whether or not pursuant to the declaration of an emergency or war, (xv) the existence, occurrence or continuation of any force majeure events, including any earthquakes, floods, hurricanes, tropical storms, fires or other natural disasters or any national, international or regional calamity or any man-made disaster, (xvi) any actions taken, or not taken, with the consent, waiver or at the request of Buyer or the Buyer Designees or any action taken to the extent expressly permitted by this Agreement, (xvii) any actions taken by Buyer, the Buyer Designees or its or their representatives or financing sources after the Execution Date, (xviii) any exceptions to the representations and warranties expressly disclosed in the Schedules or (xix) any effect that is cured by Sellers prior to the termination of this Agreement; provided, that any change, event, state of facts or occurrence referred to in clauses (ii), (iv), (v), (vi), (vii), (xi), or (xii) above may be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent that such change, event, state of facts or occurrence has a disproportionate effect on the Business as compared to other similar participants in the restaurant industry in which the

Business is operated (in which case solely the incremental disproportionate impact or impacts may be taken into account in determining whether there has been a Material Adverse Effect).

"*MC Sellers*" means:

(i)     Perkins & Marie Callender's Holding, LLC, a Delaware limited liability company;

(ii)    Perkins & Marie Callender's, LLC, a Delaware limited liability company;

(iii)   Marie Callender Pie Shops, LLC, a California limited liability company;

(iv)    MC Wholesalers, LLC, a California limited liability company;

(v)     PMCI Promotions, LLC, a Colorado limited liability company;

(vi)    MCID, Inc., an Idaho corporation;

(vii)   Wilshire Beverage, Inc., a Texas corporation;

(viii)  FIV, LLC, a Delaware limited liability company;

(ix)    P&MC's Real Estate Holding LLC; and

(x)     P&MC's Holding Corp., a Delaware corporation.

"*Multiemployer Plan*" means a "multiemployer plan" within the meaning of Section 3(37) or Section 4001(a)(3) of ERISA.

"*Order*" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, decree or binding determination or finding entered, issued, made or rendered by any Governmental Authority, or any arbitrator, mediator, or other quasi-judicial or judicially sanctioned Person or body.

"*Ordinary Course of Business*" means, with respect to any Person, the ordinary and usual course of normal day to day operations of such Person and its business, consistent with its past practice during the twelve (12) month period preceding the date of this Agreement; provided, however, that in the case of Sellers, "Ordinary Course of Business" shall include any and all actions taken by Sellers in preparation of or as required by the Bankruptcy Cases.

"*Owned Real Property*" means the real property in which Sellers have fee title (or equivalent) interest, in each case, which is used in, held for use in, or necessary for the operation of the Business, as set forth on Schedule 5.5(a), together with all buildings and other structures, facilities or Improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of Sellers attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

13

"*Party*" or "*Parties*" means, individually or collectively, Buyer and Sellers.

"*Patents*" means United States and foreign issued patents and pending applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"*Perkins Specified Net Adjustment*" means (without duplication) an amount equal to: (a) the sum of (i) the Inventory Value, (ii) the value of the Accounts Receivable of the Perkins Business included in the Acquired Assets, (iii) ten percent (10%) of the Post-Closing Lease Savings with respect to the Perkins Business, if any, and (iv) the amount of Pre-Paid Expenses of the Perkins Business included in the Acquired Assets, including with respect to (A) Leases constituting Assigned Contracts or (B) insurance policies to the extent constituting Acquired Assets, <u>minus</u> (b) the sum of (i) Pre-Closing Gift Card Liabilities, (ii) any Liabilities for advertising obligations owed to Franchisees pursuant to the terms of the Franchise Agreements but excluding any Liabilities for contributions required to be paid by Franchisees not owned by Sellers but which contributions have not been paid by such Franchisees (the "*Marketing Fund Liabilities*"), (iii) any Trade Payables of the Perkins Business, (iv) any accrued expenses of the Perkins Business, including utilities, in each case, determined in accordance with the Accounting Principles and expressly excluding such expenses with respect to the following entries on the Company's Financial Statements: major medical plan, accrued short-term disability, use tax payable-AL, accrued insurance property and liability, accr 13-pd auto leasing, intercompany franchise fees, LSTC Unimp lease rejection, and intercompany-marketing fund, (v) any Property Taxes with respect to the Perkins Business allocable to Sellers pursuant to <u>Section 8.1</u>, (vi) the lesser of (A) 90% of any Cure Costs and (B) the Cure Cap, in each case, excluding from this clause (vi) any such Cure Cap any Cure Costs relating to Leases, and (vii) any Cure Costs relating to the Leases that constitute Assigned Contracts as of the Closing or the Adjustment Statement Date, as applicable, if any, <u>plus</u> (c) $81,998, in the case of each item listed in (a) and (b), (1) solely to the extent included as Assumed Liabilities or Acquired Assets, as applicable, (2) solely to the extent incurred prior to the Closing with respect to the Perkins Business, (3) calculated as of the Closing but, with respect to Post-Closing Lease Savings including any such Post-Closing Lease Savings or Cure Costs with respect to clause (a)(iii) or clause (b)(vii) achieved or payable on or prior to the Adjustment Statement Date; (4) excluding from the calculations thereof any Excluded Liabilities or Excluded Assets; and (5) excluding any contingent liabilities or contingent reserves, intercompany assets or liabilities, or assets or liabilities eliminated in consolidation to the extent such liabilities, reserves, assets and liabilities are not included in Assumed Liabilities or Acquired Assets.

"*Permits*" means all approvals, permits, licenses, franchises, waivers, filings, consents, certificates, notices, qualifications, authorizations, registrations and clearances, together with all modifications, amendments, supplements and extensions thereof, of or from any Governmental Authority or any other Person that are necessary for Sellers to own the Acquired Assets or operate the Business, including, for the avoidance of doubt, all of the foregoing relating to the sale and serving of alcohol at the Leased Real Property.

"*Permitted Encumbrances*" means (a) applicable zoning Legal Requirements, building codes and other similar restrictions imposed by Legal Requirements (but excluding any violations of any such Legal Requirements); (b) materialmans', mechanics', artisans', shippers',

warehousemans' or other similar common law, contractual or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Bankruptcy Cases or which are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established on the Financial Statements in accordance with GAAP (it being understood that all such Encumbrances described in this clause (b) shall be discharged or released at the Closing); (c) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings and, in each case, for which appropriate reserves have been established on the Financial Statements in accordance with GAAP (it being understood that all such Encumbrances described in this clause (c) shall be discharged or released at the Closing); (d) easements, covenants, conditions, restrictions, declarations and other similar non-monetary matters affecting title to real property and encroachments and other non-monetary title and survey defects with respect to any Owned Real Property that, in the case of each of the foregoing, do not and would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (e) matters that would be disclosed on an accurate survey of the real property that do not and would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (f) Encumbrances on equipment registered under the Uniform Commercial Code as adopted in any applicable state or similar legislation in other jurisdictions by any lessor or licensor of assets to Sellers (in respect of the Business) or in respect of the purchase price therefor (it being understood that all such Encumbrances described in this clause (f) shall be discharged or released at the Closing); (g) with respect to Leased Real Property, (1) the terms, conditions and provisions of the Leases pursuant to which such Leased Real Property is leased, and (2) any lien, Encumbrance, or other matter affecting title to the fee estate underlying such Leased Real Property; (h) any statutory or common law liens in favor of landlords or lessors under leases or rental agreements to secure amounts that are not yet due or payable thereunder; (i) non-exclusive rights granted to any licensee of any Intellectual Property in the Ordinary Course of Business; (j) Encumbrances that will be and are discharged or released either prior to, or simultaneously with the Closing; (k) such other Encumbrances, title exceptions or imperfections of title set forth on <u>Schedule 1.1(j)</u> or as Buyer may approve in writing in its sole discretion; (l) any Encumbrances permitted by the Sale Order; and (m) any Liabilities created by this Agreement or any of the other Transaction Documents.

"***Person***" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or Governmental Authority.

"***Petty Cash***" means all cash and cash equivalents held at any restaurant and bakery of the Business owned by Sellers on the Closing Date.

"***Post-Closing Lease Amendments***" means any amendment, amendment and restatement, modification or replacement executed after the Closing and related to an existing Lease that is an Assigned Contract as of the Closing or the Adjustment Statement Date.

"***Post-Closing Lease Savings***" means the aggregate amount by which rent required to be paid by Buyer or its Affiliates under the Leases that are Assigned Contracts as of the Closing or the Adjustment Statement Date, after giving effect to any Post-Closing Lease Amendments,

during the twelve (12) month period following the Closing is reduced (whether as a result of reduction of rent, offsets, or credits pursuant to the applicable Post-Closing Lease Amendments).

"*Post-Closing Tax Period*" means any Tax period or year, or portion of any Straddle Period, that begins after the Closing Date.

"*Pre-Closing Tax Period*" means any Tax period or year, or portion of any Straddle Period, that ends on or before the Closing Date.

"*Pre-Paid Expenses*" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise, but excluding those utility deposits approved pursuant to the "First Day Orders" by the Bankruptcy Court) for rent, electricity, telephone or otherwise), pre-paid expenses, prepayments, vendor rebates, other refunds, claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non contingent), and other current assets included in the Sample Specified Adjustment Calculation, in each case, of the Business and calculated in accordance with the Accounting Principles.

"*Prepetition Bank of America Credit Agreement*" means that certain Credit Agreement, dated as of June 26, 2015, by and among Perkins & Marie Callender's, LLC and Marie Callender Pie Shops, LLC, as borrowers, the guarantors party thereto, Bank of America, N.A., in its capacity as administrative agent, and the lenders party thereto, as the same may be amended, restated, supplemented or otherwise modified, together with all annexes, exhibits and schedules thereto.

"*Products*" means any and all products of the Business that Sellers package, market, distribute or sell as of the Execution Date.

"*Professional*" means any Person retained by Sellers in the Bankruptcy Case pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code.

"*Real Property*" means the Owned Real Property and the Leased Real Property; provided, however, that, the Foxtail Facilities, the Fairfield Storage Facility and the Corona Storage Facility shall each be excluded from and not be deemed Real Property hereunder.

"*Release*" means any releasing, spilling, dumping, discharging, disposing, leaking, pumping, injecting, pouring, emitting, leaching or migrating into the indoor or outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata.

"*Representative*" means, with respect to a particular Person, any director, manager, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"*Retention Expenses*" means, with respect to a particular Person, including any director, manager, officer or employee, the amount of stay bonuses, sales bonuses, change of control payments, severance payments, retention payments or other payments (whether pursuant to the KEIP or otherwise) and the amount of the employer's share of any employment, payroll,

social security, unemployment or similar Taxes with respect to the amounts described in this definition.

"***Sale Hearing***" means the hearing to consider the entry of the Sale Order.

"***Sale Motion***" means the motion filed by Sellers pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code to obtain the Bidding Procedures Order and the Sale Order and approve the transactions contemplated by this Agreement.

"***Sale Order***" means an Order of the Bankruptcy Court, substantially in the form attached as **Exhibit E**, or otherwise acceptable to Buyer in its sole discretion, pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, *inter alia*, the sale of the Acquired Assets to Buyer or the Buyer Designees, as applicable, on the terms and conditions set forth herein, free and clear of any and all Encumbrances (other than Permitted Encumbrances), and the assumption and assignment of the Assigned Contracts to Buyer or the Buyer Designees, as applicable, and containing findings of fact and conclusions of law that Buyer and/or the Buyer Designees, as applicable, has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code.

"***Sales Proceeds***" means an amount equal to the sum of: the Cash Consideration, *less* the Seller Retained Professional Fees paid under Section 4.2(a)(i), *less* the Estimated Wind Down Expenses paid under Section 4.2(a)(ii), *less* the Specified Adjustment Escrow Amount paid under Section 4.2(a)(iii), *plus* any amounts released to Sellers pursuant to the Specified Adjustment Escrow Agreement, *less* the Carve Out (as such term is defined in that certain Interim Order Approving Post-Petition Financing, filed with the Bankruptcy Court on the Petition Date and as may be further amended or modified by an Order of the Bankruptcy Court approving the DIP Credit Agreement) paid under Section 4.2(a)(v) and solely to the extent such amounts are not otherwise included in the Seller Retained Professional Fees paid under Section 4.2(a)(i), or the Estimated Wind Down Expenses paid under Section 4.2(a)(ii), if any (such amount, if any, and, for the avoidance of doubt, without duplication to the Estimated Wind Down Expenses, the "***Carve Out Amount***").

"***Sales Proceeds Escrow***" means the escrow account established pursuant to the Sales Proceeds Escrow Agreement.

"***Sales Proceeds Escrow Agreement***" means an escrow agreement by and among Sellers and Escrow Agent for the disbursement of the amounts paid by Buyer pursuant to Section 4.2(a)(iv).

"***Seller Retained Professional Fees***" means (a) an aggregate amount equal to the reasonable and documented out-of-pocket fees and expenses of, or incurred by, Professionals retained by Sellers pursuant to Section 327 of the Bankruptcy Code, in each case, to the extent such out-of-pocket fees and expenses (x) are accrued and unpaid as of the Closing Date, and (y) with respect to any transaction-based fees, have been authorized to be paid by the Bankruptcy Court, and (b) an aggregate amount equal to the Sellers' good faith estimate of the reasonable and documented out-of-pocket fees and expenses to be incurred by Professionals retained by Sellers to

close the Bankruptcy Cases and/or to perform any other covenants and other obligations contemplated under this Agreement and the transactions contemplated hereby.

"*Specified Adjustment Escrow*" means the escrow account established pursuant to the Specified Adjustment Escrow Agreement.

"*Specified Adjustment Escrow Agreement*" means an escrow agreement by and among Buyer, Sellers and Escrow Agent for the disbursement of the amounts payable by Buyer pursuant to Section 4.2(a)(iii), in substantially the form attached hereto as **Exhibit F**.

"*Specified Adjustment Escrow Amount*" means $2,000,000.

"*Specified Net Adjustment*" means the Perkins Specified Net Adjustment.  A sample calculation of Specified Net Adjustment (the "*Sample Specified Adjustment Calculation*") is attached hereto as **Exhibit D**.

"*Straddle Period*" means any Tax period or year commencing on or before, and ending after, the Closing Date.

"*Subsidiary*" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the managers, directors or similar managing body.

"*Successful Bidder*" has the meaning set forth in the Bidding Procedures.

"*Tax*" or "*Taxes*" (and with correlative meaning, "*Taxable*" and "*Taxing*") means any federal, state, provincial, local, foreign or other income, alternative minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, escheat, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not).

"*Tax Return*" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"*Trade Payables*" means accounts payable obligations of Sellers incurred at any time following the Petition Date but prior to the Closing, solely to the extent that such obligations (a) are outstanding at Closing, (b) relate to the Acquired Assets, (c) are calculated in accordance with the Accounting Principles and (d) do not constitute Cure Costs.

"*Trade Secrets*" means confidential and proprietary business information, trade secrets, business methods, and know-how, including recipes, in each case to the extent protectable under applicable Legal Requirements.

"*Trademarks*" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names, social media identifiers, and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"*Transaction Documents*" means this Agreement, the Assignment and Assumption Agreement, the Deeds, the Bill of Sale, the Wind Down and Professional Expense Escrow Agreement, the Sales Proceeds Escrow Agreement, the Carve Out Escrow Agreement, the Specified Adjustment Escrow Agreement, the Amended and Restated Foxtail Supply Agreement, the Transition Services Agreement, the Estate Transition Services Agreement, and any other agreements, instruments, certification, or documents entered into pursuant to this Agreement.

"*Transfer Tax*" all transfer, documentary, sales, use, stamp, registration and other similar Taxes, and all conveyance fees, recording charges and other similar fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement.

"*Transfer Time*" means 12:01 a.m. on the applicable Hire Date.

"*WARN Act*" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar state or local Legal Requirement and the rules and regulations thereunder.

"*Wind Down and Professional Expenses Escrow*" means the escrow account established pursuant to the Estimated Wind Down Expenses and Seller Retained Professional Fees Escrow Agreement with subaccounts for the Estimated Wind Down Expenses and each Professional.

"*Wind Down and Professional Expenses Escrow Agreement*" means an escrow agreement by and among Sellers and Escrow Agent for the receipt and disbursement of the amounts payable pursuant to Section 4.2(a)(i) and Section 4.2(a)(ii), respectively, in connection with the Estimated Wind Down Expenses and the Seller Retained Professional Fees.

1.2     Cross Reference of Other Definitions.  Each capitalized term listed below is defined on the corresponding Section of this Agreement:

| Term | Section |
|---|---|
| *Acquired Assets* | 2.1 |
| *Adjustment Statement* | 3.2(b) |
| *Adjustment Statement Date* | 3.2(b) |
| *Affiliate Transactions* | 5.24 |
| *Agreement* | Preamble |
| *Allocation Statement* | 3.4(a)(i) |

19

| Term | Section |
|------|---------|
| *Amended and Restated Foxtail Supply Agreement* | 2.6 |
| *Assigned Contracts* | 2.5(a)(i) |
| *Assumed Benefits* | 2.3(i) |
| *Assumed Liabilities* | 2.3 |
| *Audited Financial Statements* | 5.19(a) |
| *Bankruptcy Case* | Recitals |
| *Bankruptcy Court* | Recitals |
| *Benefit Plan* | 5.12(a) |
| *Bidding Procedures and Sale Motion* | 1.1 |
| *Business Software* | 5.13(c) |
| *Buyer* | Preamble |
| *Buyer Benefit Plans* | 8.4(e) |
| *Buyer Employees* | 8.4(b) |
| *Buyer Lenders* | 12.15 |
| *California Facility* | Recitals |
| *Carve Out Amount* | 1.1 |
| *Cash Consideration* | 3.1(a) |
| *Closing* | 4.1 |
| *Closing Date* | 4.1 |
| *COBRA* | 5.12(e) |
| *Collective Bargaining Agreement* | 5.11(a) |
| *Company* | Preamble |
| *Confidentiality Agreements* | 12.2 |
| *Debt Commitment Letter* | 12.15 |
| *Debtors* | Recitals |
| *Determination Date* | 2.5(a)(i) |
| *Disputed Amounts* | 3.2(c) |
| *Disputed Contract* | 2.5(a)(i) |
| *DOL* | 5.12(c) |
| *Estate Transition Services Agreement* | 2.7 |
| *Estimated Cash Consideration* | 3.2(a) |
| *Estimated Lease Cure Costs* | 3.2(a) |
| *Estimated Specified Net Adjustment* | 3.2(a) |
| *Excluded Assets* | 2.2 |
| *Excluded Business* | Recitals |
| *Excluded Business Assets* | 2.2(h) |
| *Excluded Liabilities* | 2.4 |
| *Execution Date* | Preamble |
| *Execution Date Contract Schedule* | 2.5(a)(i) |
| *Extended Contract Period* | 2.5(a)(i) |
| *Final Adjustment Amount* | 3.3(c) |
| *Final Arbiter* | 3.2(f) |
| *Final Determination Date* | 2.1(k) |
| *Financial Statements* | 5.19(a) |
| *Financing Sources* | 12.15 |

| Term | Section |
|------|---------|
| *Foxtail Business* | Recitals |
| *Foxtail Facilities* | Recitals |
| *Foxtail Purchaser* | 2.6 |
| *Foxtail Sale* | 2.6 |
| *Franchise Documents* | 5.26(b) |
| *Hire Date* | 8.4(b) |
| *Initial Purchase Price* | 3.1(a) |
| *Inventory* | 2.1(a) |
| *Labor Claim* | 5.11(e) |
| *Listed Employees* | 8.4(a) |
| *Material Franchisees* | 5.22(b) |
| *Material Suppliers* | 5.22(a) |
| *MC Business* | Recitals |
| *Negotiation Period* | 3.2(d) |
| *Objection Notice* | 3.2(c) |
| *Offered Employees* | 8.4(b) |
| *Ohio Facility* | Recitals |
| *Outside Date* | 11.1(b)(i) |
| *Perkins Business* | Recitals |
| *Petition Date* | Recitals |
| *Pre-Closing Gift Card Liabilities* | 2.3(f) |
| *Preliminary Statement* | 3.2(a) |
| *Previously Omitted Contract* | 2.5(b) |
| *Property Taxes* | 8.1(b) |
| *Purchase Price* | 3.1 |
| *Rejected Contracts* | 2.5(a)(i) |
| *Schedule Supplement* | 7.5(a) |
| *Section 505 Determination* | 8.1(c) |
| *Sellers* | Preamble |
| *Specified Leases* | 3.2(a) |
| *Third-Party Licenses* | 5.13(f) |
| *Transferred Permits* | 2.1(e) |
| *Transition Services Agreement* | 2.6 |
| *Unaudited Balance Sheet* | 5.19(a) |
| *Unaudited Balance Sheet Date* | 5.19(a) |
| *Unaudited Financial Statements* | 5.19(a) |
| *Union* | 5.11(a) |
| *Unregistered Trademarks* | 5.13(b) |

1.3    Other Definitions and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this

21

Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

Day.  Any reference in this Agreement to days (but not Business Days) means to calendar days.

Dollars.  Any reference in this Agreement to $ means United States dollars.

Exhibits/Schedules.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender includes all genders, and words imparting the singular number only include the plural and vice versa.

Headings.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "***Section***" or "***Article***" are to the corresponding Section or Article of this Agreement unless otherwise specified.

Herein.  Words such as "***herein***," "***hereof***" and "***hereunder***" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

Including.  The word "***including***" or any variation thereof means "***including, without limitation***," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Or.  The word "***or***" shall be disjunctive but not exclusive.

Made Available.  Any reference in this Agreement to "***made available***" shall mean that such documents or information referenced shall have been provided in that certain electronic dataroom titled "Project Pie" located at https://services.intralinks.com/web/index.html#workspace/6765745/documents for Buyer and its Representatives at least two (2) days prior to the Execution Date.

(b)    No Strict Construction.  Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limiting the foregoing, no rule of strict construction

construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

(c)    <u>Disclosure Schedules</u>.    The disclosures in the Disclosure Schedules modify and relate to the representations and warranties in the corresponding section or subsection of such Article to which they refer and are intended to qualify and provide certain information elicited by, such representations and warranties.    The information set forth in one section or subsection of the Disclosure Schedules that is specifically referred to in another section or subsection of the Disclosure Schedules by appropriate cross-reference shall also be deemed to qualify such other section or subsection of such Article, and the information set forth in one section or subsection of the Disclosure Schedules shall also be deemed to qualify each other section or subsection of such Article to the extent that the relevance of a disclosure in one section or subsection of the Disclosure Schedules to another section or subsection of such Article is reasonably apparent on its face.

# ARTICLE 2

## PURCHASE AND SALE

2.1    <u>Purchase and Sale</u>.    Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, acquire and accept from Sellers, free and clear of any and all Encumbrances (other than Permitted Encumbrances), all of Sellers' direct or indirect right, title and interest in, to or under the Business, including with all of Sellers' properties, rights, Claims and assets (other than the Excluded Assets) of every kind and description (wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, or licensed) primarily used in, held for use in, or necessary for the operation of the Business, whether or not reflected on the books and records of Sellers (collectively, the "***Acquired Assets***"). Without limiting the generality of the foregoing, the Acquired Assets shall include all of Sellers' direct or indirect right, title and interest in, to and under the following assets primarily used in, held for use in, or necessary for the operation of the Business:

(a)    all inventory of any kind or nature, merchandise and goods related to the Business and maintained, held or stored by or for Sellers on the Closing Date at the Real Property (or in transit to the Real Property), and any prepaid deposits for any of the same, including raw materials, produce, dairy, work-in-process, finished goods or products, packaging materials and labels, and other stores, supplies, disposables and consumables, in each case, to the extent primarily used in, held for use in, or necessary for the operation of the Business, including any such goods or products in transit to such Real Property ("***Inventory***");

(b)    all Equipment, whether owned or leased (and, to the extent leased, any Contract or rights related thereto if such Contract is an Assigned Contract);

(c)    subject to <u>Section 2.5(c)</u>, all Assigned Contracts;

(d)     all (i) Owned Real Property and (ii) Leased Real Property (and any such agreement and rights related thereto or under such Lease to the extent that such Lease is an Assigned Contract), in each case, together with all interests (if any) of Sellers in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)     subject to Section 2.5(c), all Permits and pending applications therefor of Sellers primarily used in, held for use in, or necessary for the operation of the Business, including all Permits described in Schedule 2.1(e), in each case, to the extent transferable under applicable Legal Requirements (the "***Transferred Permits***");

(f)     all Intellectual Property;

(g)     all Pre-Paid Expenses related to the Business;

(h)     all goodwill, customer and referral relationships, other intangible property and all privileges, set-offs, indemnification rights, causes of action, actions, Claims and demands and rights of any kind as against others (whether by contract or otherwise) relating to, arising from or associated with the Acquired Assets, the Assumed Liabilities or the Business;

(i)     to the extent permitted by Legal Requirements, all Documents and other books and records (financial, accounting, personnel files and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, proprietary software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, arising under or relating to the Acquired Assets, the Assumed Liabilities or the Business;

(j)     all rights, remedies and benefits of Sellers arising under or relating to any of the Assumed Liabilities or the Business, including rights, remedies and benefits arising out of express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Business or affecting the Inventory, Equipment, Real Property, or other tangible Acquired Assets described in Sections 2.1(a), 2.1(b), 2.1(c), 2.1(d), and 2.1(f) (and in any case, any component thereof), and all claims and causes of action arising or existing therefrom;

(k)     all Avoidance Actions against any person or entity (including trade vendors, suppliers, employees, or customers) (i) who is a party to an Assigned Contract or with respect to whom an Assumed Liability is owed or (ii) with whom Buyer or Buyer Designee (or any of their Affiliates) otherwise anticipates doing business following the Closing (as preliminarily disclosed by Buyer to Sellers at least two (2) Business Days prior to the Closing, with a final list to be provided by no later than 45 days after the Closing (such date, the "***Final Determination Date***")); provided, however, that Buyer agrees that it shall not use such Avoidance Actions offensively in an Action, and shall not transfer any such Avoidance Actions unless such transferee agrees to be bound by the limitations in this Section 2.1(k), and that all such Avoidance Actions are affirmatively and irrevocable waived and released (other than for the sole purpose of a defense

to an Action commenced by or on behalf of any such Person) upon the Final Determination Date but *nunc pro tunc* to the Closing Date;

(l)    all telephone, telex and telephone facsimile numbers and other directory listings, in each case, to the extent (i) transferrable and (ii) either (A) primarily used in, held for use in, or necessary for the operation of the Business or (B) set forth on Schedule 2.1(l);

(m)    all Corporate Assets;

(n)    all assets, if any, listed on Schedule 2.1(n) (regardless of whether such assets are covered by any of the foregoing);

(o)    all Petty Cash;

(p)    with respect to any Buyer Benefit Plan (i) that is funded by a trust (other than a so-called "rabbi trust"), the assets of such related trust; (ii) that is funded by an insurance policy, the related insurance policy (to the extent transferable); and (iii) to the extent applicable and subject to conformity with Legal Requirements, the administrative service agreements and other contracts, files and records in respect thereof;

(q)    any Employee personnel files or records, to the extent such personnel files or records relate to the employment of the Buyer Employees and the delivery of such files or records to Buyer is not prohibited by applicable Legal Requirements;

(r)    all Business Software;

(s)    all rights and interests of any Seller in the names "Perkins," including any derivatives thereof, together with all goodwill associated therewith and all rights to sue for and receive damages or other relief in respect of any past infringement or other violation of any rights thereto; and

(t)    all Accounts Receivable.

2.2    Excluded Assets.    Notwithstanding anything to the contrary in this Agreement (including Section 2.1), nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer or any of its Buyer Designees, and Sellers shall retain all right, title and interest to, in and under, the Excluded Assets.  For all purposes of and under this Agreement, the term "***Excluded Assets***" shall consist of only the following items, assets and properties:

(a)    any (i) Employee personnel files or records delivery of which to Buyer is prohibited by applicable Legal Requirements or which does not relate to a Buyer Employee and (ii) Benefit Plans that are not Buyer Benefit Plans, and any assets (whether in trust or otherwise), trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(b)    any shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller;

(c)    the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers, Tax records, work papers and other records of Sellers as they pertain to ownership, organization, qualification to do business or existence of Sellers; provided, however, that copies of the foregoing items (including copies of Tax records and work papers of Sellers) shall be made available by Sellers to Buyer;

(d)    all documents and other books and records (financial, accounting, personnel files and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case (i) that relate exclusively to the Excluded Assets or Excluded Liabilities, (ii) that if transferred would violate any applicable Legal Requirements (including with respect to privacy) or (iii) that are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Cases, this Agreement or the transactions contemplated hereby;

(e)    any Contract that is not an Assigned Contract;

(f)    all rights under or arising out of (i) director or officer insurance policies and (ii) any other insurance policies;

(g)    any rights, Claims or causes of action of Sellers under this Agreement or any other Transaction Document;

(h)    other than the Corporate Assets, all properties, rights, Claims, and assets exclusively used in the Excluded Business, including the Foxtail Facilities (the "*Excluded Business Assets*");

(i)    any intercompany Contracts, claims, obligations, and receivables solely between or among one or more Sellers and/or any Affiliates of any of Sellers, regardless of the subject matter of such transaction;

(j)    any prepaid deposits related to professional fee retainers;

(k)    the Wind Down and Professional Expenses Escrow;

(l)    the Sales Proceeds Escrow;

(m)    any Credit Support in effect prior to the Closing Date, including any Credit Support pursuant to the Prepetition Bank of America Credit Agreement (including, with respect thereto, any cash, cash equivalents, cash proceeds or other net refund amounts returned or

refunded, or due to be returned or refunded, pursuant to any Credit Support in effect prior to the Closing Date);

(n)    any deposits, escrows, surety bonds or other financial assurance to the extent relating primarily to any other Excluded Assets or Excluded Liabilities;

(o)    any other properties, rights, Claims or assets listed on Schedule 2.2(o);

(p)    all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Sellers, including any of the foregoing in the accounts set forth on Schedule 2.2(p), in each case, other than Petty Cash;

(q)    the Carve Out Escrow; and

(r)    all Excluded Accounts Receivable.

2.3    <u>Assumed Liabilities</u>.  Subject to entry of the Sale Order and the adjustment for Specified Net Adjustment contemplated by this Agreement, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall, effective at the time of the Closing, assume and agree to promptly discharge and perform when due, only the following Liabilities, responsibilities and obligations of any Seller (the "***Assumed Liabilities***"), and no other Liabilities:

(a)    all Liabilities under the Assigned Contracts to the extent such obligations relate to and are required to be performed during periods after the Closing (but not including any Liabilities arising from a breach or default or an Assigned Contract by any Seller);

(b)    all Cure Costs (subject to <u>Section 2.5</u>);

(c)    any Trade Payables;

(d)    those specific Liabilities of Sellers, if any, identified on Schedule 2.3(d);

(e)    subject to <u>Section 8.1</u>, all Liabilities with respect to Taxes imposed on the Business, the Acquired Assets or the Assumed Liabilities that are attributable to any Post-Closing Tax Period and all Transfer Taxes;

(f)    all Liabilities arising under any valid and outstanding gift cards, gift certificates, or other pre-paid promotional items issued by any Seller or any Franchisee with respect to the Business prior to the Closing (the "***Pre-Closing Gift Card Liabilities***");

(g)    all Marketing Fund Liabilities;

(h)    all Liabilities with respect to all Buyer Employees that arise on or after the Closing Date; and

(i)      all Liabilities in respect of any Buyer Benefit Plan and/or specific Liabilities of Sellers (if any) related to Buyer Employees, as identified on Schedule 2.3(i) (the "***Assumed Benefits***"), provided, however, that, for the avoidance of doubt (A) Buyer shall not assume or be responsible for any Retention Expenses or accrued vacation, sick pay or bonuses and (B) any such accrued and earned vacation and sick pay and such Retention Expenses and bonuses with respect to Offered Employees shall be paid in accordance with the terms of Section 8.4(e).

The assumption by Buyer or any of its applicable Buyer Designees of any Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4      Excluded Liabilities.  Notwithstanding any provision in this Agreement to the contrary, neither Buyer nor any Buyer Designee shall assume, nor shall Buyer or any of its applicable Buyer Designees be obligated to assume or be obliged to pay, perform or otherwise discharge, any Liability of, or Liability against, Sellers, Sellers' Subsidiaries, the Business or the Acquired Assets, other than the Assumed Liabilities, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers and their Subsidiaries, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "***Excluded Liabilities***").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of Sellers and Sellers' Subsidiaries other than the Assumed Liabilities (whether the same are disclosed to Buyer pursuant to this Agreement or otherwise):

(a)      any and all Liabilities for Indebtedness with respect to borrowed money (other than obligations with respect to capitalized leases that are Assigned Contracts);

(b)      all guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations under any Credit Support, including the Credit Support set forth in Schedule 2.4(b);

(c)      subject to Section 8.1, all Liabilities related to Taxes that are not expressly assumed by Buyer under Section 2.3, including (i) all Liabilities with respect to Taxes imposed on the Business or the Acquired Assets that are attributable to any Pre-Closing Tax Period, (ii) all income Tax or similar Liabilities of Sellers for any Tax period, and (iii) any Tax or similar Liability related to the Excluded Assets;

(d)      all Liabilities relating to any Action (i) that is pending or has been threatened against any Seller or the properties or assets of the Business prior to or at Closing (including any Action or Order set forth on Schedule 5.9) or (ii) to the extent arising from, relating to or otherwise in respect of the ownership or operation of the Business or the Acquired Assets prior to the Closing (even if instituted after the Closing);

(e)      all workers' compensation claims and occupational health claims related to the Acquired Assets, including with respect to Buyer Employees and former employees of Sellers who were employed by the Business or at or with respect to the Acquired Assets, in each case, to the extent relating to the ownership or operation of the Business or the Acquired Assets prior to the Closing;

(f)        except for the Assumed Benefits, any Liability of Sellers arising under, relating to or with respect to any single employer "employee pension benefit plan" (as defined in Section 3(2) of ERISA) or Multiemployer Plan;

(g)        except with respect to the Assumed Benefits or as otherwise provided for in this Agreement, all Liabilities of Sellers and their Affiliates, including any predecessors, to or in respect of any former or current Employee or both (or their representatives or beneficiaries) arising prior to the Closing Date including the following to the extent arising prior to the Closing Date: (i) for salary, wages, health care and other welfare benefits (including COBRA), vacation, payroll, sick leave, unemployment benefits, retirement benefits, pension benefits, employee stock option, equity compensation, employee stock purchase, profit sharing plans, supplies or overhead, (ii) arising under any claims of wrongful discharge or discrimination, (iii) severance and/or termination liabilities, (iv) obligations under employment contracts, (v) any change in control or other amounts or benefits payable to any current or former officers, directors or employees as a result of the transactions contemplated by this Agreement, and (vi) arising under any other employee plans, practices, programs or arrangements or benefits or other compensation of any kind to any employee, including under any Benefit Plan that is not a Buyer Benefit Plan;

(h)        all Liabilities relating to or arising out of any Excluded Asset;

(i)        all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Bankruptcy Case by Sellers (including all Seller Retained Professional Fees and all Estimated Wind Down Expenses); and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated by this Agreement by Sellers;

(j)        all Liabilities relating to the sale of alcohol or the serving of alcohol prior to Closing;

(k)        all Retention Expenses and all Liabilities arising under the KEIP;

(l)        except as set forth in Sections 2.3(b), 2.3(c), 2.3(d), 2.3(f), 2.3(g) and 2.3(i), all Liabilities relating to the conduct of the Business or to the Acquired Assets (and the use thereof) to the extent arising or relating to any period prior to the Closing (including all Liabilities arising from any breach of Environmental Laws or any release of Hazardous Substances occurring prior to the Closing); and

(m)        all Liabilities relating to or arising out of the Excluded Business Assets.

2.5        Assignment and Assumption of Contracts.

(a)        Assignment and Assumption at Closing.

(i)        Schedule 2.5(a) sets forth a list of all executory Contracts primarily relating to the Business (including all Leases, Franchise Agreements and Buyer Benefit Plans primarily relating to the Business) to which one or more of Sellers are party and which are to be included in the Acquired Assets (the "**Assigned Contracts**") and

Sellers' good faith estimate of the Cure Costs as of the Execution Date (such Schedule 2.5(a), as such exists at the time of execution of this Agreement without any additions or deletions, the "***Execution Date Contract Schedule***"). Sellers have made, or will, upon Buyer's requests make, available to Buyer a true, correct and complete copy of all Contracts (including amendments and modifications thereto) included on the Execution Date Contract Schedule. As of the Execution Date, Buyer has preliminarily agreed to assume all executory Contracts set forth on the Execution Date Contract Schedule; however, at or before 12:01 p.m. (Eastern Daylight Time) on October 16, 2019 (the "***Determination Date***", where reference to such date in this Agreement shall mean, as applicable, such date as of immediately following such time), Sellers shall make such additions and deletions to Schedule 2.5(a) as Buyer shall request in writing; provided, however, that any such additional Contracts are Contracts primarily relating to the Business. Any such added Contract shall be deemed an Assigned Contract. Other than any Disputed Contracts (as provided below), all Contracts of Sellers that are not listed on Schedule 2.5(a) as of the Determination Date shall not be considered an Assigned Contract or Acquired Asset and shall be deemed "***Rejected Contracts***" as of the Closing. For the avoidance of doubt, Buyer shall not assume or otherwise have any Liability with respect to any Rejected Contract. Notwithstanding the foregoing, if an Assigned Contract is subject to a cure dispute with the counterparty thereto or other dispute with the counterparty thereto as to the assumption or assignment of such Assigned Contract that has not been resolved to the mutual satisfaction of Buyer, Sellers and such counterparty prior to the Determination Date (any such Contract, a "***Disputed Contract***"), and if Buyer directs Sellers to delete such Contract from Schedule 2.5(a) prior to the Closing Date, then, in each case, with the written permission of such counterparty (or an order of the Bankruptcy Court) and with the consent of Buyer and Seller (such consent not to be unreasonable withheld, conditioned or delayed but in any event at no cost or Liability to Sellers), then the Determination Date shall be extended (but only with respect to each such Disputed Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer, Sellers and such counterparty, (B) the date on which such Disputed Contract is deemed rejected by operation of 11 U.S.C. § 365(d)(4), (C) the date required by the Bankruptcy Court and (D) December 31, 2019 (unless otherwise agreed by Buyer, Sellers and the applicable counterparty, the "***Extended Contract Period***"). If such any Disputed Contract is not expressly assumed by Buyer in writing by the end of such Extended Contract Period, such Disputed Contract shall be automatically deemed a Rejected Contract. Notwithstanding the foregoing, Buyer agrees to designate a minimum of forty (40) Leases as Assigned Contracts under this Agreement.

    (ii)  Sellers shall use commercially reasonable efforts to take all actions required to assume and assign the Assigned Contracts to Buyer or any of its applicable Buyer Designees (other than payment of Cure Costs, if so required), including taking all actions required to obtain an Order containing a finding that the proposed assumption and assignment of the Assigned Contracts to Buyer or the applicable Buyer Designee satisfies all applicable requirements of section 365 of the Bankruptcy Code;

provided, however, notwithstanding the foregoing, no monetary amount shall be required to be paid or incurred by Sellers in connection with any consent or approval from any

Person that is required to assume and assign any Assigned Contracts to Buyer or any of its applicable Buyer Designees.

        (iii)    As soon as practicable following the Closing, (x) Sellers shall, pursuant to the Sale Order and the Assumption Agreement, assign to Buyer or the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assigned Contracts that is capable of being assumed and assigned and (y) Buyer or the applicable Buyer Designee shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among Buyer and Sellers or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assigned Contracts, pursuant to the Assumption Agreement.

        (b)    <u>Previously Omitted Contracts</u>.  If prior to or following the Closing, it is discovered that a Contract primarily related to the Business should have been listed on <u>Schedule 2.5(a)</u> but was not listed on <u>Schedule 2.5(a)</u> (any such Contract, a "***Previously Omitted Contract***"), Sellers shall use commercially reasonable efforts to promptly deliver to Buyer, or make available at Buyer's request, a true, correct and complete copy of all such Previously Omitted Contracts (including amendments and modifications thereto).  On or after the Closing Date, Buyer shall have the right (but not the obligation) in its sole and absolute discretion to have any Previously Omitted Contract assumed and assigned to Buyer (for no additional consideration), and upon any assumption and assignment of such Previously Omitted Contract to Buyer, such Contract shall become an Assigned Contract and Assumed Liability; <u>provided</u>, that, subject to <u>Section 3.2</u> and <u>Section 3.3</u>, Buyer shall be responsible for and shall promptly pay all Cure Costs associated therewith.  Any Previously Omitted Contract not assumed and assigned to Buyer pursuant to this <u>Section 2.5(b)</u> shall be deemed a Rejected Contract.

        (c)    <u>Shared Contracts</u>.  Sellers and Buyer shall use commercially reasonable efforts (which efforts shall not, for the avoidance of doubt, include any efforts or actions that could be materially detrimental to the Business) to assist the applicable purchasers of any of the Excluded Business to negotiate and enter into new Contracts with respect to those certain Contracts set forth on <u>Schedule 2.5(c)</u>.

        (d)    <u>Assigned Contracts; Cure Cap</u>.  In the event that the actual aggregate Cure Costs for all of the Assigned Contracts will exceed the Cure Cap at Closing, then each Assigned Contract that has a Cure Cost that exceeds the estimated Cure Cost for such Assigned Contract set forth on the Execution Date Contract Schedule shall be deleted from <u>Schedule 2.5(a)</u> (and therefore not be an Assigned Contract) and shall be an Excluded Contract and an Excluded Liability unless Buyer elects, in its sole and absolute discretion, by written notice to Sellers by the Determination Date, to assume and assign such Contract and, if Buyer so elects to assume and assign such Contract, then such Contract shall be an Assigned Contract and Buyer shall be liable for all Cure Costs associated with such Assigned Contract.

        (e)    <u>Obligation to Maintain Seller Contracts Until the Closing; Amendments</u>.

        (i)    From and after the date hereof until the Closing, Sellers shall not reject or alter in any material respect (other than alterations in the Ordinary Course of

Business) the terms of Contracts listed on <u>Schedule 2.5(a)</u> unless otherwise agreed to in writing by Buyer.  Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to such Contracts (excluding any Seller or Subsidiary thereof) in accordance with the Bidding Procedures and take all other actions reasonable and necessary to cause such Contracts to be assigned to Buyer or Buyer's designee pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at the Closing or later with respect to Disputed Contracts or Previously Omitted Contracts, as provided hereunder.

         (ii)    At Buyer's request and sole cost and expense, Sellers shall reasonably cooperate with Buyer to allow Buyer to enter into an amendment to any Contract listed on <u>Schedule 2.5(a)</u> to be effective upon assumption by Buyer of such Contract as an Assigned Contract and shall cooperate with Buyer in good faith to the extent reasonably requested in negotiations with counterparties thereto (including with respect to any Disputed Contract).

        (f)    <u>Non-Assignment of Contracts and Permits</u>.    Notwithstanding anything contained in this Agreement to the contrary but subject to the last sentence of this <u>Section 2.5(f)</u>, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof, or in any way adversely affect any of the rights of Buyer or the applicable Buyer Designee, as the assignee or transferee of such Contract or Permit (as the case may be), thereunder.  If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of Sellers, such consent or approval is required but not obtained with respect to an Assigned Contract or a Permit, neither Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor shall the Closing be delayed in respect of the Assigned Contracts or the Permits; <u>provided</u>, <u>however</u>, if the Closing occurs, then, with respect to any Assigned Contract or Permit for which consent or approval is required but not obtained, from and after the Closing, Sellers shall cooperate, without further consideration, with Buyer or the applicable Buyer Designee in any reasonable arrangement Buyer or the applicable Buyer Designee may request to provide Buyer or the applicable Buyer Designee with all of the benefits of, or under, the applicable Assigned Contract or applicable Permit, including enforcement for the benefit of Buyer or the applicable Buyer Designee of any and all rights of Sellers against any party to the applicable Assigned Contract or applicable Permit arising out of the breach or cancellation thereof by such party; <u>provided</u>, <u>however</u>, to the extent that any such arrangement has been made to provide Buyer or the applicable Buyer Designee with the benefits of, or under, the applicable Assigned Contract or applicable Permit, from and after Closing, Buyer or the applicable Buyer Designee shall be responsible for, and shall promptly pay all payments, costs, expenses and other obligations under such Assigned Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assigned Contract or Permit had been assigned or transferred at Closing with respect to Assigned Contracts and Permits, and at such applicable later date specified in this <u>Section 2.5(f)</u> with respect to any additional Assigned Contracts.  Any assignment to Buyer or the applicable Buyer Designee of any Assigned Contract or Permit that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made

subject to such consent or approval being obtained.  Notwithstanding the foregoing, nothing in this Section 2.5(f) shall (i) prevent any Seller from, or require any Seller to delay, the winding down of their bankruptcy estates, (ii) require any of Sellers to pay or incur any monetary amount (other than Cure Costs), (iii) impose on any Seller any burdens not expressly imposed on such Seller pursuant to the other provisions of this Agreement, or (iv) require any Seller to become involved in any Action.

       2.6     Foxtail Sale.  In connection with the acquisition of the Foxtail Business by a third party (a "*Foxtail Sale*" and such third party, a "*Foxtail Purchaser*"), the Buyer and the Foxtail Purchaser shall (i) execute and deliver an amended and restated Foxtail supply agreement (an "*Amended and Restated Foxtail Supply Agreement*"), in the form attached hereto as **Exhibit G**, and (ii) if required by the Foxtail Purchaser, execute and deliver a transition services agreement (the "*Transition Services Agreement*"), in the form attached hereto as **Exhibit H**. Notwithstanding the foregoing or anything in this Agreement to the contrary, Buyer shall have sole and absolute discretion to accept or reject any proposed changes to the Amended and Restated Foxtail Supply Agreement and Transition Services Agreement from the forms attached hereto.

       2.7     Estate Transition.  The Parties shall negotiate in good faith a transition services agreement (the "*Estate Transition Services Agreement*") to support the bankruptcy estates of Sellers, it being understood that the form of Estate Transition Services Agreement attached hereto as **Exhibit I** is acceptable to Buyer.  Notwithstanding the foregoing or anything in this Agreement to the contrary, Buyer shall have sole and absolute discretion to accept or reject any proposed changes to the Estate Transition Services Agreement from the form attached hereto.

       2.8     Further Assurances.

       At and after the Closing, and without further consideration therefor, Sellers shall execute and deliver to Buyer or the applicable Buyer Designee such further instruments and certificates as shall be necessary (a) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, Sellers' right, title or interest in, to or under any or all of the Acquired Assets and the Business free and clear of any and all Encumbrances (other than Permitted Encumbrances) or (b) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets and exercising rights with respect thereto.  Each Seller, on the one hand, and Buyer, on the other hand, shall take, or cause to be taken, all actions and shall do, or cause to be done all things as may be reasonably requested by the other Party in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be reasonably required to consummate the transactions contemplated by this Agreement.  Without limiting the generality of this Section 2.8, Sellers shall take all commercially reasonable actions necessary to transfer all Permits or assist Buyer in obtaining new Permits relating to the sale and serving of alcohol by the Business without interruption following the Closing; provided, however, that in no event shall Sellers be obligated to incur or pay any costs, fees or expenses in connection therewith.  To the fullest extent permitted by applicable law, Sellers hereby authorize Buyer or Buyer Designees and their assignees and give Buyer or Buyer Designees and their assignees its irrevocable power of attorney, with full power

of substitution, which authorization shall be coupled with an interest, to take any and all steps in Sellers' respective names and on behalf of Sellers that are necessary or desirable in the reasonable determination of Buyer and its assignees to assign, transfer, endorse, negotiate, deposit or otherwise realize on any Acquired Asset or any writing of any kind in connection with any Acquired Asset if Sellers do not do so within a reasonable period of time after receipt of a request from Buyer.

## ARTICLE 3

### PURCHASE PRICE

3.1     Consideration.  The aggregate consideration (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets shall consist of:

(a)     (i) cash equal to $51,500,000 (the "**Initial Purchase Price**"), plus (ii) Final Specified Net Adjustment (which may be positive or negative) (such cash consideration described in this clause (a), whether or not reduced, the "**Cash Consideration**"); and

(b)     the assumption by Buyer or any of its applicable Buyer Designees of the Assumed Liabilities from Sellers.

3.2     Specified Liabilities Adjustment.

(a)     Buyer shall (with the assistance of Sellers), at or before one (1) Business Day after the Determination Date, cause to be prepared and delivered to Sellers a good faith estimate of Cure Costs that will be payable with respect to the Leases that will be Assigned Contracts at Closing (such Leases, the "**Specified Leases**" and such Cure Costs, the "**Estimated Lease Cure Costs**").  Sellers shall, on the Business Day immediately following the delivery of such estimate by Buyer, cause to be prepared and delivered to Buyer a statement (the "**Preliminary Statement**"), setting forth (i) Sellers' good faith line item calculation of estimated Specified Net Adjustment (the "**Estimated Specified Net Adjustment**"); provided, that amounts for Cure Costs relating to Leases included in such estimate shall include all Cure Costs for the Specified Leases and (ii) a calculation of the Cash Consideration using the Estimated Specified Net Adjustment in lieu of Final Specified Net Adjustment (the "**Estimated Cash Consideration**"), in each case together with reasonable supporting documentation. The Estimated Specified Net Adjustment and Estimated Cash Consideration shall be calculated in accordance with the Accounting Principles and in good faith consultation with Buyer, it being understood that the components thereof shall be binding on Sellers (other than with respect to Estimated Lease Cure Costs).  Thereafter, at the request of Buyer, Sellers shall give Buyer reasonable access during normal business hours to documents and the books and records of each Seller and supporting schedules, analyses, workpapers and other underlying documentation that are relevant to the calculation of the Estimated Specified Net Adjustment and the Estimated Cash Consideration; provided, however, that (y) the provision of any such information or access will be subject to appropriate confidentiality undertakings and, if applicable, execution of customary release letters in favor of the auditors as requested by the auditors in connection with the sharing of such information and work papers, and (z) nothing herein will require Sellers to disclose information that is subject to

34

attorney-client privilege or is otherwise prohibited from disclosure by Legal Requirements. In addition, Sellers shall make their respective Representatives reasonably available to answer questions with respect to the calculation of the Estimated Specified Net Adjustment. Sellers and Buyer shall cooperate in good faith and endeavor to resolve any disputes regarding the calculation of the Estimated Specified Net Adjustment and the Estimated Cash Consideration prior to Closing.

(b)    Within seventy-five (75) days after the Closing Date (the "*Adjustment Statement Date*"*)*, Buyer shall cause to be prepared and delivered to the Company a statement (the "*Adjustment Statement*") setting forth Buyer's proposed line item calculations of (i) Final Specified Net Adjustment and (ii) the Cash Consideration using the amounts set forth in the Adjustment Statement, in each case together with reasonable supporting documentation; provided, that such calculations shall provide (A) a credit equal to ten percent (10%) of the Post-Closing Lease Savings to the extent not reflected in the Estimated Specified Net Adjustment and (B) a credit for any Cure Costs reflected in the Preliminary Statement with respect to Leases to the extent such Cure Costs have been reduced or relate to Leases not assumed by Buyer as of the Adjustment Statement Date. The Adjustment Statement shall also set forth the proposed Final Adjustment Amount, which shall be the amount by which Buyer's proposed calculation of the Cash Consideration exceeds, or is less than, the Estimated Cash Consideration. Following such delivery, Buyer shall provide the Company and its accountants with reasonable access during normal business hours to the books and records as necessary in connection with its review of the Adjustment Statement; provided, however, that (y) the provision of any such information or access will be subject to appropriate confidentiality undertakings and, if applicable, execution of customary release letters in favor of the auditors as requested by the auditors in connection with the sharing of such information and work papers, and (z) nothing herein will require Buyer to disclose information that is subject to attorney-client privilege or is otherwise prohibited from disclosure by Legal Requirements.

(c)    The Company shall be entitled to dispute Buyer's proposed changes to the Estimated Specified Net Adjustment that are included in its proposed calculation of Final Specified Net Adjustment and the Final Adjustment Amount set forth in the Adjustment Statement if the Company delivers a written notice ("*Objection Notice*") to Buyer within thirty (30) days after delivery of the Adjustment Statement in which describes its good faith objections in reasonable detail to Buyer's proposed calculations of Final Specified Net Adjustment and the Final Adjustment Amount. The Objection Notice shall contain the Company's calculation of each line item shown on the Adjustment Statement so disputed and the amount in dispute (collectively, the "*Disputed Amounts*") and reasonable supporting documentation for each Disputed Amount (to the extent available). If no Objection Notice is delivered within the time period specified in this Section 3.2, the Company shall be deemed to have accepted and agreed to the Adjustment Statement and Buyer's calculation of the Final Adjustment Amount and the Cash Consideration shall be final, binding and conclusive on the Parties, and the payment provided for in Section 3.3 shall be based on such amount. Items on the Adjustment Statement that are not Disputed Amounts reflected in the Objection Notice provided in accordance with this Section 3.2(c) shall be final, binding and conclusive on the Parties.

(d)    If the Company delivers an Objection Notice to Buyer within the time period specified in Section 3.2(c) above, Buyer and the Company shall attempt in good faith to agree upon the Disputed Amounts and the resulting adjustment to the calculation of the

Specified Net Adjustment and the resulting Final Adjustment Amount during the period commencing on the Objection Date and ending thirty (30) days thereafter (the "***Negotiation Period***").

(e)    If Buyer and the Company agree in writing prior to the expiration of the Negotiation Period on resolution of all Disputed Amounts and the resulting adjustment to the calculation of the Specified Net Adjustment and the resulting Final Adjustment Amount (whether such amount is the same as or different from the amount calculated based upon the Adjustment Statement), the payment provided for in Section 3.3 shall be based upon the agreed upon amount

(f)    If Buyer and the Company do not agree in writing prior to the expiration of the Negotiation Period on a resolution of the Disputed Amounts and the amount of the Final Adjustment Amount, then either Buyer or the Company may submit the unresolved Disputed Amounts (but no other matters) to Ernst & Young LLP, PricewaterhouseCoopers LLP or Grant Thornton LLP or, if such firms decline to serve as accounting arbiter, such other firm of independent public accountants mutually agreed upon by Buyer and the Company (in either case, the "***Final Arbiter***"), for final and binding resolution in accordance with this Section 3.2(f). The Final Arbiter shall make a final and binding determination as to such unresolved Disputed Amounts and the resulting determination of Final Specified Net Adjustment and the Cash Consideration and the Final Adjustment Amount in accordance with the guidelines and procedures set forth in this Agreement and in the Final Arbiter Procedures. In determining the proper calculation of such unresolved Disputed Amounts, the Final Arbiter shall be bound by the terms of this Section 3.2(f) and the Final Arbiter Procedures and may not increase the amount of any such unresolved Disputed Amount above the highest amount or decrease any item below the lowest amount set forth in the Preliminary Statement or the Adjustment Statement, as applicable. The Parties will cooperate in good faith with the Final Arbiter during the term of its engagement. The determination of Final Specified Net Adjustment, together with a calculation of the Cash Consideration and the Final Adjustment Amount that results from such determination, shall become final and binding on the Parties on the date the Final Arbiter delivers its final resolution to the Parties, absent fraud or manifest error. All fees and expenses relating to the work, if any, to be performed by the Final Arbiter (including any retainer) shall be borne by Buyer, on the one hand, and the Company, on the other hand, in inverse proportion to the dollar amount of the matters in dispute as to which such party prevails as finally determined by the Final Arbiter, which proportionate allocations shall also be determined by the Final Arbiter at the time it renders its determination on the merits of the matters in dispute.

3.3    Post-Closing Adjustment. No later than five (5) Business Days after a final determination of the Final Specified Net Adjustment, Cash Consideration and the Final Adjustment Amount has been made in accordance with Section 3.2:

(a)    If the Cash Consideration as finally determined pursuant to Section 3.2(c), Section 3.2(e) or by the Final Arbiter exceeds the Estimated Cash Consideration, Buyer shall make a payment equal to such excess in immediately available funds to the Sale Proceeds Escrow.

(b)    If the Estimated Cash Consideration exceeds the Cash Consideration as finally determined pursuant to Section 3.2(c), Section 3.2(e) or by the Final Arbiter, Buyer and

Sellers shall jointly instruct the Escrow Agent to release a payment from the Specified Adjustment Escrow equal to such excess, in immediately available funds, to such account or accounts as designated in writing by Buyer; provided, however, that, except in the event of actual fraud by any Seller,

(i)     Buyer's sole recourse for any such Estimated Cash Consideration in excess of the Cash Consideration shall be the amount contained in the Specified Adjustment Escrow and (ii) in no event shall Buyer be entitled to any payment greater than the Specified Adjustment Escrow Amount (even in the event the amount in which the Estimated Cash Consideration exceeds the Cash Consideration is greater than the Specified Adjustment Escrow Amount). In the event that payments required to be made to Buyer from the Specified Adjustment Escrow pursuant to this Section 3.3(b) are less than the amounts then in the Specified Adjustment Escrow, Buyer and Sellers shall jointly instruct the Escrow Agent to release an amount equal to the Specified Adjustment Escrow Amount, less any amounts required to be paid to Buyer pursuant to this Section 3.3(b) to the Sale Proceeds Escrow.

(c)     The amount to be paid pursuant to this Section 3.3 (and as finally determined in accordance with Section 3.2) is referred to herein as the "*Final Adjustment Amount*." If the Cash Consideration as finally determined pursuant to Section 3.2(c), Section 3.2(e) or by the Final Arbiter equals the Estimated Closing Consideration, no Final Adjustment Amount will be paid by Buyer or Sellers and Buyer and Sellers shall jointly instruct the Escrow Agent to release all amounts in the Specified Adjustment Escrow to the Sale Proceeds Escrow.

(d)     All payments made pursuant to this Section 3.3 shall be treated by all Parties for Tax purposes as adjustments to the Purchase Price.

3.4     Allocation of Purchase Price.

(a)     Following the Closing Date, the Cash Consideration, and the applicable Assumed Liabilities shall be allocated among the Acquired Assets of the Business as set forth in Section 3.4(a)(i) and Section 3.4(a)(ii).

(i)     Within forty-five (45) days after the final determination of the Final Adjustment Amount, Buyer shall prepare and deliver to Sellers, or any trustee appointed under the terms set forth in any bankruptcy plan confirmed by Sellers or as otherwise appointed (as applicable), a statement allocating the sum of the Cash Consideration, the Assumed Liabilities and other relevant items among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (such statement, the "*Allocation Statement*"). If within fifteen (15) days after the receipt of the proposed Allocation Statement, Sellers' notify Buyer in writing that Sellers' disagree with the proposed Allocation Statement, then Sellers and Buyer shall attempt in good faith to resolve their disagreement within the twenty (20) days following Sellers' notification to Buyer of such disagreement. If Sellers do not so notify Buyer within fifteen (15) days of receipt of the proposed Allocation Statement, or upon resolution of the dispute by Buyer and Sellers, the proposed Allocation Statement shall

become the final Allocation Statement.  The Parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position inconsistent therewith in any Tax Return (including IRS Form 8594), in any Tax refund claim, in any litigation or otherwise, unless required by Legal Requirements or as may be adjusted by subsequent agreement following an audit by the IRS (or by an applicable state or local taxing authority). Notwithstanding anything in this Agreement to the contrary, in the event Buyer and Sellers are unable to agree to an Allocation Statement pursuant to this <u>Section 3.4</u>, the dispute mechanics of <u>Section 3.2(f)</u> shall apply to this <u>Section 3.4</u>, *mutatis mutandis*.

(ii)    Each Party shall deliver to the other Party a copy of its Form 8594 no later than thirty (30) days prior to the filing of their respective Forms 8594 relating to this transaction.

3.5    <u>Pre-Closing Accounts Receivable</u>.  In the event any Seller or its estate receives any payment to the extent in respect of the conduct of the Business after the Closing, Sellers agree to remit promptly (or cause to be remitted promptly) such funds to Buyer.  In the event that Buyer receives any payment in respect of (i) the conduct of any Excluded Business, Buyer agrees to remit promptly (or cause to be remitted promptly) such funds to the applicable Seller.

3.6    <u>Withholding</u>.  Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to withhold and deduct from any consideration payable or otherwise deliverable pursuant to this Agreement such amounts as such Person is required to deduct and withhold under the Code or any provision of state, local or foreign Legal Requirements.  To the extent that amounts are so deducted or withheld and paid over to the appropriate Governmental Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made.

## ARTICLE 4

### CLOSING AND DELIVERIES

4.1    <u>Closing Date</u>.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "***Closing***") shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, 2001 K Street N.W., Washington, DC 20006, or via overnight courier, facsimile or portable document format (.pdf) as agreed by the parties hereto, on the date that is the later of (a) five (5) Business Days following the date on which all the conditions set forth in <u>Article 9</u> and <u>Article 10</u> have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions at the Closing) and (b) October 21, 2019 (or on such other date and time as Sellers and Buyer may mutually agree in writing).  The date and time at which the Closing actually occurs is hereinafter referred to as the "***Closing Date***."  Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

4.2    <u>Buyer's Deliveries</u>.  At the Closing, Buyer shall deliver to Sellers:

(a)    the Estimated Cash Consideration (including any good faith deposit previously advanced by Buyer) in cash by wire transfer of immediately available funds to the accounts specified by Sellers to Buyer at least three (3) days prior to the anticipated Closing Date as follows:

(i)    an amount equal to the Seller Retained Professional Fees into the Wind Down and Professional Expenses Escrow for the purpose of paying the Seller Retained Professional Fees;

(ii)    an amount equal to the Estimated Wind Down Expenses into the Wind Down and Professional Expenses Escrow for the purpose of winding down the bankruptcy estates of Sellers;

(iii)    an amount equal to the Specified Adjustment Escrow Amount into the Specified Adjustment Escrow solely for the purpose of paying any amounts payable by Sellers pursuant to <u>Section 3.3</u>;

(iv)    an amount equal to the Sales Proceeds into the Sales Proceeds Escrow; and

(v)    an amount equal to the Carve Out Amount into the Carve Out Escrow, if any.

(b)    the Assignment and Assumption Agreement, duly executed by Buyer or the applicable Buyer Designee;

(c)    subject to <u>Section 2.6</u>, the Transition Services Agreement, duly executed by Buyer;

(d)    subject to <u>Section 2.6</u>, the Amended and Restated Foxtail Supply Agreement, duly executed by Buyer;

(e)    subject to <u>Section 2.7</u>, the Estate Transition Services Agreement, duly executed by Buyer;

(f)    each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(g)    the certificates of Buyer to be received by Sellers pursuant to <u>Sections 10.1</u> and <u>10.2</u>;

(h)    a certificate of an authorized officer, manager or managing member of Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to Sellers, as to Buyer's and each Buyer Designee's authorization to execute and perform its obligations under the Transaction Documents to which each of them is a party; and

39

(i)        such other documents as Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

4.3    <u>Sellers' Deliveries</u>.  At the Closing, Sellers shall deliver to Buyer:

(a)        possession of the Acquired Assets and the Business;

(b)        the Bills of Sale, the Deeds, the Assignment and Assumption Agreement and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers;

(c)        subject to <u>Section 2.6</u>, the Transition Services Agreement, duly executed by the Foxtail Purchaser;

(d)        subject to <u>Section 2.6</u>, the Amended and Restated Foxtail Supply Agreement, duly executed by the Foxtail Purchaser;

(e)        subject to <u>Section 2.7</u>, the Estate Transition Services Agreement, duly executed by the applicable Sellers;

(f)        instruments of assignment of the Patents and Trademarks that are owned by Sellers and included in the Acquired Assets, if any, duly executed by the applicable Sellers, in form for recordation with the appropriate Governmental Authorities, in customary form and reasonably acceptable to the Parties;

(g)        with respect to the Leased Real Property, possession of the Leased Real Property, together with any and all keys, access cards, security passcodes and combinations, any existing surveys, legal descriptions and title policies concerning the Leased Real Property that are in the possession of Sellers, which shall be deemed to be delivered to the extent located at any Leased Real Property;

(h)        a certified copy of the Sale Order;

(i)        the certificates of Sellers to be received by Buyer pursuant to <u>Sections 9.1</u> and <u>9.2</u>;

(j)        certificates executed by each Seller (or if Seller is disregarded as an entity for U.S. federal income tax purposes, the direct or indirect regarded parent of Seller), in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller (or such Person) is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(k)        such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer (including separate assignments and assumptions of lease for included parcels of Leased Real Property), in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Sellers in, to or under any or all the Acquired Assets, including Owned Real Property;

(l)      a certificate of an authorized officer, manager or managing member of the Company, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer, as to Sellers' authorization to execute and perform its obligations under the Transaction Documents to which Sellers are a party;

(m)      releases and termination statements sufficient for Buyer to receive the Acquired Assets free and clear of any and all Encumbrances (other than Permitted Encumbrances); provided, however, that releases shall not be required with respect to Encumbrances that are both (a) released by the Sale Order and (b) not required to be released at Closing pursuant to releases and termination statements in connection with a financing or debt facility obtained by Buyer; and

(n)      such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby, jointly and severally, represent and warrant to Buyer as follows, except as set forth in the corresponding numbered section of the Disclosure Schedules attached hereto:

5.1      Organization and Good Standing.  Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Each Seller has all requisite corporate or limited liability company power and authority to own or lease and to operate and use its properties and assets and to carry on its Business as now conducted. Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their Business or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.  Schedule 5.1 contains a correct and complete list of each jurisdiction where each Seller is qualified or licensed to do business.

5.2      Authority; Validity; Consents.  Each Seller has, subject to entry of the Sale Order, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate or limited liability company action.  This Agreement has been duly and validly executed and delivered by each Seller, and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing.  Subject to entry of the Sale Order, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, the legal, valid

and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Subject to entry of the Sale Order, except, in each case, (a) for notices, filings and consents required in connection with the Bankruptcy Case and (b) for the notices, filings and consents set forth on Schedule 5.2, Sellers are not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

       5.3    Subsidiaries.  Except as set forth in Schedule 5.3, no Seller (a) has any direct or indirect Subsidiaries; (b) has any direct or indirect interest in, or is under any current or prospective obligation to receive an interest in, any shares or other equity or ownership interest in any other Person; or (c) is a member of or participant in any partnership, joint venture or similar entity.

       5.4    No Conflict.  Except as set forth in Schedule 5.4, neither the execution and delivery by any Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Sale Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order, compliance by it with any of the provisions hereof or thereof will (with or without notice or lapse of time, or both) (a) conflict with or result in a violation or breach of (i) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of such Seller or (ii) any Legal Requirement binding upon such Seller or by which the Business or any Acquired Assets are subject or bound, (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under (or an event, which with notice or lapse of time or both, would become a default), or give rise to any right of termination, modification, cancellation or acceleration under (i) any Assigned Contract (other than any Buyer Benefit Plan) or (ii) any Transferred Permit set forth on Schedule 2.1(e), or (c) result in the creation of any Encumbrance upon the Acquired Assets of such Seller or the Business being sold or transferred hereunder, except in each of clauses (a) and (c) above, as would not, individually or in the aggregate, be material to the Business or in clause (b) above, as would not, individually or in the aggregate, have a Material Adverse Effect.

       5.5    Real Property.

       (a)    Owned Real Property.  Except for Permitted Encumbrances and as set forth on Schedule 5.5(a)(i), Sellers have marketable fee simple title in the Owned Real Property set forth on Schedule 5.5(a).  Except for the Permitted Encumbrances and except as set forth on Schedule 5.5(a)(ii), none of the Owned Real Property is subject to any lease or grant to any Person of any right to the use, purchase or occupancy of such Owned Real Property or any portion thereof.  Except for Permitted Encumbrances, the Owned Real Property is not subject to any Encumbrances or to any use restrictions, exceptions, reservations or limitations, which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business and in the same manner after the Closing as conducted by Sellers prior to Closing.  There are no pending or, to Sellers' Knowledge, threatened condemnation proceedings relating to any of the Owned Real Property.

    (b)    <u>Leased Real Property</u>.

    (i)    <u>Schedule 5.5(b)(i)</u> contains a list of all Leased Real Property held, occupied, used or necessary for the operation of the Business. Prior to the date hereof, Buyer has either been supplied with, or has been given access to, true, correct and complete copies of each Lease and any amendments, modifications, renewals, guaranties and other Contracts thereto relating to such Leased Real Property. None of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use or occupancy of the Leased Real Property or any portion thereof. Sellers have a valid leasehold interest in each Leased Real Property that is not subject to any Encumbrances (other than Permitted Encumbrances). Each Lease is in full force and effect and is enforceable against Sellers, and to Sellers' Knowledge, the other parties thereto, except, in each case, as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity or as otherwise required by the Bankruptcy Court (including any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code). Neither Sellers nor, to Sellers' Knowledge, any other party to any Lease is in breach thereof or default thereunder, and to Seller's Knowledge there does not currently exist any conditions or circumstances that, upon the passage of time or the giving of notice or both, would constitute such a breach or default, except, in each case, for such breaches and defaults which would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the current use or occupancy of the applicable Leased Real Property.

    (ii)    Except as set forth on <u>Schedule 5.5(b)(ii)</u>, Seller has not received any written notice of: (i) proposed public improvement which that involve the creation or imposition of any Encumbrance on any lot, parcel or tract of land constituting any of the Leased Real Property, (ii) any pending or threatened eminent domain, condemnation, federal forfeiture or similar Action affecting all or any portion of the Leased Real Property, and (iii) any contemplated sale of any Leased Real Property in lieu of condemnation.

    (iii)    All Improvements and other facilities situated on any Real Property are supplied with all utilities and other services necessary for the current use thereof and are suitable for the purposes for which they are being used by Sellers. All roofs and structural elements of the Improvements are in a condition that does not, to Sellers' Knowledge, violate any Legal Requirement.

    5.6    <u>Environmental Matters</u>. Notwithstanding anything to the contrary in this Agreement, the representations and warranties contained in this <u>Section 5.6</u> are the sole and exclusive representations and warranties of Sellers pertaining or relating to any environmental matters, including any arising from or relating to any Environmental Law. Except as set forth on <u>Schedule 5.6</u>,

    (a)    Sellers' operation of the Business, and use of the Real Properties related thereto, have materially complied during the previous three (3) years and are in material compliance with all applicable Environmental Laws;

(b)     Sellers have not received any written notice alleging any violation, non-compliance, liability or potential liability regarding Environmental Laws with regard to any of the Real Properties or the Business;

(c)     To Sellers' Knowledge, no properties or facilities currently owned or operated by Sellers related to the Business, including the Real Properties, contain any Hazardous Substances in amounts or concentrations which constitute a violation of any Environmental Law or which would reasonably be expected to give rise to liability under any applicable Environmental Law;

(d)     No Action is pending or, to Sellers' Knowledge, threatened, under any Environmental Law against Sellers with respect to the Real Properties or the Business, nor are there any Orders outstanding under any Environmental Law with respect to the Real Properties or the Business;

(e)     Sellers (i) have obtained all Permits required under Environmental Law for the occupation of the Real Properties and the operation of the Business and (ii) have not received any written notice that the Permits required under Environmental Law will be cancelled, suspended, modified, or not renewed;

(f)     There has not been any offsite disposal of any Hazardous Substances by Seller or any of its Affiliates related to the Acquired Assets or the Business contrary to any Environmental Law;

(g)     Seller has made available to Buyer all environmental third-party audits or reports relating to the Acquired Assets, the Real Properties or the Business, to the extent there are any, that are in the possession or control of Seller or any of its Affiliates.

5.7     <u>Title to Acquired Assets</u>.  Immediately prior to the Closing, Sellers will have, and, upon delivery to Buyer or the applicable Buyer Designee on the Closing Date of the instruments of transfer contemplated by <u>Section 4.3</u>, and upon entry of the Sale Order, Sellers will thereby transfer to Buyer or the applicable Buyer Designee, and Buyer or the applicable Buyer Designee will (subject to <u>Section 2.5(d)</u>) be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid and marketable title to, or, in the case of property leased or licensed by Sellers, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of any and all Encumbrances, except (a) for the Assumed Liabilities and (b) for Permitted Encumbrances.  The Acquired Assets consisting of personal property are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put and to allow the Business to be operated in the ordinary course of business as currently conducted.  None of such personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. No Acquired Asset is subject to any agreement, written or oral, for its sale or use by any Person other than Sellers.  All of the owned and leased personal property included in the Acquired Assets is located at the Leased Real Property.

5.8    <u>Taxes</u>.  Except as set forth on <u>Schedule 5.8</u>,

(a)    Sellers have each timely filed all income or other material Tax Returns required to be filed with the appropriate Governmental Authorities (taking into account any extension of time to file granted to Sellers), and all such Tax Returns are true, correct and complete in all material regards.  All income and other material Taxes due and payable, whether or not shown to be payable on such Tax Returns, have been timely paid.  No Seller is the beneficiary of any extension of time within which to file any Tax Return.  Sellers have withheld or collected and paid over to the appropriate Governmental Authorities all amounts of Taxes required by Legal Requirements to be withheld or collected and have properly received and maintained any and all certificates, forms, and other documents required by Legal Requirements for any exemption from withholding and remitting any Taxes.  No claim has been made in writing within the last three (3) taxable years by a Governmental Authority in a jurisdiction where any Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction.  There are no Encumbrances on any of the assets of Sellers that arose in connection with any failure (or alleged failure) to pay any Tax, other than Permitted Encumbrances.

(b)    No examination of any such Tax Return of Sellers is currently in progress by any Governmental Authority and no Seller has received notice of any contemplated examination of any such Tax Return.  No adjustment has been proposed in writing with respect to any such Tax Returns for the last three (3) taxable years by any Governmental Authority.

5.9    <u>Legal Proceedings</u>.  Except for the Bankruptcy Case or as set forth on <u>Schedule 5.9</u>, there is no Action or Order pending, outstanding or, to Sellers' Knowledge, threatened, against or related to the Business or the Acquired Assets, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to Sellers' Knowledge, are there any investigations relating to the Business pending or threatened by or before any arbitrator or any Governmental Authority.  There are no Actions or legal proceedings pending as of the date of this Agreement in which any Seller is the claimant or plaintiff relating to or affecting any of the Acquired Assets, the Business or the transactions contemplated hereby.

5.10    <u>Compliance with Legal Requirements; Permits</u>.

(a)    Sellers hold all of the material Permits necessary for Sellers' operation and conduct of the Business and ownership of the Acquired Assets.  The Permits set forth on <u>Schedule 2.1(e)</u> are all of the Permits held by Sellers with respect to the current operation and conduct of the Business and ownership of the Acquired Assets.

(b)    Except as set forth on <u>Schedule 5.10(b)(i)</u>, Sellers have during the previous three (3) years conducted the Business and own and operate the Business and the Acquired Assets in accordance, in all material respects, with all applicable Legal Requirements, Orders and Permits.  Except as set forth on <u>Schedule 5.10(b)(ii)</u>, neither Sellers nor, to Sellers' Knowledge, any of their Representatives have during the previous three (3) years received any written notice or other communication from a Governmental Authority that alleges that the Business is not in compliance with any Legal Requirement, Order or Permit applicable to the Business or the operations or properties of the Business or the Acquired Assets or that states the

intention on the part of any issuing authority to cancel, suspend or modify any Permit necessary for the current operation and conduct of the Business and the Acquired Assets.

(c)     Except as forth on Schedule 5.2, Schedule 5.4, or Schedule 5.10(c) and subject to entry of the Sale Order, each Permit set forth on Schedule 2.1(e) may be transferred or reissued to Buyer in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Court).

5.11    Labor Matters.

(a)     None of Sellers or their Affiliates are or ever have been party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements, or other similar agreements (each, a "*Collective Bargaining Agreement*") with any union, works council, or labor organization (each, a "*Union*").

(b)     Except as set forth on Schedule 5.11(b), to Sellers' Knowledge, (i) at no time in the past three (3) years has any Union or group of Employees or former Employees organized any employees of the Business for purposes of collective bargaining, sought to bargain collectively with any of Sellers or their Affiliates, made a demand for recognition or certification as an employee representative for purposes of collective bargaining or filed a petition for recognition with any Governmental Authority; (ii) no Collective Bargaining Agreement is being negotiated by any of Sellers or their Affiliates with respect to the Employees; and (iii) at no time in the past three (3) years, has there been any, and, to Sellers' Knowledge, there are no currently threatened, strikes, lockouts, slowdowns, work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs, or other material forms of organized labor disruption with respect to any of Sellers or their Affiliates.  To Sellers' Knowledge, no Union has within the last three (3) years requested that any Seller or Affiliate cease doing business with any other entity.

(c)     Within the past three (3) years, Sellers and their Affiliates have been in compliance in all material respects with all applicable Legal Requirements relating to labor and employment, including all Legal Requirements relating to employment practices; the hiring, promotion, assignment, and termination of employees; discrimination; retaliation; equal employment opportunities; reasonable accommodation; disability; labor relations; wages and hours; FLSA, classification of independent contractors, hours of work; payment of wages; immigration; workers' compensation; employee benefits; background and credit checks; working conditions; occupational safety and health; family and medical leave; employee terminations; the payment of social security and other Taxes; and data privacy and data protection.

(d)     Throughout the past three (3) years, Sellers and have complied in all material respects with the WARN Act and have not failed to comply with the Legal Requirements thereunder, or any applicable Legal Requirement for employees outside the United States regarding the termination or layoff of employees.  Schedule 5.11(d) sets forth a true and complete list of all employees who primarily provided services to the Business and whose employment has been terminated by Sellers, by date and work location, in the six (6)-month period ending on the Execution Date.

(e)      Schedule 5.11(e)(i) sets forth a list of all pending or, to the Knowledge of Sellers, threatened, labor-related Claims against any Seller or any Affiliate with respect to the Business brought by or on behalf of any current or former director, officer, employee or independent contractor of any Seller or by any Governmental Authority (a "***Labor Claim***"). Schedule 5.11(e)(ii) sets forth a list of all Labor Claims relating to wage-and-hour matters or with respect to which class certification was sought or obtained pending at any time in the preceding five (5) years (even if now resolved).

(f)      Schedule 5.11(f) sets forth a true, complete, and accurate list of name, title, current compensation rate (including base salary or wage rate), status as exempt or non-exempt under the FLSA, leave status and place of employment of all Employees.

(g)      Except as set forth on Schedule 5.11(g), within the past three (3) years, (i) no Seller has entered into a settlement agreement with any Employee resolving allegations of sexual harassment by either an officer or an employee of any Seller or Affiliate thereof, and (ii) there have not been any Actions pending or, to Sellers' Knowledge, threatened, against or related to the Business, in each case, involving allegations of sexual harassment by any employee of Sellers in a managerial or executive position.

5.12    Employee Benefits.

(a)      Except as set forth in Schedule 5.12(a), neither Sellers nor any of their ERISA Affiliates sponsor, maintain or contribute to, or have any obligation to maintain or contribute to, any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, employment, consulting, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller(s) is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, including any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise) under which any current officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) in respect of the Business has any present or future right to benefits (each, a "***Benefit Plan***").

(b)      Neither Sellers nor any of their ERISA Affiliates maintain, contribute to, or have any obligation to maintain or contribute to, or have any direct or indirect Liability, whether contingent or otherwise, with respect to, and within the last six (6) years, have not maintained, contributed to or had any direct or indirect Liability, whether contingent or otherwise, with respect to any Benefit Plan or other "employee benefit plan," within the meaning of Section 3(3) of ERISA, that is, or has been within the last six (6) years, (i) subject to Title IV of ERISA or Section 412 of the Code, (ii) except as set forth on Schedule 5.12(b), maintained by

47

more than one employer within the meaning of Section 413(c) of the Code, (iii) subject to Sections 4063 or 4064 of ERISA or (iv) a Multiemployer Plan.

(c)    (i) Each Benefit Plan has been established and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other Legal Requirements; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the IRS, the United States Department of Labor ("*DOL*") or any other Governmental Authority, or to the participants or beneficiaries of such Benefit Plan have been filed or furnished on a timely basis; (iii) each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination letter from the IRS (covering all required tax law changes) to the effect that the Benefit Plan satisfies the requirements of Section 401(a) of the Code and that its related trust is exempt from taxation under Section 501(a) of the Code and, to Sellers' Knowledge, there are no facts or circumstances that could reasonably be expected to adversely affect such qualification or cause the imposition of any Liability, penalty or tax under ERISA, the Code or any other Legal Requirements; (iv) other than routine claims for benefits, no liens, lawsuits or complaints to or by any person or Governmental Authority have been filed against any Benefit Plan or Sellers or their Affiliates or, to Sellers' Knowledge, against any other person or party and, to Sellers' Knowledge, no such liens, lawsuits or complaints are contemplated or threatened with respect to any Benefit Plan; (v) no individual who has performed services for any Seller has been improperly excluded from participation in any Benefit Plan; and (vi) there are no audits or proceedings initiated pursuant to the IRS Employee Plans Compliance Resolution System (currently set forth in Revenue Procedure 2019-19) or similar proceedings pending with the IRS or DOL with respect to any Benefit Plan.

(d)    All contributions (including all employer contributions and employee salary reduction contributions) or premium payments required to have been made under the terms of any Benefit Plan, or in accordance with Legal Requirements, as of the Execution Date have been timely made or reflected on Sellers' financial statements in accordance with GAAP.

(e)    Sellers and their Affiliates have no obligation to provide or make available post-employment benefits under any Benefit Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA) to any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of Sellers, except as may be required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (otherwise referred to as "*COBRA*"), and at the sole expense of such individual.

(f)    Except as set forth on Schedule 5.12(f), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due, or increase the amount of any compensation due, to any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) in respect of the Business; (ii) increase any benefits otherwise payable under any Benefit Plan; (iii) result in the acceleration of the time of payment or vesting of any such compensation or benefits under any Benefit Plan; (iv) result in any breach or violation of, or default under (with or without notice or lapse of time, or both) or limit Sellers' and their Affiliates' ability to amend, modify or terminate, any Benefit

Plan, in each case, with respect to any Employee, or (v) result in payments which would not be deductible under Section 280G of the Code.

(g)     With respect to each Benefit Plan, Sellers have provided to Buyer, a true, correct and complete copy (or, to the extent no such copy exists or the Benefit Plan is not in writing, an accurate written description) thereof and, to the extent applicable, (i) all material documents constituting such Benefit Plan, (ii) any related trust agreements and all other material contracts currently in effect with respect to such Benefit Plan, (iii) discrimination tests for the most recent plan year, (iv) the most recent IRS determination letter, (v) IRS Forms 5500 (including schedules) for the last three (3) plan years, (vi) financial statements for the last three (3) plan years, (vii) any material correspondence with any Governmental Authority, and (viii) any other documents reasonably requested by Buyer.

     5.13    Sellers' Intellectual Property.

(a)     Schedule 5.13(a) sets forth a true and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; (iii) registered Copyrights and pending applications for Copyrights and (iv) domain name registrations, in each case (i)-(iv), which are owned by a Seller as of the Execution Date and included in the Acquired Assets. Each item of registered Intellectual Property listed on Schedule 5.13(a) is valid, subsisting and in effect. Except as set forth on Schedule 5.13(a), Sellers are the sole owners of all of the applications and registrations set forth on Schedule 5.13(a), free and clear of all liens except for Permitted Encumbrances, and all such applications and registrations are in effect and subsisting.

(b)     Schedule 5.13(b) sets forth a list of all material unregistered Trademarks (the "***Unregistered Trademarks***") owned by a Seller as of the Execution Date and included in the Acquired Assets.

(c)     Schedule 5.13(c) sets forth a list of all software that both (i) relates to and is material to the Business and (ii) was developed by or for the Business or any Seller in which any Seller has an ownership interest (the "***Business Software***"). No open source software is incorporated into, integrated, distributed or bundled with Business Software.

(d)     Except as disclosed on Schedule 5.13(d), to Sellers' Knowledge, (i) the conduct of the Business by Sellers as currently conducted (including the products and services currently sold or provided by Sellers) does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened in writing against Sellers, and (ii) no Person is infringing or otherwise violating any Intellectual Property owned by Sellers, and no such claims are pending or threatened in writing against any Person by Sellers.

(e)     Sellers have taken all commercially reasonable steps to protect the secrecy, confidentiality and value of all material Trade Secrets used in the Business. To Sellers' Knowledge, (i) none of such material Trade Secrets has been disclosed or authorized to be disclosed to any Person other than to employees or agents for use in connection with the Business or pursuant to a confidentiality or non-disclosure agreement, and (ii) no unauthorized disclosure of any such Trade Secrets has occurred.

(f)       Schedule 5.13(f) lists each Contract through which material third party intellectual property is licensed to any Seller or the Business (the "***Third-Party Licenses***") that is used or held for use in the conduct of the Business as currently conducted, excluding any "off the shelf," "shrink-wrap" or "click-through" end-user software licenses.  To Sellers' Knowledge, each such Third-Party License is valid, binding and enforceable in accordance with its terms, and no Seller is in material breach or default under any such agreement.  No Seller has received any notice of any pending cancellation or non-renewal of any such Third-Party License.

(g)       To Sellers' Knowledge, all computers, systems or software required to conduct the Business as presently conducted by Sellers, including the Business Software, (i) are included in the Acquired Assets, (ii) perform in conformance with their respective documentation in all material respects, (iii) are free from any material software defect, and (iv) do not contain any material virus or component designed to permit unauthorized access or disable or otherwise harm any computer, systems or software. To Sellers' Knowledge, (i) in the previous three (3) years, no third party has gained unauthorized access to any computers, systems or software of the Business or personally identifiable information or data collected in the conduct of the Business by Sellers, (ii) the conduct of the Business by Sellers complies in all material respects with any Legal Requirements or other requirements related to the collection, use, storage or protection of personally identifiable information or data, including PCI-DSS standards or privacy policies of the Business, and (iii) the consummation of the transaction and the acquisition of any data or information will not violate any privacy policy of the Business as it currently exists or as it existed at any time during which any of such data or information was collected or obtained.

5.14     Contracts.  The Execution Date Contract Schedule sets forth Sellers' good faith estimate of the Cure Costs with respect to each Contract listed thereon.  No Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract listed on the Execution Date Contract Schedule.  Each such Contract listed on the Execution Date Contract Schedule is in full force and effect and is a legal, valid, binding and enforceable obligation of each Seller party thereto in accordance with its terms and conditions, in each case, except (a) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity and (b) as set forth on Schedule 5.14. Upon entry of the Sale Order and payment of the Cure Costs, (i) no Seller will be in breach or default of its obligations under any Assigned Contract, and (ii) to Sellers' Knowledge, no other party to any Assigned Contract is in material breach or default thereunder and no event has occurred, and no circumstance or condition exists, that (with or without notice, lapse of time or both) would reasonably be expected to result in such breach or default.  To Sellers' Knowledge, the Contracts set forth on the Execution Date Contract Schedule will continue to be legal, valid, binding and enforceable and in full force and effect on the same terms as immediately following the consummation of the transaction contemplated hereby, in each case, except (a) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (b) as set forth on Schedule 5.14 and (c) as would not, individually or in the aggregate, have a Material Adverse Effect.

5.15     Sufficiency of Assets.   Except as set forth on Schedule 5.15, (a) the Acquired Assets will, as of the Closing Date, constitute all of the assets, properties and rights

necessary for Buyer to conduct the Business as presently conducted by Sellers and (b) none of the Acquired Assets is owned by any Person other than Sellers.

5.16    Insurance.    Sellers or their Affiliates maintain the insurance policies set forth on Schedule 5.16, which Schedule sets forth all insurance policies covering the Acquired Assets, Employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage).  Such policies are in full force and effect.  Sellers have paid all premiums on such policies due and payable prior to the Closing Date.  Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

5.17    Brokers or Finders.    Other than the Seller Retained Professional Fees, Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

5.18    Undue Influence.    No Seller or any person or other entity acting on behalf of a Seller has directly or indirectly, on behalf of or with respect to the Business or the Acquired Assets: (a) made any contributions, payments or gifts of its property to or for the private use of any governmental official, employee or agent where either the payment or the purpose of such contribution, payment or gift is illegal under the laws of the United States, any state thereof or any other jurisdiction (foreign or domestic); (b) either established or maintained any unrecorded fund or asset for any purpose, or made any intentionally false or artificial entries on its books or records for any reason; (c) made any payments to any Person with the intention or understanding that any part of such payment was to be used for any purpose other than that described in the documents supporting the payment; (d) either made any contribution, or reimbursed any political gift or contribution made by any other Person, to candidates for public office, whether federal, state or local, where such contribution or reimbursement would be in violation of any Legal Requirement in any material respect; (e) made or received any payment which was not legal in any material respect to make or receive; (f) engaged in any material transaction or made or received any material payment which was not properly recorded on the books of Sellers; (g) created or used any "off-book" bank or cash account or "slush fund;" or (h) engaged in any conduct constituting a violation in any material respect of the Foreign Corrupt Practices Act of 1977.

5.19    Financial Statements.

(a)    Sellers have delivered to Buyer the consolidated balance sheets of the Company and its Subsidiaries as of December 30, 2018, and consolidated statements of operations, stockholder's equity (deficit) and cash flows for, the fiscal years ended 2018, 2017 and 2016 (collectively, the "***Audited Financial Statements***").  The Audited Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with the Company's past practice throughout the periods indicated.  Sellers have also delivered to Buyer an unaudited condensed consolidated balance sheets for the Company and its Subsidiaries as of the period ended June 16, 2019 (such date the "***Unaudited Balance Sheet Date***" and such balance sheet the "***Unaudited Balance Sheet***") and the condensed consolidated statements of operations, stockholder's equity (deficit) and cash flows for the period then ending (collectively, the

"*Unaudited Financial Statements*").    The Audited Financial Statements and the Unaudited Financial Statements (together the "*Financial Statements*") (i) are true, correct and complete in all material respects, (ii) are derived from and in accordance in all material respects with the books and records of Sellers, (iii) have been prepared on a consistent basis with respect to each period covered thereunder and (iv) fairly present in all material respects the financial position of Sellers at the dates specified and the results of their operations for the period covered.

(b)    With respect to the periods addressed in the Financial Statements, the Business has maintained a system of internal control over financial reporting of the type sufficient to provide reasonable assurance (i) that transactions have been executed only in accordance with management's authorization, (ii) that transactions have been recorded as necessary to permit preparation of the Financial Statements on a consistent basis and to maintain asset accountability and (iii) regarding prevention or timely detection of any unauthorized acquisition, use or disposition of assets.    For the last five years, there has been no fraud in connection with the Business or its respective financial condition or results of operations that involved management or other employees of the Business who have a significant role in the Business's internal control over financial reporting.

5.20    <u>Undisclosed Liabilities</u>.    Sellers have no Liabilities which, under GAAP, should be accrued or disclosed on a balance sheet of Sellers similar to that included in the Financial Statements (including the footnotes thereto), other than Liabilities (a) reflected in, reserved against or otherwise described in the Unaudited Balance Sheet, (b) that have arisen since the Unaudited Balance Sheet Date in the Ordinary Course of Business and are similar in character and amount to the Liabilities set forth in the Unaudited Balance Sheet or (c) that are otherwise disclosed on <u>Schedule 5.20</u>.    None of the accrued expenses attributable to Affiliate Transactions reflected in the Financial Statements (including on the Unaudited Balance Sheet) shall be effective after the consummation of the transactions contemplated by this Agreement.

5.21    <u>Absence of Certain Changes</u>.    Except as set forth on <u>Schedule 5.21</u> or as expressly contemplated by this Agreement, from the Unaudited Balance Sheet Date to the Execution Date, Sellers, and Sellers' subsidiaries, have not:

(a)    except for executory contracts and unexpired leases rejected by Sellers pursuant to the Sale Order with the prior written consent of Buyer, terminated, modified or amended any Assigned Contract or taken any action which violates, conflicts with or resulted in a breach of any provision of, or constitutes a default under, any Assigned Contract;

(b)    (i) (A) purchased or otherwise acquired any material properties or assets (tangible or intangible) relating to the Business or (B) sold, leased, transferred or otherwise disposed of any Acquired Assets, except for (x) purchases of materials and sales of Inventory in the Ordinary Course of Business and (y) sales and dispositions of obsolete assets with a market value of less than $50,000 individually or $250,000 in the aggregate, or (ii) removed any material Equipment or other material assets (other than Inventory) from the Real Property other than in the Ordinary Course of Business;

(c)     incurred any Encumbrance on any Acquired Asset, other than (i) in the Ordinary Course of Business, (ii) Encumbrances that will be discharged prior to Closing or (iii) Permitted Encumbrances;

(d)     waived or released any claim or rights included in or related to the Acquired Assets or the Business with a value individually or in the aggregate in excess of $50,000 or revalued any of the Acquired Assets, except for adjustments to the value of Inventory in the Ordinary Course of Business;

(e)     entered into any contractual relationship with any third party related to the Acquired Assets or the Business, other than (i) in the Ordinary Course of Business, (ii) contractual relationships with professionals and advisors entered into in connection with the bankruptcy of Sellers and the transactions contemplated hereby and (iii) non-disclosure and confidentiality agreements entered into with potential bidders for all or a portion of Sellers' assets;

(f)     made any material commitments for capital expenditures;

(g)     except as required by Law, (i) increased, or permitted any increase of, the benefits of or compensation (whether in the form of salary or target bonus opportunity) payable to any Employee, individual independent contractor or consultant of Sellers in respect of the Business, whose annual rate of base salary prior to such increase was in excess of $100,000, or granted any bonus, benefit, or other direct or indirect compensation (other than any such payments authorized pursuant to any first or second day orders in the Bankruptcy Case) to any such Employee, individual independent contractor or consultant of Sellers; (ii) adopted, modified, amended or terminated, or permitted the adoption, modification, amendment or termination of, any Benefit Plan; (iii) entered into, or permitted the entry into, any employment, compensation, severance, non-competition, or similar contract (or amended any such contract) to which any Seller or an Affiliate thereof, is a party; (iv) taken any action to accelerate the vesting or payment of any compensation or benefit for any Employee, individual independent contractor or consultant of Sellers in respect of the Business; or (v) adopted, or permitted the adoption of, any new severance pay, termination pay, deferred compensation, bonus or other employee benefit plan with respect to Employees that would be a Benefit Plan if it existed on the Execution Date, except, in the case of each of clauses (i) through (v), (A) to the extent permitted by any order of the Bankruptcy Court or as required by applicable Legal Requirements (including to avoid the imposition of Taxes or to conform to the requirements of Tax qualification), Contract or Benefit Plan; (B) pursuant to the terms of any Benefit Plan, as in effect on the Execution Date; or (C) for immaterial changes to Benefit Plans available to all employees generally (other than changes that increase the amount, or accelerate the timing, of the payment of benefits) in the Ordinary Course of Business;

(h)     suffered any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(i)     changed in any way Sellers' accounting methods, principles or practices other than required by changes in GAAP;

(j)     entered into any commitment or transaction or series of commitments or transactions in respect of Indebtedness or paid, discharged or satisfied any claims,

liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than (i) the payment, discharge or satisfaction in the Ordinary Course of Business of Liabilities incurred in the Ordinary Course of Business and (ii) the DIP Credit Agreement and the financing transactions contemplated thereby;

(k)    allowed any Permit held by any Seller to terminate, expire or lapse;

(l)    made any loans, advances or capital contributions to, or investment in, any other Person;

(m)    acquired (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) any Person or division or material assets thereof;

(n)    purchased, sold or entered into any agreement to purchase or sell any interest in real property;

(o)    failed to timely renew any renewal options under any Lease (other than, purposes of Section 7.2(b), any Lease not identified on Schedule 2.5(a) as of the Determination Date);

(p)    extended any Lease; or

(q)    agreed or committed to do any of the foregoing.

5.22    Suppliers and Franchisees.

(a)    Schedule 5.22(a) sets forth a list of the ten (10) largest suppliers (the "*Material Suppliers*") of the Business for (i) the year ended December 31, 2018 and (ii) the six (6) month period ending June 30, 2019, together with, in each case, the amount of purchases from such supplier in the applicable period.  No Seller has received any notice, and has no reason to believe, that any of its Material Suppliers has ceased, or intends to cease, to supply goods or services to such Seller or to otherwise terminate or materially reduce its relationship with the Business.

(b)    Schedule 5.22(b) sets forth a list of the ten (10) largest Franchisees (by Franchisee gross revenue) (the "*Material Franchisees*") of the Business for (i) the year ended December 31, 2018 and (ii) the six (6) month period ending June 30, 2019, together with, in each case, the amount of sales by such Franchisee in the applicable period.  There are no material disputes with respect to the Material Franchisees, and no such disputes have existed in the prior three (3) years.  No Seller has received any notice, and has no reason to believe, that any Material Franchisee intends to materially alter its relationship with the Business.

5.23    Products; Warranties; Food Laws; Regulatory Matters.

(a)    Except as set forth on Schedule 5.9 or Schedule 5.23(a), there is no currently pending Action for product liability, warranty or other claims by a third party of the Business (whether based on contract or tort and whether relating to personal injury, including death, or economic loss) in excess of $10,000, individually, or $25,000, in the aggregate, or series

of related claims, arising from (i) the services or Products rendered by the Business during the last three (3) years, or (ii) the operation of the Business during the last three (3) years.

(b)    In the last three (3) years, no Products produced by Sellers in connection with the Business have (i) been adulterated or misbranded (as defined in any Food Law), (ii) been an article which may not, under Section 504, 505 or 512 of the Federal Food, Drug, and Cosmetic Act (and all acts and/or rules and regulations amending or supplementing the same), be introduced into interstate commerce, or (iii) produced without all necessary labeling requirements pursuant to applicable Legal Requirements.

(c)    There are no pending Actions alleging that any Product is unsafe or fails to meet any product warranty or any other standards that are promulgated by any Governmental Authority.  There are no pending notices of recall (written or oral) with regard to any Product.  For the last three (3) years, Sellers have not received any claim alleging that, as a result of the actions or negligence of Sellers, a Product is unsafe or fails to meet any applicable product warranty, nor to Sellers' Knowledge does any such claim exist.

(d)    In each case, except as set forth on Schedule 5.23(d): (i) the Company's and its Subsidiaries' operation of the Business is currently in compliance in all material respects with all Food Laws applicable to such operation; (ii) the Company and its Subsidiaries collectively possess or have the right to use or have the benefit of all food related Permits necessary for the operation of the Business and such operation is in compliance with such Permits, (iii) the Company and its Subsidiaries have not received written notice that any of such Permits will not be renewed and (iv) to Sellers' Knowledge, for the last three (3) years, there have been no government inquiries or investigations by or claims made to the United Stated Food and Drug Administration, United States Department of Agriculture, or other regulatory bodies in respect of the Business.

5.24    Interests of Affiliates.  No Seller, any other Affiliate of Sellers, or any of their respective equityholders, officers, directors, or employees, has any right, title or interest in or to any of the Acquired Assets, regardless of kind or character (whether real, personal or mixed, tangible or intangible, contingent or otherwise) other than any Benefit Plan.  The Business, as currently conducted, has been conducted solely by Sellers and not through an Affiliate of any Seller.   Other than as set forth on Schedule 5.24 or under any Benefit Plan, no obligations, Contracts or other Liabilities exist between any Seller, on the one hand, and any other Seller or any Affiliate of such Seller or their respective equityholders, officers, directors or employees, on the other hand ("*Affiliate Transactions*"), that relate to the operation of the Business, the use of the Acquired Assets or the Assumed Liabilities.  The Prices set forth in the Amended and Restated Foxtail Supply Agreement are consistent in all material respects with the prices charged by the Foxtail Business to the Perkins Business as of May 1, 2019.

5.25    Credit Support.  Schedule 2.4(b) sets forth all Contracts for which any Seller has, or is required to provide, performance, surety or similar bonds, letters of credit or similar third-party assurances or credit support, and the amount of such bonds, letters of credit or assurances or credit support and the issuer thereof.

5.26    Franchise Matters.

(a)    Schedule 5.26(a) sets forth the following information: (i) a true, correct and complete list of all Franchisees currently operating any establishment of the Perkins Business and a list of all Franchisees who have signed a Franchise Agreement but who have not yet opened an establishment of the Perkins Business, together with franchise numbers and addresses and the number of establishments operated by each such Franchisee; and (ii) a current list of jurisdictions in which Sellers are (with respect to the Perkins Business) currently registered to offer and sell franchises (as the term "Franchise" is defined under the FTC Rule or applicable state franchise laws) or are exempt from registration and a current list of any jurisdictions in which applications to offer and sell franchises are pending.  To Sellers' Knowledge, there are no circumstances that may materially impede or preclude any Seller, their Affiliates or the Perkins Business from registering in any franchise registration state in the United States in which the Perkins Business is not currently registered or exempt thereunder or from obtaining a business opportunity registration or exemption in any business opportunity state in the United States where the Business does not presently have such a registration or exemption approved. Within the three (3) year period preceding the Closing, no Seller, its Affiliates or the Perkins Business has waived any material defaults by any other party under any Franchise Agreement or any of its rights under any Franchise Agreement.

(b)    None of the Franchise Agreements (collectively, the "***Franchise Documents***") are subject to any rescission claims in respect of acts or omissions of any Seller prior to the Closing.  Sellers have provided to Buyer true, correct and complete copies of each standard form of Franchise Document.  No Seller has entered into a Franchise Document with any foreign master franchisee, and no foreign master franchisee has operated any establishment of the Perkins Business.  Except as set forth on Schedule 5.26(b), there are not any unresolved or threatened material disputes between any Franchisee and any of Sellers with respect to the Perkins Business, material breaches or pending cancellations/terminations by any Person to any of the Franchise Documents, including without limitation any failure by any Franchisee to pay any initial fee, royalty fee or other amount due under such Franchise Documents for which a written notice has been provided and excluding royalty fees and other amounts due from Franchisees that are less than ninety (90) days outstanding and there have been no such material disputes, breaches or cancellations for the preceding three (3) years.

(c)    None of the Franchise Documents contain any right of exclusivity that conflicts with the right of exclusivity contained in another Franchise Document. The only Franchise Documents that contain any right of exclusivity with respect to any aspect of the Perkins Business are the Franchise Agreements.

(d)    Neither any Seller nor the Perkins Business has (i) offered or sold Franchises in any jurisdiction where its offer or sale of the Franchise violated the applicable Legal Requirements of the jurisdiction or (ii) received any stop order, revocation or withdrawal of approval of a registration or exemption thereof to offer and sell Franchises in respect of the Business in any jurisdiction.  All Franchises for the Perkins Business have been offered and sold (and all corresponding Franchise Agreements have been executed) in material compliance with applicable Legal Requirements, including state and federal franchise and business opportunity laws in effect at the time of such offer, sale and execution.  Each FDD of any Seller and the Perkins

Business has been prepared in material compliance with the applicable provisions of the FTC Rule and any of the Legal Requirements of those jurisdictions in which offers or sales of Franchises have been made, and no such FDD contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  Sellers have in their possession an Item 23 "Receipt" for each FDD delivered by any Seller for the Perkins Business signed by the corresponding franchisee, developer or master developer and dated to reflect that disclosure was made within the time period required by the FTC Rule and any other applicable Legal Requirements.

        (e)     No Franchise Agreement or other Contract imposes on any Seller any obligation to guarantee or indemnify any Person for the lease obligations, third party financing obligations or other liability of any Franchisee to any third party.

        (f)     For the past three (3) years, Sellers have contributed, administered, disclosed and spent all funds associated with the national marketing fund as required pursuant to the terms of the Perkins Business's operation manuals, Franchise Agreements, Legal Requirements, FDDs and other applicable Contracts of any Seller.

        5.27    <u>Powers of Attorney</u>.  There are no Persons holding a power of attorney on behalf of a Seller, the assets of a Seller or the Business that would enable any such Person to sell, convey, assign, lease, encumber or otherwise transfer or dispose of any of the assets of such Seller or the Business.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

        Buyer represents and warrants to Sellers as follows:

        6.1    <u>Organization and Good Standing</u>.  Buyer is a corporation duly formed, validly existing and in good standing under the laws of the State of Georgia.  Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

        6.2    <u>Authority; Validity; Consents</u>.  Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing.  This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except, in each case, as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Except for the Liquor

Consents, Buyer is not or will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3    No Conflict.  Neither the execution and delivery by Buyer of this Agreement or the other Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer or (ii) any Legal Requirement binding upon Buyer or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority.

6.4    Availability of Funds.  Buyer has access to as of the Execution Date, and shall have access to on the Closing Date, sufficient unrestricted funds or committed lines of credit on hand to pay the Estimated Cash Consideration at the Closing.

6.5    Litigation.  There is no Action or Order pending or, to the knowledge of Buyer, threatened against Buyer, whether at law or equity, whether civil or criminal in nature, or by or before any arbitration or Governmental Authority, that would affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.6    Brokers or Finders.  Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement or any other Transaction Document for which any Seller is or will become liable.

6.7    Qualification.  To Buyer's knowledge, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

6.8    Information.  Buyer has conducted such investigations of the Company and its Subsidiaries as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby.  Buyer acknowledges that it and its Representatives have been permitted full and complete access to the books and records, facilities, equipment, Tax Returns, Contracts, insurance policies (or summaries thereof) and other properties and assets of Sellers, that it and its Representatives have desired or requested to see or

review, and that it and its Representatives have had a full opportunity to meet with the officers and employees of Sellers to discuss the Business. Neither Sellers nor any other Person (including any officer, director, member or partner of Sellers or any of their Affiliates) shall have or be subject to any liability to Buyer, or any other Person, resulting from Buyer's use of any information, documents or material made available to Buyer in any "data rooms," management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by the other Transaction Documents.

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

7.1    Access and Reports.

(a)    Subject to applicable Legal Requirements, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of Article 11, Sellers shall (i) afford Buyer and its Representatives access upon reasonable notice to its employees, Franchisees, landlords, customers, suppliers, properties, books, Contracts and records of Sellers during normal business hours to the extent such access does not unreasonably interfere with the businesses of Sellers, and furnish promptly to Buyer all information concerning the Acquired Assets, the Business, properties, any Buyer Benefit Plans and personnel as may be reasonably requested; (ii) furnish to Buyer such financial and operating data and other information relating to Sellers, the Business and the Acquired Assets as may be reasonably requested; (iii) permit Buyer to make such reasonable inspections and copies as Buyer may require, in each case, during normal business hours to the extent such inspections and making of copies does not unreasonably interfere with the businesses of Sellers; (iv) instruct the executive officers and senior business managers, employees, counsel, auditors and financing advisors of Sellers to cooperate with Buyer and its Representatives regarding the same and (v) conduct, or permit Buyer or any of its Representatives to conduct, with the prior written consent of the Company (not to be unreasonably withheld, conditioned or delayed), any Phase I environmental site assessment or investigation relating to the Owned Real Property. Notwithstanding anything to the contrary in this Agreement, to the extent any such assessment reveals issues that cannot be resolved to the satisfaction of Buyer prior to Closing, the Parties hereto will take all actions necessary to cause the applicable Owned Real Property to be an Excluded Asset hereunder. All requests for information made pursuant to this Section 7.1 shall be directed to Houlihan Lokey, Inc. or Akin Gump Strauss Hauer & Feld LLP. All such information shall be governed by the terms of the Confidentiality Agreements. No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the Execution Date shall affect or be deemed to modify any representation or warranty made by Sellers herein. Notwithstanding anything contained in this Agreement to the contrary, none of Buyer or any Buyer Designees shall have any right to perform or conduct any product testing or any environmental sampling, testing or invasive investigation in, at, on or underneath any of Sellers' properties or facilities without the prior written consent of Sellers.

(b)    This Section 7.1 shall not require Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any

violation of any Legal Requirement or cause any privilege (including attorney-client privilege) that Sellers would be entitled to assert to be undermined with respect to such information and such undermining of such privilege could in the Company's good faith judgment (after consultation with counsel, which may be in-house counsel) adversely affect in any material respect Sellers' position in any pending or, what the Company believes in good faith (after consultation with counsel, which may be in-house counsel) could be, future litigation or (ii) if the Company or any Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, however, that, in the case of clause (i), the Parties shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or be reasonably likely to cause such privilege to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

   7.2 <u>Operations Prior to the Closing Date</u>. Sellers covenant and agree that, except (1) as expressly contemplated by this Agreement, (2) as disclosed in <u>Schedule 7.2</u>, (3) with the prior written consent of Buyer (which consent shall not be unreasonably conditioned, withheld or delayed), (4) as otherwise required by Legal Requirements or the Bankruptcy Court (including any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code), (5) as occurring as a result of Sellers being in bankruptcy under the Bankruptcy Code, or (6) with respect to any business not constituting the Business or otherwise with respect to the Excluded Assets or the Excluded Liabilities, after the Execution Date and prior to the Closing Date:

    (a) Sellers shall:

     (i) carry on the Business in the Ordinary Course of Business and use commercially reasonable efforts to maintain, preserve and protect all of the Acquired Assets in the condition in which they exist on the Execution Date, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

     (ii) maintain their books, accounts and records in accordance with past custom and practice;

     (iii) use commercially reasonable efforts to (A) retain Employees who are in good standing and are necessary to conduct the Business as presently conducted by Sellers and (B) maintain their relationships with and preserve for the Business the goodwill of their Franchisees, lessors, key suppliers and customers;

     (iv) (A) comply in all material respects with all Legal Requirements applicable to them or having jurisdiction over the Business or any Acquired Asset, (B) comply in all material respects with contractual obligations applicable to or binding upon them pursuant to Assigned Contracts and (C) maintain in full force and effect all Permits and comply in all material respects with the terms of each such Permit;

(v)      cause any of their current property insurance policies with respect to the Business or any of the other Acquired Assets not to be canceled or terminated or any of the coverage thereunder to lapse unless simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(vi)     use commercially reasonable efforts to maintain, preserve and protect in full force and effect the existence of all material Intellectual Property owned by Sellers and included in the Acquired Assets; provided, however, that any such Intellectual Property that is no longer of commercial value or no longer used in the conduct of the Business may be abandoned or cancelled; and

(vii)    use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (A) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (B) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

(b)      Sellers shall not:

(i)      take any action enumerated in Section 5.21, except as set forth on Schedule 5.21;

(ii)     assume, reject or assign any Assigned Contract other than pursuant to Section 2.5;

(iii)    sell, assign, transfer, lease, license or allow to lapse any rights in the material Intellectual Property of or affecting the Business;

(iv)     other than in the Ordinary Course of Business, hire or terminate any employee, individual independent contractor or consultant whose annual rate of base salary or fee is greater than $100,000 and who is a store manager or an executive officer of any Seller;

(v)      enter into any Collective Bargaining Agreement;

(vi)     except as required by Law, increased the hourly wages of any Employees in any amount that increased the compensation expense of the Business by more than $100,000 per month in the aggregate

(vii)    enter into or renew any Contract having a term of one year or greater or that may require Sellers to incur potential liabilities of $300,000 or greater per year without the consent of Buyer; or

(viii)   authorize, or commit or agree to take, any of the actions set forth in this Section 7.2(b).

7.3    <u>Cooperation</u>.

(a)    Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including taking commercially reasonable steps to: (i) cause the conditions precedent set forth in <u>Article 9</u> and <u>Article 10</u> to be satisfied; (ii) obtain, at the earliest practicable date, all necessary Governmental Authorizations and making all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any); (iii) avoid any Action by any Governmental Authority; (iv) defend any Actions challenging this Agreement or the consummation of the transaction contemplated hereby, and (v) execute and deliver any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(b)    Buyer and Sellers shall take all commercially reasonable actions and do, or cause to be done, all commercially reasonable things necessary under the applicable Legal Requirements with the appropriate Governmental Authorities to put in place, to transfer, to amend, or to acquire all Transferred Permits that are necessary for the operation and conduct of the Business or Acquired Assets by or on the Closing Date, unless the applicable Legal Requirements regarding such a Permit require certain actions to be taken upon or after Closing, and, in that event, Buyer and Sellers shall take all commercially reasonable actions and do, or cause to be done, all commercially reasonable things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authorities which can only be taken or done after Closing to put in place, to transfer, to amend, or to acquire such remaining Permits as promptly as reasonably practicable after the Closing.

(c)    Sellers, on the one hand, and Buyer, on the other hand, (i) shall to the extent legally permitted promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine).  In addition, none of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless, to the extent legally permitted, such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate in such meeting, in each case, to the maximum extent practicable.  Subject to restrictions under any Legal Requirements, each of Buyer, on the one hand, and Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification

or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

      7.4    <u>Bankruptcy Court Matters</u>.

      (a)    <u>Sale Order</u>. Sellers shall use their reasonable best efforts to obtain the Bankruptcy Court's entry of the Sale Order on or before September 30, 2019.

      (b)    <u>Bankruptcy Filings</u>. From and after the Execution Date and until the Closing Date, Sellers shall consult with Buyer with respect to any and all material pleadings, motions, notices, statements, plans, disclosure statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement, including any Tax motions, in each case, that relate to the Acquired Assets, any Assumed Liabilities, Buyer's obligations hereunder or the consummation or approval of the transactions contemplated by this Agreement and such filings shall, if and when applicable, be consistent with this Agreement and otherwise reasonably acceptable to Buyer solely to the extent they relate to the Acquired Assets, any Assumed Liabilities, Buyer's obligations hereunder or the consummation or approval of the transactions contemplated by this Agreement. Sellers agree to use commercially reasonable efforts to prosecute the entry of the Sale Order. Sellers shall provide Buyer with opportunity to review and the right to approve all notice and mailing lists to be used to notify known and potential creditors and parties-in-interest of the proposed free and clear sale of the Acquired Assets, and Sellers shall accept Buyer's reasonable comments. In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal. Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, (ii) of the Local Rules of Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, or (iii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. Seller shall use its commercially reasonable efforts to cause the Bidding Procedures Order and the Sale Order to be entered and become a Final Order as soon as practicable after entry and to defend any appeal of the Bidding Procedures Order and/or the Sale Order. Notwithstanding the foregoing, nothing in this Agreement precludes the Parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and Buyer, in its sole discretion, waives in writing the condition set forth in <u>Section 9.6</u> that the Sale Order be a Final Order.

      (c)    <u>Bidding Procedures and Sale Order</u>. Sellers shall comply with all of their obligations under the Bidding Procedures Order and Sale Order, in each case, after the entry of such Order by the Bankruptcy Court.

      7.5    <u>Sellers Update of Disclosure Schedules; Notice of Developments; Buyer Update of Disclosure Schedules</u>.

      (a)    <u>Seller Supplements</u>. Until the Closing Date, Sellers shall from time to time, supplement or amend the Disclosure Schedules with a corresponding reference to be added

in this Agreement to disclose any matter hereafter arising or of which Sellers becomes aware of after the Execution Date which, if existing, occurring or known at the Execution Date, would have been required to be set forth or described in the Disclosure Schedules or that is otherwise necessary to correct any information in the Disclosure Schedules that has been rendered inaccurate thereby (each a "*Schedule Supplement*"), no later than five days after the discovery of such matter by Sellers and in any case at least five days prior to the anticipated Closing Date.  Notwithstanding anything to the contrary in this Agreement, any such Schedule Supplement shall not be deemed to have cured any breach of any representation or warranty made in this Agreement for any purposes hereunder and shall not affect in any way Buyer's rights under Article 9 or Article 11.

(b)  Notice of Developments.  Sellers shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, (i) any event that would reasonably be expected to cause any of the conditions set forth in Article 9 not to be fulfilled by the Outside Date or (ii) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.

(c)  Buyer Updates.  Notwithstanding anything to the contrary in this Agreement, Buyer may in its sole discretion from time to time at any time until two (2) days prior to the Sale Hearing update Schedule 2.3(i) and Schedule 8.4(e) upon written notice to Sellers.

7.6  Limitations.  For the avoidance of doubt, nothing in this Agreement, including Section 2.8, or Section 7.3, or the Transition Services Agreement shall (a) prevent any of Sellers from, or require any of Sellers to delay, the winding down of their bankruptcy estates, (b) impose on any Seller any burdens not expressly imposed on such Seller pursuant to the other provisions of this Agreement, or (c) require any Seller to become involved in any Action.

7.7  Inventory.  Sellers shall use commercially reasonable efforts to (a) maintain the Inventory of the Business in the Ordinary Course of Business and (b) produce, maintain, preserve and protect all of the Inventory in the Ordinary Course of Business, in each case, from and after the Execution Date until the Closing Date, except for sales of and changes to Inventory levels, amounts or conditions in the Ordinary Course of Business.

## ARTICLE 8

### ADDITIONAL AGREEMENTS

8.1  Taxes.

(a)  Any Transfer Tax shall be borne exclusively by Buyer. Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to (a) exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes, to the fullest extent permitted by applicable law and (b) provide one another with all required certificates, documents or evidence to establish any available exemption from Transfer Taxes or reduced rate of Transfer Taxes. Sellers shall be responsible for preparing and filing Tax Returns with respect to Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by the other Party, the Party responsible for preparing the Tax Return shall deliver it to the other Party not less than ten days

before the due date thereof, and the other Party shall promptly execute such Tax Return and return it to the Party responsible for filing it.

(b)        All Liability for any real or personal property and other ad valorem Taxes ("***Property Taxes***") with respect to the Acquired Assets for any Pre-Closing Tax Period shall be borne by Sellers. All Liability for any Property Taxes with respect to the Acquired Assets for any Post-Closing Tax Period shall be borne by Buyer. The total amount of such Property Taxes allocable to the Pre-Closing Tax Period of any Straddle Period shall be the product of (i) such Tax for the entirety of such Straddle Period, multiplied by (ii) a fraction, the numerator of which is the number of days for such Straddle Period included in the Pre-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period, and the balance of such Taxes shall be allocable to the Post-Closing Tax Period. At the Closing, Property Taxes with respect to each Acquired Asset for the applicable Straddle Period that is allocated to the Pre-Closing Tax Period shall be determined in accordance with the foregoing provisions based on the Property Tax assessment for such Acquired Asset for such Straddle Period, if available, or if otherwise, based on the Property Taxes paid with respect to such Acquired Asset during the preceding Tax year and included in the determination of the Specified Net Adjustment.

(c)        Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; provided, however, that neither Buyer nor any Seller shall be required to disclose the contents of its income Tax Returns to any Person other than the Parties. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(c) shall be borne by the Party requesting it.

(d)        If requested by Buyer, Sellers shall seek a determination from the Bankruptcy Court under Section 505 of the Bankruptcy Code with respect to any Tax matter related to the Sellers and the Acquired Assets that could reasonably be expected to affect the Tax liability of Buyer or any of its Affiliates (a "***Section 505 Determination***"). Sellers shall control the conduct of any Section 505 Determination, but Buyer shall have the right to participate in such Section 505 Determination, and Seller shall not settle, compromise and/or concede any portion of such Section 505 Determination without the consent of Buyer, which consent shall not be unreasonably withheld, delayed or conditioned.

8.2    <u>Payments Received; Mail and Other Communications</u>. Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts. Sellers agree that at any time and from time to time after the Closing, Buyer and its Affiliates shall have the right and authority to open all mail and other communications, in all formats (both tangible and intangible),

including service of process, received by Buyer or its Affiliates pertaining to the Business, even if addressed to a Seller, for processing or forwarding to the applicable Seller. Sellers further agree to forward to Buyer all mail and other communications, in all formats (both tangible and intangible) pertaining to the Business received by Sellers at any time and from time to time after the Closing.

8.3    <u>Assigned Contracts: Adequate Assurance and Performance</u>.

(a)    Buyer shall use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assigned Contract as required under Section 365 of the Bankruptcy Code. Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Sellers' employees and representatives available to testify before the Bankruptcy Court.

(b)    Without limiting the provisions of this <u>Section 8.3</u> Buyer acknowledges that Sellers have no duty to maintain any Credit Support to secure performance for any Assigned Contract after the Closing. From and after the Closing, Buyer shall post all Credit Support. Prior to the Closing, Buyer shall use commercially reasonable efforts, and Sellers will cooperate (it being understood that such cooperation will not include any requirement to pay any consideration or offer or grant any financial accommodation) in all reasonable respects with Buyer, to ensure that, effective as of the Closing, all Credit Support and any Liabilities related thereto, whether attributable to periods before or after the Closing shall be fully and unconditionally released as to Sellers and their Affiliates; <u>provided</u>, <u>however</u>, that if as of the Closing any Credit Support and related Liabilities have not otherwise been fully and unconditionally released and the applicable Assigned Contract permits them to be released by depositing cash with the counterparty or another Person, then at or before the Closing, Buyer shall so deposit cash in the amount required to obtain such release.

8.4    <u>Employee Matters</u>.

(a)    <u>Listed Employees</u>. Sellers shall provide a list of all Employees on Schedule 8.4(a) (the "***Listed Employees***"), which such schedule shall reflect any and all Employees as of the Execution Date, and such schedule shall be updated upon Buyer's request (and in any event at least fifteen (15) Business Days prior to the anticipated Closing Date) to reflect applicable changes due to hirings, resignations and terminations.

(b)    <u>Buyer Employees</u>. At least five (5) Business Days prior to the Closing Date, Buyer or an Affiliate thereof may in its sole discretion offer employment to substantially all Listed Employees (the "***Offered Employees***"), and at least five (5) Business Days prior to the Closing Date Buyer shall provide written notice to Sellers containing a schedule of all Offered Employees. Such offers shall be on Buyer's standard terms and conditions of employment for new hires. Subject to <u>Section 8.4(c)</u>, Buyer shall hire (or shall cause its Affiliate to hire) each Offered Employee effective as of the Closing Date (the "***Hire Date***") and such obligation to hire

each such Offered Employee shall be conditioned on (i) the acceptance of such offer by the applicable Offered Employee within one week of receiving it, (ii) Buyer's or its Affiliate's receipt of satisfactory results from Buyer's or its Affiliate's normal pre-employment background check, (iii) the Offered Employee's completion of Buyer's or its Affiliate's personal profile, employment application, confidential information agreement and business conduct guidelines and applicable I-9 Federal and State tax forms and (iv) the Offered Employee's ability to work for Buyer or an Affiliate thereof without any reasonable and non-waivable contractual restriction (*i.e.*, the Offered Employee does not have non-compete obligations or other restrictive clauses with his or her current or former employer that cannot be resolved to Buyer's satisfaction). Buyer's or its applicable Affiliate's employment of each Offered Employee in accordance with this Section 8.4 shall begin as of the Hire Date, and the employment and other relationships of such Offered Employee with Sellers and their Affiliates shall end immediately prior to such date. Those Offered Employees who commence employment with Buyer (or one of its Affiliates) shall be referred to as the "***Buyer Employees***." Buyer shall provide initial compensation, including vacation compensation, to non-hourly Buyer Employees that is substantially comparable, in the aggregate (and on the same terms and conditions of employment) as in effect immediately prior to the Closing. Buyer shall in no way be obligated to continue to employ any Buyer Employee for any specific period of time, except to the extent otherwise required by applicable Legal Requirements or provided in any written agreement entered into by Buyer and/or any Affiliate thereof and any Buyer Employee after the Closing.

(c)     Notwithstanding the preceding Section 8.4(b), to the extent that any Offered Employee is not actively working for Sellers or their Affiliates as of the Hire Date, Sellers shall permit Buyer or its applicable Affiliate to extend an offer of employment to such individual that is contingent upon commencing employment with Buyer or an Affiliate thereof by a specified date.

(d)     Access to Information. After the Execution Date, Sellers shall provide Buyer and its Affiliates with reasonable access to Sellers' employees and Employees and with information, including employee records and Benefit Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by applicable Legal Requirements.

(e)     Buyer Benefit Plans. Buyer shall assume all obligations under or Liabilities with respect to all Benefit Plans set forth on Schedule 8.4(e) (such Benefit Plans, the "***Buyer Benefit Plans***") and the Buyer Benefit Plans, and all assets, trusts, insurance policies and other Contracts relating thereto, shall be assumed by and assigned to Buyer (or such Buyer Affiliates as Buyer so directs) on the Closing Date in the manner described in this Agreement. Sellers shall make good faith efforts to consult with, and give reasonable assistance (including with respect to making amendments) to Buyer and its Affiliates in respect of any Buyer Benefit Plans, prior to the Closing Date; provided, that, Sellers shall remain responsible for and pay (x) on the Closing Date to each Buyer Employee in cash the amount of his or her accrued and earned (A) but unused vacation and sick pay and (B) bonuses (other than Retention Expenses), in each case as of the Closing Date and (y) at the time required under the Applicable Contract or Legal Requirement, all Retention Expenses. To the extent that service is relevant for purposes of eligibility and vesting, but not accrual under any benefit plan of Buyer or its Affiliates, including any Buyer Benefit Plan, Buyer shall credit (or cause to be credited) Buyer Employees for service earned prior to the Closing with Sellers to the same extent as such service was credited for such

purposes by Sellers in addition to service earned with Buyer on and after the Closing, except where crediting such service would result in a duplication of benefits.  To the extent the Buyer Employees and their eligible dependents enroll in any welfare benefit plan sponsored by Buyer or its Affiliates (including any Buyer Benefit Plan as applicable), subject to the terms of any such plan, Buyer shall undertake commercially reasonable efforts to waive, or cause such waiver of, any preexisting condition limitation applicable to such Buyer Employees to the extent that the Buyer Employee's or eligible dependent's condition would not have operated as a preexisting condition under the applicable welfare benefit plan maintained by Sellers.  In addition, with respect to any benefit plans of Buyer or its Affiliates in which any Buyer Employee may, at any time, be eligible to participate that provide medical or health benefits (including prescription drug, dental, and vision, but not life insurance or disability benefits), subject to the terms of any such plan, Buyer shall undertake commercially reasonable efforts to (i) waive all waiting periods otherwise applicable to the Buyer Employees and their eligible dependents, other than waiting periods that are in effect with respect to such individuals as of the Closing to the extent not satisfied under the Buyer Benefit Plans or such other corresponding Benefit Plans of Sellers and (ii) provide each Buyer Employee and his or her dependents with corresponding credit for any co-payments and deductibles paid by them under such Buyer Benefit Plans or corresponding Benefit Plans of Sellers during the portion of the respective plan year prior to the Closing.  At any time and from time to time after the Execution Date, Sellers and Buyer shall take, or cause to be taken, any and all actions necessary to effectuate the terms of this Section 8.4(e), including taking all action necessary to assign and assume and adopt each Buyer Benefit Plan in the manner contemplated by this Agreement effective as of the Closing.  Sellers will reasonably cooperate with Buyer and its Affiliates and take, or cause to be taken, all reasonable actions as Buyer may reasonably request in order to effectuate the foregoing.  Nothing herein shall prohibit Buyer or its Affiliates, as applicable, from terminating, amending, or otherwise affecting any Buyer Benefit Plan, at any time and from time to time following the Closing.

        (f)    Payroll Taxes.  Buyer and Sellers agree to utilize or cause their respective Affiliates to utilize, the alternative procedure set forth in the Revenue Procedure 2004-53 with respect to wage reporting.

        (g)    Sellers and their Affiliates shall retain all Liabilities arising from, or relating to, such Seller' or its Affiliates' employment or engagement of (or termination of employment or engagement of) their employees and contractors, including payroll, wages, compensation, wage and hour claims or any other claims or causes of action relating to overtime, meal and rest periods, classification of employees and contractors, anti-discrimination, anti-retaliation, recordkeeping, employee leave, Tax withholding and reporting, affirmative action, equal employment opportunity, immigration, safety, workers' compensation claims, unemployment benefits or other benefits, in each case with respect to individuals (A) who do not become Buyer Employees and (B) who become Buyer Employees, to the extent such Liabilities arise prior to such Buyer Employees' Transfer Time.

        (h)    For purposes of this Agreement, the following claims shall be deemed to be incurred as follows: (i) life, accidental death and dismemberment, short-term disability, and workers' compensation insurance benefits, on the event giving rise to such benefits; (ii) medical, vision, dental, and prescription drug benefits, upon delivery of the applicable services, materials or supplies were provided; (iii) long-term disability benefits, on the eligibility date

determined by the long-term disability insurance carrier for the plan in which the applicable Buyer Employee participates; and (iv) a claim for workers compensation benefits shall be deemed to be incurred when the event giving rise to the claim occurs.

(i)  To the extent required by Law, effective as of the Closing Date, Sellers or their Affiliates, as applicable, shall be responsible for providing COBRA coverage to any Listed Employee, his or her spouse or dependent person as to whom a "qualifying event" as defined in Section 4890B of the Code has occurred on or prior to the Closing Date.

(j)  No Third-Party Beneficiaries; Employment Status.  All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective parties hereto.  Nothing contained herein (i) shall confer upon any former, current or future employee of Sellers or Buyer or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee of Buyer to be other than terminable at will or (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.  The provisions of this Section 8.4 shall not constitute an adoption, amendment, or other modification to any Benefit Plan or any plan, program, agreement or arrangement covering Buyer Employees or Employees or Sellers' employees.

(k)  WARN Act.  With respect to all Employees, including those that become Buyer Employees, Sellers shall be solely responsible for compliance with any Liabilities relating in any way to all applicable Legal Requirements with respect to the WARN Act for any act or omission of Sellers prior to the Closing Date.  With respect to the Buyer Employees, Buyer shall be solely responsible for compliance with any Liabilities relating in any way to all applicable Legal Requirements with respect to the WARN Act for any act or omission of Buyer on or after the Closing Date, including as a result of any failure to comply with Section 8.4(b).  The Parties agree to cooperate in good faith, including by sharing information about terminations of employment in a timely manner, to determine whether any notification may be required under the WARN Act as a result of the transactions contemplated by this Agreement, including Sellers updating the list set forth in Schedule 5.11(d) to include all employees terminated during the period from the Execution Date through the Closing Date.

(l)  For the avoidance of doubt, this Section 8.4 is subject to Sections 2.3 and 2.4.

8.5  Post-Closing Books and Records and Personnel.  From and after the Closing Date, each Party hereto shall provide the other Parties hereto (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, solely to the books and records acquired pursuant to this Agreement as of the Closing Date so as to enable Buyer and Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions, and with respect to Sellers, to wind up their bankruptcy estates.  If any party desires to dispose of any such records, such Party shall, thirty (30)

days prior to such disposal, provide the other Party with a reasonable opportunity to remove such records to be disposed of at the removing Party's expense.

8.6     <u>Representations and Warranties Exclusive</u>.   Buyer acknowledges and agrees that it has conducted its own independent investigation, review and analysis of the Business, the Acquired Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Sellers for such purpose.  Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Sellers set forth in <u>Article 5</u> of this Agreement and <u>Section 12.16</u>; and (b) none of Sellers nor any other Person has made any representation or warranty as to Sellers, the Business, the Acquired Assets, the Assumed Liabilities or this Agreement, except as expressly set forth in <u>Article 5</u> of this Agreement (as qualified by the Disclosure Schedules) and <u>Section 12.16</u>.  SUCH REPRESENTATIONS AND WARRANTIES MADE BY SELLERS IN <u>ARTICLE 5</u> AND <u>SECTION 12.16</u> CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF SELLERS TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND BUYER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN <u>ARTICLE 5</u> OF THIS AGREEMENT AND <u>SECTION 12.16</u>, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED, WRITTEN OR ORAL (INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING SELLERS, ANY AFFILIATES OF SELLERS, THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES FURNISHED OR MADE AVAILABLE TO BUYER AND ITS REPRESENTATIVES AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO BUYER, MANAGEMENT PRESENTATIONS OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR AS TO THE FUTURE REVENUE, PROFITABILITY OR SUCCESS OF THE BUSINESS, OR ANY REPRESENTATION OR WARRANTY ARISING FROM STATUTE OR OTHERWISE IN LAW OR IN EQUITY OR RELATING TO MERCHANTABILITY OR FITNESS FOR USE) ARE SPECIFICALLY DISCLAIMED BY SELLERS.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

8.7     <u>Casualty Loss</u>.  Without limiting any of Buyer's rights pursuant to the other provisions of this Agreement if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Buyer promptly in writing of such fact, and (i) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (ii) in the case of fire, flood or other casualty, Sellers shall, at Buyer's option, either restore such damage (but only if Sellers have funds available for such purpose) or assign the insurance proceeds therefrom to Buyer at Closing.

8.8     <u>Covenant to Change Names</u>.  Within ten (10) Business Days after the Closing Date, Sellers shall provide Buyer with evidence, including, without limitation, certified copies of the amended articles of organization, verifying that each applicable Seller has changed

its name to eliminate the name "Perkins" and each Seller shall, and shall cause their direct and indirect Subsidiaries to, discontinue the use of Perkins (and any other trade names or "d/b/a" names currently utilized by Sellers or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Perkins" without the prior written consent of Buyer, and each Seller shall cause the names of Sellers in the caption of the Bankruptcy Case to be changed to the new names of each Seller as provided in the last sentence of this Section 8.8.  From the Closing, each Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the Intellectual Property rights utilized by Sellers and Sellers' Subsidiaries in the conduct of the Business or any Acquired Asset, which rights shall be included in the Acquired Assets purchased hereunder.

## ARTICLE 9

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

9.1     Accuracy of Representations.  The representations and warranties of Sellers set forth in this Agreement shall be true and correct, in all material respects (except that (a) those representations and warranties which are qualified as to materiality or Material Adverse Effect or similar expressions shall be true and correct in all respects, and (b) the representations set forth in Section 5.1 and Section 5.2 shall be true and correct in all respects), as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date).  Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

9.2     Sellers' Performance.  The covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with, in all material respects, and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

9.3     No Order.  No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Order, which is in effect and has the effect of restraining or preventing the consummation of or imposing material modifications on the transactions contemplated by this Agreement.

9.4     Consents.  All notices, filings, approvals and consents set forth on Schedule 9.4 shall have been made or obtained.

9.5     Sellers' Deliveries.  Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

9.6     Sale Order.  The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become a Final Order.

9.7     <u>Assigned Contracts</u>.   The Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assigned Contract, except for any Contracts that are removed from <u>Schedule 2.5(a)</u> pursuant to the provisions of <u>Section 2.5(a)</u>.

9.8     <u>Material Adverse Effect</u>.   Since the Execution Date, no Material Adverse Effect shall have occurred.

9.9     <u>Releases and Termination Statements</u>.   Sellers shall have delivered to Buyer releases and termination statements sufficient for Buyer to receive the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) (including releases evidencing the release of all Encumbrances on the Acquired Assets under the DIP Credit Facility); <u>provided</u>, <u>however</u>, that releases shall not be required with respect to Encumbrances that are both (a) released by the Sale Order and (b) not required to be released at Closing pursuant to releases and termination statements in connection with a financing or debt facility.

# ARTICLE 10

## <u>Conditions Precedent to the Obligation of Sellers to Close</u>

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Sellers, in their sole and absolute discretion:

10.1     <u>Accuracy of Representations</u>.   The representations and warranties of Buyer set forth in this Agreement shall be true and correct, in all material respects (except that those representations and warranties which are qualified as to materiality or material adverse effect or similar expressions shall be true and correct in all respects), as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (<u>provided</u>, <u>however</u>, that representations and warranties which are confined to a specified date shall speak only as of such date).   Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.2     <u>Buyer's Performance</u>.   The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with, in all material respects, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.3     <u>No Order</u>.   No Governmental Authority shall have enacted, issued, promulgated or entered any Order, which is in effect and has the effect of preventing the consummation of the transactions contemplated by this Agreement.

10.4     <u>Buyer's Deliveries</u>.   Each of the deliveries required to be made to Sellers pursuant to <u>Section 4.2</u> shall have been so delivered.

10.5     <u>Sale Order</u>.   The Bankruptcy Court shall have entered the Sale Order.

# ARTICLE 11

## TERMINATION

11.1     Termination Events.  Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)     by mutual written consent of Sellers and Buyer;

(b)     by written notice of either Sellers or Buyer:

(i)     if the Closing shall not have occurred by October 31, 2019 (as may be extended by written agreement of the Parties, the "*Outside Date*"); provided, however, that the right to terminate this Agreement under this Section 11.1(b)(i) shall not be available to any Party whose willful failure to fulfill any of its obligations under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(ii)     if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by the terminating Party; provided, however, that the right to terminate this Agreement under this Section 11.1(b)(ii) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(c)     by Buyer:

(i)     if the Bankruptcy Court enters an Order dismissing or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Sellers' businesses (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within fourteen (14) days after the entry thereof or any of Sellers seeks such an Order;

(ii)     in the event of any breach by any Seller of, or failure by any Seller to perform, any agreements, covenants, representations or warranties of any Seller contained herein or in the Sale Order, which breach or failure to perform would result in Sellers being unable to satisfy a condition set forth in Section 9.1 or Section 9.2 by the Outside Date; provided, however, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 11.1(c)(ii) if Buyer is in breach in any material respect of its covenants, representations or agreements contained in this Agreement;

73

(iii)    in the event of any withdrawal by any Debtor of Bidding Procedures and Sale Motion without Buyer's prior written consent; <u>provided</u>, <u>however</u>, that Buyer shall not have the right to terminate this Agreement pursuant to this <u>Section 11.1(c)(iii)</u> if Buyer is in breach in any material respect of its covenants, representations or agreements contained in this Agreement; or

(iv)    if (A) the Sale Order is not entered within ten (10) days after the conclusion of the Auction or such other date as the Bankruptcy Court's schedule permits if Sellers have timely moved the Bankruptcy Court to enter the Sale Order, or (B) the Bidding Procedures Order or the Sale Order shall have been stayed, vacated, or materially and adversely to Buyer amended or modified or supplemented without Buyer's prior written consent.

(d)    by Sellers in the event of any breach by Buyer of, or failure by Buyer to perform, any agreements, covenants, representations or warranties of Buyer contained herein, which breach or failure to perform would result in Buyer being unable to satisfy a condition set forth in <u>Section 10.1</u> or <u>Section 10.2</u>; <u>provided</u>, <u>however</u>, that Sellers shall not have the right to terminate this Agreement pursuant to this <u>Section 11.1(d)</u> if any Seller is in breach in any material respect of its covenants, representations or agreements contained in this Agreement.

Each condition set forth in this <u>Section 11.1</u>, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in <u>Section 11.1</u> are applicable, the applicable Party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated. The Parties acknowledge and agree that no notice of termination or extension of the Outside Date provided pursuant to this <u>Section 11.1</u> shall become effective until two (2) days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) day period or otherwise become invalid.

11.2    <u>Effects of Termination</u>.

(a)    In the event of termination of this Agreement by Buyer or Sellers pursuant to this <u>Article 11</u>, this Agreement shall become null and void *ab initio* and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any breach of this Agreement occurring prior to such termination and (ii) the provisions of this <u>Section 11.2</u> (and, to the extent applicable to the interpretation or enforcement of such provisions, <u>Article 1</u> and <u>Article 12</u>), shall expressly survive the termination of this Agreement.

(b)    Each Party acknowledges that the agreements contained in this <u>Article 11</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this <u>Article 11</u> do not constitute a penalty.

# ARTICLE 12

## GENERAL PROVISIONS

12.1    Survival.  All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms.  All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate on the Closing, including any Actions for damages in respect of any breach thereof.

12.2    Confidentiality.  The Parties agree that the confidentiality agreements entered into by them and their Affiliates, dated February 12, 2019 (as amended by their terms from time to time, the "***Confidentiality Agreements***"), shall continue in full force and effect notwithstanding the execution and delivery by the Parties of this Agreement; provided, however, that (a) the Confidentiality Agreements shall be deemed terminated effectively immediately upon the occurrence of the Closing with respect to all or any of the information concerning the Business or the Acquired Assets, (b) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute a breach of such Confidentiality Agreements, and (c) disclosures permitted under this Agreement shall not constitute a breach of such Confidentiality Agreements.  Following the Closing, each Seller agrees to, and to cause its Affiliates to, treat and hold as confidential, and not use or disclose all or any of the information concerning the Business, the Acquired Assets, the negotiation or existence and terms of this Agreement or the business affairs of Buyer except (i) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto and (ii) disclosures permitted under this Agreement.

12.3    Public Announcements.  Unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed).

12.4    Notices.  All notices, requests, claims, demands, consents, waivers, or other communications under this Agreement shall be in writing and shall be delivered by hand, overnight courier service or email or to all parties hereto at the following addresses:

(i)      If to Sellers, then to:

Perkins & Marie Callender's Holding, LLC
6075 Poplar Avenue, Suite 800
Memphis, TN 38119
Attn:    Jeff Warne
Email:   jeff.warne@prkmc.com

with a copy (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, DC 20006
Attn:    Scott Alberino, Esq.
Email:   salberino@akingump.com

(ii)     If to Buyer:

Huddle House, Inc.
5901-B Peachtree Dunwoody Rd NE
Suite 450
Sandy Springs, GA 30328
Attn:    Michael B. Abt
Email:   mabt@huddlehouse.com

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attn:    John Scott, Esq.
Email:   jscott@paulweiss.com

or to such other Persons or addresses as may be designated in writing by the Person entitled to receive such communication as provided above.  Each such communication shall be effective (a) if delivered by hand, when such delivery is made at the address specified in this Section 12.4, (b) if delivered by overnight courier service guaranteeing next Business Day delivery, the next Business Day after such communication is sent to the address specified in this Section 12.4 or (c) if delivered by email, only when the recipient, by return email or notice delivered by other method provided for in this Section 12.4, acknowledges having received that email (with an automatically generated receipt or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section 12.4).

12.5    Waiver.  Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or

privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    Entire Agreement; Amendment.  This Agreement (including the Disclosure Schedules, Annexes and the Exhibits), together with the other Transaction Documents, supersede all prior agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter.  Except as otherwise provided in Section 12.15, this Agreement (including the Disclosure Schedules, Annexes and Exhibits) may not be amended, modified or supplemented except by a written agreement executed by each of the Parties hereto (or, in the case of the Disclosure Schedules, as expressly provided herein).

12.7    Assignment.  This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of Sellers so long as prior to such assignment such Buyer Designee agrees in writing in favor of Sellers to be bound by the provisions of this Agreement pursuant to Section 12.19, it being agreed that, following any such assignment, Buyer shall continue to be bound by the provisions of this Agreement and remain liable for any breaches of this Agreement by its assignee.

12.8    Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    Expenses.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby.  Except as otherwise explicitly provided in this Agreement, any and all fees required by any Governmental Authority or any Person to obtain or for the transfer of a Permit shall be the sole responsibility of Buyer.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, or as otherwise provided in Section 12.15, this Agreement shall be governed by, and

construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)     Except as otherwise provided in <u>Section 12.15</u>, but without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action; <u>provided</u>, <u>however</u>, that, if the Bankruptcy Case is closed, all Actions arising out of or relating to this Agreement shall be heard and determined in a Delaware state court or a federal court sitting in the District of Delaware, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action.  The Parties consent to service of process by mail (in accordance with <u>Section 12.4</u>) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11    <u>Counterparts</u>.  This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument.  Notwithstanding anything to the contrary in <u>Section 12.4</u>, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.12    <u>Parties in Interest; No Third Party Beneficiaries; No Amendment</u>.  This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Except as otherwise provided in <u>Section 12.15</u>, this Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.  Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Benefit Plan.

12.13    <u>Remedies</u>.  Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or

limit Sellers or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.14   Specific Performance for Post-Closing Covenants.   Solely with respect to the Parties' respective covenants under this Agreement that survive the Closing, and solely to the extent to be performed after the Closing, (a) each Party recognizes that if such Party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of such covenants, (c) if any Action is brought by the non-breaching Party or Parties to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (d) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action seeking specific performance of such covenants and (e) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.   Notwithstanding any other provision of this Agreement to the contrary, no Party shall be entitled to any equitable remedy, including an injunction or order for specific performance, to enforce any provision of this Agreement prior to the Closing.

12.15   Debt Financing Party Arrangements.   Notwithstanding anything to the contrary contained in this Agreement, each of the Parties hereto (a) agrees that it will not bring or support any Person, or permit any of its Affiliates to bring or support any Person, in any Action, cause of action, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Person that has committed or subsequently commits to provide or otherwise enters into agreements in connection with providing debt financing to Buyer or any of its Affiliates (the "***Financing Sources***," which defined term for the purposes of this provision shall include the Buyer Lenders (as defined below) and their respective former, current and future Affiliates, equityholders, members, partners, controlling persons, officers, directors, employees, agents, advisors and Representatives involved in such debt financing) in any way relating to this Agreement or any of the transactions contemplated by this Agreement, including any dispute arising out of or relating in any way to that certain Commitment Letter, dated as of September 5, 2019, by and among Buyer, as borrower, Regions Bank and Regions Capital Markets, a Division of Regions Bank (collectively, the "***Buyer Lenders***") and any fee letter related thereto (collectively, the "***Debt Commitment Letter***") or the performance thereof or the financings contemplated thereby, in any forum other than the federal and New York State courts located in the Borough of Manhattan within the City of New York; (b) agrees that, except as specifically set forth in the Debt Commitment Letter, all claims or causes of action (whether at law, in equity, in contract, in tort or otherwise) against any of the Financing Sources in any way relating to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, shall be exclusively governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of laws of another jurisdiction; and (c) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (WHETHER AT LAW OR IN EQUITY, IN CONTRACT, IN TORT OR OTHERWISE) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING IN ANY WAY TO THE

DEBT COMMITMENT LETTER OR THE PERFORMANCE THEREOF OR THE FINANCINGS CONTEMPLATED THEREBY.  Notwithstanding anything to the contrary contained in this Agreement, (i) Sellers and their respective Subsidiaries, Affiliates, directors, officers, employees, agents, partners, managers, members or stockholders shall not have any rights or claims against any Financing Source in any way relating to this Agreement or any of the transactions contemplated by this Agreement, or in respect of any oral representations made or alleged to have been made in connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, whether at law or in equity, in contract, in tort or otherwise and (ii) no Financing Source shall have any liability (whether in contract, in tort or otherwise) to Sellers or any of their respective Subsidiaries, Affiliates, directors, officers, employees, agents, partners, managers, members or stockholders for any Liabilities of any Party hereto under this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby or in respect of any oral representations made or alleged to have been made in connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, whether at law or in equity, in contract, in tort or otherwise.  Notwithstanding anything to the contrary contained in this Agreement, the Financing Sources are intended third-party beneficiaries of, and shall be entitled to the protections of this provision and Section 12.6 (Entire Agreement; Amendment), Section 12.10 (Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver) and Section 12.12 (Parties in Interest; No Third Party Beneficiaries; No Amendment) which cross-reference this Section 12.15 to the same extent as if the Financing Sources were parties to this Agreement. This Section 12.15, and Section 12.6, Section 12.10 and Section 12.12 (and any related definitions) may not be amended, modified or supplemented, or any of its provisions waived, without the written consent of the Financing Sources, which consent may be granted or withheld in the sole discretion of the Financing Sources.

12.16  Sellers' Representative; Reliance.  Sellers, jointly and severally, hereby represent and warrant that the statements in this Section 12.16 are correct and complete as of the date of this Agreement:

(a)  The Company has been appointed, and is authorized, and empowered to act, in connection with, and to facilitate the consummation of, the transactions contemplated by this Agreement and the other Transaction Documents and in connection with any activities to be performed by Sellers under this Agreement and the other Transaction Documents, for the purposes and with the powers, and authority set forth in this Agreement, which will include the sole power and authority:

(i)  to receive notices on behalf of Sellers hereunder pursuant to Section 12.4;

(ii)  to receive and distribute the Purchase Price or any other amount paid in connection with this Agreement or the other Transaction Documents to Sellers;

(iii)  to enforce and protect the rights and interests of Sellers arising out of or under or in any manner relating to this Agreement and the other

Transaction Documents (including in connection with any claims related to the transactions contemplated hereby and thereby) and, in connection therewith, to (A) assert any claim or institute any Action, (B) investigate, defend, contest or litigate any Action initiated by Buyer or any other Person pursuant to this Agreement and the other Transaction Documents and receive process on behalf of each Seller in any such Action and compromise or settle on such terms as the Company will determine to be appropriate, give receipts, releases and discharges on behalf of all or any Seller with respect to any such Action, (C) file any proofs, debts, claims and petitions as the Company may deem advisable or necessary, (D) settle or compromise any claims related to the transactions contemplated by this Agreement and the other Transaction Documents, including with respect to the Specified Net Adjustment and the adjustments contemplated by Section 3.2 and Section 3.3, (E) assume, on each Sellers' behalf, the defense of any claims related to the transactions contemplated by this Agreement and the other Transaction Documents, and (F) file and prosecute appeals from any decision, judgment or award rendered in any of the foregoing Actions;

(iv)    to enforce or refrain from enforcing any right of any Seller (prior to the Closing) and/or of the Company arising out of or under or in any manner relating to this Agreement or the other Transaction Documents;

(v)    to engage attorneys, accountants and agents, including the Final Arbiter in accordance with Section 3.3;

(vi)    to amend this Agreement (other than this Section 12.16), or any of the instruments to be delivered to Buyer by Sellers pursuant to this Agreement;

(vii)    to take any action to be taken by one or more Sellers under or in connection with this Agreement or any other Transaction Document; or

(viii)    to make, execute, acknowledge and deliver all such other Contracts, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Company, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the activities described Section 12.16(a)(i) through Section 12.16(a)(vii) and the transactions contemplated by this Agreement and the other Transaction Documents.

(b)    The Company's power and grant of authority is (i) coupled with an interest and is irrevocable and survives the bankruptcy or liquidation of any Seller and will be binding on any successor thereto and (ii) may be exercised by the Company acting by signing as the representative of any Seller.

(c)    Buyer and its Affiliates and representatives may conclusively and absolutely rely, without inquiry, upon the action of the Company as the action of each Seller (and may ignore any action taken or notice given by any Seller other than the Company) in all matters relating to this Agreement, the other Transaction Documents or the transactions contemplated hereby and thereby.  Any document delivered or notice delivered by or on behalf of Buyer or its

Affiliates to, or action taken by or on behalf of Buyer or its Affiliates with respect to, the Company shall be deemed to have been delivered to, or taken with respect to, all Sellers.  Any amounts to be paid by Buyer to Sellers pursuant to this Agreement shall be divided by Sellers among themselves, but may be paid by Buyer to the Company.  Sellers shall be jointly and severally liable for any amounts due to be paid or owed by Sellers to Buyer pursuant to this Agreement.

(d)     The agreements in this Section 12.16 shall survive termination of this Agreement.

12.17  <u>Limitations on Damages</u>.  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, COST OF CAPITAL OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY; PROVIDED, HOWEVER, THAT THE FOREGOING LIMITATION SHALL NOT APPLY TO THE EXTENT SUCH DAMAGES ARE PAYABLE BY THE PARTY SEEKING SUCH DAMAGES TO A THIRD PARTY.

12.18  <u>Non-Recourse</u>.  No past, present or future director, officer, employee, incorporator, member, partner or equity holder of the Parties will have any liability for any obligations or liabilities of any Seller or Buyer, as applicable, under this Agreement, or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.  Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties hereto, no Person shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any action or proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

12.19  <u>Joinder</u>.  At the Closing, any Person to whom Buyer assigns the right to receive the Acquired Assets at Closing shall execute a joinder to this Agreement in the form attached hereto as **<u>Exhibit J</u>**, pursuant to which each such other Person will assume Buyer's obligations with respect to such Acquired Assets (and any corresponding Assumed Liabilities, as applicable) as set forth in such joinder.

*[Signature pages follow.]*

**IN WITNESS WHEREOF,** the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

HUDDLE HOUSE, INC.

By: _____

Name: Michael B Abt

Title: CEO

PERKINS & MARIE CALLENDER'S HOLDING, LLC

By: _____
Name:  Jeffrey Warne
Title:    President and CEO

PERKINS & MARIE CALLENDER'S, LLC

By: _____
Name:  Jeffrey Warne
Title:    President and CEO

MARIE CALLENDER PIE SHOPS, LLC

By: _____

Name:  Jeffrey Warne

Title:    President

MC WHOLESALERS, LLC

By: _____

Name:  Jeffrey Warne

Title:    President

PMCI PROMOTIONS LLC

By: _____
Name:  Jeffrey Warne
Title:    President and CEO

MCID, INC.

By: _____
Name: Jeffrey Warne
Title:    President

WILSHIRE BEVERAGE, INC.

By: _____
Name:  Jeffrey Warne
Title:    President

FIV, LLC

By: _____
Name:  Jeffrey Warne
Title:    President

P&MC'S HOLDING CORP.

By: _____
Name:  Jeffrey J. Warne
Title:   President

## SCHEDULE A

# SCHEDULE A

## Application of Sale Proceeds

Upon the Closing of the Sale, notwithstanding anything to the contrary in the Asset Purchase Agreement or otherwise, all Cash Consideration paid or payable to any of the Debtors shall be allocated and distributed as follows, and in each case without duplication (the "**Sale Proceeds Waterfall**"): [1]

        *FIRST*, to the Specified Adjustment Escrow, established in accordance with the terms of the Asset Purchase Agreement and the escrow agreement contemplated thereby (the "**Specified Adjustment Escrow Agreement**"), in an amount equal to $2,000,000, with any distribution therefrom being governed by the Asset Purchase Agreement and the Specified Adjustment Escrow Agreement;

        *SECOND*, to an escrow (or escrows) to fund (i) the Carve-Out Escrow (as defined in the Final DIP Order), (ii) the amount of fees and expenses qualifying under clause (a) of "Seller Retained Professional Fees" (as defined in the Asset Purchase Agreement), and (iii) the approved amount set forth in that certain order approving the Debtors' motion for implementation of its key employee incentive program [Docket No. 237];

        *THIRD*, to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, in an amount sufficient to repay in full the DIP Obligations, such repayment and disbursement to the DIP Agent and the DIP Lenders being fully authorized without delay; provided, that: (i) the payment of accrued and unpaid professional fees and expenses incurred by the DIP Agent and the DIP Lenders (including the allocated costs (with no profit margin) of the DIP Lenders' internal counsel in connection with the Cases) in accordance with the DIP Documents and the Final DIP Order (collectively, the "**DIP Legal Fees and Expenses**") shall not be subject to allowance by the Court, but shall be subject to the procedures set forth in paragraph 31 of the Final DIP Order; and (ii) the DIP Agent shall hold in escrow an amount equal to the DIP Agent's good faith estimate of the portion of the DIP Obligations constituting the DIP Legal Fees and Expenses until such time as payment thereof is permitted pursuant to paragraph 31 of the Final DIP Order, at which time the DIP Agent is authorized to pay or reimburse, as the case may be, the DIP Agent and the DIP Lenders for the DIP Legal Fees and Expenses in accordance with the DIP Documents (and shall distribute the remainder therefrom, if any, in accordance with this Sale Proceeds Waterfall);[2]

---

[1] The Debtors reserve the right to establish one or more escrows, with sub-accounts for the escrowed amounts set forth herein, or separate escrow accounts, as determined by the Debtors in consultation with the Prepetition Agent (as defined in the Final DIP Order) and the Committee.

[2] Capitalized terms used in this clause *THIRD* and not otherwise defined in this Schedule A shall have the meanings ascribed to them in the Final DIP Order.

1

*FOURTH*, to the Wind Down and Professional Expenses Escrow established in accordance with the terms of the Asset Purchase Agreement, in an aggregate amount equal to the sum of (a) the Estimated Wind Down Expenses, which, for the avoidance of doubt, shall include the Administrative and Priority Claim Reserve (as defined in the Final DIP Order), (b) an amount equal to the estimate of fees and expenses qualifying under clause (b) of "Seller Retained Professional Fees" and (c) the Carve Out Amount (as defined in the Asset Purchase Agreement, solely to the extent such amounts have not been funded in First through Third above);

*FIFTH*, to an escrow (or escrows) to fund the GUC Fixed Recovery Fund and the GUC Percentage Recovery Fund (each as defined in the Final DIP Order);

*SIXTH*, with any remainder of proceeds from the Sale to be deposited by the Debtors into the Sales Proceeds Escrow pending further order of the Court, with the distribution and use thereof subject to the terms and conditions of the Final DIP Order; *provided*, *however*, in the event that, after the funding of the FIRST through FIFTH amounts above, the aggregate cash balance of proceeds received into the Sales Proceeds Escrow exceeds $11.0 million at any time, then the Debtors shall cause any amount in excess of $11.0 million to be promptly distributed to the Prepetition Agent, for the benefit of the Prepetition Secured Parties (as defined in the Final DIP Order), and for application in accordance with the Prepetition Credit Agreement to the Prepetition Obligations (each as defined in the Final DIP Order).

The foregoing Sale Proceeds Waterfall is intended to govern the funding of reserves for any payments that are not expressly required pursuant to the Asset Purchase Agreement (while also taking into account the funding of reserves for payments that are expressly required pursuant to the Asset Purchase Agreement) upon Closing of the Sale, and shall in no way alter or supersede paragraph 47 of the Final DIP Order.

Notwithstanding the deposit and receipt of any Cash Consideration into the escrows set forth above and any other sub-accounts or related accounts established by or on behalf of the Debtors with respect to the net cash proceeds of the Sale (collectively, the "**Closing Escrow Accounts**"), all such proceeds in such Closing Escrow Accounts (other than the Specified Adjustment Escrow which shall not be subject to the Prepetition Secured Parties' or DIP Parties' liens, except to the extent of any residual interests of the Debtors therein) shall remain subject to the DIP Liens, the Prepetition Liens and the Adequate Protection Liens (each as defined in the

2

Final DIP Order) in favor of the DIP Agent and the Prepetition Agent, as the case may be, until such proceeds are disbursed to or for the benefit of the respective beneficiaries of such Closing Escrow Accounts in accordance with the Asset Purchase Agreement and the terms hereof, consistent with applicable law, or pursuant to any subsequent order and direction of the Court (including for release from the applicable Closing Escrow Account to the Debtors for immediate deposit into the Sales Proceeds Escrow to be governed by paragraph _SIXTH_ above).

The terms and conditions of each of the escrow agreements entered into by the Debtors with respect to the Closing Escrow Accounts shall be reasonably acceptable to the DIP Agent, the Prepetition Agent and, solely as it relates to the Wind Down and Professionals Expense Escrow and the GUC Reserve, the Committee, and the identity of the escrow agents engaged with respect to such escrows, shall be reasonably acceptable to the DIP Agent, the Prepetition Agent and, as applicable, the Committee; _provided, however,_ that notwithstanding anything to the contrary herein, the Specified Adjustment Escrow shall be governed by the terms of the Asset Purchase Agreement.

With respect to the specific amounts of the deposits into the Carve Out Escrow and the Wind Down and Professional Expense Escrow, the Debtors shall provide the DIP Agent, the Prepetition Agent, and the Committee with such information and supporting documents as they may reasonably request to confirm the amount thereof, and to the extent that the Debtors, the DIP Agent, the Prepetition Agent, the Committee, and, solely as it relates to the Wind Down and Professionals Expense Escrow and the GUC Reserve, cannot agree on the amounts allocable to the Carve Out Escrow and the Wind Down and Professional Expense Escrow (or any sub-accounts established with respect thereto), then such disputed amounts will be resolved by the Court after notice and hearing on an expedited basis.

3

Notwithstanding the foregoing, the Sale Proceeds Waterfall shall be funded from the sale proceeds upon the closing of the first of either the Sale, the sale of the MC Business Assets and the California Business Assets or the sale of the Foxtail Business Assets and, then, upon the closing of the subsequent sales of the foregoing until the Sale Proceeds Waterfall is fully funded as set forth herein.

4