## Exhibit A

**Asset Purchase Agreement**

*Execution Version*

---

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF SEPTEMBER 10, 2019**

BY AND AMONG

**FAIRFIELD GOURMET FOOD CORP.,**

**PERKINS & MARIE CALLENDER'S HOLDING, LLC,**

**PERKINS & MARIE CALLENDER'S, LLC,**

**MARIE CALLENDER PIE SHOPS, LLC**

AND

**MC WHOLESALERS, LLC**

---

TABLE OF CONTENTS

## ARTICLE 1

### DEFINITIONS

1.1      Definitions.................................................................................................................9
1.2      Cross Reference of Other Definitions.................................................................20
1.3      Other Definitions and Interpretive Matters.........................................................21

## ARTICLE 2

### PURCHASE AND SALE

2.1      Purchase and Sale ...............................................................................................23
2.2      Excluded Assets ..................................................................................................24
2.3      Assumed Liabilities ............................................................................................26
2.4      Excluded Liabilities ............................................................................................27
2.5      Assignment and Assumption of Contracts..........................................................28
2.6      Further Assurances..............................................................................................30

## ARTICLE 3

### PURCHASE PRICE

3.1      Consideration ......................................................................................................30
3.2      Allocation of Purchase Price...............................................................................30

## ARTICLE 4

### CLOSING AND DELIVERIES

4.1      Closing Date........................................................................................................31
4.2      Buyer's Deliveries ..............................................................................................31
4.3      Sellers' Deliveries...............................................................................................32

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLERS

5.1      Organization and Good Standing.........................................................................33
5.2      Authority; Validity; Consents ............................................................................33
5.3      Subsidiaries.........................................................................................................34
5.4      No Conflict..........................................................................................................34
5.5      Real Property ......................................................................................................34
5.6      Environmental Matters........................................................................................35
5.7      Title to Acquired Assets......................................................................................36

| | | |
|---|---|---|
| 5.8 | Taxes | 36 |
| 5.9 | Legal Proceedings | 36 |
| 5.10 | Compliance with Legal Requirements; Permits. | 36 |
| 5.11 | Labor Matters | 37 |
| 5.12 | Employee Benefits | 38 |
| 5.13 | Sellers' Intellectual Property | 39 |
| 5.14 | Contracts | 39 |
| 5.15 | Sufficiency of Assets | 40 |
| 5.16 | Insurance | 40 |
| 5.17 | Brokers or Finders | 40 |
| 5.18 | Undue Influence | 40 |
| 5.19 | Financial Statements | 40 |
| 5.20 | Absence of Certain Changes | 41 |
| 5.21 | Customers and Suppliers | 42 |
| 5.22 | Products; Warranties; Food Laws; Regulatory Matters | 42 |

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

| | | |
|---|---|---|
| 6.1 | Organization and Good Standing | 43 |
| 6.2 | Authority; Validity; Consents | 43 |
| 6.3 | No Conflict | 43 |
| 6.4 | Availability of Funds | 44 |
| 6.5 | Litigation | 44 |
| 6.6 | Brokers or Finders | 44 |
| 6.7 | Qualification | 44 |
| 6.8 | Information | 44 |

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

| | | |
|---|---|---|
| 7.1 | Access and Reports | 45 |
| 7.2 | Operations Prior to the Closing Date | 46 |
| 7.3 | Governmental Approvals;Cooperation | 47 |
| 7.4 | Bankruptcy Court Matters | 48 |
| 7.5 | Break-Up Fee | 48 |
| 7.6 | Update of Disclosure Schedules; Notice of Developments | 49 |
| 7.7 | Limitations | 49 |

## ARTICLE 8

### ADDITIONAL AGREEMENTS

| | | |
|---|---|---|
| 8.1 | Taxes | 49 |
| 8.2 | Payments Received | 50 |

| 8.3 | Assigned Contracts: Adequate Assurance and Performance | 50 |
| 8.4 | Employee Matters | 51 |
| 8.5 | Post-Closing Books and Records and Personnel | 52 |
| 8.6 | Representations and Warranties Exclusive | 52 |
| 8.7 | Casualty Loss | 53 |
| 8.8 | Names and Transition Trademark License | 53 |

## ARTICLE 9

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

| 9.1 | Accuracy of Representations | 54 |
| 9.2 | Sellers' Performance | 54 |
| 9.3 | No Order | 54 |
| 9.4 | Governmental Authorizations | 54 |
| 9.5 | Sellers' Deliveries | 54 |
| 9.6 | Sale Order | 54 |
| 9.7 | Assigned Contracts | 54 |
| 9.8 | Material Adverse Effect | 55 |
| 9.9 | Releases and Termination Statements | 55 |
| 9.10 | Cure Costs | 55 |

## ARTICLE 10

### CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

| 10.1 | Accuracy of Representations | 55 |
| 10.2 | Buyer's Performance | 55 |
| 10.3 | No Order | 56 |
| 10.4 | Buyer's Deliveries | 56 |
| 10.5 | Sale Order in Effect | 56 |

## ARTICLE 11

### TERMINATION

| 11.1 | Termination Events | 56 |
| 11.2 | Effect of Termination | 57 |

## ARTICLE 12

### GENERAL PROVISIONS

| 12.1 | Survival | 58 |
| 12.2 | Confidentiality | 59 |
| 12.3 | Public Announcements | 59 |
| 12.4 | Notices | 59 |
| 12.5 | Waiver | 60 |

12.6      Entire Agreement; Amendment ..........................................................................60
12.7      Assignment ........................................................................................................60
12.8      Severability .......................................................................................................61
12.9      Expenses ...........................................................................................................61
12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver...............61
12.11    Counterparts ......................................................................................................62
12.12    Parties in Interest; No Third Party Beneficiaries; No Amendment .....................62
12.13    Remedies...........................................................................................................62
12.14    Specific Performance for Post-Closing Covenants................................................62
12.15    Sellers' Representative; Reliance .........................................................................62
12.16    Definition of Damages ........................................................................................64
12.17    Non-Recourse ....................................................................................................64
12.18    Joinder................................................................................................................64

**SCHEDULES**

Schedule 1.1(a)        Corporate Assets
Schedule 1.1(b)        Equipment
Schedule 1.1(c)        Inventory Item and Price
Schedule 1.1(d)        Sellers' Knowledge Persons
Schedule 1.1(e)        Permitted Encumbrances
Schedule 2.1(a)        Inventory
Schedule 2.1(c)        Assigned Contracts
Schedule 2.1(e)        Permits
Schedule 2.1(f)        Intellectual Property
Schedule 2.1(m)        Telecommunications
Schedule 2.1(n)        Other Acquired Assets
Schedule 2.2(v)        Other Excluded Assets
Schedule 2.4(b)        Credit Liabilities
Schedule 2.5(a)        Assigned Contracts
Schedule 5.2           Required Consents
Schedule 5.3           Subsidiaries
Schedule 5.4           No Conflict
Schedule 5.5(b)        Leased Real Property
Schedule 5.6           Environmental Matters
Schedule 5.8           Taxes
Schedule 5.9           Legal Proceedings
Schedule 5.10(b)       Compliance with Legal Requirements
Schedule 5.10(c)       Permits
Schedule 5.11(b)       Labor Matters
Schedule 5.11(d)       Labor Matters
Schedule 5.11(e)       Employee Settlements; Actions
Schedule 5.12(a)       Business Benefit Plans
Schedule 5.12(b)       Multiple Employer Plans
Schedule 5.12(f)       Benefit Plans
Schedule 5.13(a)       Intellectual Property
Schedule 5.13(b)       Intellectual Property
Schedule 5.14          Contracts
Schedule 5.16          Insurance
Schedule 5.20          Absence of Changes
Schedule 5.21(a)       Suppliers
Schedule 5.21(b)       Customers
Schedule 5.22(a)       Products; Warranties; Food Laws; Regulatory Matters
Schedule 5.22(d)       Products; Warranties; Food Laws; Regulatory Matters
Schedule 6.2           Authority; Validity; Consents
Schedule 7.2           Operations Prior to the Closing Date
Schedule 8.4(c)        Buyer Benefit Plans
Schedule 9.4           Governmental Authorizations

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption Agreement |
| Exhibit B | Form of Bidding Procedures |
| Exhibit C | Form of Bidding Procedures Order |
| Exhibit D | Form of Bill of Sale |
| Exhibit E | Form of Sale Order |
| Exhibit F-1 | Form of Supply Agreement |
| Exhibit F-2 | Form of Alternative Supply Agreement |
| Exhibit F-3 | Form of MC Supply Agreement |
| Exhibit G | Form of Joinder |

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

**THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT** (this "*Agreement*"), dated as of September 10, 2019 (the "*Execution Date*"), is made and entered into by and among Fairfield Gourmet Food Corp., a New Jersey Corporation ("*Buyer*"), Perkins & Marie Callender's Holding, LLC, a Delaware limited liability company (the "*Company*"), Perkins & Marie Callender's, LLC ("*PMC*"), Marie Callender Pie Shops, LLC ("*MCPS*") and MC Wholesalers, LLC, a California limited liability company ("*MCW*" and, together with the Company, PMC and MCPS, the "*Sellers*" and each entity individually a "*Seller*"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in ARTICLE 1.

## RECITALS

**WHEREAS**, Sellers are engaged in the business of manufacturing and supplying to restaurants, supermarket in-store bakeries, and branded food companies premium baked goods, mixes, and syrups, including pies, muffin batters, cookies, brownies, pancake mixes and syrups, from (a) the facility located at 6880 Fairfield Business Drive, Fairfield, Ohio 45014 (the "*Ohio Facility*" and such business, together with the warehousing and related services provided to such business at the Fairfield Storage Facilities, the "*Ohio Business*") and (b) the facility located at 170 East Rincon Street, Corona, California 92879 (the "*California Facility*" and such business, together with the warehousing and related services provided to such business at the Corona Storage Facilities, the "*Corona Business*");

**WHEREAS**, Sellers are also engaged in (i) the franchise, ownership and operation of the "Perkins" branded family dining restaurants and bakeries (the "*Perkins Business*") and (ii) the franchise, ownership and operation of "Marie Callender's" branded family dining restaurants and bakeries (the "*MC Business*");

**WHEREAS**, on August 5 2019 (as applicable, the "*Petition Date*"), Sellers filed a voluntary petition for relief (the "*Bankruptcy Case*") pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

**WHEREAS**, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, (i) Sellers desire to sell to Buyer all of the Acquired Assets, and Buyer desires to cause the Buyer Designee to purchase from Sellers all of the Acquired Assets, and Sellers desire to assign, and Buyer desires to cause the Buyer Designee to assume, all of the Foxtail Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer, pursuant to the Sale Order, free and clear of any and all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, Buyer is not acquiring, and Sellers are retaining or selling to a third party, the Excluded Business and assets and liabilities associated therewith, which assets and liabilities constitute, subject to the terms and conditions contained herein, Excluded Assets and Excluded Liabilities under this Agreement;

**WHEREAS**, Sellers' ability to consummate the transactions contemplated by this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court;

WHEREAS, the Parties intend to amend and restate in its entirety that certain stalking horse Asset Purchase Agreement, dated as of August 21, 2019, by and between Buyer and Sellers (the "***Prior Agreement***"); and

WHEREAS, the applicable board of managers, managing member, or similar governing body of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same;

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

### DEFINITIONS

1.1     Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"***Accounts Receivable***" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that have not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing and any payments with respect thereto, in each case, of or generated by the Business of such Seller.

"***Action***" means any legal action, suit, petition, plea, charge, claim, demand, arbitration, audit, complaint, grievance, summons, litigation, mediation, suit, proceeding (including any civil, criminal, or administrative proceeding), prosecution, contest, hearing, audit, examination or investigation commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"***Affiliate***" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934.

"***Applicable Rate***" means, for a particular day, the prime rate as reported in The Wall Street Journal published for such day or, if such rate is regularly reported in The Wall Street Journal, but is not reported on such day, such rate as most-recently reported in The Wall Street Journal (or, if such rate is no longer reported in The Wall Street Journal, a comparable rate), calculated on a daily basis based on a 365-day year.

"***Assignment and Assumption Agreement***" means the Assignment and Assumption Agreement in substantially the form attached hereto as **Exhibit A**.

"***Auction***" means the auction contemplated by the Bidding Procedures.

"***Avoidance Action***" means any claim, right or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Acquired Assets or the Business.

"***Backup Bidder***" has the meaning set forth in the Bidding Procedures.

"***Bankruptcy Code***" means Title 11 of the United States Code, Sections 101 *et seq.*

"***Benefit Plan***" means any material plan, program, arrangement or agreement that is a compensation, pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, including any (a) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (b) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices, whether or not subject to ERISA.

"***Bid Deadline***" has the meaning set forth in the Bidding Procedures.

"***Bidding Procedures***" means bid procedures in substantially the form attached hereto as **Exhibit B**, to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"***Bidding Procedures Order***" means an Order of the Bankruptcy Court in substantially the form attached hereto as **Exhibit C**.

"***Bill of Sale***" means the Bill of Sale in substantially the form attached hereto as **Exhibit D**.

"***Business***" means the Ohio Business and, in each case, excluding the Excluded Business.

"***Business Day***" means any day of the year on which national banking institutions in New York, New York and Wilmington, Delaware are open to the public for conducting business and are not required or authorized to close.

"***Buyer***" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee designated by Buyer pursuant to the terms of this Agreement.

"***Buyer Designee***" means the Buyer or any other Person designated by Buyer to purchase any of the Acquired Assets pursuant to the terms of this Agreement.

"***Carve Out Escrow***" means the escrow account established pursuant to the Carve Out Escrow Agreement.

"***Carve Out Escrow Agreement***" means an escrow agreement by and among Sellers and Escrow Agent for the disbursement of the amounts paid by Buyer pursuant to Section 4.2(a)(iv).

"***Cash Consideration***" means cash equal to $18,700,000 (the "***Target Price***"); provided, however, that, in the event that the A/R and Inventory Value is less than $13,000,000, then the Target Price shall be reduced on a dollar-for-dollar basis by an amount equal to such deficit.

"***Claim***" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, against any Seller.

"***Closing Date***" means the date and time as of which the Closing occurs as set forth in Section 4.1.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Contract***" means any agreement, contract, obligation, promise, undertaking, lease (including any Leases), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (in each case, whether written or oral), and any amendments, modifications or supplements thereto.

"***Copyrights***" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"***Corona Storage Facilities***" means each of (a) that certain warehouse facility located at 2324 Fleetwood Drive, Riverside, California, 92509, where Lineage Logistics, LLC ("***Lineage***") provides warehousing and related services to the California Business, as described in that certain letter agreement between Lineage and Perkins & Marie Callender's, LLC, d/b/a Foxtail Foods, dated July 31, 2018 and (b) that certain warehousing arrangement pursuant to which AWC Packaging provides warehousing and related services to the California Business.

"***Corporate Assets***" means (a) the Corporate Headquarters, (b) any Equipment, Inventory or other tangible assets located at the Corporate Headquarters, and (c) any assets set forth on Schedule 1.1(a).

"***Corporate Headquarters***" means the Sellers' corporate campus located at 6075 Poplar Ave., in Memphis, Tennessee.

"***Credit Support***" means all guaranties, letters of credit, reimbursement agreements, bonds, deposits, prepayments amounts and other credit or contractual assurances of a comparable nature made or issued by or for the account of any Seller for the benefit of a counterparty under the Assigned Contracts or otherwise in connection with the Business.

"***Cure Cap***" means, at any time of determination, an amount equal to (a) $939,000, *less* (b) the estimated Cure Costs set forth on the Execution Date Contract Schedule for any Contract that is deleted from Schedule 2.5(a) pursuant to the provisions of Section 2.5(a).

"***Cure Costs***" means all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court.

"***Cure Notice***" means, with respect to each Assigned Contract, the notice submitted by Sellers to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth the Cure Cost amount with respect thereto as calculated by Sellers.

"***DIP Credit Agreement***" means that certain superpriority secured debtor-in-possesison credit agreement to be entered into on or shortly after the Petition Date, by and among the Sellers and certain other affiliates of the Sellers party thereto, Bank of America, N.A., in its capacity as administrative

agent, and the lenders from time to time party thereto, as the same may be amended, restated, supplemented or otherwise modified, together with all annexes, exhibits and schedules thereto.

"*Disclosure Schedules*" means the Disclosure Schedules attached hereto, dated as of the Execution Date, delivered by Sellers to Buyer in connection with the execution of this Agreement and as may be amended, restated, modified or updated in accordance with the terms hereof.

"*Documents*" means all of the documents of, generated by, used in, held for use in, or necessary for the operation of the Business.

"*Employees*" means all employees of the Business on the Execution Date as well as any additional persons who become employees of the Business as permitted by Section 7.2 during the period from the Execution Date through and including the Closing Date.

"*Encumbrance*" means any mortgage, deed of trust, pledge, security interest, lien, charge, hypothecation, option, right of first offer or first refusal, restrictive covenant, right of way, preemptive right, conditional sale or other title retention agreement or any other encumbrance.

"*Environmental Laws*" means any and all current Legal Requirements concerning or relating to the protection of worker/occupational health from exposure to Hazardous Substances, and pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, discharge, Release, control, or cleanup of Hazardous Substances.

"*Equipment*" means all furniture, fixtures, equipment, computers, machinery, tools, molds, vehicles, apparatus, appliances, implements, telephone systems, management information systems (including all proprietary software and hardware related thereto), signage, supplies and all other tangible personal property of every kind and description, and improvements and tooling with respect thereto, in each case, (a) to the extent exclusively used in, held for use in, or necessary for the operation of the Business, (b) and located at the Ohio Facility, or (c) otherwise set forth on Schedule 1.1(b), including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents with respect thereto, and including all warranties of the vendor applicable thereto.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Escrow Agent*" means U.S. Bank National Association or such other escrow agent mutually acceptable to Sellers and Buyer.

"*Estimated Wind Down Expenses*" means any and all administrative costs and expenses of the Sellers and their affiliates, including any sales tax, payroll costs and expenses (including payroll taxes with respect thereto), accrued vacation expenses, and any other employee Liabilities, in each case, that Sellers have incurred or incur during the Bankruptcy Cases or otherwise expect to incur in connection with winding down their respective bankruptcy estates, excluding any such costs and expenses that are assumed or included as Assumed Liabilities.

"*Excluded Business*" means the Perkins Business, the MC Business, the California Business, and any other business conducted by Sellers other than the Business.

"*Fairfield Storage Facilities*" means each of (a) that certain warehouse facility where Merchants Cold Storage ("*MCS*") provides warehousing and related services to the Ohio Business, as

described in that certain letter arrangement between MCS and Perkins & Marie Callender's, LLC d/b/a Foxtail Foods, dated June 27, 2017 and (b) that certain warehousing arrangement pursuant to which H&O Distribution Inc. provides warehousing and related services to the Ohio Business.

"*Final Inventory Value*" means the Inventory Value as finally determined pursuant to the terms hereof.

"*Final Order*" means an Action taken or Order issued by the applicable Governmental Authority as to which: (a) no request for stay of the Action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (b) no petition for rehearing or reconsideration of the Action or Order, or protest of any kind, is pending before the Governmental Authority, and the time for filing any such petition or protest is passed; (c) the Governmental Authority does not have the Action or Order under reconsideration or review on its own motion, and the time for such reconsideration or review has passed; and (d) the Action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

"*FLSA*" means Fair Labor Standards Act of the United States Department of Labor, and any state or local laws governing wages, hours, and/or overtime pay.

"*Food Laws*" means the Federal Food, Drug, and Cosmetic Act, the FDA Food Safety Modernization Act, the Federal Meat Inspection Act and Poultry Product Inspection Act, all acts and/or rules and regulations amending or supplementing the foregoing, as well as any applicable Legal Requirements regulating or related to food.

"*GAAP*" means generally accepted accounting principles in the United States.

"*Governmental Authority*" means any United States federal, state or local, municipal, or any foreign government, governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction, including, for the avoidance of doubt, the Bankruptcy Court.

"*Governmental Authorization*" means any approval, consent, license, Permit, Order, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"*Hazardous Substance*" means any substance, material or waste (including chemicals, compounds, mixtures, pollutants and contaminants) (a) to the extent such materials are prohibited, limited or regulated by the Environmental Laws as "hazardous", "acutely hazardous" or "toxic"; (b) petroleum or any fraction thereof, or petroleum products, (c) natural gas, (d) asbestos and asbestos-containing materials, (e) radioactive material, (f) urea formaldehyde, and (g) polychlorinated biphenyls.

"*Improvements*" means the buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to and/or demised under any lease of, or other contract or agreement for the use of, the Leased Real Property.

13

"***Indebtedness***" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services (other than Trade Payables, other expense accruals and deferred compensation items arising in the Ordinary Course of Business); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person under leases which have been recorded as capital leases in accordance with GAAP on the Financial Statements; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (g) all vendor financing arrangements; (h) all obligations of such Person under interest rate or currency swap transactions or commodity hedges (valued at the termination value thereof); (i) all Indebtedness of others referred to in clauses (a) through (h) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person, through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iii) otherwise to assure a creditor against loss in respect of such Indebtedness; and (j) all Indebtedness referred to in clauses (a) through (i) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"***Intellectual Property***" means all Copyrights, Patents, Trademarks and Trade Secrets, that are owned by Sellers and primarily used in, held for use in, or necessary for the operation of the Business.

"***Inventory Item***" means a particular type of Inventory identified on Schedule 1.1(c) under the column "Inventory Items".

"***Inventory Value***" means the sum of the Item Value for all Inventory Items included as Acquired Assets.

"***Item Price***" means the applicable price for an individual Inventory Item as set forth next to such item on the column titled "Price" on the pricing schedule listed on Schedule 1.1(c).

"***Item Value***" means, with respect to each Inventory Item included as Inventory in the Acquired Assets, the product of (x) the Item Price for such Inventory Item, multiplied by (y) the total number of such Inventory Items included as Foxtail Inventory in the Acquired Assets.

"***IRS***" means the United States Internal Revenue Service.

"***Knowledge***" means, with respect to any matter in question, in the case of Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(d), as of the Execution Date following inquiry to such individuals' direct reports.

"***Leased Real Property***" means the real property leased by Sellers, as tenant, which is used in, held for use in, or necessary for the operation of the Business or on which any buildings, other structures, facilities or Improvements that constitute Acquired Assets are located.

"***Lease***" means any and all leases, subleases, tenancies, rental agreements, occupancy agreements, and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record, pursuant to which any Seller uses or occupies all or any portion of any Leased Real Property.

"***Legal Requirement***" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"***Lender***" means any lender party under the Prepetition Bank of America Credit Agreement or under the DIP Credit Agreement, and their respective successors and assigns.

"***Liability***" means any indebtedness, liabilities or obligations of any kind or nature whatsoever (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), including all costs and expenses relating thereto (including all fees, disbursements and expenses of legal counsel, experts, engineers and consultants and costs of investigation).

"***Material Adverse Effect***" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, state of facts or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (a) the Acquired Assets, in each case, taken as a whole, or (b) the ability of Sellers to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement; provided, however, that the following (or the effect of any of the following) shall not be deemed in themselves, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or would be, a Material Adverse Effect: (i) the fact of the commencement of the Bankruptcy Cases, any events of default under any Indebtedness necessitating the commencement of such cases (including any events of default under the Prepetition Bank of America Credit Agreement and/or the DIP Credit Agreement), or any actions taken in the Bankruptcy Cases in furtherance of the transactions contemplated herein, (ii) any national, international or any foreign or domestic regional economic, financial, social, military or political conditions (including changes therein) or events in general, including the results of any primary or general elections and acceptance or rejection thereof, (iii) any congressional, regulatory or administrative hearings or testimony, (iv) any change in any financial, debt, credit, capital or banking markets or conditions (including any disruption thereof), (v) any change in interest, currency or exchange rates or the price of any commodity, security or market index, (vi) any change in Legal Requirements, Orders, or other accounting regulations, principles, or standards, including changes or proposed changes in Legal Requirements, Orders, GAAP or other accounting regulations, principles, or standards, or any changes or proposed changes in interpretations or enforcement thereof, (vii) any change in the industries in which Sellers operate, (viii) any change in the price or trading volume of any securities or indebtedness of Sellers, (ix) any change in, or failure of Sellers to meet, or the publication of any report regarding, any internal or public projections, forecasts, budgets or estimates of or relating to Business or the Acquired Assets for any period, including with respect to revenue, earnings, cash flow or cash position, (x) the occurrence, escalation, outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts, whether or not pursuant to the declaration of an emergency or war, (xi) the existence, occurrence or continuation of any force majeure events, including any earthquakes, floods, hurricanes, tropical storms, fires or other natural disasters or any national, international or regional calamity or any man-made disaster, (xii) the general public awareness of Sellers' intention or desire to enter into this Agreement or a similar agreement and the process leading to the execution or announcement of this Agreement, (xiii) any Action arising from or relating to this Agreement or the transactions contemplated by this Agreement, including the execution, announcement, performance or existence of this

Agreement, the identity of the parties hereto or any of their respective Affiliates, representatives or financing sources, the taking or not taking of any action to the extent required by this Agreement or the pendency or contemplated consummation of the transactions contemplated by this Agreement, the compliance by Sellers with the terms of this Agreement, including the taking of any action required by this Agreement or the failure to take any action restricted by this Agreement, (xiv) any actions taken, or not taken, with the consent, waiver or at the request of Buyer or the Buyer Designees or any action taken to the extent expressly permitted by this Agreement, (xv) any actions taken by Buyer, the Buyer Designees or its or their representatives or financing sources after the Execution Date, (xvi) any matters disclosed in the Schedules, or (xvii) any effect that is cured by Sellers prior to the termination of this Agreement.

"***MC Supply Agreement***" means that certain Supply Agreement to be entered into by Buyer and the Successful Bidder for the MC Business (the "***Successful MC Bidder***"), in substantially the form attached hereto as **Exhibit F-3**;

"***Multiemployer Plan***" means a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA.

"***Order***" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, decree or binding determination or finding entered, issued, made or rendered by any Governmental Authority, or any arbitrator, mediator, or other quasi-judicial or judicially sanctioned Person or body.

"***Ordinary Course of Business***" means, with respect to any Person, the ordinary and usual course of normal day to day operations of such Person and its business, consistent with its past practice during the period immediately preceding the date of this Agreement; provided, however, that in the case of Sellers, "Ordinary Course of Business" shall take into account the business and operating practices that have been utilized by Sellers since the commencement of the Bankruptcy Cases and shall include any and all actions taken by Sellers in preparation of or as required by the Bankruptcy Cases.

"***Owned Real Property***" means the real property in which Sellers have fee title (or equivalent) interest, which is primarily used in, held for use in, or necessary for the operation of the Business, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of Sellers attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"***Party***" or "***Parties***" means, individually or collectively, Buyer and Sellers.

"***Patents***" means United States and foreign issued patents and pending applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"***Permits***" means all approvals, permits, licenses, franchises, waivers, filings, consents, certificates, notices, qualifications, authorizations, registrations and clearances, together with all modifications, amendments, supplements and extensions thereof, of or from any Governmental Authority or any other Person that are necessary for Sellers to own the Acquired Assets or operate the Business.

"***Permitted Encumbrances***" means (a) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments, irregularities or defects against title to any of the Acquired Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Business; (b) applicable zoning Legal Requirements, building codes, land use restrictions and other similar restrictions imposed by Legal Requirements (but excluding any

violations of any such Legal Requirement); (c) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law, contractual or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Bankruptcy Cases or which are being contested in good faith by appropriate proceedings; (d) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; (e) easements, covenants, conditions, restrictions, declarations and other similar matters affecting title to real property and other encroachments and title and survey defects with respect to any Leased Real Property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (f) matters that would be disclosed on an accurate survey of the real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (g) any Encumbrances shown in any title commitment, report or policy, or otherwise of record that do not or would not reasonably be expected to adversely affect the current occupancy or use of the real property in any material respect; (h) Encumbrances on equipment registered under the Uniform Commercial Code as adopted in any applicable state or similar legislation in other jurisdictions by any lessor or licensor of assets to Sellers (in respect of the Business) or in respect of the purchase price therefor (it being understood that all such Encumbrances described in this clause (h) shall be discharged or released at the Closing); (i) with respect to Leased Real Property, (i) the terms, conditions and provisions of the Leases pursuant to which such Leased Real Property is leased, and (ii) any lien, Encumbrance, or other matter affecting title to the fee estate underlying such Leased Real Property; (j) rights granted to any licensee of any Intellectual Property in the Ordinary Course of Business; (k) Encumbrances that will be and are discharged or released either prior to, or simultaneously with the Closing; (l) such other Encumbrances, title exceptions or imperfections of title set forth on Schedule 1.1(e) or as Buyer may approve in writing in its sole discretion; (m) any Encumbrances permitted by the Sale Order; and (n) any Liabilities created by this Agreement or any of the other Transaction Documents.

"*Person*" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or Governmental Authority.

"*Post-Closing Tax Period*" means any Tax period or year, or portion of any Straddle Period, that begins after the Closing Date.

"*Pre-Closing Tax Period*" means any Tax period or year, or portion of any Straddle Period, that ends on or before the Closing Date.

"*Pre-Paid Expenses*" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise, but excluding those utility deposits approved pursuant to the "First Day Orders" by the Bankruptcy Court) for rent, electricity, telephone or otherwise), pre-paid expenses, prepayments, vendor rebates and other refunds, claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non contingent), in each case, of the Business or with respect to the Leased Real Property described in Section 2.1(d).

"*Prepetition Bank of America Credit Agreement*" means that certain Credit Agreement, dated as of June 26, 2015, by and among the Company and MCPS, as borrowers, the guarantors party thereto, Bank of America, N.A., in its capacity as administrative agent, and the lenders party thereto, as the same may be amended, restated, supplemented or otherwise modified, together with all annexes, exhibits and schedules thereto.

"***Products***" means any and all products of the Business that the Sellers package, warehouse, market, distribute or sell as of the Execution Date.

"***Professional***" means any Person retained by Sellers in the Bankruptcy Case pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code.

"***Qualified Bid***" has the meaning set forth in the Bidding Procedures.

"***Release***" means any releasing, spilling, dumping, discharging, disposing, leaking, pumping, injecting, pouring, emitting, leaching or migrating into the indoor or outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata.

"***Representative***" means, with respect to a particular Person, any director, manager, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"***Sale Hearing***" means the hearing to consider the entry of the Sale Order.

"***Sale Motion***" means the motion filed by Sellers pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code to obtain the Bidding Procedures Order and the Sale Order and approve the transactions contemplated by this Agreement.

"***Sale Order***" means an Order of the Bankruptcy Court, substantially in the form attached as **Exhibit E**, pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, *inter alia*, the sale of the Acquired Assets to Buyer or the Buyer Designees, as applicable, on the terms and conditions set forth herein, free and clear of any and all Encumbrances (other than Permitted Encumbrances), and the assumption and assignment of the Assigned Contracts to Buyer or the Buyer Designees, as applicable, and containing findings of fact and conclusions of law that Buyer and/or the Buyer Designees, as applicable, has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code.

"***Sales Proceeds***" means an amount equal to the result of: the Cash Consideration, *less* the Seller Retained Professional Fees paid under Section 4.2(a)(i), *less* the Wind Down Expenses paid under Section 4.2(a)(ii), *less* the Carve Out (as such term is defined in that certain Interim Order Approving Post-Petition Financing, filed with the Bankruptcy Court on the Petition Date and as may be further amended or modified by an Order of the Bankruptcy Court approving the DIP Credit Agreement) paid under Section 4.2(a)(iv) and solely to the extent such amounts are not otherwise included in the Seller Retained Professional Fees paid under Section 4.2(a)(i), or the Estimated Wind Down Expenses paid under Section 4.2(a)(ii), if any (such amount, if any, the "***Carve Out Amount***").

"***Sales Proceeds Escrow***" means the escrow account established pursuant to the Sales Proceeds Escrow Agreement.

"***Sales Proceeds Escrow Agreement***" means an escrow agreement by and among Buyer, Sellers and Escrow Agent for the disbursement of the amounts payable by Buyer pursuant to Section 4.2(a)(iii).

"***Seller Retained Professional Fees***" means (a) an aggregate amount equal to the reasonable and documented out-of-pocket fees and expenses of, or incurred by, Professionals retained by Sellers pursuant to Section 327 of the Bankruptcy Code, in each case, to the extent such out-of-pocket fees and expenses (x) are accrued and unpaid as of the Closing Date, and (y) with respect to any transaction-

based fees, have been authorized to be paid by the Bankruptcy Court, and (b) an aggregate amount equal to the Parties' good faith estimate of the reasonable and documented out-of-pocket fees and expenses to be incurred by Professionals retained by Sellers to close the Bankruptcy Cases and/or to perform any other covenants and other obligations contemplated under this Agreement and the transactions contemplated hereby.

"***Straddle Period***" means any Tax period or year commencing on or before, and ending after, the Closing Date.

"***Subsidiary***" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the managers, directors or similar managing body.

"***Successful Bidder***" has the meaning set forth in the Bidding Procedures.

"***Supply Agreement***" means that certain Supply Agreement to be entered into by Buyer and the Successful Bidder for the Perkins Business (the "***Successful Perkins Bidder***"), in substantially the form attached hereto as **Exhibit F-1**; provided, however, that in the event the Successful Perkins Bidder enters into that certain Alternative Supply Agreement, in substantially the form attached hereto as **Exhibit F-2** (the "***Alternative Supply Agreement***"), then for purposes of this Agreement the Alternative Supply Agreement shall be deemed the Supply Agreement.

"***Tax***" or "***Taxes***" (and with correlative meaning, "***Taxable***" and "***Taxing***") means any federal, state, provincial, local, foreign or other income, alternative minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not).

"***Tax Return***" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"***Trade Payables***" means accounts payable obligations of Sellers incurred at any time prior to the Closing, solely to the extent that such obligations (a) are currently outstanding, (b) relate to the Acquired Assets, (c) are Assumed Liabilities under the Assigned Contracts, and (d) do not constitute Cure Costs.

"***Trade Secrets***" means confidential and proprietary business information, trade secrets, business methods, and know-how, in each case to the extent protectable under applicable Legal Requirements.

"***Trademarks***" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"***Transaction Documents***" means this Agreement, the Assignment and Assumption Agreement, the Bill of Sale, Wind Down and Professional Expense Escrow Agreement, the Sales Proceeds Escrow Agreement, and any other agreements, instruments, certification, or documents entered into pursuant to this Agreement.

"***Transfer Tax***" all transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement.

"***WARN Act***" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar state or local Legal Requirement and the rules and regulations thereunder.

"***Wind Down and Professional Expenses Escrow***" means the escrow account established pursuant to the Estimated Wind Down Expenses and Seller Retained Professional Fees Escrow Agreement with subaccounts for the Estimated Wind Down Expenses and each Professional.

"***Wind Down and Professional Expenses Escrow Agreement***" means an escrow agreement by and among Sellers and Escrow Agent for the receipt and disbursement of the amounts payable by Buyer pursuant to Section 4.2(a)(i) and Section 4.2(a)(ii), respectively, in connection with the Estimated Wind Down Expenses and the Seller Retained Professional Fees.

     1.2    <u>Cross Reference of Other Definitions.</u> Each capitalized term listed below is defined on the corresponding page of this Agreement:

Term          Page No.

A/R and Inventory Value ........................................................................................................... 33
Acquired Assets ......................................................................................................................... 23
Agreement .................................................................................................................................... 8
Allocation Statement .................................................................................................................. 31
Alternative Supply Agreement .................................................................................................. 19
Assigned Contracts ..................................................................................................................... 28
Assumed Liabilities .................................................................................................................... 26
Auction ....................................................................................................................................... 28
Audited Financial Statements .................................................................................................... 40
Bankruptcy Case ........................................................................................................................... 8
Bankruptcy Court .......................................................................................................................... 8
Break-Up Fee ............................................................................................................................. 49
Buyer ............................................................................................................................................. 8
Buyer Benefit Plans ................................................................................................................... 51
Buyer Employees ....................................................................................................................... 51
California Facility ......................................................................................................................... 8
Cease Date .................................................................................................................................. 53
Closing ....................................................................................................................................... 31
Closing Date ............................................................................................................................... 31
Collective Bargaining Agreement .............................................................................................. 37
Company ....................................................................................................................................... 8
Confidentiality Agreements ....................................................................................................... 59
DOL ........................................................................................................................................... 38

Excluded Assets ................................................................................................................. 25
Excluded Business Assets ................................................................................................. 25
Excluded Liabilities .......................................................................................................... 27
Execution Date .................................................................................................................... 8
Execution Date Contract Schedule ................................................................................... 28
Financial Statements ......................................................................................................... 41
Inventory ........................................................................................................................... 23
MCW .................................................................................................................................... 8
Ohio Facility ....................................................................................................................... 8
Outside Date ...................................................................................................................... 56
Petition Date ........................................................................................................................ 8
Previously Omitted Contract ............................................................................................ 29
Prior Agreement .................................................................................................................. 9
Property Taxes ................................................................................................................... 49
Purchase Price ................................................................................................................... 30
Rejected Contracts ............................................................................................................ 28
Related Party ..................................................................................................................... 58
Schedule Supplement ........................................................................................................ 49
Seller .................................................................................................................................... 8
Sellers .................................................................................................................................. 8
Successful MC Bidder ....................................................................................................... 16
Successful Perkins Bidder ................................................................................................. 19
Target Price ....................................................................................................................... 10
Transferred Permits .......................................................................................................... 23
Unaudited Balance Sheet .................................................................................................. 41
Unaudited Balance Sheet Date ......................................................................................... 41
Unaudited Financial Statements ....................................................................................... 41
Union .................................................................................................................................. 37
Unions ................................................................................................................................ 37

1.3    <u>Other Definitions and Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

<u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

<u>Day</u>. Any reference in this Agreement to days (but not Business Days) means to calendar days.

<u>Dollars</u>. Any reference in this Agreement to $ means United States dollars.

<u>Exhibits/ Schedules</u>. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any

capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender includes all genders, and words imparting the singular number only include the plural and vice versa.

Headings. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "*Section*" or "*Article*" are to the corresponding Section or Article of this Agreement unless otherwise specified.

Herein. Words such as "*herein*," "*hereof*" and "*hereunder*" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

Including. The word "*including*" or any variation thereof means "*including, without limitation,*" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Made Available. Any reference in this Agreement to "*made available*" shall mean that such documents or information referenced shall have been provided in that certain electronic dataroom titled "Project Pie" located at https://services.intralinks.com/web/index.html#workspace/6765745/documents for Buyer and its Representatives at least two (2) days prior to the Execution Date.

(b)     No Strict Construction. Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

(c)     Disclosure Schedules. The disclosures in the Disclosure Schedules modify and relate to the representations and warranties in the corresponding section or subsection of such Article to which they refer and are intended to qualify and provide certain information elicited by, such representations and warranties. The information set forth in one section or subsection of the Disclosure Schedules that is specifically referred to in another section or subsection of the Disclosure Schedules by appropriate cross-reference shall also be deemed to qualify such other section or subsection of such Article, and the information set forth in one section or subsection of the Disclosure Schedules shall also be deemed to qualify each other section or subsection of such Article to the extent that the relevance of a disclosure in one section or subsection of the Disclosure Schedules to another section or subsection of such Article is reasonably apparent on its face.

# ARTICLE 2

## PURCHASE AND SALE

2.1     Purchase and Sale.

Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, acquire and accept from Sellers, free and clear of any and all Encumbrances (other than Permitted Encumbrances), all of the Acquired Assets exclusively used in, held for use in, or necessary for the operation of the Business.  For all purposes of and under this Agreement, the term "***Acquired Assets***" shall mean all of Sellers' direct or indirect right, title and interest in, to or under the Business together with the following: (i) all of Sellers' properties, rights, Claims and assets (other than the Excluded Assets) of every kind and description (wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, or licensed) exclusively used in, held for use in, or necessary for the operation of the Business, whether or not reflected on the books and records of Sellers, and (ii) without limiting the generality of clause (i) of this Section 2.1, such Acquired Assets shall include all of Sellers' direct or indirect right, title and interest in, to and under the following assets:

(a)     all inventory of any kind or nature, merchandise and goods whether or not prepaid, and any prepaid deposits for any of the same, including raw materials, produce, dairy, work-in-process, finished goods or products, packaging materials and labels, and other stores, supplies, disposables and consumables, in each case, (i) to the extent exclusively used in, held for use in, or necessary for the operation of the Business, (ii) located at the Ohio Facility, (iii) stored or otherwise maintained at the Fairfield Storage Facilities or (iv) otherwise set forth on Schedule 2.1(a) (the "***Inventory***");

(b)     all  Equipment, in each case, to the extent, and solely to the extent, (i) exclusively used in, held for use in, or necessary for the operation of the Business, (ii) located at the Ohio Facility, or (iii) otherwise set forth on Schedule 1.1(b);

(c)     all of Sellers' respective rights under Contracts exclusively related to the Business or set forth on Schedule 2.1(c), in each case, including all Claims or Actions with respect thereto;

(d)     the real property leases for the Ohio Facility and the Fairfield Storage Facilities, in each case, together with all interests (if any) of the Sellers in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)     subject to Section 2.5(d), all Permits and pending applications therefor of Sellers exclusively used in, held for use in, or necessary for the operation of the Business or set forth on Schedule 2.1(e), in each case, to the extent transferable under applicable Legal Requirements (the "***Transferred Permits***");

(f)     all Copyrights, Patents, Trademarks and Trade Secrets, in each case, that are identified on Schedule 2.1(f);

(g)     all Accounts Receivable arising under or related to the Business;

(h)     all Pre-Paid Expenses arising under or related to the Business;

(i)      all goodwill, customer and referral relationships, other intangible property and all privileges, set-offs, indemnification rights, causes of action, actions, Claims and demands and rights of any kind as against others (whether by contract or otherwise) relating to, arising from or associated with the Business;

(j)      to the extent permitted by Legal Requirements, all Documents and other books and records (financial, accounting, personnel files and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, proprietary software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, to the extent exclusively arising under or relating to the Business;

(k)      all rights, remedies and benefits of Sellers exclusively arising under or relating to the Business, including rights, remedies and benefits arising out of express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent exclusively relating to the operation of the Business or affecting the Inventory, Equipment or other tangible Acquired Assets described in Sections 2.1(a), 2.1(b), 2.1(c), 2.1(d) and 2.1(f) (and in any case, any component thereof), and all claims and causes of action arising or existing therefrom;

(l)      all Avoidance Actions against each Person (including trade vendors, landlords, suppliers, and non-insider employees):  (i) who is a party to an Assigned Contract or with respect to whom an Assumed Liability is owed or (ii) with whom Buyer or Buyer Designee (or any of their Affiliates) otherwise anticipates doing business following the Closing; provided; however, that Buyer agrees that it shall not use such Avoidance Actions offensively in an Action, and shall not transfer any such Avoidance Actions unless such transferee agrees to be bound by the limitations in this Section 2.1(l), and that all such Avoidance Actions are affirmatively and irrevocable waived and released (other than for the sole purpose of a defense to an action commenced by or on behalf of such person or entity) upon the final determination date but *nunc pro tunc* to the Closing Date;

(m)      all telephone, telex and telephone facsimile numbers and other directory listings, in each case, to the extent (i) exclusively related to or associated with the Ohio Facility or the Business or (ii) listed on Schedule 2.1(m);

(n)      all assets, if any, listed on Schedule 2.1(n) (regardless of whether such assets are covered by any of the foregoing);

(o)      with respect to any Buyer Benefit Plan relating to the Business (i) that is funded by a trust (other than a so-called "rabbi trust"), the assets of such related trust; (ii) that is funded by an insurance policy, the related insurance policy (to the extent transferable); and (iii) to the extent applicable and subject to conformity with Legal Requirements, the administrative service agreements and other contracts, files and records in respect thereof; and

(p)      all proceeds and products of any and all of the foregoing described Acquired Assets.

2.2      Excluded Assets.

Notwithstanding anything to the contrary in this Agreement (including Section 2.1), nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer or any of its Buyer Designees, and Sellers shall retain all right, title and interest to, in and under, the

Excluded Assets. For all purposes of and under this Agreement, the term "***Excluded Assets***" shall consist of only the following items, assets and properties:

(a)      any Benefit Plans and any assets (whether in trust or otherwise), trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(b)      any shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller;

(c)      the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers, Tax records, work papers and other records of Sellers as they pertain to ownership, organization, qualification to do business or existence of Sellers; provided, however, that copies of the foregoing items (including copies of Tax records and work papers of Sellers) shall be made available by Sellers to Buyer;

(d)      all Documents and other books and records (financial, accounting, personnel files and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case (i) that relate exclusively to the Excluded Assets or Excluded Liabilities, (ii) that if transferred would violate any Person's privacy rights or any other applicable Legal Requirements or (iii) that are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Cases, this Agreement or the transactions contemplated hereby;

(e)      any Contract that is not an Assigned Contract;

(f)      any Permits that are not Transferred Permits;

(g)      all Copyrights, Patents, Trademarks and Trade Secrets not specifically identified on Schedule 2.1(f);

(h)      all rights under or arising out of (i) director or officer insurance policies and (ii) any other insurance policies;

(i)      any rights, Claims or causes of action of Sellers under this Agreement or any other Transaction Document;

(j)      all properties, rights, Claims, and assets primarily used in, held for us in, or necessary for the operation of, the Excluded Business (the "***Excluded Business Assets***");

(k)      any intercompany Contracts, claims, obligations, and receivables solely between or among one or more Sellers and/or any Affiliates of any of the Sellers, regardless of the subject matter of such transaction;

(l)     cash or cash equivalents in an amount sufficient to satisfy drafts and checks issued by any of the Sellers in the Ordinary Course of Business at any time following the commencement of the Bankruptcy Cases which remain outstanding as of the Closing Date;

(m)     any Sellers' bank accounts (including any deposit accounts, securities accounts and any sub-accounts);

(n)     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of the Sellers;

(o)     any prepaid deposits related to professional fee retainers;

(p)     the Wind Down and Professional Expenses Escrow;

(q)     the Sales Proceeds Escrow;

(r)     the Carve Out Escrow;

(s)     any Credit Support in effect prior to the Closing Date, including any Credit Support pursuant to the Prepetition Bank of America Credit Agreement (including with respect thereto any cash, cash equivalents, cash proceeds or other net refund amounts returned or refunded, or due to be returned or refunded, pursuant to any Credit Support in effect prior to the Closing Date);

(t)     any deposits, escrows, surety bonds or other financial assurance to the extent relating to any other Excluded Assets or Excluded Liabilities;

(u)     all Corporate Assets;

(v)     any other properties, rights, Claims or assets listed on Schedule 2.2(v); and

(w)     all proceeds and products of any and all of the foregoing Excluded Assets.

2.3     Assumed Liabilities.

Subject to entry of the Sale Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall, effective at the time of the Closing, assume and agree to promptly discharge and perform when due, all of the Assumed Liabilities of, related to, associated with or pertaining to the Business.  Except to the extent that any of the following are specified in Section 2.4, the following Liabilities of Sellers (and only the following Liabilities) shall constitute, without duplication, the "*Assumed Liabilities*":

(a)     all Liabilities arising out of the ownership or operation of the Business or the Acquired Assets to the extent arising form and after the Closing Date;

(b)     all Cure Costs;

(c)     any Trade Payables;

(d)     subject to Section 8.1, all Liabilities with respect to Taxes imposed on the Business or the Acquired Assets that are attributable to any Post-Closing Tax Period and all Transfer Taxes;

(e)    all Liabilities with respect to all Buyer Employees that arise on or after the Closing Date, including under any Benefit Plan and all Liabilities and other obligations assumed or retained by, transferred, assigned or allocated to or otherwise undertaken by Buyer or one of its Affiliates or for which Buyer or one of its Affiliates agreed to be responsible, in each case, as provided for in <u>Section 8.4</u>; and

(f)    any claims relating to current or former employees that provide or provided services to the Business as and to the extent that such claims are allowed under section 507(a) and/or section 503 of the Bankruptcy Code.

The assumption by Buyer or any of its applicable Buyer Designees of any Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4    <u>Excluded Liabilities</u>.

Notwithstanding any provision in this Agreement to the contrary, neither Buyer nor any Buyer Designee shall assume, nor shall Buyer or any of its applicable Buyer Designees be obligated to assume or be obliged to pay, perform or otherwise discharge, any Liability of, or Liability against, Sellers, Sellers' Subsidiaries, the Business or the Acquired Assets, other than the Assumed Liabilities, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "*Excluded Liabilities*"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of Sellers and Sellers' Subsidiaries other than the Assumed Liabilities:

(a)    any and all Liabilities for Indebtedness with respect to borrowed money (other than obligations with respect to capitalized leases that are Assigned Contracts);

(b)    all guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations under the Credit Support set forth in <u>Schedule 2.4(b)</u>;

(c)    subject to <u>Section 8.1</u>, all Liabilities related to Taxes that are not expressly assumed by Buyer under <u>Section 2.3</u>, including (i) all Liabilities with respect to Taxes imposed on the Business or the Acquired Assets that are attributable to any Pre-Closing Tax Period, (ii) all income Tax or similar Liabilities of Sellers for any Tax period, and (iii) any Tax or similar Liability related to the Excluded Assets.

(d)    all Liabilities relating to any pending or threatened Actions arising from, relating to or otherwise in respect of the ownership or operation of the Business or the Acquired Assets to the extent that such Action relates to such ownership or operation prior to the Closing Date (even if instituted after the Closing Date);

(e)    all workers' compensation claims and occupational health claims related to the Acquired Assets, including with respect to Buyer Employees and former employees of Sellers who were employed by the Business or at or with respect to the Acquired Assets, in each case, to the extent relating to the ownership or operating of the Business or the Acquired Assets prior to the Closing Date;

(f)    except for the Buyer Benefit Plans, any Liability of Sellers arising under, relating to or with respect to any single employer pension plan or Multiemployer Plan, in each case, to the extent relating to the ownership or operating of the Business or the Acquired Assets prior to the Closing Date;

(g)     except with respect to the Buyer Benefit Plans, as otherwise provided in this Agreement, or to the extent relating to the ownership or operation of the Business or the Acquired Assets on and after the Closing Date, all Liabilities of Sellers and their Affiliates, including any predecessors, to or in respect of any former or current Employee or both (or their representatives or beneficiaries) arising prior to the Closing Date including: (i) for salary, wages, health care and other welfare benefits (including COBRA), vacation, payroll, sick leave, unemployment benefits, retirement benefits, pension benefits, employee stock option, equity compensation, employee stock purchase, profit sharing plans, supplies or overhead, (ii) arising under any claims of wrongful discharge or discrimination, (iii) severance and/or termination liabilities, (iv) obligations under employment contracts, (v) any change in control or other amounts or benefits payable to any current or former Employees, and (vi) arising under any other employee plans, practices, programs or arrangements or benefits or other compensation of any kind to any employee, including under any Benefit Plan;

(h)     all Liabilities with respect to any Excluded Asset, including Contracts that are not Assigned Contracts;

(i)     all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Bankruptcy Case (including all Seller Retained Professional Fees and all Estimated Wind Down Expenses); and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated by this Agreement;

(j)     all Liabilities relating to the conduct of the Business or to the Acquired Assets (and the use thereof) to the extent arising or accruing at any time on or prior to the Closing Date;

(k)     all Liabilities with respect to the Actions and Order set forth on Schedule 5.9; and

(l)     all Liabilities of the Excluded Business Assets.

2.5     Assignment and Assumption of Contracts.

(a)     Assignment and Assumption at Closing.

(i)     Schedule 2.5(a) sets forth a list of all executory Contracts (including the Supply Agreement and all Leases) to which one or more of Sellers are party and which are to be included in the Acquired Assets (the "**Assigned Contracts**") and Sellers' good faith estimate of the Cure Costs as of the Execution Date (such Schedule 2.5(a), as such exists at the time of execution of this Agreement without any additions or deletions, the "**Execution Date Contract Schedule**"). From and after the Execution Date until two (2) Business Days prior to the auction contemplated by the Bidding Procedures (the "**Auction**"), Sellers shall make such additions and deletions to Schedule 2.5(a) as Buyer shall request in writing. Any such deleted Contract shall be deemed to no longer be an Assigned Contract. Any such added Contract shall be deemed an Assigned Contract. All Contracts of Sellers that are not listed on Schedule 2.5(a) shall not be considered an Assigned Contract or Acquired Asset and shall be deemed "**Rejected Contracts**." Notwithstanding anything to the contrary in this Agreement (including this Section 2.5) (i) in no event shall the Supply Agreement be deleted from Schedule 2.5, and (ii) as such the Supply Agreement shall be deemed an Assigned Contract and not a Rejected Contract.

(ii)     Sellers shall use commercially reasonable efforts to take all actions required to assume and assign the Assigned Contracts to Buyer or any of its applicable Buyer Designees (other than payment of Cure Costs, if so required), including taking all actions required to obtain an Order containing a finding that the proposed assumption and assignment of the Assigned Contracts to Buyer or

the applicable Buyer Designee satisfies all applicable requirements of section 365 of the Bankruptcy Code; provided, however, notwithstanding the foregoing, no monetary amount shall be required to be paid or incurred by Sellers in connection with any consent or approval from any Person that is required to assume and assign any Assigned Contracts to Buyer or any of its applicable Designees.

(iii)    (x) Upon the Closing, Sellers shall, pursuant to the Sale Order and the Assumption Agreement, assume and assign to Buyer or the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assigned Contracts that is capable of being assumed and assigned and (y) as soon as practicable following the Closing, Buyer or the applicable Buyer Designee shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among Buyer and Sellers or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assigned Contracts, pursuant to the Assumption Agreement.

(b)    Previously Omitted Contracts. If prior to or following the Closing, it is discovered that a Contract should have been listed on Schedule 2.5(a) but was not listed on Schedule 2.5(a) (any such Contract, a "**Previously Omitted Contract**"), upon receipt of the written request of the Buyer, and at the sole expense of Buyer, Sellers shall use commercially reasonable efforts to have such Previously Omitted Contracts assumed and assigned to the Buyer, and upon any assumption and assignment of such Previously Omitted Contract to Buyer, such Contract shall become an Assigned Contract and Assumed Liability (and Buyer shall be responsible for and shall promptly pay all Cure Costs associated therewith). A Previously Omitted Contract designated in accordance with this Section 2.5(b) as "rejected" shall be deemed a Rejected Contract.

(c)    Assigned Contracts; Cure Cap. In the event that the actual aggregate Cure Costs for all of the Assigned Contracts will exceed the Cure Cap at Closing, then each Assigned Contract that has a Cure Cost that exceeds the estimated Cure Cost for such Assigned Contract set forth on the Execution Date Contract Schedule shall be deleted from Schedule 2.5(a) (and therefore not be an Assigned Contract) and shall be an Excluded Contract and an Excluded Liability unless Buyer elects, in its sole and absolute discretion, by written notice to Sellers to assume and assign such Contract and, if Buyer so elects to assume and assign such Contract, then such Contract shall be an Assigned Contract and Buyer shall be liable for all Cure Costs associated with such Assigned Contract.

(d)    Non-Assignment of Contracts and Permits. Notwithstanding anything contained in this Agreement to the contrary but subject to the last sentence of this Section 2.5(d), this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof, subject Sellers to any Liability, or in any way adversely affect any of the rights of Buyer or the applicable Buyer Designee, as the assignee or transferee of such Contract or Permit (as the case may be), thereunder. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of Sellers, such consent or approval is required but not obtained with respect to an Assigned Contract or a Permit, neither Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor shall the Closing be delayed in respect of the Assigned Contracts or the Permits; provided, however, if the Closing occurs, then, with respect to any Assigned Contract or Permit for which consent or approval is required but not obtained, from and after the Closing, Sellers shall cooperate, without further consideration, with Buyer or the applicable Buyer Designee in any reasonable arrangement Buyer or the applicable Buyer Designee may request to provide Buyer or the applicable Buyer Designee with all of the benefits of, or under, the applicable Assigned Contract or applicable Permit, including enforcement for the benefit of Buyer or the applicable Buyer Designee of any and all rights of Sellers against any party to the applicable Assigned Contract or applicable

Permit arising out of the breach or cancellation thereof by such party; provided, however, to the extent that any such arrangement has been made to provide Buyer or the applicable Buyer Designee with the benefits of, or under, the applicable Assigned Contract or applicable Permit, from and after Closing, Buyer or the applicable Buyer Designee shall be responsible for, and shall promptly pay all payments, costs, expenses and other obligations under such Assigned Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assigned Contract or Permit had been assigned or transferred at Closing with respect to Assigned Contracts and Permits, and at such applicable later date specified in this Section 2.5(d) with respect to any additional Assigned Contracts. Notwithstanding the foregoing, nothing in this Section 2.5(d) shall (i) prevent any of the Sellers from, or require any of the Sellers to delay, the winding down of their bankruptcy estates, (ii) require any of the Sellers to pay or incur any monetary amount (other than as expressly contemplated in this Agreement), (iii) impose on any Seller any burdens not expressly imposed on such Seller pursuant to the other provisions of this Agreement or (iv) require any Seller to become involved in any Action.

2.6     Further Assurances.

At and after the Closing, and without further consideration therefor, Sellers shall execute and deliver to Buyer or the applicable Buyer Designee such further instruments and certificates as shall be necessary (a) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, Sellers' right, title or interest in, to or under any or all of the Acquired Assets and the Business free and clear of any and all Encumbrances (other than Permitted Encumbrances) or (b) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets and exercising rights with respect thereto. Each Seller, on the one hand, and Buyer, on the other hand, shall take, or cause to be taken, all actions and shall do, or cause to be done all things as may be reasonably requested by the other Party in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement and shall execute and deliver all bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be reasonably required to consummate the transactions contemplated by this Agreement.

# ARTICLE 3

## PURCHASE PRICE

3.1     Consideration.

The aggregate consideration (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets shall consist of:

(a)     an amount equal to the Cash Consideration; and

(b)     the assumption by Buyer or any of their applicable Buyer Designees of the Assumed Liabilities from Sellers, including the assumption of the obligation to pay to the applicable counterparties of the applicable Assigned Contracts the Cure Costs payable by Buyer under Section 2.5.

3.2     Allocation of Purchase Price.

(a)     Within sixty (60) days after the Closing Date, Buyer shall prepare and deliver to Sellers, or any trustee appointed under the terms set forth in any bankruptcy plan confirmed by the Seller or as otherwise appointed (as applicable), a statement allocating the sum of the Purchase Price,

the Assumed Liabilities and other relevant items among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (such statement, the "***Allocation Statement***"). If within thirty (30) days after the receipt of the proposed Allocation Statement, Sellers' notify Buyer in writing that Sellers' disagree with the proposed Allocation Statement, then Sellers and Buyer shall attempt in good faith to resolve their disagreement within the thirty (30) days following Sellers' notification to Buyer of such disagreement. If Sellers do not so notify Buyer within thirty (30) days of receipt of the proposed Allocation Statement, or upon resolution of the dispute by Buyer and Sellers, the proposed Allocation Statement shall become the final Allocation Statement. If Buyer and Sellers are unable to resolve their disagreement within the thirty (30) days following any such notification by Sellers, the dispute shall be submitted to a nationally recognized independent accounting firm, for resolution within thirty (30) days of such submission, which resolution shall be final and binding on and non-appealable by the Parties. Each Party shall cooperate fully with the other Party to facilitate a prompt determination of the Allocation Statement. The Parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position inconsistent therewith in any Tax Return (including IRS Form 8594), in any Tax refund claim, in any litigation or otherwise, unless required by Legal Requirements or as may be adjusted by subsequent agreement following an audit by the IRS (or by an applicable state or local taxing authority). The fees, costs and expenses of the valuation firm retained to resolve any dispute with respect to the Allocation Statement, if applicable, shall be borne equally by Sellers, on the one hand, and Buyer, on the other.

(b)        Each Party shall deliver to the other Party a copy of its Form 8594 no later than thirty (30) days prior to the filing of their respective Forms 8594 relating to this transaction.

## ARTICLE 4

### CLOSING AND DELIVERIES

4.1        Closing Date.

Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "***Closing***") shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, 2001 K Street N.W., Washington, DC 20006, or via overnight courier, facsimile or portable document format (.pdf) as agreed by the parties hereto, no later than five (5) Business Days following the date on which all the conditions set forth in <u>ARTICLE 9</u> and <u>ARTICLE 10</u> have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions at the Closing), or on such other date and time as Sellers and Buyer may mutually agree in writing. The date and time at which the Closing actually occurs is hereinafter referred to as the "***Closing Date***." Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

4.2        Buyer's Deliveries.

At the Closing, Buyer shall deliver to Sellers:

(a)        the Cash Consideration in cash by wire transfer of immediately available funds to the accounts specified by Sellers to Buyer at least three (3) days prior to the anticipated Closing Date as follows:

(i)    an amount equal to the Seller Retained Professional Fees into the Wind Down and Professional Expenses Escrow for the purpose of paying the Seller Retained Professional Fees in accordance with the Sale Order;

(ii)    an amount equal to the Estimated Wind Down Expenses into the Wind Down and Professional Expenses Escrow for the purpose of winding down the bankruptcy estates of Sellers;

(iii)    an amount equal to the Sales Proceeds into the Sales Proceeds Escrow; and

(iv)    an amount equal to the Carve Out Amount into the Carve Out Escrow, if any.

(b)    the Assignment and Assumption Agreement, duly executed by Buyer or the applicable Buyer Designee;

(c)    each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(d)    the certificates of Buyer to be received by Sellers pursuant to Sections 10.1 and 10.2;

(e)    a certificate of an authorized officer, manager or managing member of Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to Sellers, as to Buyer's and each Buyer Designee's authorization to execute and perform its obligations under the Transaction Documents to which each of them is a party; and

(f)    such other documents as Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

4.3    Sellers' Deliveries.

At the Closing, Sellers shall deliver to Buyer:

(a)    possession of the Acquired Assets and the Business;

(b)    the Bills of Sale, the Assignment and Assumption Agreement and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers;

(c)    instruments of assignment of the Patents and Trademarks that are owned by Sellers and included in the Acquired Assets, if any, duly executed by the applicable Sellers, in form for recordation with the appropriate Governmental Authorities, in customary form and reasonably acceptable to the Parties;

(d)    with respect to the Leased Real Property, possession of the Leased Real Property, together with any and all keys, access cards, security passcodes and combinations;

(e)    a certified copy of the Sale Order;

(f)    the certificates of Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;

(g)        certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(h)        such other bills of sale, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Sellers in, to or under any or all the Acquired Assets;

(i)        a certificate of an authorized officer, manager or managing member of the Company, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer, as to Sellers' authorization to execute and perform its obligations under the Transaction Documents to which Sellers are a party;

(j)        releases and termination statements sufficient for Buyer to receive the Acquired Assets free and clear of any and all Encumbrances (other than Permitted Encumbrances); provided, however, that releases shall not be required with respect to Encumbrances that are both (a) released by the Sale Order and (b) not required to be released at Closing pursuant to releases and termination statements in connection with a financing or debt facility obtained by Buyer;

(k)        a certificate of an authorized officer, manager or managing member of the Company, dated as of the Closing Date, certifying (a) the Inventory Value and (b) the value of the Accounts Receivable, in each case, as of the Closing Date and calculated in accordance with GAAP applied in a manner consistent with the Financial Statements (the sum of clauses (a) and (b), the "*A/R and Inventory Value*"); and

(l)        such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby, jointly and severally, represent and warrant to Buyer as follows, except as disclosed in the Disclosure Schedules attached hereto:

5.1        Organization and Good Standing.

Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Each Seller has all requisite corporate or limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their Business or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

5.2        Authority; Validity; Consents.

Each Seller has, subject to entry of the Sale Order, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and

the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate or limited liability company action. This Agreement has been duly and validly executed and delivered by each Seller, and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing. Subject to entry of the Sale Order, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to entry of the Sale Order, except, in each case, (a) entry of the Sale Order, (b) for notices, filings and consents required in connection with the Bankruptcy Case and (c) for the notices, filings and consents set forth on Schedule 5.2, Sellers are not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

      5.3    Subsidiaries.

      Except as set forth in Schedule 5.3, no Seller (a) has any direct or indirect Subsidiaries; (b) has any direct or indirect interest in, or is under any current or prospective obligation to receive an interest in, any shares or ownership interest in any other Person; or (c) is a member of or participant in any partnership, joint venture or similar entity.

      5.4    No Conflict.

      Except as set forth in Schedule 5.4, neither the execution and delivery by any Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Sale Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order, compliance by it with any of the provisions hereof or thereof will (a) conflict with or result in a violation of (i) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of such Seller or (ii) any Legal Requirement binding upon such Seller or by which the Business or any Acquired Assets are subject or bound, (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (i) any Assigned Contract or (ii) any Transferred Permit set forth on Schedule 2.1(e), or (c) result in the creation of any Encumbrance upon the Acquired Assets of such Seller being sold or transferred hereunder, except in each case of clauses (a) through (c) above, as would not, individually or in the aggregate, have a Material Adverse Effect.

      5.5    Real Property.

      (a)    Owned Real Property. No Owned Real Property is used in connection with the operation of the Business.

      (b)    Leased Real Property. Schedule 5.5(b) contains a list of all Leased Real Property held, used or necessary for the operation of the Business. To the Sellers' Knowledge, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use or occupancy of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real

Property in the operation of the Business. To Sellers' Knowledge, Sellers' leasehold interest in the Leased Real Property is not subject to any Encumbrances (other than Permitted Encumbrances) that were placed on the Leased Real Property through the action or inaction of Sellers and that materially impact the Business use of the Leased Real Property.  To Sellers' Knowledge, no pending Action or Order exists against any Seller or, to Sellers' Knowledge, any other Person which would require the repair, alteration or correction of any existing condition of any portion of any Leased Real Property.  No Seller has received any written notice from any Governmental Authority that any of the improvements on the Leased Real Property or the Sellers' use of the Leased Real Property currently violates any use or occupancy restrictions, any covenant of record or any zoning or building Laws.  To Sellers' Knowledge, there are no pending or threatened condemnation or eminent domain Actions with respect to the Leased Real Property.

     5.6   <u>Environmental Matters</u>.

Notwithstanding anything to the contrary in this Agreement, the representations and warranties contained in this <u>Section 5.6</u> are the sole and exclusive representations and warranties of the Sellers pertaining or relating to any environmental, health or safety matters, including any arising from or relating to any Environmental Law. Except as set forth on <u>Schedule 5.6</u> and except as would not, individually or in the aggregate, reasonable be expected to have a Material Adverse Effect,

     (a)   Sellers' operation of the Business, and use of the Real Properties related thereto, have complied during the previous three (3) years and are in compliance with all applicable Environmental Laws;

     (b)   Sellers have not received any written notice alleging any violation, non-compliance, liability or potential liability regarding Environmental Laws with regard to any of the Real Properties or the Business;

     (c)   To Sellers' Knowledge, no properties or facilities currently owned or operated by Sellers related to the Business, including the Real Properties, contain any Hazardous Substances in amounts or concentrations which constitute a violation of any Environmental Law or which would reasonable be expected to give rise to liability under any applicable Environmental Law;

     (d)   No Action is pending or, to Sellers' Knowledge, threatened, under any Environmental Law against Sellers with respect to the Real Properties or the Business, nor are there any Orders outstanding under any Environmental Law with respect to the Real Properties or the Business;

     (e)   Sellers (i) have obtained all Permits required under Environmental Law for the occupation of the Leased Real Property and the operation of the Business and (ii) have not received any written notice that the Permits required under Environmental Law will be cancelled, suspended, modified, or not renewed.

     (f)   There has not been any offsite disposal of any Hazardous Substances by Sellers or their Affiliates related to the Acquired Assets or the Business in violation of any Environmental Law;

     (g)   Seller has made available to Buyer all environmental third-party audits or reports relating to the Acquired Assets, the Leased Real Property or the Business, to the extent there are any, that are in the possession or control of Sellers or any of their Affiliates.

5.7     Title to Acquired Assets

Immediately prior to the Closing, Sellers will have, and, upon delivery to Buyer or the applicable Buyer Designee on the Closing Date of the instruments of transfer contemplated by Section 4.3, and upon entry of the Sale Order, Sellers will thereby transfer to Buyer or the applicable Buyer Designee, and Buyer or the applicable Buyer Designee will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid and marketable title to, or, in the case of property leased or licensed by Sellers, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of any and all Encumbrances, except (a) for the Assumed Liabilities and (b) for Permitted Encumbrances. The Acquired Assets consisting of personal property are in good operating condition and repair (reasonable wear and tear excepted) and are suitable for the purposes for which they are presently used. No Acquired Asset (except for the Owned Real Property and Leased Real Property) is subject to any agreement, written or oral, for its sale or use by any Person other than Sellers.

5.8     Taxes.

Except as set forth on Schedule 5.8,

(a)     Sellers have each timely filed all material Tax Returns required to be filed with the appropriate Governmental Authorities (taking into account any extension of time to file granted to Sellers). All material Taxes due and payable, whether or not shown to be payable on such Tax Returns, have been timely paid. No Seller is the beneficiary of any extension of time within which to file any Tax Return. No claim has been made in writing within the last three (3) taxable years by a Governmental Authority in a jurisdiction where any Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction. There are no Encumbrances on any of the assets of Sellers that arose in connection with any failure (or alleged failure) to pay any Tax, other than Permitted Encumbrances.

(b)     No examination of any such Tax Return of Sellers is currently in progress by any Governmental Authority and no Seller has received notice of any contemplated examination of any such Tax Return. No adjustment has been proposed in writing with respect to any such Tax Returns for the last three (3) taxable years by any Governmental Authority.

5.9     Legal Proceedings.

Except for the Bankruptcy Case or as set forth on Schedule 5.9, there is no Action or Order pending, outstanding or, to Sellers' Knowledge, threatened, against or related to the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to Sellers' Knowledge, are there any investigations relating to the Business pending or threatened by or before any arbitrator or any Governmental Authority, in each case, which, if determined adversely, would reasonably be expected to be material to the Business or the Acquired Assets, taken as a whole.

5.10     Compliance with Legal Requirements; Permits.

(a)     Sellers hold all of the material Permits necessary for the current operation and conduct of the Business and the Acquired Assets. The Permits set forth on Schedule 2.1(e) are all of the material Permits held by Sellers with respect to the current operation and conduct of the Business and the Acquired Assets.

(b)     Except as set forth on Schedule 5.10(b)(i), Sellers have during the previous three (3) years conducted the Business and own and operate the Business and the Acquired Assets in accordance, in all material respects, with all applicable Legal Requirements, Orders and Permits. Except as

set forth on Schedule 5.10(b)(ii), neither Sellers nor, to the Seller's Knowledge, any of their representatives have during the previous three (3) years received any written notice or other communication from a Governmental Authority that alleges that the Business is not in compliance with any Legal Requirement, Order or Permit applicable to the Business or the operations or properties of the Business or the Acquired Assets or that states the intention on the part of any issuing authority to cancel, suspend or modify any Permit necessary for the current operation and conduct of the Business and the Acquired Assets.

(c)     Except as forth on Schedule 5.10(c) and subject to entry of the Sale Order, each Permit set forth on Schedule 2.1(e) may be transferred or reissued to Buyer in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Court).

5.11    Labor Matters.

(a)     None of the Sellers are party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements, and other similar agreements (each, a "***Collective Bargaining Agreement***") with any union, works council, or labor organization (each, a "***Union***" and collectively, "***Unions***").

(b)     Except as set forth on Schedule 5.11(b), (i) in the past three (3) years, other than pursuant to procedures established in connection with the Bankruptcy Case, no Union or group of Employees or former Employees has organized any employees for purposes of collective bargaining, sought to bargain collectively with any of Sellers, made a demand for recognition or certification as an employee representative for purposes of collective bargaining or filed a petition for recognition with any Governmental Authority; (ii) as of this date, no Collective Bargaining Agreement is being negotiated by any of Sellers, other than pursuant to procedures established in connection with the Bankruptcy Case; and (iii) in the past two (2) years, there have been no material strikes, lockouts, slowdowns, work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs, or other material forms of organized labor disruption with respect to any of Sellers.

(c)     (i) within the past two (2) years, Sellers have not failed to provide advance notice of layoffs or terminations as required by, or incurred any Liability under the WARN Act, or any applicable Legal Requirement for employees outside the United States regarding the termination or layoff of employees; and (ii) except pursuant to procedures established in connection with the Bankruptcy Case, and except as would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect, within the past two (2) years, Sellers have been in compliance in all material respects with all applicable Legal Requirements relating to labor and employment, including all Legal Requirements relating to employment practices; the hiring, promotion, assignment, and termination of employees; discrimination; equal employment opportunities; disability; labor relations; wages and hours; FLSA, classification of independent contractors, hours of work; payment of wages; immigration; workers' compensation; employee benefits; background and credit checks; working conditions; occupational safety and health; family and medical leave; employee terminations; and data privacy and data protection.

(d)     Schedule 5.11(d) sets forth a true, complete, and accurate list of name, title, leave status, and place of employment of all Employees of the Business.

(e)     Except as set forth on Schedule 5.11(e), within the past three (3) years, (i) none of the Sellers has entered into a settlement agreement with any Employee resolving allegations of sexual harassment by either an officer or an employee of any Seller or Affiliate thereof, and (ii) there have not been any Actions pending or, to Sellers' Knowledge, threatened, against or related to the Business, in each case, involving allegations of sexual harassment by any employee of the Sellers in a managerial or executive position.

5.12    Employee Benefits.

(a)    Except as set forth in Schedule 5.12(a), Sellers do not sponsor, maintain or contribute to, or have any obligation to maintain or contribute to, any Benefit Plan.

(b)    Sellers do not maintain, contribute to, or have any obligation to maintain or contribute to, or have any direct or indirect liability, whether contingent or otherwise, with respect to, and within the last six years have not maintained, contributed to or had any direct or indirect liability, whether contingent or otherwise, with respect to any Benefit Plan (including, for such purpose, any "employee benefit plan," within the meaning of Section 3(3) of ERISA, which any Seller previously maintained or contributed to), that is, or has been, (i) within the last six (6) years, subject to Title IV of ERISA or Section 412 of the Code, (ii) except as set forth on Schedule 5.12(b), maintained by more than one employer within the meaning of Section 413(c) of the Code, (iii) subject to Sections 4063 or 4064 of ERISA or (iv) a Multiemployer Plan.

(c)    Except where Sellers could not reasonably be expected to have any material liability, (i) each Benefit Plan has been established and administered in all respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other Legal Requirements; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the IRS, the United States Department of Labor ("*DOL*") or any other Governmental Authority, or to the participants or beneficiaries of such Benefit Plan have been filed or furnished on a timely basis; (iii) each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination letter from the IRS (covering all required tax law changes) to the effect that the Benefit Plan satisfies the requirements of Section 401(a) of the Code and that its related trust is exempt from taxation under Section 501(a) of the Code and, to the Sellers' Knowledge, there are no facts or circumstances that could reasonably be expected to cause the loss of such qualification or the imposition of any material liability, penalty or tax under ERISA, the Code or any other Legal Requirements; (iv) other than routine claims for benefits, no liens, lawsuits or complaints to or by any person or Governmental Authority have been filed against any Benefit Plan or Sellers or, to the Sellers' Knowledge, against any other person or party and, to the Sellers' Knowledge, no such liens, lawsuits or complaints are contemplated or threatened with respect to any Benefit Plan; (v) no individual who has performed services for any Seller has been improperly excluded from participation in any Benefit Plan; and (vi) there are no audits or proceedings initiated pursuant to the IRS Employee Plans Compliance Resolution System (currently set forth in Revenue Procedure 2008-50) or similar proceedings pending with the IRS or DOL with respect to any Benefit Plan.

(d)    All contributions (including all employer contributions and employee salary reduction contributions) or premium payments required to have been made under the terms of any Buyer Benefit Plan, or in accordance with Legal Requirements, as of the Execution Date have been timely made or reflected on Sellers' financial statements in accordance with GAAP.

(e)    Sellers have no obligation to provide or make available post-employment benefits under any Benefit Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA) to any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of Sellers, except as may be required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (otherwise referred to as "COBRA"), and at the sole expense of such individual.

(f)    Except as set forth on Schedule 5.12(f), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due, or increase the amount of any compensation due, to any current or former officer, director, employee, leased employee, consultant or

agent (or their respective beneficiaries) of Sellers; (ii) increase any benefits otherwise payable under any Buyer Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any such compensation or benefits under any Buyer Benefit Plan.

(g)      With respect to each Buyer Benefit Plan, Sellers have provided to Buyer, a true, correct and complete copy (or, to the extent no such copy exists or the Buyer Benefit Plan is not in writing, an accurate written description) thereof and, to the extent applicable, (A) all material documents constituting such Buyer Benefit Plan, (B) any related trust agreements and all other material contracts currently in effect with respect to such Buyer Benefit Plan, (C) discrimination tests for the most recent plan year, (D) the most recent IRS determination letter, (E) IRS Forms 5500 (including schedules) for the last three plan years, (F) financial statements for the last three plan years, (G) any material correspondence with any Governmental Authority, and (H) any other documents reasonably requested by Buyer.

5.13    Sellers' Intellectual Property.

(a)      Schedule 5.13(a) sets forth a true and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; and (iii) registered Copyrights and pending applications for Copyrights, in each case, which are owned by a Seller as of the Execution Date and which are material to the Business. Except as set forth on Schedule 5.13(a), Sellers are the sole owners of all of the applications and registrations set forth on Schedule 5.13(a), free and clear of all liens except for Permitted Encumbrances, and all such applications and registrations are in effect and subsisting.

(b)      Except as disclosed on Schedule 5.13(b), and except as would not, individually or in the aggregate, have a Material Adverse Effect, to Sellers' Knowledge, (i) the conduct of the Business by Sellers as currently conducted (including the products and services currently sold or provided by Sellers) does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened in writing against Sellers, and (ii) no Person is infringing or otherwise violating any Intellectual Property owned by Sellers, and no such claims are pending or threatened in writing against any Person by Sellers.

(c)      To Sellers' Knowledge, the Acquired Assets and any rights provided to Buyer pursuant to the Transaction Documents include all third party intellectual property rights licensed to Sellers that are required to conduct the Business as presently conducted by Sellers.

5.14    Contracts.

The Execution Date Contract Schedule sets forth Sellers' good faith estimate of the Cure Costs with respect to each Contract listed thereon. No Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract listed on the Execution Date Contract Schedule. Each such Contract listed on the Execution Date Contract Schedule is in full force and effect and is a legal, valid, binding and enforceable obligation of each Seller party thereto in accordance with its terms and conditions, in each case, except (a) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (b) as set forth on Schedule 5.14 and (c) as would not, individually or in the aggregate, have a Material Adverse Effect. Upon entry of the Sale Order and payment of the Cure Costs, (i) no Seller will be in breach or default of its obligations under any Assigned Contract, and (ii) to Sellers' Knowledge, no other party to any Assigned Contract is in material breach or default thereunder. To the Sellers' Knowledge, the Contracts set forth on the Execution Date Contract Schedule will continue to be legal, valid, binding and enforceable and in full force and effect on the same terms as immediately following the consummation of the transaction contemplated hereby, in each

case, except (a) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (b) as set forth on <u>Schedule 5.14</u> and (c) as would not, individually or in the aggregate, have a Material Adverse Effect.

5.15    <u>Sufficiency of Assets</u>.

Except for any Excluded Assets, (a) the Acquired Assets will, as of the Closing Date, constitute all of the assets and rights necessary for Buyer to conduct the Business as presently conducted by Sellers and (b) none of the Acquired Assets is owned by any Person other than Sellers.

5.16    <u>Insurance</u>.

Sellers or their Affiliates maintain the insurance policies set forth on <u>Schedule 5.16</u>, which Schedule sets forth all insurance policies covering the Acquired Assets, Employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect. Sellers have paid all premiums on such policies due and payable prior to the Closing Date. Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

5.17    <u>Brokers or Finders</u>.

Other than the Seller Retained Professional Fees, Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

5.18    <u>Undue Influence</u>.

No Seller or any person or other entity acting on behalf of a Seller has directly or indirectly, on behalf of or with respect to the Business or the Acquired Assets: (a) made any contributions, payments or gifts of its property to or for the private use of any governmental official, employee or agent where either the payment or the purpose of such contribution, payment or gift is illegal under the laws of the United States, any state thereof or any other jurisdiction (foreign or domestic); (b) either established or maintained any unrecorded fund or asset for any purpose, or made any intentionally false or artificial entries on its books or records for any reason; (c) made any payments to any Person with the intention or understanding that any part of such payment was to be used for any purpose other than that described in the documents supporting the payment; (d) either made any contribution, or reimbursed any political gift or contribution made by any other Person, to candidates for public office, whether federal, state or local, where such contribution or reimbursement would be in violation of any Legal Requirement in any material respect; (e) made or received any payment which was not legal in any material respect to make or receive; (f) engaged in any material transaction or made or received any material payment which was not properly recorded on the books of Sellers; (g) created or used any "off-book" bank or cash account or "slush fund;" or (h) engaged in any conduct constituting a violation in any material respect of the Foreign Corrupt Practices Act of 1977.

5.19    <u>Financial Statements</u>.

Sellers have delivered to Buyer the consolidated balance sheets of the Company and its Subsidiaries and consolidated statements of operations, stockholder's equity (deficit) and cash flows for, the fiscal years ended December 31, 2018 and December 31, 2017 (collectively, the "**Audited Financial Statements**"). The Audited Financial Statements have been prepared in accordance with GAAP consistently

applied in accordance with the Company's past practice throughout the periods indicated. Sellers have also delivered to Buyer an unaudited condensed consolidated balance sheets for the Company and its Subsidiaries as of July 14, 2019 (such date the "***Unaudited Balance Sheet Date***" and such balance sheet the "***Unaudited Balance Sheet***") and the condensed consolidated statements of operations, stockholder's equity (deficit) and cash flows for the period then ending March 24, 2019 (collectively, the "***Unaudited Financial Statements***"). The Audited Financial Statements and the Unaudited Financial Statements (together the "***Financial Statements***") (i) are true, correct and complete in all material respects, (ii) are in accordance in all material respects with the books and records of Sellers, and (iii) fairly present in all material respects the financial position of Sellers at the dates specified and the results of their operations for the period covered.

5.20    <u>Absence of Certain Changes</u>.

Except as set forth on <u>Schedule 5.20</u> or as expressly contemplated by this Agreement, from the Unaudited Balance Sheet Date to the Execution Date, Sellers have not:

(a)    except for executory contracts and unexpired leases rejected by Sellers pursuant to the Sale Order with the prior written consent of Buyer, terminated, modified or amended any Assigned Contract or taken any action which violates, conflicts with or resulted in a breach of any provision of, or constitutes a default under, any Assigned Contract;

(b)    (i) purchased or otherwise acquired any material properties or assets (tangible or intangible) or sold, leased, transferred or otherwise disposed of any Acquired Assets, except for purchases of materials and sales of Inventory in the Ordinary Course of Business and sales and dispositions of obsolete assets, or (ii) removed any material Equipment or other material assets (other than Inventory) from the Real Property other than in the Ordinary Course of Business;

(c)    waived or released any claim or rights included in or related to the Acquired Assets or the Business with a value individually or in the aggregate in excess of $100,000 or revalued any of the Acquired Assets, except for adjustments to the value of Inventory in the Ordinary Course of Business;

(d)    entered into any contractual relationship with any third party related to the Acquired Assets or the Business, other than (i) in the Ordinary Course of Business, (ii) contractual relationships with professionals and advisors entered into in connection with the bankruptcy of the Sellers and the transactions contemplated hereby and (iii) non-disclosure and confidentiality agreements entered into with potential bidders for all or a portion of Sellers' assets;

(e)    made any material commitments for capital expenditures;

(f)    materially increased the benefits of or compensation (whether in the form of salary or target bonus opportunity) payable to any employee, contractor or consultant of Sellers, whose annual rate of base salary prior to such increase was in excess of $100,000, or granted any bonus, benefit, or other direct or indirect compensation (other than any such payments authorized pursuant to any first or second day orders in the Bankruptcy Case) to any such employee, contractor or consultant of Sellers; (ii) adopted, modified, amended or terminated any Benefit Plan; (iii) entered into any employment, compensation, severance, non-competition, or similar contract (or amended any such contract) to which any Seller is a party; (iv) adopted any new severance pay, termination pay, deferred compensation, bonus or other employee benefit plan with respect to Employees that would be a Benefit Plan if it existed on the

Execution Date, except, in the case of each of clauses (i) through (iv), (A) to the extent permitted by any order of the Bankruptcy Court or as required by applicable Legal Requirements (including to avoid the imposition of Taxes or to conform to the requirements of Tax qualification), Contract or Benefit Plan; (B) pursuant to the terms of any Benefit Plan, as in effect on the Execution Date; (C) for immaterial changes to Benefit Plans available to all employees generally (other than changes that materially increase the amount, or accelerate the timing, of the payment of benefits); or in the Ordinary Course of Business;

(g)     suffered any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(h)     changed in any way Sellers' accounting methods, principles or practices other than required by changes in GAAP;

(i)     entered into any commitment or transaction or series of commitments or transactions in respect of Indebtedness or paid, discharged or satisfied any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than (i) the payment, discharge or satisfaction in the Ordinary Course of Business of Liabilities incurred in the Ordinary Course of Business and (ii) the DIP Credit Agreement and the financing transactions contemplated thereby;

(j)     allowed any Permit held by any Seller to terminate, expire or lapse; or

(k)     agreed or committed to do any of the foregoing.

5.21    Customers and Suppliers.

(a)     Schedule 5.21(a) sets forth a list of the ten (10) largest suppliers of each of the Perkins Business, the MC Business and the Foxtail Business for the year ended December 31, 2018.

(b)     Schedule 5.21(b) sets forth a list of the ten (10) largest customers of the Foxtail Business for the year ended December 31, 2018.

5.22    Products; Warranties; Food Laws; Regulatory Matters

(a)     Except as set forth on Schedule 5.9 or Schedule 5.22(a), there is no currently pending claim for product liability, warranty or other claims by a third party of the Business (whether based on contract or tort and whether relating to personal injury, including death, or economic loss) in excess of $10,000, individually, or $25,000, in the aggregate, or series of related claims, arising from (i) the services or Products rendered by the Business during the last three (3) years, or (ii) the operation of the Business during the period from January 1, 2018 through and including the Execution Date.

(b)     In the last three (3) years, no Products produced by the Sellers in connection with the Business have (i) been adulterated or misbranded (as defined in any Food Law), (ii) been an article which may not, under Section 504, 505 or 512 of the Federal Food, Drug, and Cosmetic Act (and all acts and/or rules and regulations amending or supplementing the same), be introduced into interstate commerce, or (iii) produced without all necessary labeling requirements pursuant to applicable Legal Requirement.

(c)     There are no pending claims alleging that any Product is unsafe or fails to meet any product warranty or any other standards that are promulgated by any Governmental Body. There are no pending notices of recall (written or oral) with regard to any Product. For the last three (3) years, Sellers have not received any claim alleging that, as a result of the actions or negligence of Sellers, a Product

is unsafe or fails to meet any applicable product warranty, nor to the Sellers' Knowledge does any such claim exist.

        (d)     In each case, except as set forth on <u>Schedule 5.22(d)</u> and except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect: (i) to Sellers' Knowledge, the Company's and its Subsidiaries' operation of their businesses is currently in compliance with all Food Laws currently applicable to such operation; (ii) the Company and its Subsidiaries collectively possess or have the right to use or have the benefit of all food related Permits necessary for the operation of their businesses and, to Sellers' Knowledge, such operation is currently in compliance with such Permits and (iii) to Sellers' Knowledge, for the last three (3) years, there have been no government inquiries or investigations by or claims made to the United Stated Food and Drug Administration, United States Department of Agriculture, or other regulatory bodies in respect of the Company or its Subsidiaries.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

6.1     <u>Organization and Good Standing</u>.

Buyer is a corporation, duly organized, validly existing and in good standing under the laws of the State of New Jersey. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2     <u>Authority; Validity; Consents</u>.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except, in each case, as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as set forth on <u>Schedule 6.2</u>, Buyer is not or will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3     <u>No Conflict</u>.

Neither the execution and delivery by Buyer of this Agreement or the other Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of

(i) any provision of the organizational documents of Buyer or (ii) any Legal Requirement binding upon Buyer or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority.

6.4     Availability of Funds.

Buyer has as of the Execution Date, and shall have on the Closing Date, sufficient unrestricted funds or committed lines of credit on hand to pay the Cash Consideration at the Closing.

6.5     Litigation.

There is no Action or Order pending or, to the knowledge of Buyer, threatened against Buyer, whether at law or equity, whether civil or criminal in nature, or by or before any arbitration or Governmental Authority, that would affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.6     Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement or any other Transaction Document for which any Seller is or will become liable.

6.7     Qualification.

To Buyer's knowledge, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

6.8     Information.

Buyer has conducted such investigations of the Company and its Subsidiaries as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby. Buyer acknowledges that it and its Representatives have been permitted full and complete access to the books and records, facilities, equipment, Tax Returns, Contracts, insurance policies (or summaries thereof) and other properties and assets of Sellers, that it and its Representatives have desired or requested to see or review, and that it and its Representatives have had a full opportunity to meet with the officers and employees of Sellers to discuss the Business. Neither Sellers nor any other Person (including any officer, director, member or partner of Sellers or any of their Affiliates) shall have or be subject to any liability to Buyer, or any other Person, resulting from Buyer's use of any information, documents or material made available to Buyer in any "data rooms," management presentations, due

diligence or in any other form in expectation of the transactions contemplated hereby or by the other Transaction Documents.

# ARTICLE 7

## ACTIONS PRIOR TO THE CLOSING DATE

7.1     Access and Reports.

(a)     Subject to applicable Legal Requirements, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of ARTICLE 11, Sellers shall (i) afford Buyer and its Representatives access upon reasonable notice to its employees, customers, suppliers, properties, books, Contracts and records of Sellers during normal business hours solely to the extent such access does not unreasonably interfere with the businesses of the Sellers, and furnish promptly to Buyer all information concerning the Acquired Assets, the Business, properties, any Benefit Plans and personnel as may be reasonably requested; (ii) furnish to Buyer such financial and operating data and other information relating to Sellers, the Business and the Acquired Assets as may be reasonably requested; (iii) permit Buyer to make such reasonable inspections and copies as Buyer may require, in each case, during normal business hours to the extent such inspections and making of copies does not unreasonably interfere with the businesses of the Sellers and (iv) instruct the executive officers and senior business managers, employees, counsel, auditors and financing advisors of Sellers to cooperate with Buyer and its Representatives regarding the same. All requests for information made pursuant to this Section 7.1 shall be directed to Houlihan Lokey, Inc. or Akin Gump Strauss Hauer & Feld LLP, unless otherwise directed by the Sellers; provided, however, that the foregoing shall not in any way limit the obligation of the Sellers to comply with this Section 7.1 in a timely and complete manner. All such information shall be governed by the terms of the Confidentiality Agreements. No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the Execution Date shall affect or be deemed to modify any representation or warranty made by Sellers herein. Notwithstanding anything contained in this Agreement to the contrary, none of Buyer or any Buyer Designees shall have any right to perform or conduct any environmental sampling, testing or invasive investigation in, at, on or underneath any of Sellers' properties or facilities without the prior written consent of Sellers (such consent not to be unreasonably withheld or delayed).

(b)     This Section 7.1 shall not require Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or cause any privilege (including attorney-client privilege) that Sellers would be entitled to assert to be undermined with respect to such information and such undermining of such privilege could in the Company's good faith judgment (after consultation with counsel, which may be in-house counsel) adversely affect in any material respect Sellers' position in any pending or, what the Company believes in good faith (after consultation with counsel, which may be in-house counsel) could be, future litigation or (ii) if the Company or any Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, however, that, in the case of clause (i), the parties hereto shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or be reasonably likely to cause such privilege to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

7.2     Operations Prior to the Closing Date.

Sellers covenant and agree that, except (1) as expressly contemplated by this Agreement, (2) as disclosed in Schedule 7.2, (3) with the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), (4) as otherwise required by Legal Requirements or the Bankruptcy Court (including any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code), (5) as occurring as a result of Sellers being in bankruptcy under the Bankruptcy Code, or (6) with respect to any business not constituting the Business or otherwise with respect to the Excluded Assets or the Excluded Liabilities after the Execution Date and prior to the Closing Date:

(a)     Sellers shall:

(i)     carry on the Business in the Ordinary Course of Business and use commercially reasonable efforts to maintain, preserve and protect all of the Acquired Assets in the condition in which they exist on the Execution Date, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

(ii)     maintain their books, accounts and records in accordance with past custom and practice;

(iii)    use commercially reasonable efforts to (A) retain Employees who are in good standing and are necessary to conduct the Business as presently conducted by Sellers and (B) maintain their relationships with and preserve for the Business the goodwill of their key suppliers and customers;

(iv)    (A) comply in all material respects with all Legal Requirements applicable to them or having jurisdiction over the Business or any Acquired Asset, (B) comply in all material respects with contractual obligations applicable to or binding upon them pursuant to Assigned Contracts and (C) maintain in full force and effect all Permits and comply in all material respects with the terms of each such Permit;

(v)     not cause any of their current property insurance policies with respect to the Business or any of the other Acquired Assets to be canceled or terminated or any of the coverage thereunder to lapse unless simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(vi)    use commercially reasonable efforts to maintain, preserve and protect in full force and effect the existence of all material Intellectual Property owned by Sellers and included in the Acquired Assets, provided, however, that any such Intellectual Property that is no longer in use or is determined to lack any commercial value may be abandoned or cancelled; and

(vii)   use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (A) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (B) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

(b)     Sellers shall not:

46

(i)     take any action enumerated in <u>Section 5.20</u>, except as set forth on <u>Schedule 5.20</u>;

(ii)    assume, reject or assign any Assigned Contract other than pursuant to <u>Section 2.5</u>;

(iii)   other than in the Ordinary Course of Business, hire or terminate any employee, individual independent contractor or consultant whose annual rate of base salary or fee is greater than $100,000;

(iv)   enter into or renew any Contract having a term of one year or greater or that may require Sellers to incur potential liabilities of $300,000 or greater per year without the consent of Buyer.

7.3     <u>Governmental Approvals; Cooperation</u>.

(a)     Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including: (i) taking all commercially reasonable acts necessary to cause the conditions precedent set forth in <u>ARTICLE 9</u> and <u>ARTICLE 10</u> to be satisfied; (ii) obtaining, at the earliest practicable date, all necessary Governmental Authorizations and making all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any); (iii) taking all commercially reasonable steps to avoid any Action by any Governmental Authority, including selling, licensing, transferring, assigning, leasing, disposing of, or holding separate any business or assets; (iv) defending any Actions challenging this Agreement or the consummation of the transaction contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, and (v) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(b)     Buyer and Sellers shall take all commercially reasonable actions and do, or cause to be done, all commercially reasonable things necessary under the applicable Legal Requirements with the appropriate Governmental Authorities to put in place, to transfer, to amend, or to acquire all Transferred Permits that are necessary for the operation and conduct of the Business or Acquired Assets by or on the Closing Date, unless the applicable Legal Requirements regarding such a Permit require certain actions to be taken upon or after Closing, and, in that event, Buyer and Sellers shall take all commercially reasonable actions and do, or cause to be done, all commercially reasonable things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authorities which can only be taken or done after Closing to put in place, to transfer, to amend, or to acquire such remaining Permits as promptly as reasonably practicable after the Closing.

(c)     Sellers, on the one hand, and Buyer, on the other hand, (i) shall to the extent legally permitted promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine). In addition, none of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless, to the extent legally

permitted, such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case, to the maximum extent practicable. Subject to restrictions under any Legal Requirements, each of Buyer, on the one hand, and Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

7.4     Bankruptcy Court Matters.

(a)     Bankruptcy Filings. From and after the Execution Date and until the Closing Date, Sellers shall use commercially reasonable efforts to consult with Buyer with respect to any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement, including any Tax motions, and such filings shall, as applicable, be consistent with this Agreement and otherwise reasonably acceptable to Buyer solely to the extent they relate to the Acquired Assets, any Assumed Liabilities or any of Buyer's obligations hereunder. Sellers agree to use commercially reasonable efforts to prosecute the entry of the Bidding Procedures Order and the Sale Order. In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal. Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, (ii) of the Local Rules of Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, or (iii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.  Sellers shall use its commercially reasonable efforts to cause the Bidding Procedures Order and the Sale Order to be entered and become a Final Order as soon as practicable after entry and to defend any appeal of the Bidding Procedures Order and/or the Sale Order. Notwithstanding the foregoing, nothing in this Agreement precludes the Parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and the Buyer, in its sole discretion, waives in writing the condition set forth in Section 9.6 that the Sale Order be a Final Order.

(b)     Bidding Procedures and Sale Order. The Sellers and the Buyer shall comply with all of their respective obligations under the Bidding Procedures Order and Sale Order, in each case, after the entry of such Order by the Bankruptcy Court.

(c)     Qualified Bids. Pursuant to the Bidding Procedures Order, any and all Qualified Bids shall have been submitted on or prior to the Bid Deadline. If any Qualified Bid is submitted prior to the Bid Deadline, Sellers shall have commenced the Auction as promptly as practicable in accordance with the Bidding Procedures, the Bidding Procedures Order, and this Agreement.

7.5     Break-Up Fee.

From and after the entry, and consistent with the terms, of the Bidding Procedures Order, Sellers agree to pay Buyer an amount equal $500,000 in the event this Agreement is terminated if and to

the extent provided in Section 11.2 (the "***Break-Up Fee***"). The Parties acknowledge and agree that the terms and conditions set forth in Section 11.2 with respect to the payment of the Break-Up Fee shall become operative only if and to the extent that the Bankruptcy Court enters the Bidding Procedures Order.

7.6    Update of Disclosure Schedules; Notice of Developments.

(a)    Seller Supplements. Until the Closing Date, Sellers may from time to time, supplement or amend the Disclosure Schedules with a corresponding reference to be added in this Agreement to disclose any matter hereafter arising or of which Sellers becomes aware of after the Execution Date which, if existing, occurring or known at the Execution Date, would have been required to be set forth or described in the Disclosure Schedules or that is otherwise necessary to correct any information in the Disclosure Schedules that has been rendered inaccurate thereby (each a "***Schedule Supplement***"), no later than ten (10) days after the discovery of such matter by Sellers and in any case at least ten (10) days prior to the anticipated Closing Date. If the event, development or occurrence which is the subject of the Schedule Supplement constitutes or relates to something that would provide Buyer with a right to terminate this Agreement in accordance with its express terms and Buyer has the right to, but does not elect to terminate this Agreement within five (5) days of its receipt of such Schedule Supplement, then Buyer shall be deemed to have irrevocably waived any right to terminate this Agreement with respect to such matter.

(b)    Notice of Developments. Sellers shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, any event that would reasonably be expected to cause any of the conditions set forth in ARTICLE 9 not to be fulfilled by the Outside Date.

7.7    Limitations.

For the avoidance of doubt, nothing in this Agreement, including Section 2.6, or Section 7.3, shall (a) prevent any of the Sellers from, or require any of the Sellers to delay, the winding down of their bankruptcy estates, (b) require any of the Sellers to pay or incur any monetary amount not expressly imposed on such Seller pursuant to the other provisions of this Agreement, (c) impose on any Seller any burdens not expressly imposed on such Seller pursuant to the other provisions of this Agreement, or (d) require any Seller to become involved in any Action.

## ARTICLE 8

### ADDITIONAL AGREEMENTS

8.1    Taxes.

(a)    Any Transfer Tax shall be borne exclusively by Buyer. Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes. Buyer shall be responsible for preparing and filing Tax Returns with respect to Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by the other Party, the Party responsible for preparing the Tax Return shall deliver it to the other Party not less than ten days before the due date thereof, and the other Party shall promptly execute such Tax Return and return it to the Party responsible for filing it.

(b)    All Liability for any real or personal property and other ad valorem Taxes ("***Property Taxes***") with respect to the Acquired Assets for any Pre-Closing Tax Period shall be borne by Sellers. All Liability for any Property Taxes with respect to the Acquired Assets for any Post-Closing Tax Period shall be borne by Buyer. The total amount of such Property Taxes allocable to the Pre-Closing Tax Period of any Straddle Period shall be the product of (i) such Tax for the entirety of

such Straddle Period, multiplied by (ii) a fraction, the numerator of which is the number of days for such Straddle Period included in the Pre-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period, and the balance of such Taxes shall be allocable to the Post-Closing Tax Period. At the Closing, Property Taxes with respect to each Acquired Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Property Tax assessment for such Acquired Asset for such Straddle Period, if available, or if otherwise, based on the Property Taxes paid with respect to such Acquired Asset during the preceding Tax year.

(c)    Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; provided, however, that neither Buyer nor any Seller shall be required to disclose the contents of its income Tax Returns to any Person other than the Parties. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(c) shall be borne by the Party requesting it.

8.2    Payments Received.

Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts.

8.3    Assigned Contracts: Adequate Assurance and Performance.

(a)    Buyer shall use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assigned Contract as required under Section 365 of the Bankruptcy Code. Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Sellers' employees and representatives available to testify before the Bankruptcy Court.

(b)    Without limiting the provisions of this Section 8.3, Buyer acknowledges that Sellers have no duty to implement new Credit Support to secure performance for any Assigned Contract after the Closing. From and after the Closing, Buyer shall post any required Credit Support. Prior to the Closing, Buyer shall use commercially reasonable efforts, and Sellers will cooperate (it being understood that such cooperation will not include any requirement to pay any consideration or offer or grant any financial accommodation) in all reasonable respects with Buyer, to ensure that, effective as of the Closing, all Credit Support and any Liabilities related thereto, whether attributable to periods before or after the Closing shall be fully and unconditionally released as to Sellers and their Affiliates; provided, however, that if as of the Closing any Credit Support and related Liabilities have not otherwise been fully and unconditionally released and the applicable Assumed Contract permits them to be released by depositing cash with the counterparty or another Person, then at or before the Closing, Buyer shall so deposit cash in the amount required to obtain such release.

8.4    Employee Matters.

(a)    Buyer Employees. Upon the Closing Date, Buyer shall accept the transfer of all Employees on substantially similar terms and conditions, in the aggregate, of employment as exist with Sellers immediately prior to the Closing Date (collectively, the "**Buyer Employees**"). The employment of each such Buyer Employee with Buyer will commence immediately after the Closing Date.

(b)    Access to Information. After the Execution Date, Sellers shall provide Buyer and its Affiliates with reasonable access to Sellers' employees and Employees and with information, including employee records and Benefit Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by law.

(c)    Buyer Benefit Plans. Buyer shall assume all obligations under or Liabilities with respect to all Benefit Plans solely to the extent set forth on Schedule 8.4(c) (such Benefit Plans, the "**Buyer Benefit Plans**") and the Buyer Benefit Plans shall be assumed by and assigned to Buyer (or such Buyer affiliates as Buyer so directs) on the Closing Date in the manner described in this Agreement. Sellers shall make good faith efforts to consult with, and give reasonable assistance (including with respect to making amendments) to Buyer and its Affiliates in respect of any Buyer Benefit Plans, prior to the Closing Date. Buyer shall assume all accrued, but unused, vacation of Buyer Employees as a Buyer Benefit Plan. To the extent that service is relevant for purposes of eligibility and vesting, but not accrual under any benefit plan of Buyer or its affiliates, including any Buyer Benefit Plan, Buyer shall credit (or cause to be credited) Buyer Employees for service earned prior to the Closing with Sellers in addition to service earned with Buyer on and after the Closing. To the extent the Buyer Employees and their eligible dependents enroll in any welfare benefit plan sponsored by Buyer or its affiliates (including any Buyer Benefit Plan as applicable), subject to the terms of any such plan, Buyer shall undertake commercially reasonable efforts to waive, or cause such waiver of, any preexisting condition limitation applicable to such Buyer Employees to the extent that the Buyer Employee's or eligible dependent's condition would not have operated as a preexisting condition under the applicable welfare benefit plan maintained by Sellers. In addition, subject to the terms of any such plan, Buyer shall undertake commercially reasonable efforts to (i) waive all waiting periods otherwise applicable to the Buyer Employees and their eligible dependents, other than waiting periods that are in effect with respect to such individuals as of the Closing to the extent not satisfied under the Buyer Benefit Plans or such other corresponding Benefit Plans of Sellers and (ii) provide each Buyer Employee and his or her dependents with corresponding credit for any co-payments and deductibles paid by them under such Buyer Benefit Plans or corresponding Benefit Plans of Sellers during the portion of the respective plan year prior to the Closing. At any time and from time to time after the Execution Date, Sellers and Buyer shall take, or cause to be taken, any and all actions necessary to effectuate the terms of this Section 8.4(c), including taking all action necessary to assign and assume and adopt each Buyer Benefit Plan in the manner contemplated by this Agreement effective as of the Closing. Sellers will reasonably cooperate with Buyer and its affiliates and take, or cause to be taken, all reasonable actions as Buyer may reasonably request in order to effectuate the foregoing. Nothing herein shall prohibit Buyer or its affiliates, as applicable, from terminating, amending, or otherwise affecting any Buyer Benefit Plan, at any time and from time to time following the Closing.

(d)    Payroll Taxes. Buyer and Sellers agree to utilize or cause their respective Affiliates to utilize, the alternative procedure set forth in the Revenue Procedure 2004-53 with respect to wage reporting.

(e)    No Third-Party Beneficiaries; Employment Status. All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective parties hereto. Nothing contained herein (i) shall confer upon any former, current or future employee of Sellers or Buyer or any legal representative or beneficiary

thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee of Buyer to be other than terminable at will or (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof. The provisions of this <u>Section 8.4</u> shall not constitute an adoption, amendment, or other modification to any Benefit Plan or any plan, program, agreement or arrangement covering Buyer Employees or Employees or Sellers' employees.

(f)     <u>Employee Benefits</u>. Other than the Buyer Benefit Plans and except as provided in <u>Section 8.4(a)</u>, Buyer shall not be obligated to, and does not, accept or adopt any wage rates, employee benefits, employee policies, or any other terms and conditions of employment.

(g)     <u>WARN Act</u>. With respect to all Employees, including those that become Buyer Employees, Sellers shall be solely responsible for compliance with and Liabilities relating in any way to all applicable Legal Requirements with respect to the WARN Act for any act or omission of Sellers prior to the Closing Date. With respect to the Buyer Employees, Buyer shall be solely responsible for compliance with and Liabilities relating in any way to all applicable Legal Requirements with respect to the WARN Act for any act or omission of Buyer on or after the Closing Date, including any failure to comply with <u>Section 8.4(a)</u>.

8.5     <u>Post-Closing Books and Records and Personnel</u>.

From and after the Closing Date, each Party hereto shall provide the other Parties hereto (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, solely to the books and records acquired pursuant to this Agreement as of the Closing Date so as to enable Buyer and Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions, and with respect to Sellers, to wind up their bankruptcy estates. If any party desires to dispose of any such records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove such records to be disposed of at the removing Party's expense.

8.6     <u>Representations and Warranties Exclusive</u>.

Buyer acknowledges and agrees that it has conducted its own independent investigation, review and analysis of the Business, the Acquired Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Sellers for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Sellers set forth in <u>ARTICLE 5</u> of this Agreement and <u>Section 12.15</u>; and (b) none the Sellers nor any other Person has made any representation or warranty as to the Sellers, the Business, the Acquired Assets, the Assumed Liabilities or this Agreement, except as expressly set forth in this Agreement (as qualified by the Disclosure Schedules) . SUCH REPRESENTATIONS AND WARRANTIES MADE BY THE SELLERS IN <u>THIS AGREEMENT</u> CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE SELLERS TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND BUYER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED, WRITTEN OR ORAL (INCLUDING ANY REPRESENTATION

OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING THE SELLERS, ANY AFFILIATES OF THE SELLERS, THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES FURNISHED OR MADE AVAILABLE TO BUYER AND ITS REPRESENTATIVES AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO BUYER, MANAGEMENT PRESENTATIONS OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR AS TO THE FUTURE REVENUE, PROFITABILITY OR SUCCESS OF THE BUSINESS, OR ANY REPRESENTATION OR WARRANTY ARISING FROM STATUTE OR OTHERWISE IN LAW OR IN EQUITY OR RELATING TO MERCHANTABILITY OR FITNESS FOR USE) ARE SPECIFICALLY DISCLAIMED BY THE SELLERS. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

        8.7       Casualty Loss.

Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Buyer promptly in writing of such fact, and (i) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (ii) in the case of fire, flood or other casualty, Sellers shall, at Buyer's option, either restore such damage (but only if Sellers have funds available for such purpose) or assign the insurance proceeds therefrom to Buyer at Closing.

        8.8       Names and Transition Trademark License.

Promptly following the Closing, but no later than ten (10) days after Closing (the "***Cease Date***") each Seller shall, and shall cause their direct and indirect Subsidiaries to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by Sellers or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Foxtail" and "Foxtail Foods" without the prior written consent of Buyer, and each Seller shall cause the names of Sellers in the caption of the Bankruptcy Case to be changed to the new names of each Seller as provided in the last sentence of this Section 8.8. During this transition period, Buyer shall grant to Sellers and does hereby grant to Sellers, a limited license to use the applicable trademarks and d/b/a names in connection with its operations and the transition to a new name and trademark. All use of such names and marks shall be consistent with each Sellers' past practices and subject to Buyer's quality control. No new use of the names and trademarks shall be permitted. From the Closing and after the Cease Date, each Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the Intellectual Property rights utilized by Sellers and Sellers' Subsidiaries in the conduct of the Business or any Acquired Asset, which rights shall be included in the Acquired Assets purchased hereunder. Promptly following the Closing but no later than the Cease Date, Sellers shall file, and shall cause their direct and indirect Subsidiaries to file, all necessary organizational amendments with the applicable Secretary of State of each Seller's jurisdiction of formation and in each State in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

# ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

9.1     Accuracy of Representations.

The representations and warranties of Sellers set forth in this Agreement shall be true and correct, in all material respects (except that (a) those representations and warranties which are qualified as to materiality or Material Adverse Effect or similar expressions shall be true and correct in all respects, and (b) the representations set forth in this Agreement shall be true and correct in all respects), as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date). Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

9.2     Sellers' Performance.

The covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with, in all material respects, and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

9.3     No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Order, which is in effect and has the effect of restraining or preventing the consummation of or imposing material modifications on the transactions contemplated by this Agreement.

9.4     Governmental Authorizations.

All notices, filings, approvals and consents set forth on Schedule 9.4 shall have been made or obtained.

9.5     Sellers' Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

9.6     Sale Order.

The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become a Final Order.

9.7     Assigned Contracts.

The Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assigned Contract, except as would not have a material effect on the Business from and after the

Closing and except for any Contracts that are removed from <u>Schedule 2.5</u> pursuant to the provisions of <u>Section 2.5</u>.

9.8    <u>Material Adverse Effect.</u>

Since the Execution Date, no Material Adverse Effect shall have occurred.

9.9    <u>Releases and Termination Statements</u>.

Sellers shall have delivered to Buyer releases and termination statements sufficient for Buyer to receive the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances); <u>provided</u>, <u>however</u>, that releases shall not be required with respect to Encumbrances that are both (a) released by the Sale Order and (b) not required to be released at Closing pursuant to releases and termination statements in connection with a financing or debt facility.

9.10    <u>Cure Costs</u>.

The aggregate Cure Costs shall not exceed the Cure Cap; <u>provided</u>, <u>however</u>, that, for purposes of calculating the aggregate Cure Costs for purposes of this <u>Section 9.10</u>, the following Cure Costs shall be excluded: (a) all Cure Costs associated with any Contract that is added to or deleted from <u>Schedule 2.5</u> pursuant to the provisions of <u>Section 2.5</u> at any time following the Execution Date, and (b) all Cure Costs associated with any Previously Omitted Contract.

## ARTICLE 10

### <u>CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE</u>

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Sellers, in their sole and absolute discretion:

10.1    <u>Accuracy of Representations</u>.

The representations and warranties of Buyer set forth in this Agreement shall be true and correct, in all material respects (except that those representations and warranties which are qualified as to materiality or material adverse effect or similar expressions shall be true and correct in all respects), as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (<u>provided</u>, <u>however</u>, that representations and warranties which are confined to a specified date shall speak only as of such date). Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.2    <u>Buyer's Performance</u>.

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with, in all material respects, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.3    No Order.

No Governmental Authority shall have enacted, issued, promulgated or entered any Order, which is in effect and has the effect of preventing the consummation of the transactions contemplated by this Agreement.

10.4    Buyer's Deliveries.

Each of the deliveries required to be made to Sellers pursuant to Section 4.2 shall have been so delivered.

10.5    Sale Order in Effect.

The Bankruptcy Court shall have entered the Sale Order.

# ARTICLE 11

## TERMINATION

11.1    Termination Events.

Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by written notice of either Sellers or Buyer:

(i)    if the Closing shall not have occurred by October 31, 2019 (as may be extended by written agreement of the Parties, the "*Outside Date*"); provided, however, that (A) in the event that the Sale Order is not entered into on or before September 30, 2019, then such October 31, 2019 date shall be extended, upon written notice from either Buyer or Sellers prior to October 31, 2019, by the number of days equal to the number of days from September 30, 2019 until the date that the Sale Order is entered by the Bankruptcy Court and (B) the right to terminate this Agreement under this Section 11.1(b)(i) shall not be available to any Party whose willful failure to fulfill any of its material obligations under this Agreement shall have been the primary cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(ii)    if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by the terminating Party; provided, however, that the right to terminate this Agreement under this Section 11.1(b)(ii) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the primary cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date; and

(c)    By Buyer:

(i)    if the Bidding Procedures Order (which order shall include approval of the Break-Up Fee contemplated by this Agreement) has not been entered by the Bankruptcy Court on or before the date that is thirty (30) days after the Execution Date;

(ii)    if the Bankruptcy Court enters an Order dismissing or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Sellers' businesses (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an order of dismissal, conversion or appointment is entered for any reason and is not be reversed or vacated within fourteen (14) days after the entry thereof or any of Sellers seeks such an Order;

(iii)    in the event of any breach by any Seller of, or failure by any Seller to perform, any agreements, covenants, representations or warranties of any Seller contained herein or in the Sale Order, which breach or failure to perform would result in Sellers being unable to satisfy a condition set forth in Section 9.1 or Section 9.2 by the Outside Date;

(iv)    if the Sale Order has been amended or rescinded or has been modified in any respect that is materially detrimental to Buyer, and the Order revoking, rescinding, or so modifying the Sale Order shall not be reversed or vacated within fourteen (14) days after the entry thereof; or

(v)    if, at the end of the Auction, Buyer is not determined by Sellers to be the Successful Bidder or the Backup Bidder and Sellers have entered into any material agreement with any such Successful Bidder or Backup Bidder; provided, however, that in the event Buyer is not the Successful Bidder but has been declared the Backup Bidder, Buyer may terminate this Agreement on the earlier of (x) thirty (30) days after the Sale Hearing and (y) the closing of the sale to the Successful Bidder.

(d)    By Sellers:

(i)    in the event of any breach by Buyer of, or failure by Buyer to perform, any agreements, covenants, representations or warranties of Buyer contained herein, which breach or failure to perform would result in Buyer being unable to satisfy a condition set forth in Section 10.1 or Section 10.2; or

(ii)    if, at the end of the Auction, Buyer is not determined by Sellers to be the Successful Bidder or the Backup Bidder and Sellers have entered into any material agreement with any such Successful Bidder or Backup Bidder; provided, however, that in the event Buyer is not the Successful Bidder but has been declared the Backup Bidder, Seller may terminate this Agreement on the earlier of (x) thirty (30) days after the Sale Hearing and (y) the closing of the sale to the Successful Bidder.

Each condition set forth in this Section 11.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in Section 11.1 are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated. The Parties acknowledge and agree that no notice of termination or extension of the Outside Date provided pursuant to this Section 11.1 shall become effective until two (2) days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) day period or otherwise become invalid.

11.2    Effect of Termination.

(a)    In the event of termination of this Agreement by Buyer or Sellers pursuant to this ARTICLE 11, this Agreement shall become null and void and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any breach of this Agreement

occurring prior to such termination and (ii) the provisions of Section 7.5 and this Section 11.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, ARTICLE 1 and ARTICLE 12), shall expressly survive the termination of this Agreement.

(b)     In event (x) this Agreement is terminated by Buyer pursuant to Section 11.1(c)(v) or (y) a bid other than Buyer's offer to purchase the Acquired Assets pursuant to this Agreement is consummated by Sellers, Sellers shall pay to Buyer the Break-Up Fee by wire transfer of immediately available funds within two (2) Business Days following such consummation; provided, however, that under no circumstances shall Sellers be obligated to pay the Break-Up Fee more than once. Notwithstanding anything to the contrary in this Section 11.2(b), in no event shall Sellers (or any other Person, including any other purchaser under a Qualified Bid) be required to pay all or any portion of the Break-Up Fee to Buyer if Sellers have terminated this Agreement pursuant to Section 11.1(a), Section 11.1(b), Section 11.1(d)(i) or if Buyer has materially breached any of the material provisions of this Agreement.

(c)     The full amount of the Break-Up Fee shall be afforded super priority administrative expense protection pursuant to sections 507 and 503(b) of the Bankruptcy Code (subject to any carve-out provided in the order of the Bankruptcy Court approving the DIP Credit Agreement).

(d)     Each Party acknowledges that the agreements contained in this Section 11.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this Section 11.2 do not constitute a penalty.

(e)     The Parties acknowledge and agree that any payment of the Break-Up Fee shall constitute liquidated damages (and not a penalty) and shall be deemed to be the sole and exclusive remedy of Buyer and any other Person against Sellers in connection with the termination of this Agreement, and Sellers' former, current or future equity holders, controlling persons, directors, officers, employees, agents, managers, members, shareholders, Affiliates or assignees and any and all former, current or future equity holders, controlling persons, directors, officers, employees, agents, general or limited partners, managers, management companies, members, shareholders, Affiliates or assignees of any of the foregoing, and any and all former, current or future heirs, executors, administrators, trustees, successors or assign of any of the foregoing, and each Affiliate, officer, director, employee, controlling person, advisor, agent, attorney or representatives of any such Person (each, a "***Related Party***" and no Related Party of Sellers shall have any other Liability for any or all damages suffered or incurred by Buyer or any other Person in connection with the termination of this Agreement or any matter forming the basis for such termination, and, upon payment of the Break-Up Fee, in each case, as applicable, under such circumstances, neither Buyer nor any other Person shall be entitled to bring or maintain any other Action against Sellers or any Related Party and none of Sellers nor any Related Party shall have any further liability or obligation to Buyer arising out of this Agreement or any matters forming the basis for such termination.

## ARTICLE 12

### GENERAL PROVISIONS

12.1    Survival.

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive

the Closing and shall thereupon terminate on the Closing, including any Actions for damages in respect of any breach thereof.

12.2    Confidentiality.

The Parties agree that the confidentiality agreements entered into by them and their Affiliates, dated March 18, 2019 (as amended by their terms from time to time, the "***Confidentiality Agreements***"), shall continue in full force and effect notwithstanding the execution and delivery by the Parties of this Agreement; provided, however, that (a) the Confidentiality Agreements shall be deemed terminated effectively immediately upon the occurrence of the Closing with respect to all or any of the information concerning the Business or the Acquired Assets, (b) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute a breach of such Confidentiality Agreements, and (c) disclosures permitted under this Agreement shall not constitute a breach of such Confidentiality Agreements. Following the Closing, each Seller agrees to, and to cause its Affiliates to, treat and hold as confidential, and not use or disclose all or any of the information concerning the Business, the Acquired Assets, the negotiation or existence and terms of this Agreement or the business affairs of Buyer except (i) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto and (ii) disclosures permitted under this Agreement.

12.3    Public Announcements.

Unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

12.4    Notices.

All notices, requests, claims, demands, consents, waivers, or other communications under this Agreement shall be in writing and shall be delivered by hand, overnight courier service, email or by facsimile to all parties hereto at the following addresses:

(i)    If to Sellers, then to:

Perkins & Marie Callender's Holding, LLC
6075 Poplar Avenue, Suite 800
Memphis, TN  38119
Attn:    Jeff Warne
Email:  jeff.warne@prkmc.com

with a copy (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, DC  20006
Attn: Scott Alberino, Esq.
Email: salberino@akingump.com
Facsimile: 202-887-4288

(ii)     If to Buyer:

Fairfield Gourmet Food Corp.
11 Cliffside Drive
Cedar Grove, NJ 07009
Email: Ari@davidscookies.com
Facsimile: 973-882-6998

with a copy (which shall not constitute notice) to:

Larry Frenkel, Esq.
38 Sky Meadow Road
Suffern, NY 10901
Email: Larry@LarryFrenkel.com
Facsimile: 845-364-8299

or to such other Persons, addresses, or facsimile numbers as may be designated in writing by the Person entitled to receive such communication as provided above. Each such communication shall be effective (a) if delivered by hand, when such delivery is made at the address specified in this Section 12.4, (b) if delivered by overnight courier service guaranteeing next Business Day delivery, the next Business Day after such communication is sent to the address specified in this Section 12.4, (c) if delivered by email, only when the recipient, by return email or notice delivered by other method provided for in this Section 12.4, acknowledges having received that email (with an automatically generated receipt or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section 12.4) or (d) if delivered by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section 12.4 and appropriate confirmation is received.

12.5    Waiver.

Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    Entire Agreement; Amendment.

This Agreement (including the Disclosure Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements (including, for the avoidance of doubt, the Prior Agreement) between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter. This Agreement may not be amended, modified or supplemented except by a written agreement executed by each of the Parties hereto.

12.7    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties

(which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of Sellers so long as prior to such assignment such Buyer Designee agrees in writing in favor of Sellers to be bound by the provisions of this Agreement, it being agreed that, following any such assignment, (i) Buyer shall continue to be bound by the provisions of this Agreement and (ii) Buyer and all such assignees shall be jointly and severally liable with respect to any breach by any of them of their respective representations, warranties, covenants and agreements contained herein or in any of the other Transaction Documents to which any of them is bound.

12.8    Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    Expenses.

Except as otherwise expressly provided in this Agreement, including Section 11.2, whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby. Except as otherwise explicitly provided in this Agreement, any and all fees required by any Governmental Authority or any Person to obtain or for the transfer of a Permit shall be the sole responsibility of Buyer.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action; provided, however, that, if the Bankruptcy Case is closed, all Actions arising out of or relating to this Agreement shall be heard and determined in a Delaware state court or a federal court sitting in the District of Delaware, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action. The Parties consent to service of process by mail (in accordance with Section 12.4) or any other manner permitted by law.

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11    Counterparts.

This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.12    Parties in Interest; No Third Party Beneficiaries; No Amendment.

This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Benefit Plan.

12.13    Remedies.

Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Sellers or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.14    Specific Performance for Post-Closing Covenants.

Solely with respect to the Parties' respective covenants under this Agreement that survive the Closing, and solely to the extent to be performed after the Closing, (a) each Party recognizes that if such Party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of such covenants, (c) if any Action is brought by the non-breaching Party or Parties to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (d) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action seeking specific performance of such covenants and (e) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants. Notwithstanding any other provision of this Agreement to the contrary, no Party shall be entitled to any equitable remedy, including an injunction or order for specific performance, to enforce any provision of this Agreement prior to the Closing.

12.15    Sellers' Representative; Reliance.

Sellers, jointly and severally, hereby represent and warrant that the statements in this Section 12.15 are correct and complete as of the date of this Agreement:

(a)    The Company has been appointed, and is authorized, and empowered to act, in connection with, and to facilitate the consummation of, the transactions contemplated by this Agreement and the other Transaction Documents and in connection with any activities to be performed by Sellers under this Agreement and the other Transaction Documents, for the purposes and with the powers, and authority set forth in this Agreement, which will include the sole power and authority:

(i)    To receive notices on behalf of Sellers hereunder pursuant to Section 12.4;

(ii)    to receive and distribute the Purchase Price or any other amount paid in connection with this Agreement or the other Transaction Documents to Sellers;

(iii)    to enforce and protect the rights and interests of Sellers arising out of or under or in any manner relating to this Agreement and the other Transaction Documents (including in connection with any claims related to the transactions contemplated hereby and thereby) and, in connection therewith, to (A) assert any claim or institute any action, (B) investigate, defend, contest or litigate any action initiated by Buyer or any other Person pursuant to this Agreement and the other Transaction Documents and receive process on behalf of each Seller in any such action and compromise or settle on such terms as the Company will determine to be appropriate, give receipts, releases and discharges on behalf of all or any Seller with respect to any such action, (C) file any proofs, debts, claims and petitions as the Company may deem advisable or necessary, (D) settle or compromise any claims related to the transactions contemplated by this Agreement and the other Transaction Documents, including with respect to the Inventory Value, (E) assume, on each Sellers' behalf, the defense of any claims related to the transactions contemplated by this Agreement and the other Transaction Documents, and (F) file and prosecute appeals from any decision, judgment or award rendered in any of the foregoing actions;

(iv)    to enforce or refrain from enforcing any right of any Seller (prior to the Closing) and/or of the Company arising out of or under or in any manner relating to this Agreement or the other Transaction Documents;

(v)    to engage attorneys, accountants and agents;

(vi)    to amend this Agreement (other than this Section 12.15), or any of the instruments to be delivered to Buyer by Sellers pursuant to this Agreement;

(vii)    to take any action to be taken by one or more Sellers under or in connection with this Agreement or any other Transaction Document; or

(viii)    to make, execute, acknowledge and deliver all such other Contracts, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Company, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the activities described Section 12.15(a)(i) through Section 12.15(a)(v) and the transactions contemplated by this Agreement and the other Transaction Documents.

(b)    The Company's power and grant of authority is (i) coupled with an interest and is irrevocable and survives the bankruptcy or liquidation of any Seller and will be binding on any successor thereto and (ii) may be exercised by the Company acting by signing as the representative of any Seller.

(c)    Buyer and its Affiliates and representatives may conclusively and absolutely rely, without inquiry, upon the action of the Company as the action of each Seller (and may ignore any action taken or notice given by any Seller other than the Company) in all matters relating to this Agreement, the other Transaction Documents or the transactions contemplated hereby and thereby. Any document delivered or notice delivered by or on behalf of Buyer or its Affiliates to, or action taken by or on behalf of Buyer or its Affiliates with respect to, the Company shall be deemed to have been delivered to, or taken with respect to, all Sellers. Any amounts to be paid by Buyer to Sellers pursuant to this Agreement shall be divided by Sellers among themselves, but may be paid by Buyer to the Company. Sellers shall be jointly and severally liable for any amounts due to be paid or owed by Sellers to Buyer pursuant to this Agreement.

12.16    Definition of Damages.

WITHOUT LIMITING ANY RIGHTS OF ANY PARTY TO RECEIVE THE BREAK-UP FEE IN ACCORDANCE WITH SECTION 11.2(b) OF THIS AGREEMENT, NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, COST OF CAPITAL, OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

12.17    Non-Recourse.

No past, present or future director, officer, employee, incorporator, member, partner or equity holder of the parties to this Agreement will have any liability for any obligations or liabilities of any Seller or Buyer, as applicable, under this Agreement, or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the parties hereto, no party shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any action or proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

12.18    Joinder.

At the Closing, any Person to whom Buyer assigns the right to receive the Acquired Assets at Closing shall execute a joinder to this Agreement in the form attached hereto as **Exhibit G**, pursuant to which each such other Person will assume, and will be obligated with Buyer on a joint and several basis, to perform and satisfy each of Buyer's obligations under this Agreement.

[*Signature pages follow.*]

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

FAIRFIELD GOURMET FOOD CORP.

By: _____

Name: A. M ARGULIEF

Title: PROSIDENT

PERKINS & MARIE CALLENDER'S HOLDING, LLC

By: _____

Name:  Jeffrey Warne

Title:   President and CEO

PERKINS & MARIE CALLENDER'S, LLC

By: _____

Name:    Jeffrey Warne

Title:    President and CEO

MARIE CALLENDER PIE SHOPS, LLC

By: _____
Name:  Jeffrey Warne
Title:   President

MC WHOLESALERS, LLC

By: _____
Name:    Jeffrey Warne
Title:    President