## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Perkins & Marie Callender's, LLC, *et al.*,[1] | ) | Case No. 19-11743 (KG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' COMBINED DISCLOSURE STATEMENT AND
## <u>CHAPTER 11 PLAN OF LIQUIDATION</u>

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Michael J. Merchant (No. 3854)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  302-651-7700
Fax:  302-651-7701
Email: defranceschi@rlf.com
       merchant@rlf.com
       shapiro@rlf.com
       haywood@rlf.com

*Co-Counsel to the Debtors and Debtors in
Possession*

**AKIN GUMP STRAUSS HAUER &
FELD LLP**
Scott L. Alberino (admitted *pro hac vice*)
Joanna Newdeck (admitted *pro hac vice*)
2001 K Street, N.W.
Washington, DC 20006
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288

Gary A. Ritacco (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

*Co-Counsel to the Debtors and Debtors in
Possession*

Dated:  October [●], 2019

---

[1]      The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Perkins & Marie Callender's, LLC (2435); Perkins & Marie Callender's Holding, LLC (3381); Marie Callender Pie Shops, LLC (1620); MC Wholesalers, LLC (2420); PMCI Promotions, LLC (7308); MCID, Inc. (2015); Wilshire Beverage, Inc. (5887); FIV, LLC (9288); P&MC's Real Estate Holding LLC (8553); and P&MC's Holding Corp. (2225).  The mailing address for the Debtors is 6075 Poplar Avenue, Suite 800, Memphis, Tennessee 38119-4709.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II.  DEFINITIONS AND CONSTRUCTION OF TERMS.....................................................1

    A.  Definitions.........................................................................................................1

    B.  Interpretation; Application of Definitions and Rules of Construction..................16

III.  BACKGROUND AND DISCLOSURES.........................................................................16

    A.  General Background ..........................................................................................16

        1.  The Debtors' Businesses as of the Filing Date .........................................16

        2.  Organizational Structure ........................................................................17

        3.  Prepetition Debt Structure......................................................................18

            a.  Secured Debt Obligations ................................................................18

            b.  Unsecured Trade Obligations ..........................................................18

    B.  Events Leading to Commencement of the Chapter 11 Cases ...............................18

        1.  Pre-Petition Liquidity and Operational Concerns.....................................18

        2.  Initial Turnaround Activities...................................................................18

    C.  The Chapter 11 Cases .......................................................................................19

        1.  First Day Motions and Orders (other than the DIP Motion and DIP Financing Order)...................................................................................19

        2.  Post-Petition Financing..........................................................................22

        3.  Key Employee Incentive Plan Motion.....................................................23

        4.  Employment and Compensation of Debtors' Professionals and Advisors 23

        5.  Appointment of Committee .....................................................................23

        6.  Rejection of Executory Contracts and Unexpired Leases..........................23

        7.  Claims Process and Bar Date..................................................................24

a. Section 341(a) Meeting of Creditors..................................................24

b. Schedules and Statements ................................................................24

c. Bar Date ..........................................................................................24

8. Prepetition Marketing Efforts and Sale Process .........................................24

9. Postpetition Sale Process ............................................................................25

D. Certain Federal Income Tax Consequences..........................................................27

E. Alternative Plan ....................................................................................................36

F. Global Resolution ................................................................................................36

G. Best Interests Test and Liquidation Analysis.......................................................36

H. Releases by the Debtors and Third Parties ...........................................................37

IV. SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED
RECOVERIES..................................................................................................................37

A. Summary of Treatment of Claims and Equity Interests and Estimated Recoveries 37

V. CONFIRMATION AND VOTING PROCEDURES ........................................................38

A. Confirmation Procedure.......................................................................................38

1. Confirmation Hearing .................................................................................38

2. Procedure for Objections ............................................................................38

3. Requirements for Confirmation ..................................................................39

4. Classification of Claims and Equity Interests............................................39

5. Impaired Claims or Equity Interests ..........................................................39

6. Feasibility....................................................................................................40

7. Eligibility to Vote on the Combined Disclosure Statement and Plan........40

8. Solicitation Notice ......................................................................................40

9. Procedure/Voting Deadlines .......................................................................41

10. Acceptance of the Combined Disclosure Statement and Plan...................41

11. Elimination of Vacant Classes ...................................................................41

ii

VI.    TREATMENT OF UNCLASSIFIED CLAIMS ................................................................42

    A.    Administrative Expense Bar Date ...............................................................42

    B.    Administrative Expense Claims ..................................................................42

    C.    DIP Credit Agreement Claims ....................................................................42

    D.    Priority Tax Claims .....................................................................................42

    E.    Professional Claims ....................................................................................43

        1.    Payment of Professional Claims .....................................................43

        2.    Professional Fee Reserve .................................................................43

        3.    Allocation and Estimation of Professional Claims .........................43

        4.    Timing for Filing Professional Claims ...........................................43

        5.    Post-Effective Date Fees and Expenses ..........................................44

    F.    Intercompany Claims ..................................................................................44

    G.    Payment of Statutory Fees ..........................................................................44

VII.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS;
    ESTIMATED RECOVERIES ....................................................................................45

VIII.    TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................................45

    A.    Treatment of Claims ...................................................................................45

        1.    CLASS 1 – REMAINING PREPETITION SECURED CLAIMS ...........45

            a.    Classification ......................................................................45

            b.    Allowance ...........................................................................45

            c.    Impairment and Voting .......................................................45

            d.    Treatment ............................................................................46

        2.    CLASS 2 – OTHER SECURED CLAIMS ...........................................46

            a.    Classification ......................................................................46

            b.    Impairment and Voting .......................................................46

            c.    Treatment ............................................................................46

        3.      CLASS 3 – PRIORITY NON-TAX CLAIMS ..........................................46

              a.     Classification...........................................................................46

              b.     Impairment and Voting .................................................46

              c.     Treatment .......................................................................47

        4.      CLASS 4 – GENERAL UNSECURED CLAIMS ..................................47

              a.     Classification...........................................................................47

               b.     Impairment and Voting .................................................47

               c.     Treatment .......................................................................47

        5.      CLASS 5 – EQUITY INTERESTS IN P&MC HOLDING .....................47

              a.     Classification...........................................................................47

               b.     Impairment and Voting .................................................48

               c.     Treatment .......................................................................48

        6.      CLASS 6 – EQUITY INTERESTS IN DEBTORS OTHER THAN P&MC HOLDING..........................................................................48

              a.     Classification...........................................................................48

               b.     Impairment and Voting .................................................48

               c.     Treatment .......................................................................48

   B.     Modification of Treatment of Claims and Equity Interests ...................48

   C.     Cramdown and No Unfair Discrimination...............................................49

IX.    PROVISIONS REGARDING THE PLAN ADMINISTRATOR .......................49

   A.     Appointment of the Plan Administrator..................................................49

   B.     Rights and Powers of the Plan Administrator.........................................49

   C.     Post Effective Date Expenses of the Plan Administrator........................50

   D.     Plan Administrator Agreement ...............................................................50

X.     PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN.......................................................51

iv

A. Method of Payment ........................................................................................51

B. Objections to and Resolution of Claims ............................................................51

C. Claims Objection Deadline ..............................................................................51

D. No Distribution Pending Allowance ..................................................................51

E. Claims Reserve ..............................................................................................51

F. Timing of Distributions ...................................................................................52

G. Special Provisions Related to Distributions of Certain Remaining Estate Assets and Residual Secured Cash to Holders of Remaining Prepetition Secured Claims52

H. Delivery of Distributions .................................................................................53

I. Unclaimed Distributions ..................................................................................53

J. De Minimis Distributions .................................................................................53

K. Setoff ...........................................................................................................53

L. Postpetition Interest .......................................................................................53

M. Allocation of Distributions Between Principal and Interest ..................................54

N. No Creditor to Receive More than Payment in Full .............................................54

O. Compliance with Tax Requirements ..................................................................54

XI. IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED DISCLOSURE STATEMENT AND PLAN ..................................................................54

A. Means for Implementation of the Combined Disclosure Statement and Plan .......54

    1. Limited Substantive Consolidation ............................................................54

    2. Funding of Liabilities and Distributions ....................................................55

    3. Corporate Action; Effectuating Documents; Further Transactions ..........55

    4. Direction to Parties ..................................................................................55

    5. Title to Accounts ......................................................................................55

    6. Exemption from Certain Taxes .................................................................55

XII. EXCULPATION, RELEASES and injunctions ..................................................56

RLF1 22091466v.11

|  |  |  |  |
|---|---|---|---|
| | A. | Exculpation | 56 |
| | B. | Releases By the Debtors | 56 |
| | C. | Third Party Releases | 57 |
| | D. | Injunctions Relating to Releases | 57 |
| | E. | Injunctions to Protect Estate Assets | 58 |
| XIII. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 58 |
| | A. | Rejection of Executory Contracts and Unexpired Leases | 58 |
| | B. | Deadline for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Combined Disclosure Statement and Plan | 58 |
| | C. | Debtors' Insurance Policies | 59 |
| XIV. | | CONDITIONS TO THE EFFECTIVE DATE | 59 |
| | A. | Conditions Precedent to the Effective Date | 59 |
| | B. | Establishing the Effective Date | 59 |
| | C. | Effect of Failure of Conditions | 59 |
| | D. | Waiver of Conditions to Confirmation and Effective Date | 59 |
| XV. | | RETENTION OF JURISDICTION | 60 |
| XVI. | | MISCELLANEOUS PROVISIONS | 61 |
| | A. | Books and Records | 61 |
| | B. | Revesting of Debtors' Assets | 62 |
| | C. | Termination of Injunctions or Stays | 62 |
| | D. | Amendment or Modification of the Combined Disclosure Statement and Plan | 62 |
| | E. | Severability | 63 |
| | F. | Revocation or Withdrawal of the Combined Disclosure Statement and Plan | 63 |
| | G. | Binding Effect | 63 |
| | H. | Notices | 63 |

RLF1 22091466v.11

I.      Governing Law ........................................................................................63

J.      Withholding and Reporting Requirements .........................................63

K.      Headings ................................................................................................64

L.      Exhibits/Schedules................................................................................64

M.      Filing of Additional Documents .........................................................64

N.      No Admissions.......................................................................................64

O.      Successors and Assigns.........................................................................64

P.      Reservation of Rights...........................................................................64

Q.      Implementation .....................................................................................65

R.      Inconsistency.........................................................................................65

S.      Dissolution of Debtors .........................................................................65

T.      Dissolution of the Committee ..............................................................65

U.      Termination of the Plan Administrator ..............................................65

V.      Compromise of Controversies .............................................................66

W.      Request for Expedited Determination of Taxes...................................66

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**THE COMMITTEE HAS INDEPENDENTLY CONCLUDED THAT THE COMBINED DISCLOSURE STATEMENT AND PLAN IS IN THE BEST INTERESTS OF GENERAL UNSECURED CREDITORS AND URGES SUCH CREDITORS TO VOTE IN FAVOR OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.  A LETTER FROM THE COMMITTEE EXPRESSING ITS SUPPORT FOR THE COMBINED DISCLOSURE STATEMENT AND PLAN IS ATTACHED HERETO AS <u>EXHIBIT B</u> AND INCLUDED IN THE SOLICITATION PACKAGE.**

1

## I.    INTRODUCTION

The Debtors,[2] with the support of the Committee, the Prepetition Agent and the Required Prepetition Secured Parties, hereby propose the Debtors' Combined Disclosure Statement and Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code. The Debtors are the proponents of the Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code.

The Combined Disclosure Statement and Plan constitutes a liquidating chapter 11 plan for the Debtors. Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable and at various intervals thereafter. The Debtors will be dissolved under applicable law as soon as practicable upon the closing of the Chapter 11 Cases.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XVI of the Combined Disclosure Statement and Plan, the Debtors expressly reserve the right to alter, amend or modify the Combined Disclosure Statement and Plan, one or more times, before its substantial consummation.

## II.    DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.    "**503(b)(9) Claim**" means any Claim against any of the Debtors for the value of goods sold to the Debtors in the ordinary course of business and received by the Debtors within twenty (20) days before the Filing Date.

2.    "**Additional GUC Recovery**" means any and all commercial tort claims that may be brought on behalf of the Debtors or their Estates and Avoidance Actions, and proceeds thereof, not sold or otherwise transferred pursuant to the Sale Orders or waived or released pursuant to the terms of this Plan or any other Final Order.

3.    "**Administrative and Priority Claim Reserve**" means a reserve or escrow established for the benefit of the holders of Allowed Administrative Claims, Allowed Priority Non-Tax Claims, and Allowed Priority Tax Claims, as further set forth in the Final DIP Order, in the amount of $[●], which amount is estimated by the Debtors to be the full amount of such Allowed Administrative Expense Claims, Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims and is subject to upward or downward adjustment by the Debtors, with the consent of the Prepetition Agent and the Committee, which consent shall not be unreasonably withheld.

---

[2]    All capitalized terms not defined in this introduction shall have the same meanings set forth in Article II of the Combined Disclosure Statement and Plan.

4.     **"Administrative Expense Bar Date"** means the first Business Day that is thirty (30) calendar days after the Effective Date.

5.     **"Administrative Expense Claim"** means any right to payment constituting actual and necessary costs or expenses of administration of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates, (b) 503(b)(9) Claims, and (c) any fees or charges assessed against the Estates under section 1930 of chapter 123 of Title 28 of the United States Code, but excluding Professional Claims.

6.     **"Administrative Expense Claim Objection Deadline"** means the deadline set forth in Article VI.B herein.

7.     **"Administrative Expense Request"** means a request for payment of an Administrative Expense Claim that is to be Filed in accordance with Article VI of the Combined Disclosure Statement and Plan.

8.     **"Allowed"** means any Claim that is not a Disputed Claim or a Disallowed Claim; provided, however, that a Disputed Claim shall become an Allowed Claim to the extent (i) no objection to such Claim has been interposed by the Claims Objection Deadline or such other period fixed by the Bankruptcy Court, (ii) an objection to such Claim has been interposed, but withdrawn or overruled by a Final Order and the Debtors have no right to object to such Claim on other grounds, or (iii) the Bankruptcy Court enters a Final Order providing that such Claim is an Allowed Claim.

9.     **"Asset Purchase Agreement"** or **"Asset Purchase Agreements"** means, either each of or collectively, (i) the Fairfield Asset Purchase Agreement, (ii) the Perkins Asset Purchase Agreement; and (iii) the MC Asset Purchase Agreement.

10.    **"Assets"** means all of the assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estates pursuant to section 541 of the Bankruptcy Code, Cash (including proceeds from the Sales), Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and the proceeds of all of the foregoing.

11.    **"Auction"** means auction commenced on September 9, 2019 for the sale of substantially all of the Debtors' Assets.

12.    **"Avoidance Actions"** means all avoidance and recovery actions or remedies that may be brought on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 550, 551, 552, or 553 of the Bankruptcy Code.

13.    **"Backup Bidder"** means the qualified bidder(s) with the next highest or otherwise best qualified bid or collection of qualified bids, to the Successful Bidder, as determined by the Debtors in consultation with the Committee and the Prepetition Agent.

14.  **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§101-1532, as amended from time to time.

15.  **"Bankruptcy Court"** or **"Court"** means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases, or if such Court ceases to exercise jurisdiction over the Chapter 11 Cases, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of Delaware.

16.  **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and any Local Rules of the Bankruptcy Court, as amended from time to time.

17.  **"Bar Date"** or **"Bar Dates"** means any one or more of the General Bar Date, the Governmental Bar Date, and the Rejection Bar Date, as applicable.

18.  "**Bar Date Order"** means the Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claim Arising Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Matter of Notice Thereof entered by the Court on October 2, 2019 [Docket No. 333].

19.  **"Bidding Procedures Order"** means the Order (A) Approving Bidding Procedures for Sale of Substantially all of the Debtors' Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially all of the Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief entered by the Court on August 23, 2019 [Docket No. 141].

20.  **"Bill Consolidators"** means the three third-party providers utilized by the Debtors to manage and pay bills and invoices from certain utility providers on account of various utility services.

21.  **"Borrower"** or **"Borrowers"** means P&MC and MCPS.

22.  **"Business Day**" means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

23.  **"California Business Assets"** means the assets of the Debtors primarily used in, held for use in, or necessary for the operation of the manufacturing and storage facility located in Corona, California used for producing and supplying pies and other bakery products.

24.  **"Cash"** means legal tender of the United States of America and equivalents thereof.

25.  **"Causes of Action"** means all Claims and all other claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims, whether  arising under

the Bankruptcy Code or other federal or state law, or based in equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, and any and all commercial tort claims against any party.

26.      **"Chapter 11 Cases"** means the procedurally consolidated cases under chapter 11 of the Bankruptcy Code commenced by the Debtors, styled as Perkins & Marie Callender's, LLC, et al., under Case No. 19-11743 (KG), currently pending in the Bankruptcy Court.

27.      **"Claim"** shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

28.      **"Claims and Noticing Agent"** means Kurtzman Carson Consultants LLC.

29.      **"Claims Objection Deadline"** means the earlier of (i) one hundred eighty (180) days as to General Unsecured Claims, and one-hundred twenty (120) days as to other Claims after the later of the Effective Date or the date of filing of the applicable Claim, or such later date as may be approved by the Bankruptcy Court and (ii) the date that all of the Chapter 11 Cases are closed; provided that, for Administrative Expense Claims, such deadline shall be the Administrative Expense Claim Deadline.

30.      **"Class"** means any group of substantially similar Claims or Equity Interests classified by the Combined Disclosure Statement and Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

31.      **"Clerk"** means the clerk of the Bankruptcy Court.

32.      **"Combined Disclosure Statement and Plan"** means this combined disclosure statement and chapter 11 plan of liquidation including, without limitation, the Plan Supplement, all exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time in accordance with the terms hereof.

33.      **"Committee"** means the Official Committee of Unsecured Creditors appointed by the United States Trustee on August 14, 2019 [Docket No. 97].

34.      **"Committee Support Letter"** means that certain letter from the Committee expressing its support for the Combined Disclosure Statement and Plan and urging the holders of Class 4 claims to vote in favor of the Combined Disclosure Statement and Plan.  A copy of the Committee Support Letter is attached to this Combined Disclosure Statement and Plan as Exhibit B.

35.      **"Confirmation Date"** means the date on which the Confirmation Order is entered on the Docket.

36.      **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider (i) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the

4

Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

37.    "**Confirmation Order**" means the Order of the Bankruptcy Court confirming the Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code.

38.    "**Creditor**" means any Person that is the Holder of a Claim against any of the Debtors.

39.    "**Critical Vendors**" means certain vendors, suppliers, service providers, and similar entities that provided goods or services critical to the ongoing operation of the Debtors' business.

40.    "**Critical Vendor Claims**" the claims of the Critical Vendors.

41.    "**Debtors**" means, collectively, P&MC, MCPS, P&MC Holding, PMCI, MC, MCID, Wilshire, FIV, Real Estate Holding and P&MC's Holding Corp.

42.    "**Deficiency Claims**" means any and all Claims arising under the Prepetition Credit Facility held by the Prepetition Secured Parties that are not paid in Cash under Class 1 of the Plan.

43.    "**Deficiency Threshold Trigger**" means the instance in which Holders of Allowed Deficiency Claims shall be entitled to share Pro Rata with Holders of General Unsecured Claims (that are not Holders of Allowed Deficiency Claims) in Distributions of recoveries for Holders of all Allowed General Unsecured Claims, which shall occur at such time as the Holders of Allowed General Unsecured Claims (that are not Holders of Allowed Deficiency Claims) have received a percentage of Cash recovery in respect of their Allowed General Unsecured Claims equal to the percentage of Cash recovery received by the Prepetition Secured Parties in respect of the full amount of the Allowed Prepetition Secured Claims.  Upon the occurrence of the Deficiency Threshold Trigger, the Holders of Allowed Deficiency Claims shall share ratably with the Holders of all other Allowed General Unsecured Claims in any further Class 4 Distributions.

44.    "**DIP Agent**" means Bank of America, N.A., as administrative agent under the DIP Credit Agreement.

45.    "**DIP Credit Agreement**" means that Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of August 7, 2019, by and between the Debtors, the DIP Agent, and the DIP Lenders, as the same may have been further amended, modified, ratified, extended, renewed, restated or replaced.

46.    "**DIP Credit Agreement Claims**" means those Claims arising under or related to the DIP Credit Agreement and which were indefeasibly paid in full at the closing of the Sales pursuant to terms of the Sale Orders.

5

47.    **"DIP Documents"** means the DIP Credit Agreement, the other "Loan Documents" as described in the DIP Credit Agreement and any other agreements and documents related thereto.

48.    **"DIP Facility"** means the financing facility provided to the Debtors pursuant to the terms of the DIP Credit Agreement and the DIP Financing Order.

49.    **"DIP Financing Order"** means the Court's Final Order (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, and (V) Modifying Automatic Stay [Docket No. 241], entered on September 11, 2019.

50.    **"DIP Lenders"** means the banks and other financial institutions party to the DIP Credit Agreement from time to time, in their capacities as lenders thereunder.

51.    **"DIP Motion"** means the Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and to Use Cash Collateral; (II) Granting Priming Liens and Providing Super Priority Claims; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Prescribing the Form and Manner of Notice and Setting Time for the Final Hearing [Docket No. 13], filed on August 5, 2019.

52.    **"Disallowed"** means any Claim or any portion thereof that (i) has been disallowed by a Final Order, (ii) is Scheduled as zero or as contingent, disputed or unliquidated and as to which no proof of claim or Administrative Expense Request has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or otherwise deemed timely Filed under applicable law or the Combined Disclosure Statement and Plan, (iii) is not Scheduled and as to which no proof of claim or Administrative Expense Request has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Order or otherwise deemed timely Filed under applicable law or the Combined Disclosure Statement and Plan, (iv) has been withdrawn by agreement of the Debtors and the Holder thereof or (v) has been withdrawn by the Holder thereof.

53.    **"Disputed"** means any Claim or any portion thereof that (i) has not been Scheduled by the Debtors or has been Scheduled as unknown, contingent, unliquidated, disputed or at zero, whether or not such Claim is the subject of a proof of Claim, (ii) is the subject of a proof of Claim that differs in nature, amount or priority from the Schedules (except to the extent that the Plan Administrator elects, in its discretion, to treat the Claim asserted in such proof of Claim as an Allowed Claim) or (iii) is the subject of an objection interposed by the Claims Objection Deadline or such other time period fixed by the Bankruptcy Court, which has not been withdrawn or overruled by a Final Order; provided, however, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or Disallowed Claim.

54.    **"Distribution"** means any distribution to the Holders of Allowed Claims.

55.    **"Distribution Date"** means any date on which a Distributions is made to Holders of Allowed Claims under this Combined Disclosure Statement and Plan, or as otherwise agreed. The first Distributions shall occur on or as soon as practicable after the Effective Date or as

otherwise agreed by the Post-Effective Date Debtors, the Committee, the Prepetition Agent, and the Plan Administrator, as applicable.  To the extent subsequent Distributions are necessary, such subsequent Distributions shall occur as soon after the first Distribution Date as the Plan Administrator shall determine in accordance with the Plan Administrator Agreement.

56.     **"Docket"** means the docket in the Chapter 11 Cases maintained by the Clerk.

57.     **"Effective Date"** means the date established pursuant to Article XIV of the Combined Disclosure Statement and Plan.

58.     **"Entity"** means an entity as defined in section 101(15) of the Bankruptcy Code.

59.     **"Equity Interests"** means all equity interests in the Debtors including, but not limited to, all issued, unissued, authorized or outstanding shares or membership interests together with any warrants, options or contract rights to purchase or acquire such interests at any time.

60.     **"Estates"** means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

61.     **"Exculpated Parties"** means the following Entities, each in their respective capacities as such, (a) the Debtors; (b) the Post-Effective Date Debtors; (c) the Committee; and (d) the Related Parties of each of the foregoing.

62.     **"Executory Contract"** means any executory contract or unexpired lease as of the Filing Date between the Debtors and any other Person or Entity.

63.     **"Fairfield Asset Purchase Agreement"** means that certain asset purchase agreement, dated as of September 10, 2019, by and among Fairfield Gourmet Food Corp., as buyer, and the Debtors, as sellers, and as further amended, restated, supplemented, and otherwise modified from time to time.

64.     **"File"**, "**Filed**", or "**Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

65.     **"Filing Date"** means August 5, 2019.

66.     **"Final DIP Hearing"** means the hearing held before the Bankruptcy Court on September 11, 2019 to determine whether to grant the relief requested in the DIP Motion on a final basis.

67.     **"Final Order"** means an Order of the Bankruptcy Court or a Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending.

68.     **"First Day Declaration"** means the Declaration of Jeffrey D. Warne in Support of Debtors' Chapter 11 Petitions and First Day Motions [Docket No. 14].

7

69.     **"First Forbearance Agreement"** means that certain forbearance agreement, dated as of December 17, 2018 between the Prepetition Credit Parties and the Prepetition Secured Parties.

70.     **"First Rejection Motion"** means the Debtors' First Omnibus Motion for an Order (I) Authorizing Rejection of Certain Unexpired Leases of Nonresidential Real Property Nunc Pro Tunc to the Petition Date, (II) Authorizing Abandonment of Certain Property in Connection Therewith and (III) Granting Relief [Docket No. 40], Filed on August 5, 2019.

71.     **"FIV"** means FIV, LLC.

72.     **"Foxtail"** means the Debtors' Foxtail Foods bakery goods manufacturing operations.

73.     **"General Bar Date"** means November 4, 2019 at 5:00 p.m. (prevailing Eastern Time), as stated in the Notice of Deadline for Filing Proofs of Claim, Including for Claims Asserted Under Section 503(b)(9) of the Bankruptcy Code, filed on October 2, 2019 [Docket No. 334].

74.     **"General Unsecured Claim"** means any Claim against the Debtors that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Filing Date and that is not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Intercompany Claim, Prepetition Secured Claim or Other Secured Claim, but which includes any claim arising from the rejection of an Executory Contract.

75.     **"Global Resolution"** means the settlement agreed to by the Settlement Parties, which settlement was initially embodied in paragraph 47 of the DIP Financing Order and is now embodied in this Combined Disclosure Statement and Plan.

76.     **"Governmental Unit"** shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

77.     **"Governmental Bar Date"** means February 3, 2020, which is the deadline for Governmental Units to file proofs of claim on account of pre-petition Claims against any of the Debtors.

78.     **"GUC Fixed Recovery"** means $800,000.00.

79.     **"GUC Percentage Recovery"** means $1,060,000, which amount was calculated as set forth in the Final DIP Order, and confirmed by the Debtors, the Committee and the Prepetition Agent.

80.     **"GUC Plan Consideration"** means the GUC Fixed Recovery, the GUC Percentage Recovery and Additional GUC Recovery, less the Plan Administrator GUC Reserve.

81.     **"Holder"** means the beneficial holder of any Claim or Equity Interest.

82.     **"Houlihan"** means Houlihan Lokey Capital, Inc.

8

83.     **"Huddle House Asset Purchase Agreement"** means that certain asset purchase agreement, dated as of September 10, 2019, by and among Huddle House, Inc., as buyer, and the Debtors, as sellers, and as further amended, restated, supplemented, and otherwise modified from time to time.

84.     **"Initial IOIs"** means initial, non-binding indications of interest.

85.     **"Initial Plan Administrator GUC Reserve"** means, as more fully described in the Plan Administrator Agreement, the Cash transferred to the Post-Effective Date Debtors on the Effective Date to fund the Plan Administrator GUC Activities, which shall be funded from the GUC Plan Consideration and which such amount shall be reasonably determined by the Committee, in consultation with the Debtors.

86.     **"Intercompany Claim"** means any Claim by a Debtor against another Debtor.

87.     **"Interested Parties"** means the approximately 120 potential strategic and financial acquirers of the Debtors' Assets.

88.     **"Interim Compensation Order"** means the Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals [Docket No. 223].

89.     **"IRS"** means Internal Revenue Service.

90.     **"KCC"** means Kurtzman Carson Consultants LLC.

91.     **"KEIP Motion"** means Motion of the Debtors for Entry of an Order Approving the Debtors' Key Employee Incentive Plan [Docket No. 94][3] filed on August 13, 2019.

92.     **"MC"** means MC Wholesalers, LLC.

93.     **"MC Business Assets"** means the assets of the Debtors primarily used in, held for use in, or necessary for the franchise, ownership and operation of "Marie Callender's" branded family dining restaurants and bakeries.

94.     **"MC Asset Purchase Agreement"** means that certain asset purchase agreement, dated as of August 21, 2019, by and among Marie Callenders, Inc., as buyer, and the Debtors, as sellers, as amended by that certain Letter Amendment, dated as of September 10, 2019, and as further amended, restated, supplemented, and otherwise modified from time to time.

95.     **"MCID"** means MCID, Inc.

96.     **"MCPS"** means Marie Callender Pie Shops, LLC.

97.     **"Ohio Business Assets"** means the assets of the Debtors primarily used in, held for use in, or necessary for the operation of the manufacturing and storage facility located in Fairfield, Ohio used for producing and supplying pies and other bakery products.

---

[3] The KEIP Motion was filed under seal at docket no. 94.  A redacted version of the KEIP Motion was filed at docket no. 93.

9

98.    **"Order"** means an order or judgment of the Bankruptcy Court as entered on the Docket.

99.    **"Other Secured Claims"** means any Claim that is secured by any Assets other than a Claim in Class 1 (Prepetition Secured Party Secured Claims); provided, however, that, for the avoidance of doubt, Other Secured Claims do not include any Claims secured by Assets arising under or relating to the Prepetition Credit Agreement and/or the Prepetition Credit Facility, which, other than the Remaining Prepetition Secured Claims, have been paid in full from the proceeds of the Sales as set forth in the Sale Orders.

100.    **"P&MC"** means Perkins & Marie Callender's, LLC.

101.    **"P&MC Holding"** means Perkins & Marie Callender's Holding, LLC.

102.    **"Perkins Asset Purchase Agreement"** means that certain asset purchase agreement, dated as of August 2, 2019, by and among Perkins Group LLC, as buyer, and the Debtors, as sellers, and as further amended, restated, supplemented, and otherwise modified from time to time.

103.    **"Perkins Business Assets"** means the assets of the Debtors primarily used in, held for use in, or necessary for the franchise, ownership and operation of "Perkins" branded family dining restaurants and bakeries.

104.    **"Person"** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

105.    **"Plan Administrator"** means the person appointed pursuant to Article IX of the Combined Disclosure Statement and Plan.

106.    **"Plan Administrator Agreement"** means the agreement between the Debtors and the Plan Administrator, in a form as consented to by the Committee and the Prepetition Agent (which consent shall not be unreasonably withheld, conditioned or delayed), as the same may be amended from time to time in accordance with its terms, filed as part of the Plan Supplement and approved pursuant to the Confirmation Order.

107.    **"Plan Administrator GUC Activities"** means those activities performed by the Plan Administrator, or its designees, related to General Unsecured Claims (excluding Deficiency Claims), including administering General Unsecured Claims (excluding Deficiency Claims), making Distribution to Holders of General Unsecured Claims (excluding Deficiency Claims) in accordance with the terms of this Combined Disclosure Statement and Plan, and pursuing activities meant to maximize the GUC Plan Consideration, as more fully set forth in the Plan Administrator Agreement.

108.    **"Plan Administrator GUC Reserve"** means the Initial Plan Administrator GUC Reserve and the Supplemental Plan Administrator GUC Reserve, if any.

109.    **"Plan Administrator Other Reserve"** means, as more fully described in the Plan Administrator Agreement, the Cash transferred to the Post-Effective Date Debtors on the

Effective Date to fund the fees and costs associated with winding-down the Estates, including any compensation owed to the Plan Administrator, which amount shall be reasonably determined by the Debtors, with the consent of the Prepetition Agent and the Committee (which consent shall not be unreasonably withheld, conditioned or delayed); such amount shall be funded as part of the Wind Down Fund from Assets other than the GUC Plan Consideration.

110.    **"Plan Supplement"** means (i) the form of the Plan Administrator Agreement, (ii) the identification of the Plan Administrator and, if the Plan Administrator is deemed an "insider", as defined pursuant to section 101(31) of the Bankruptcy Code, the material terms of its compensation, (iii) the amount of the Wind Down Fund (including the amount in each of the Wind Down Sub Accounts and such other component amounts), (iv) the amount of the Allowed Remaining Prepetition Secured Claim and (v) any other documents, agreements, schedules, and exhibits, specified herein, to be filed with the Bankruptcy Court no later than seven (7) days prior to the Voting Deadline, unless otherwise provided herein; provided that the Debtors may amend such Plan Supplement at any time prior to the Effective Date.

111.    **"PMCI"** means PMCI Promotions LLC.

112.    **"Post-Effective Date Debtors"** means the Debtors, from and after the Effective Date.

113.    **"Prepetition Agent"** means Bank of America, N.A., as administrative agent under the Prepetition Credit Agreement.

114.    **"Prepetition Credit Agreement"** means that certain Credit Agreement dated as of June 26, 2015 (as amended, restated, supplemented or otherwise modified from time to time), by and among the Borrowers, as borrowers, the guarantors party thereto, the lenders party thereto, and Bank of America, N.A., in its capacity as administrative and letter of credit issuer.

115.    **"Prepetition Credit Facility"** means the credit facilities under the Prepetition Credit Agreement.

116.    **"Prepetition Credit Parties"** means the Prepetition Guarantors and the Borrowers.

117.    **"Prepetition Guarantors"** means PMCI Promotions LLC, MCPS, MC Wholesalers, LLC, MCID, Inc., Wilshire Beverage, Inc., and FIV, LLC.

118.    **"Prepetition Lenders**" means the banks and other financial institutions party to the Prepetition Credit Agreement from time to time, in their capacities as lenders thereunder, including without limitation their successors and assigns.

119.    **"Prepetition Letters of Credit"** shall have the meaning set forth in section III.A.3.a herein.

120.    **"Prepetition Secured Claims"** means any and all Secured Claims held by the Prepetition Secured Parties arising under or relating to the Prepetition Credit Agreement and the Prepetition Credit Facility.

121.    "**Prepetition Secured Obligations**" means any and all obligations owed to the Prepetition Secured Parties arising under or relating to the Prepetition Credit Agreement and the Prepetition Credit Facility.

122.    "**Prepetition Secured Parties**" means the Prepetition Agent, the Prepetition Lenders and Bank of America, N.A., in its capacity as letter of credit issuer under the Prepetition Credit Agreement.

123.    "**Priority Non-Tax Claim**" means a Claim that is accorded priority in right of payment under section 507 of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

124.    "**Priority Tax Claim**" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

125.    "**Professional**" means any professional person employed in the Chapter 11 Cases pursuant to section 327, 328 or 1103 of the Bankruptcy Code pursuant to an Order of the Bankruptcy Court and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.  The term "Professional" does not include any ordinary course professionals that were retained and compensated pursuant to the Order Authorizing Employment and Compensation of Professionals Utilized in Ordinary Course of Business, Effective Nunc Pro Tunc to the Petition Date [Docket No. 350], entered on October 10, 2019.

126.    "**Professional Claims**" means all Claims under sections 330, 331, 503, or 1103 of the Bankruptcy Code for compensation and reimbursement of expenses by Professionals to the extent Allowed by the Bankruptcy Court.

127.    "**Professional Claims Objection Deadline**" has the meaning set forth in Article VI.E hereof.

128.    "**Professional Fee Reserve**" means those reserves and/or escrows established pursuant to the Final DIP Order, the Sale Orders or otherwise that will provide for payment in full of all Allowed Professional Claims, all such amounts and escrows to be subject to the consent of the Committee and the Prepetition Agent, which consent shall not be unreasonably withheld; for the avoidance of doubt, (i) to the extent that the Professional Fee Reserve is not sufficient to satisfy in full all Allowed Professional Claims, such Allowed Claims shall nevertheless be paid in full in Cash from such other available surplus Cash in the Wind Down Fund, and (ii) any fees and expenses by Professionals in connection with preparing fee applications shall be paid from the Professional Fee Reserve.

129.    "**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class or to the aggregate amount of relevant Claims, as indicated by the context.

130.    "**Real Estate Holding**" means P&MC's Real Estate Holding LLC.

12

131.    **"Regions Security Deposit"** shall have the meaning set forth in section III.C.1 herein.

132.    **"Rejection Bar Date"** means the deadline to file a proof of claim for damages relating to the rejection of an Executory Contract (including any unexpired lease), which, pursuant to the Bar Date Order, is the later of (a) the General Bar Date or (b) unless otherwise agreed to by the Debtors or Plan Administrator, as applicable, twenty-one (21) days after service of any Order authorizing the rejection of such contract or lease.

133.    **"Related Parties"** means, with respect to any Person or Entity, such Person's or Entity's current and former direct or indirect subsidiaries and affiliates and each of their respective current and former stockholders, members, limited partners, general partners, equity holders, directors, managers, officers, employees, agents, designees, attorneys, financial advisors, investment bankers, accountants, and other professionals or representatives.

134.    **"Released Parties"** means the following Entities, each in their capacity as such, (a) the Debtors; (b) the DIP Agent; (c) the DIP Lenders; (d) the Prepetition Agent; (e) the other Prepetition Secured Parties; (f) the Committee; and (f) the Related Parties of the foregoing.

135.    **"Releasing Parties"** means the following Entities, each in their respective capacities as such, (a) the Debtors; (b) the DIP Agent; (c) the DIP Lenders; (d) the Prepetition Agent; (e) the other Prepetition Secured Parties; (f) the Committee; (g) each holder of a Claim that (x) votes to accept the Plan or (y) either (I) abstains from voting or (II) votes to reject the Plan and, in the case of either (I) or (II), does not opt out of the voluntary release contained in Section XII.C hereof by checking the opt out box on the ballot, and returning it in accordance with the instructions set forth thereon, indicating that they opt not to grant the releases provided in the Plan; (h) each holder of a Claim that is deemed to accept the Plan or otherwise unimpaired under the Plan; (i) each holder of an Equity Interest that does not elect to opt out of the voluntary release contained in Section XII.C hereof by timely filing an objection to such release; and (j) the Related Parties of the foregoing.

136.    **"Remaining Estate Assets"** means any Assets, including Cash, that are property of the Estates (including, for the avoidance of doubt, any Assets or Cash that constitute "Excluded Assets", as defined in the applicable Asset Purchase Agreements) on the Effective Date, including any such property that may be reduced to Cash, that remains after the funding of the Wind Down Fund; for the avoidance of doubt, (a) the Remaining Estate Assets shall include (i) the Residual Secured Cash, (ii) any refunds or repayments that the Post-Effective Date Debtors receive with respect to the Prepetition Letters of Credit, (iii) any remaining Cash from the Regions Security Deposit and (b) the Remaining Estate Assets shall exclude the GUC Plan Consideration and any funds remaining in the Plan Administrator GUC Reserve as of the closing of the Chapter 11 Cases.

137.    **"Remaining Prepetition Secured Claims"** means the balance of the Prepetition Secured Claims, [of approximately $[____],] that remains outstanding after the Prepetition Agent received $[___], for the benefit of the Prepetition Secured Parties, from the proceeds of the Sales upon such closings.

138.    **Required Prepetition Secured Lenders**" means Prepetition Lenders holding more than fifty percent (50%) of the Total Credit Exposure (as defined in the Prepetition Credit Agreement) of all Prepetition Lenders.

139.    **Residual Secured Cash**" means any and all Cash that remains in the Wind Down Fund (excluding the Plan Administrator GUC Reserve and the GUC Plan Consideration) after all Distributions have been paid to the Holders of Allowed Claims (other than General Unsecured Claims) or otherwise as set forth herein, and all related expenses (other than those relating to the administration of General Unsecured Claims), have been paid as provided herein and in, and as may be limited by, the Plan Administrator Agreement.

140.    "**Sale**" or "**Sales**" means, either each of or collectively, (i) the sale of the Perkins Business Assets pursuant to the Huddle House Asset Purchase Agreement; (ii) the sale of the Ohio Business Assets pursuant to the Fairfield Asset Purchase Agreement; and (iii) the sale of the MC Business Assets and the California Business Assets pursuant to the MC Purchase Agreement.

141.    "**Sale Motion**" means the Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief [Docket No. 33], filed on August 5, 2019.

142.    "**Sale Motion Supplement**" means the Supplement to Motion of Debtors for entry of Orders (I)(A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially all of the Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief; and (II)(A) Approving Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief [Docket No. 118], filed on August 21, 2019.

143.    "**Sale Orders**" means, collectively, (i) the Order (A) Approving and Authorizing Sale of Substantially All of the Debtors' Perkins Business Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief [Docket No. 306], filed on September 18, 2019; (ii) the Order (A) Approving and Authorizing Sale of Substantially All of the Debtors' Ohio Business Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief [Docket No. 303], filed on September 18, 2019; and (iii) the Order (A) Approving and Authorizing Sale of Substantially All of the Debtors' MC Business Assets and California Business Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and

14

Unexpired Leases Related Thereto, and (C) Granting Related Relief [Docket No. 304], filed on September 18, 2019.

144.    **"Second Forbearance Agreement"** means that certain forbearance agreement, dated as of March 21, 2019 between the Prepetition Credit Parties and the Prepetition Secured Parties.

145.    **"Second Rejection Motion"** means the Debtors' Second Omnibus Motion for an Order (I) Authorizing Rejection of Certain Unexpired Leases of Nonresidential Real Property Nunc Pro Tunc to the Petition Date, (II) Authorizing Abandonment of Certain Property in Connection Therewith and (III) Granting Relief [Docket No. 78], Filed on August 7, 2019.

146.    **"Schedules"** means the schedules of assets and liabilities and the statement of financial affairs Filed by each of the Debtors on September 6, 2019, and any and all amendments and modifications thereto.

147.    **"Settlement Parties"** means the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, and the Committee.

148.    **"Shippers and Warehousemen"** means a complex network of common vendors, suppliers, carriers, warehousemen, transportation service provides, and other related parties relied upon by the Debtors.

149.    **"Shippers and Warehousemen Claims"** means the claims of the Shippers and Warehousemen.

150.    **"Successful Bidder"** means the prevailing bidder.

151.    **"Supplemental Plan Administrator GUC Reserve"** means any additional post-Effective Date amounts (if any) that the Plan Administrator determines, in accordance with the Plan Administrator Agreement, are necessary to fund additional costs and expenses of the Plan Administrator, solely as it relates to the Plan Administrator GUC Activities, in excess of the Initial Plan Administrator GUC Reserve, which amounts shall be funded from the GUC Plan Consideration.

152.    **"Tax Code"** means the Internal Revenue Code of 1986, as amended.

153.    **"United States Trustee"** means the Office of the United States Trustee for the District of Delaware.

154.    **"Unclaimed Distribution"** means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

155.    **"Unclaimed Distribution Deadline"** means ninety (90) days from the date the Plan Administrator makes a Distribution of Cash or other property under the Combined Disclosure Statement and Plan to a holder of an Allowed Claim.

156.    **"Wilshire"** means Wilshire Beverage, Inc.

157. **"Wind Down Fund"** means the (i) GUC Plan Consideration, (ii) the Administrative and Priority Claim Reserve, (iii) the Professional Fee Reserve, (iv) such other reserves and/or escrowed amounts as set forth on Schedule A to each of the Sale Orders, (v) the Plan Administrator GUC Reserve, and (vi) the Plan Administrator Other Reserve, in each case without duplication.

158. **"Wind Down Sub Account"** means each of (i) the Administrative and Priority Claim Reserve, (ii) the Professional Fee Reserve, (iii) such other reserves and/or escrowed amounts as set forth on Schedule A to each of the Sale Orders, and (iv) the Plan Administrator Other Reserve, in each case without duplication.

**B.      Interpretation; Application of Definitions and Rules of Construction**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule or exhibit references in the Combined Disclosure Statement and Plan are to the respective section in, Article of, Schedule to, or Exhibit to the Combined Disclosure Statement and Plan. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Combined Disclosure Statement and Plan as a whole and not to any particular section, subsection or clause contained in the Combined Disclosure Statement and Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Disclosure Statement and Plan. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in the Combined Disclosure Statement and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Disclosure Statement and Plan.

## III.      BACKGROUND AND DISCLOSURES

On the Filing Date, the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code and, since that date, have operated as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**A.      General Background[4]**

1.      The Debtors' Businesses as of the Filing Date

The Debtors were leading operators and franchisors of family-dining and casual-dining restaurants, under their two (2) highly-recognized brands: (i) their full-service Perkins family dining restaurants located primarily in Minnesota, Iowa, Wisconsin, Ohio, Pennsylvania and Florida under the name "Perkins Restaurant and Bakery" and (ii) their mid-priced, full-service Marie Callender's casual-dining restaurants, specializing in the sale of pies and other

---

[4] Further information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in detail in the First Day Declaration, which is incorporated by reference herein. Copies of the First Day Declaration and all other filings in the Chapter 11 Cases can be obtained (and viewed) free of charge at the following web address:  http://www.kccllc.net/PMC.

bakery items, located primarily in California and Nevada under the name "Marie Callender's Restaurant and Bakery".

Through the Debtors' Foxtail Foods bakery goods manufacturing operations, the Debtors offered pies, muffin batters, cookies, brownies, pancake mixes, syrups and other food products for sale to both company-owned and franchised Perkins and Marie Callender's restaurants, and to unaffiliated customers, such as food service distributors, supermarkets and third-party restaurants. Foxtail was the primary supplier of such goods to company-owned and franchised Perkins and Marie Callender's restaurants and various third-party customers. The Debtors licensed from ConAgra Foods, Inc. (f/k/a ConAgra, Inc.) and ConAgra Food RDM, Inc. the use of the registered name "Marie Callender's" in connection with restaurant operations and the sale of fresh bakery products pursuant to that certain Trademark License Agreement, dated as of June 9, 2011, pursuant to which the Debtors received a perpetual royalty free, worldwide license to use the applicable trademarks with respect thereto.

Perkins, founded in 1958, offered a full menu of approximately ninety (90) assorted breakfast, lunch, dinner, snack and dessert items. Breakfast items, which are available throughout the day, account for a majority of the entrees sold in the Perkins restaurants. Marie Callender's, founded in 1948, has one of the longest operating histories within the full-service dining sector. Marie Callender's is known for serving quality food in a warm and pleasant atmosphere and for its premium pies that are baked fresh daily. As of the Filing Date, the Debtors owned one hundred eleven (111) Perkins restaurants located in eleven (11) states, and franchised two hundred fifty five (255) Perkins restaurants located in thirty (30) states and four (4) Canadian provinces. Similarly, as of the Filing Date, the Debtors owned and/or operated twenty-eight (28) Marie Callender's restaurants located in three (3) states,[5] and franchised twenty-one (21) Marie Callender's restaurants located in two (2) states and Mexico. Thus, the Debtors owned, operated or franchised over four hundred (400) restaurants throughout the United States, Canada and Mexico.

2.     Organizational Structure

P&MC Holding is a holding company that wholly owns P&MC. P&MC is the Debtors' principal operating entity and one of the primary obligors on the Debtors' Prepetition Secured Obligations. P&MC directly or indirectly owns and operates the Debtors' restaurant operations, oversees the Debtors' franchised restaurant operations and owns and operates its Foxtail business.

P&MC Holding owns and controls one hundred (100%) percent of P&MC and P&MC's Real Estate Holding LLC, which, in turn, owns and controls one hundred (100%) percent of P&MC's Holding Corp. P&MC owns and controls one hundred (100%) percent of PMCI Promotions LLC and MCPS. Through MCPS, P&MC owns and controls one hundred (100%) percent of MC Wholesalers, LLC, MCID, Inc., Wilshire Beverage, Inc., and FIV, LLC. MCPS, together with its wholly-owned subsidiaries, owns and operates the Marie Callender's corporate restaurants and oversees the Marie Callender's franchised restaurant operations.

---

[5] Four (4) of these restaurants are held in non-Debtor partnership entities, in which MCPS holds a percentage ownership interest in such partnerships.

3.      Prepetition Debt Structure

a.      Secured Debt Obligations

P&MC and MCPS, as the Borrowers, entered into the Prepetition Credit Agreement, with the Prepetition Secured Parties, consisting of a revolving credit facility with a sub-limit of $15,000,000 for the issuance of letters of credit and a term credit facility. The Prepetition Credit Facility is guaranteed by P&MC Holding, and the Prepetition Guarantors.

The Prepetition Credit Facility provided the Borrowers with, among other things (a) $25,000,000.00 in aggregate principal amount of revolving commitments, including letters of credit and (b) $127,750,000.00 in aggregate principal amount in a term loan facility. As of the Filing Date, the Prepetition Lenders were owed on account of the Prepetition Credit Facility approximately (i) $14,541,010.00 in revolving loan principal obligations, including reimbursement obligations in the amount of approximately $8,541,010.00 in respect of face amount of outstanding letters of credit (the "<u>Prepetition Letters of Credit</u>")]; (ii) $94,001,172.55 in term loan principal obligations, (iii) $6,304,256.59 in accrued and unpaid interest, (iv) $160,677.75 in respect of accrued and unpaid letters of credit fees and (v) $91,821.22 in respect of accrued and unpaid commitment fees. The Prepetition Secured Obligations are secured by substantially all of the assets of the Prepetition Credit Parties.

b.      Unsecured Trade Obligations

In addition to the foregoing, as of the Filing Date, the Debtors had outstanding approximately $8,100,000 in unpaid trade debt to their vendors and suppliers.

## B.      **Events Leading to Commencement of the Chapter 11 Cases**

1.      Pre-Petition Liquidity and Operational Concerns

In 2017 and 2018, the Debtors' financial performance was affected by: (i) a decline in sales across the family-dining and casual-dining industries due to decreased guest-traffic; (ii) the compounding impact of negative Perkins and Marie Callender's sales in 2017 and 2018 on Foxtail—a captive and material vendor to the restaurants; (iii) an elevated commodity environment; (iv) statutory increases in labor costs; (v) an increasingly tight labor market; (vi) lower overhead absorption at Foxtail following the loss of a large customer in 2017; and (vii) operational inefficiencies at Foxtail due to initial onboarding costs for new third-party customers in 2018. The Debtors saw dramatic same-store-sale increases since late 2018 at the restaurants due to several management initiatives, including a revised marketing and media strategy and the successful launch of an off-premise initiative in late 2018. Foxtail sales also stabilized, with positive momentum from the expansion of existing customer relationships and new-customer wins. Although the Debtors believed they reached a point of stabilization, the challenges faced in 2017 and 2018 led the Debtors to consider certain restructuring alternatives and negotiate with the Prepetition Secured Parties.

2.      Initial Turnaround Activities

18

In October of 2018, the Debtors engaged FTI Consulting, Inc. as their financial advisor to, among other things, help develop and implement plans for long-term operational and financial restructuring of the Debtors or to assist an investment banker in a sale of all or a portion of the Debtors' assets.

The failure to make scheduled interest payments on the Prepetition Credit Facility in July and October of 2018, as well as a failure to make certain mandatory prepayments and the existence of certain technical defaults, resulted in the Prepetition Credit Parties entering into the First Forbearance Agreement, pursuant to which the Prepetition Secured Parties agreed to forbear from exercising their rights and remedies arising under the Prepetition Credit Agreement and related loan documents.

On March 21, 2019, the Prepetition Credit Parties and the Prepetition Secured Parties entered into that certain Second Forbearance Agreement, which set forth, among other things, certain investment banking process milestones regarding the marketing and sale of the Debtors' assets.

## C.    **The Chapter 11 Cases**

The following is a brief description of certain material events that have occurred during these Chapter 11 Cases.

1.    First Day Motions and Orders (other than the DIP Motion and DIP Financing Order)

On the Filing Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of routine motions and applications seeking certain "first day" relief, including the following:

- *Motion of Debtors for Order Authorizing Joint Administration*.    The Debtors sought entry of an Order directing the joint administration of the Chapter 11 Cases and consolidation thereof for procedural purposes only. On August 6, 2019, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 50].

- *Debtors' Application for Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective* Nunc Pro Tunc *to the Petition Date.*    The Debtors sought authorization to retain and employ KCC as their claims and noticing agent for the Chapter 11 Cases.    On August 6, 2019, the Bankruptcy Court entered an Order granting the relief requested in the application [Docket No. 47].[6]

- *Motion of Debtors for Interim and Final Orders (I) Authorizing Continued Use of the Debtors' Existing Cash Management System and Bank*

---

[6]    Additionally, on September 10, 2019, the Bankruptcy Court entered an Order [Docket No. 224] authorizing the Debtors to retain KCC, pursuant to section 327(a) of the Bankruptcy Code, to serve as administrative agent to the Debtors.

*Accounts; (II) Authorizing Continued Performance of Intercompany Transactions; (III) Waiving Certain United States Trustee Requirements; and (IV) Granting Related Relief.* The Debtors sought entry of interim and final Orders, (i) authorizing the Debtors to continue to use their cash management system and open a new account to hold of $200,000 for Regions Bank's benefit to secure any obligations that may come due and payable to Regions Bank in connection with the performance of its treasury management functions (the "Regions Security Deposit"); (ii) authorizing the continued performance of intercompany transactions; (iii) waiving certain bank account and related requirements of the United States Trustee; and (iv) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on August 6, 2019 [Docket No. 56] and thereafter entered an Order granting the relief requested in the motion on a final basis on September 10, 2019 [Docket No. 218].

- *Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Compensation, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs and (II) Granting Related Relief.* The Debtors sought entry of interim and final Orders (i) authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay prepetition wages, salaries, compensation, reimbursable expenses, and other obligations on account of their various compensation and benefits programs in the ordinary course of business not to exceed $4,913,793[7] during the interim period and $6,396,446 on a final basis and (b) continue to administer their compensation and benefits programs and (ii) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on August 6, 2019 [Docket No. 51] and thereafter entered an Order granting the relief requested in the motion on a final basis on September 16, 2019 [Docket No. 287].

- *Motion of Debtors for Interim and Final Orders (I) Establishing Procedures for Determining Adequate Assurance of Payment, (II) Finding Utilities Adequately Assured of Payment, (III) Prohibiting Utilities from Altering, Refusing, or Discontinuing Utility Services, (IV) Authorizing the Debtors to Honor Obligations to Bill Consolidators in the Ordinary Course of Business and (V) Granting Related Relief.* The Debtors sought entry of interim and final Orders, (i) approving an adequate assurance deposit as adequate assurance of postpetition payment to the utilities; (ii) establishing procedures for resolving any subsequent requests by the utilities for additional adequate assurance of payment; (iii) prohibiting the Debtors' utility service providers from altering or discontinuing service; (iv) authorizing the Debtors to honor obligations to Bill Consolidators in

---

7 This amount was subsequently reduced to $4,115,000.

the ordinary course of business; and (v) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on August 6, 2019 [Docket No. 55] and thereafter entered an Order granting the relief requested in the motion on a final basis on September 10, 2019 [Docket No. 216].

- *Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Programs, (B) Maintain Premium Financing Arrangements and (C) Pay Prepetition Insurance Obligations, and (II) Granting Related Relief.* The Debtors sought entry of interim and final Orders (i) authorizing, but not directing, the Debtors to (a) maintain, continue and renew their various insurance programs, (b) maintain, continue and renew the certain premium financing agreements, (c) pay and honor, in their sole discretion, all amounts and obligations on account of prepetition premiums for their insurance programs, payments due under their premium financing agreements, insurance deductibles, broker's fees, deductibles, taxes, charges, and other obligations owed under or with respect to their insurance programs, in an amount not to exceed $88,705 on an interim basis and $355,000 on a final basis, and (ii) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on August 6, 2019 [Docket No. 52] and thereafter entered an Order granting the relief requested in the motion on a final basis on September 16, 2019 [Docket No. 286].

- *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay Certain Taxes, Governmental Assessments and Fees and (II) Granting Related Relief.* The Debtors sought entry of interim and final Orders (i) authorizing the Debtors, in their sole discretion, to pay any prepetition tax and fee obligations including, without limitation, income taxes, sales and use taxes, business taxes, property taxes, and other taxes, including any other types of taxes, fees, assessments or similar charges and any penalty, interest or similar charges in respect of such taxes, not to exceed $1,600,000 on an interim basis and $1,800,000 on a final basis, that are owing to certain international, federal, state and local governmental authorities, and (ii) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on August 6, 2019 [Docket No. 57] and thereafter entered an Order granting the relief requested in the motion on a final basis on September 10, 2019 [Docket No. 220].

- *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Customer Programs and (B) Pay and Honor Related Prepetition Obligations and (II) Granting Related Relief.* The Debtors sought entry of interim and final Orders (i) authorizing the Debtors to (a) administer certain prepetition customer programs and practices in the ordinary course of the Debtors' businesses and (b) honor or pay certain prepetition obligations including prepetition processing costs and fees

21

associated with their customer programs and practices, and (ii) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on August 6, 2019 [Docket No. 53] and thereafter entered an Order granting the relief requested in the motion on a final basis on September 10, 2019 [Docket No. 210].

- *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Critical Vendors and (II) Granting Related Relief.* The Debtors sought entry of interim and final Orders (i) authorizing, but not directing, the Debtors to pay prepetition Critical Vendor Claims of certain Critical Vendors in the ordinary course in an amount not to exceed $2,100,000 on an interim basis and $2,500,000 on a final basis, and (ii) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on August 6, 2019 [Docket No. 48] and thereafter entered an Order granting the relief requested in the motion on a final basis on September 10, 2019 [Docket No. 213].

- *Motion of Debtors for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims Asserted Under the (A) Perishable Agricultural Commodities Act, (B) Packers and Stockyards Act, and (C) Any State Statutes of Similar Effect and (II) Granting Related Relief.* The Debtors sought entry of interim and final Orders (i) authorizing, but not directing, payment of certain claims under (a) the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499(a) *et seq.*, (b) the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. §§ 181 *et seq.*, (c) any and all state statutes of similar effect; and (ii) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on August 6, 2019 [Docket No. 49] and thereafter entered an Order granting the relief requested in the motion on a final basis on September 10, 2019 [Docket No. 219].

- *Motion of Debtors for Order (I) Authorizing the Payment of Prepetition Claims of Shippers and Warehousemen and (II) Granting Related Relief.* The Debtors sought entry of interim and final Orders, under sections 105(a), 363 and 503 of the Bankruptcy Code, authorizing, but not directing, (i) the Debtors, in their sole discretion, to pay prepetition Shipping and Warehousing Claims in an amount not to exceed $250,000 on an interim basis and $250,000 on a final basis, and (ii) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on August 6, 2019 [Docket No. 54] and thereafter entered an Order granting the relief requested in the motion on a final basis on September 10, 2019 [Docket No. 214].

2.     Post-Petition Financing

22

On the Filing Date, the Debtors also filed the DIP Motion, asking the Bankruptcy Court to, among other things, authorize the Debtors to obtain the DIP Facility from the DIP Lenders, authorize the Debtors to use "cash collateral," as such term is defined in the section 363 of the Bankruptcy Code, grant the DIP Agent a senior, priming lien on certain prepetition collateral (described in the motion) securing the DIP Facility, and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents.  The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on August 6, 2019 [Docket No. 58] and thereafter entered the DIP Financing Order granting the relief requested in the motion on a final basis on September 11, 2019 [Docket No. 241].

3.     Key Employee Incentive Plan Motion

On August 13, 2019, the Debtors filed the KEIP Motion, asking the Bankruptcy Court to approve the Debtors' key employee incentive plan, and authorize the Debtors to remit the payments contemplated thereunder.  The Bankruptcy Court entered an Order granting the relief requested in the motion on September 11, 2019 [Docket No. 237].

4.     Employment and Compensation of Debtors' Professionals and Advisors

On September 10, 2019, the Bankruptcy Court entered Orders authorizing the Debtors to retain Akin Gump Strauss Hauer & Feld LLP as bankruptcy co-counsel [Docket No. 227] and Richards, Layton & Finger, P.A. as bankruptcy co-counsel [Docket No. 226]. Additionally, on that same date, the Bankruptcy Court entered an Order authorizing the Debtors to retain FTI Consulting, Inc. as financial advisor [Docket No. 225], and on September 11, 2019, the Bankruptcy Court entered an Order authorizing the Debtors to retain Houlihan Lokey Capital, Inc. as financial advisor and investment banker [Docket No. 238].

5.     Appointment of Committee

On August 14, 2019, the United States Trustee appointed the Committee [Docket No. 97].  The members of the Committee are as follows:  (a) SCF RC Funding L, LLC; (b) WF PP Realty, LLC.; (c) Bono Burns Distr. Inc.; (d) Departure; and (e) DJ-9, Inc.

To assist the Committee in carrying out its duties, the Committee selected Pachulski Stang Ziehl & Jones LLP as its counsel.  The Bankruptcy Court entered an Order authorizing the Committee's retention of the firm on October 4, 2019 [Docket No. 340].

6.     Rejection of Executory Contracts and Unexpired Leases

Prior to the Filing Date, the Debtors vacated certain of their restaurants and, as such, had no need for any of the leases for such restaurants.  Accordingly, on August 5, 2019, the Debtors filed the First Rejection Motion to reject the leases of two (2) of the Debtors' restaurants.  The Bankruptcy Court entered an Order [Docket No. 221] approving such motion on September 10, 2019.

Further, on August 7, 2019, the Debtors filed the Second Rejection Motion seeking to reject the leases of certain additional restaurants.  This motion sought to reject the

leases to thirty-two (32) restaurants (nineteen (19) Marie Callender's restaurants and thirteen (13) Perkins restaurants). The Bankruptcy Court entered an Order [Docket No. 222] approving such motion on September 10, 2019. By way of this Order, the Debtors closed these operating locations and terminated any accruing expenses relating to any of these leased premises.[8]

       7.      Claims Process and Bar Date

          a.      Section 341(a) Meeting of Creditors

On September 10, 2019, the United States Trustee presided over the section 341(a) meeting of creditors in the Chapter 11 Cases.

          b.      Schedules and Statements

The Debtors filed with the Bankruptcy Court their Schedules on September 6, 2019.

          c.      Bar Date

On September 13, 2019, the Debtors filed the *Motion of Debtors for an Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof* [Docket No. 283], seeking entry of an Order establishing the Bar Dates, including the General Bar Date, the Governmental Bar Date, and the Rejection Bar Date. The Bankruptcy Court entered the Bar Date Order, which granted the relief requested in the motion, on October 2, 2019 [Docket No. 333].

       8.      Prepetition Marketing Efforts and Sale Process

After entry into the First Forbearance Agreement, the Debtors initiated discussions with the Prepetition Secured Parties regarding the best path forward for the Debtors. In connection therewith, on January 24, 2019, with the consent and acknowledgement of the Prepetition Secured Parties, the Debtors retained Houlihan—an investment bank with expertise in mergers and acquisitions, recapitalization, and financial restructuring—to assist them with, among other things, exploring a potential sale of the Debtors' Assets, whether pursuant to an in- or out-of-court sale of the Debtors' Assets, an investment in P&MC or any of its subsidiaries, or a carve-out and asset sale of any of the operating business units (*i.e.*, Perkins, Marie Callender's and/or Foxtail). As part of this effort, Houlihan began a robust marketing process for the potential purchase of all, or certain of, the Debtors' Assets.

Houlihan's efforts included (i) contacting approximately one hundred twenty (120) potential strategic and financial acquirers to garner interest in pursuing a possible transaction, (ii) negotiating to completion sixty-eight (68) non-disclosure agreements with Interested Parties, (iii) distributing a process letter to all Interested Parties inviting them to

---

[8] A certain landlord whose lease was not subject to the First Rejection Motion or Second Rejection Motion separately entered into a stipulation with the Debtors on August 30, 2019 that provided for the rejection of such landlord's lease and such stipulation was approved by the Bankruptcy Court on September 3, 2019. *See* Docket Nos. 157 and 162.

submit Initial IOIs, (iv) compiling, managing, and revising an online data room where interested parties who submitted Initial IOIs could review financial information, contracts, leases, intellectual property, and other data pertaining to the Debtors, and (v) holding multiple conversations with potentially interested parties and negotiating terms with those interested in transacting.

The Debtors received Initial IOIs from eleven (11) Interested Parties, including four (4) for P&MC, two (2) for the Perkins Business Assets only, and five (5) for the Ohio Business Assets only. All Interested Parties who submitted Initial IOIs were granted access to a comprehensive data room and met with senior management of the Perkins Business Assets and/or the Ohio Business Assets in person to review the opportunity and to ask any and all questions pertaining thereto.

After extensive negotiations and analysis of the benefits and risks of each proposed transaction, the Debtors ultimately determined that a bifurcated sale was the best available alternative to maximize value for the Debtors' stakeholders under the circumstances. Thereafter, the Debtors, in consultation with their advisors, determined to pursue the offer presented by Perkins Group LLC to acquire substantially all of the Perkins Business Assets and the Ohio Business Assets. Perkins Group LLC considered the MC Business Assets and the California Business Assets excluded assets.

Therefore, following substantial and good-faith negotiations, the Debtors and Perkins Group LLC agreed to the terms of that certain Asset Purchase Agreement, dated as of August 2, 2019 pursuant to which Perkins Group LLC has agreed to acquire the Perkins Business Assets and the Ohio Business Assets for a purchase price of (a) $40,000,000 in cash (subject to certain purchase price reductions) plus (b) the assumption of certain liabilities, subject to higher or otherwise better offers.

The Debtors continued to market and solicit offers for all or any portion of the Assets, including, without limitation, the Perkins Business Assets, the MC Business Assets, the Ohio Business Assets, the California Business Assets, or any combination thereof, to a wide range of potential purchasers and worked diligently with all parties that expressed an interest in the Debtors' Assets.

9.      Postpetition Sale Process

On August 5, 2019, the Debtors filed the Sale Motion with the Bankruptcy Court. The Sale Motion sought (i) approval of the bid procedures in connection with the Sale and (ii) approval of the Perkins Asset Purchase Agreement.

On August 21, 2019, the Debtors filed the Sale Motion Supplement, which sought approval of:

>    (i)     the Fairfield Asset Purchase Agreement with Fairfield Gourmet Food Corp, dated August 21, 2019, as the stalking horse bidder for the Ohio Business Assets for an initial purchase price of $13,000,000, subject to certain purchase price adjustments as well as certain bid protections; and

25

> (ii)   the MC Asset Purchase Agreement with Marie Callenders, Inc., a third party unaffiliated with the Debtors, dated August 21, 2019, as the stalking horse bidder for the MC Business Assets and the California Business Assets for a purchase price of $1,750,000.

On August 23, 2019, the Bankruptcy Court held a hearing on the bid procedures portion of the relief requested in the Sale Motion and, that same day, entered the Bidding Procedures Order [Docket No. 141] approving such relief.

Pursuant to such Order, the Debtors were to conduct an Auction on September 9, 2019 if they received any qualified bids other than the bids submitted by Perkins Group LLC, Fairfield Gourmet Food Corp., and Marie Callenders, Inc. The Debtors received (i) two (2) provisionally qualified bids for the Perkins Business Assets in addition to the Bid submitted by Perkins Group LLC; and (ii) one (1) provisionally qualified bid for the Ohio Business Assets in addition to the Bid submitted by Fairfield Gourmet Food Corp. The Debtors did not receive any additional Bids for the MC Business Assets and California Business Assets other than the Bid submitted by Marie Callenders, Inc.

On September 9, 2019, pursuant to the Bidding Procedures Order, the Debtors held the Auction with respect to the Perkins Business Assets and the Ohio Business Assets. The Auction concluded on September 10, 2019 at 12:45 a.m. At the conclusion of the Auction, the Debtors declared: (i) Huddle House, Inc. the Successful Bidder for the Perkins Business Assets for a cash purchase price of $51,500,000, with Perkins Group LLC as the Backup Bidder; (ii) Fairfield Gourmet Food Corp. the Successful Bidder for the Ohio Business Assets for a cash purchase price of $18,700,000, with Dianne's Fine Desserts, Inc. as the Backup Bidder and (iii) Marie Callenders, Inc the Successful Bidder for the MC Business Assets and the California Business Assets for a cash purchase price of $1,750,000.

Following the Auction, the Debtors executed: (i) the Huddle House Asset Purchase Agreement with Huddle House, Inc. for the Perkins Business Assets; (ii) an amended Fairfield Asset Purchase Agreement with Fairfield Gourmet Food Corp. for the Ohio Business Assets and (iii) a Letter Amendment to the MC Stalking Horse Agreement with Marie Callenders, Inc.

On September 11, 2019, the Debtors filed the *Notice of Successful Bidders with Respect to the Debtors' Assets* [Docket No. 247]. On September 16, 2019, the Debtors filed a revised form of sale order for each of the Sales [Docket No. 289].

The Bankruptcy Court held a hearing to consider the Sales on September 17, 2019, at which the Bankruptcy Court approved the Sales to the respective purchasers. On September 18, 2019, the Debtors filed further revised forms of the sale orders and the Bankruptcy Court entered the orders approving the Sales the same day [Docket Nos. 303, 304 & 306].

Pursuant to the Huddle House Asset Purchase Agreement, the Sale of the Perkins Business Assets is scheduled to close the week of October 21, 2019. Pursuant to the Fairfield Asset Purchase Agreement, the Sale of the Ohio Business Assets, the MC Business Assets, and

26

the California Business Assets is scheduled to close is scheduled to close contemporaneously with the sale of the Perkins Business Assets.

## D.    Certain Federal Income Tax Consequences

1.    Brief Overview and Disclosure

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain U.S. Holders and Non-U.S. Holders (each as defined below) of Claims entitled to vote on the Plan, and it does not address the U.S. federal income tax consequences to Holders of Claims and Equity Interests who are unimpaired or otherwise not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions, revenue rulings and revenue procedures of the U.S. Internal Revenue Service (the "**IRS**") and any other published administrative rules and pronouncements of the IRS, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations of applicable tax law may have retroactive effect and could significantly affect the U.S. federal income tax consequences describe below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the IRC, persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, certain former citizens or long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, retirement plans, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such a Claim only as a "capital asset" (within the meaning of section 1221 of the IRC). This summary also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are unimpaired or

27

otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim.

For purposes of this discussion, the term "**U.S. Holder**" means a Holder of a Claim or (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the IRC) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes, or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "**Non-U.S. Holder**" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes). In the case of a Holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership. If you are a partner (or other beneficial owner) of a partnership (or other entity treated as a partnership or other pass-through entity) that is, or will be, a Holder of a Claim, then you should consult your own tax advisors.

The following discussion assumes that each Holder of a Claim holds its Claim as a "capital asset" within the meaning of Section 1221 of the IRC.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO YOU. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

2.      Consequences to the Debtors

For U.S. federal income tax purposes, P&MC Holding is treated as a partnership and each Debtor is treated as a disregarded entity (the "**Disregarded Debtors**") or a partnership, other than certain entities organized as corporations that are not active and have no known assets. For U.S. federal income tax purposes, all of the assets and liabilities of the Disregarded Debtors are treated as owned by P&MC Holding.

In general, absent an exception, a taxpayer will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in

general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the sum of (a) the issue price of any new indebtedness of the taxpayer issued and (b) the fair market value of any other consideration (including any new equity) given in satisfaction of such indebtedness at the time of the exchange.

Under Section 108 of the IRC, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "**Bankruptcy Exception**"), or to the extent that the taxpayer is insolvent when the COD Income arises (the "**Insolvency Exception**"). Instead, as a consequence of such exclusion, a taxpayer debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. Under Section 108(d)(6) of the IRC, when an entity that is taxed as a partnership realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception or Insolvency Exception (and related attribute reduction) is applied at the partner level rather than at the entity level. Accordingly, the partners of P&MC Holding, as the direct and indirect Holders of Equity Interests in the Debtors, will be treated as receiving their allocable share of the COD Income realized by the Debtors, and the application of the Bankruptcy Exception and the Insolvency Exception will occur at the partner level.

The IRS has ruled in at least one situation that if the debt of a disregarded subsidiary is nonrecourse to the member, the income derived from the discharge of the underlying debt will be characterized as gain (as if the underlying assets were sold for the amount of the nonrecourse debt) as opposed to COD Income. Since P&MC Holdings is a guarantor of the Prepetition Credit Agreement, however, the Prepetition Credit Agreement would likely be considered as a recourse obligation of P&MC Holdings (rather than as a nonrecourse obligation), and therefore as COD Income, which is ordinary income. Such income would increase the basis of the member's interest for purposes of the COD calculation. A portion of such COD Income may be offset by losses incurred on the Sales. Any remaining net income or loss will flow through to Holders of Equity Interests, who may recognize gain or loss on the disposition of their Equity Interest.

3.    Consequences to the U.S. Holders of Allowed Claims and Equity Interests

a.    *Consequences to the U.S. Holders of Allowed Claims in Class 1 – Remaining Prepetition Secured Claims*

The U.S. Holders of Prepetition Secured Claims will be entitled to receive $[●], representing most of the proceeds of the Sales. Approximately $[●] of the distribution will be made on [●], 2019, with the balance distributed in accordance with this Plan. Such a U.S. Holder will be treated as exchanging its Claim for cash in a fully taxable exchange. A U.S. Holder who is subject to this treatment should recognize gain or loss equal to the difference between (a) such Holder's tax basis in its Claim and (b) the amount of Cash received pursuant to the Plan, reduced by the amount of accrued but previously untaxed interest on the debt underlying such Claim (see the discussion on "Accrued Interest" below). The character of such gain or loss as capital gain (subject to the "Market Discount" rules described below) or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, the extent that a portion of the

29

consideration received in exchange for the Claim is allocable to accrued but unpaid interest (see the discussion on "Accrued Interest" below), whether the Claim constitutes a capital asset in the hands of such U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent such U.S. Holder has previously claimed a bad debt with respect to its Claim.

b.    *Consequences to the U.S. Holders of Allowed Claims in Class 4 – General Unsecured Claims*

Pursuant to the Plan, each U.S. Holder of an Allowed General Unsecured Claim (excluding Holders of Allowed Deficiency Claims) shall receive its Pro Rata share of the GUC Plan Consideration; provided, however, that, upon the Deficiency Threshold Trigger, Holders of Allowed Deficiency Claims shall share ratably in the further distributions made to the Holders of such other Allowed General Unsecured Claims.   Such a U.S. Holder will be treated as exchanging its Claim for cash in a fully taxable exchange.  A U.S. Holder who is subject to this treatment should recognize gain or loss equal to the difference between (a) such Holder's tax basis in its Claim and (b) the amount of Cash received pursuant to the Plan, reduced by the amount of accrued but previously untaxed interest on the debt underlying such Claim (see the discussion on "Accrued Interest" below).  The character of such gain or loss as capital gain (subject to the "Market Discount" rules described below) or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, the extent that a portion of the consideration received in exchange for the Claim is allocable to accrued but unpaid interest (see the discussion on "Accrued Interest" below), whether the Claim constitutes a capital asset in the hands of such U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent such U.S. Holder has previously claimed a bad debt with respect to its Claim.

c.    *Summary of Consequences to Holders of Interests in Class 5 and 6 – Equity Interests*

As discussed above in Consequences to the Debtors, the partners of P&MC Holding, as the direct and indirect U.S. Holders of Equity Interests in the Debtors, will be treated as receiving their allocable share of the COD Income realized by the Debtors, and the application of the Bankruptcy Exception and the Insolvency Exception will occur at the partner level.  Such income would increase the basis of the member's interest for purposes of the COD calculation. A portion of such COD Income may be offset by losses incurred on the Sales.  Any remaining net income or loss will flow through to U.S. Holders of Equity Interests, who may recognize gain or loss on the disposition/surrender of their Equity Interest.  Generally, such income will constitute capital gain or loss.

d.    *Accrued Interest*

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but untaxed interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income for U.S. federal income tax purposes. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in

30

the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.

Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

e.    *Market Discount*

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("**OID**"), its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

U.S. federal income tax laws enacted in December 2017 added section 451 of the IRC.  This new provision generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) to include certain items of income (such as market discount) no later than the time such amounts are reflected on such a financial statement.  The application of this rule to income of a debt instrument with market

discount is effective for taxable years beginning after December 31, 2018. However, the IRS announced in Notice 2018-80 that it intends to issue proposed Treasury Regulations confirming that taxpayers may continue to defer income (including market discount income) for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. U.S. Holders are urged to consult their own tax advisors concerning the application of the market discount rules to their Claims.

f.    *Medicare Tax*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

g.    *Limitations on Use of Capital Losses*

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in other tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

4.    U.S. Federal Income Tax Consequences to the Non-U.S. Holders of Allowed Claims and Equity Interests

a.    *Gain Recognition*

Any gain income realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation, unless (a) the Non-U.S. Holder is an individual who was present in the United States for a hundred and eighty-three (183) days or more during the taxable year in which the exchange occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains

32

allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply).

Each Non-U.S. Holder will be considered to be engaged in business in the United States because of its ownership of the Equity Interests (thus meeting the second exception discussed immediately above). Furthermore, Non-U.S. Holders will be deemed to conduct such activities through a permanent establishment in the United States within the meaning of an applicable tax treaty. Consequently, each Non-U.S. Holder will be required to file federal tax returns to report its share of the Debtors' income, gain, loss or deduction and pay federal income tax on its share of the Debtors' net income or gain. Moreover, under rules applicable to publicly-traded partnerships, distributions to Non-U.S. Holders are subject to withholding at the highest applicable effective tax rate. Each Non-U.S. Holder must obtain a taxpayer identification number from the IRS and submit that number to the Debtors' transfer agent on a Form W-8BEN or W-8BEN-E (or other applicable or successor form) in order to obtain credit for these withholding taxes.

In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments. That tax may be reduced or eliminated by an income tax treaty between the United States and the country in which the foreign corporate Non-U.S. Holder is a "qualified resident." In addition, a Non-U.S. Holder that is a corporation is subject to special information reporting requirements under Section 6038C of the IRC.

      b.     *Accrued but Untaxed Interest (or OID)*

Payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but untaxed interest (or OID) generally will not be subject to U.S. federal income or withholding tax; provided, however, that (a) such Non-U.S. Holder is not a bank, (b) such Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of the interests of the Debtors, and (c) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest (or OID) at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest (or OID) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty, provided certification requirements are satisfied) on payments that are attributable to accrued but untaxed interest (or OID).  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

    c.     *Disposition of Equity Interests*

A Non-U.S. Holder who sells or otherwise disposes an Equity Interest will be subject to federal income tax on gain realized from the sale or disposition of that Equity Interest to the extent the gain is effectively connected with a U.S. trade or business of the Non-U.S. Holder. Gain realized by a Non-U.S. Holder from the sale of its interest in a partnership that is engaged in a trade or business in the United States will be considered to be "effectively connected" with a U.S. trade or business to the extent that gain that would be recognized upon a sale by the partnership of all of its assets would be "effectively connected" with a U.S. trade or business. Thus, a substantial portion of a Non-U.S. Holder's gain from the sale or other disposition of an Equity Interest would be treated as effectively connected with a holder's indirect U.S. trade or business constituted by its investment in the Debtors and would be subject to federal income tax. As a result of the effectively connected income rules described above, the exclusion from U.S. taxation under the Foreign Investment in Real Property Tax Act for gain from the sale of partnership units regularly traded on an established securities market will not prevent a Non-U.S. Holder from being subject to federal income tax on gain from the sale or disposition of its units to the extent such gain is effectively connected with a U.S. trade or business. We expect a substantial portion of the gain from the sale or disposition of Equity Interests to be treated as effectively connected with a U.S. trade or business.

Moreover, the transferee of an interest in a partnership that is engaged in a U.S. trade or business is generally required to withhold 10% of the amount realized by the transferor unless the transferor certifies that it is not a foreign person, and we are required to deduct and withhold from the transferee amounts that should have been withheld by the transferees but were not withheld. Because the "amount realized" includes a partner's share of the partnership's liabilities, 10% of the amount realized could exceed the total cash purchase price for the Equity Interests. For this and other reasons, the IRS has suspended the application of this withholding rule to open market transfers of interest in publicly traded partnerships, pending promulgation of regulations that address the amount to be withheld, the reporting necessary to determine such amount and the appropriate party to withhold such amounts, but it is not clear if or when such regulations will be issued.

d.    *FATCA*

Under the Foreign Account Tax Compliance Act ("**FATCA**"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income. Additionally, although FATCA withholding may also apply to gross proceeds of a disposition of property of a type that can produce U.S.-source interest or dividends, recently proposed U.S. Treasury Regulations suspend withholding on such gross proceeds payments indefinitely. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THE FATCA RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF THEIR CLAIMS PURSUANT TO THE PLAN.**

RLF1 22091466v.11

*The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a Distribution under the Combined Disclosure Statement and Plan are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Combined Disclosure Statement and Plan.*

## E.    Alternative Plan

If the Combined Disclosure Statement and Plan is not confirmed, the Debtors, the Committee, the Prepetition Secured Parties or any other party in interest could attempt to formulate a different plan. However, the additional costs, all of which would constitute Administrative Expense Claims may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to cases under chapter 7. Accordingly, the Debtors believe that the Combined Disclosure Statement and Plan enables creditors to realize the best return under the circumstances.

## F.    Global Resolution

Since the Committee was appointed, the Settlement Parties engaged in negotiations with the goal of consensually resolving the Chapter 11 Cases. These negotiations were ultimately successful and resulted in the Global Resolution that includes the matters announced at the Final DIP Hearing and set forth in, among other sections, paragraph 47 to the DIP Financing Order. The key terms of the Global Resolution are as follows: (i) the Debtors' establishing, for the benefit of Holders of General Unsecured Claims, the GUC Fixed Recovery (to be funded prior to any amounts being distributed to the Prepetition Secured Parties under the Sale Orders) and the GUC Percentage Recovery (to be funded once and to the extent possible after forty (40%) of the gross sale proceeds from all Sales have been reserved for the Prepetition Secured Parties); (ii) the Debtors' establishing the Administrative and Priority Claim Reserve for the benefit of Holders of Allowed Administrative Expense Claims, Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims; (iii) agreement on the terms of the treatment of Allowed General Unsecured Claims as set forth in Article VIII.A.4(c) herein and (iv) the subordination of Allowed Deficiency Claims to Allowed General Unsecured Claims until the occurrence of the Deficiency Threshold Trigger. Such terms, including the benefits of the Global Resolution, are discussed at length in Articles III.G. and III.H. below and in the Committee Support Letter, which is incorporated by reference herein and attached hereto as Exhibit B.

## G.    Best Interests Test and Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an impaired Claim or Equity Interest either (a) accept the Combined Disclosure Statement and Plan or (b) receive or retain under the Combined Disclosure Statement and Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. A hypothetical chapter 7 liquidation analysis is attached to this Combined Disclosure Statement and Plan as Exhibit A. The value of any Distributions if the Debtors' Chapter 11 Cases were converted to cases under Chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Combined Disclosure Statement and Plan for a variety of reasons. Conversion of the Chapter 11 Cases to

36

chapter 7 cases would require the appointment of a chapter 7 trustee, who would be entitled to statutory fees relating to the Distributions of the already-monetized assets. Accordingly, a portion of the Cash currently available, or that would be available upon the Effective Date under the Plan, for Distribution to holders of Allowed Claims would instead have to be paid to a chapter 7 trustee. In addition, the chapter 7 trustee would likely retain new professionals. The "learning curve" that the trustee and new professionals would be faced with comes with potentially additional costs to the Estates and with a delay compared to the time of Distributions under the Combined Disclosure Statement and Plan.

In addition, the Combined Disclosure Statement and Plan contains a number of concessions by certain of the Settlement Parties. Among other things, as part of the Global Resolution, the Prepetition Secured Parties have agreed to allow the Debtors to use their cash collateral to fund the Wind Down Fund, which fund provides for the payment of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Priority Non-Tax Claims, Professional Claims, the GUC Plan Consideration and wind down costs. Although this Global Resolution consideration was assumed in the chapter 7 liquidation analysis, there are no assurances that this Global Resolution would be available in a hypothetical chapter 7 liquidation. In any event, the conversion to chapter 7 cases would likely require the chapter 7 trustee to negotiate with the Prepetition Secured Parties to honor the Global Resolution, resulting in additional costs and administrative expenses incurred in connection there with, as well as a resulting delay in Distributions.

As a result, the Debtors believe that the Estates would have fewer funds to be distributed in a hypothetical chapter 7 liquidation than they would if the Combined Disclosure Statement and Plan is confirmed. Moreover, based on the structure of the Combined Disclosure Statement and Plan, and the settlements contained therein, the Holders of Allowed General Unsecured Claims will recover more than in the hypothetical chapter 7 cases. Accordingly, the Debtors believe that the "best interests" test of Bankruptcy Code section 1129 is satisfied.

**H.     Releases by the Debtors and Third Parties**

The release provisions set forth in Articles X.II.B. and X.II.C. of this Combined Disclosure Statement and Plan are an integral part of the Global Resolution which formed the basis for this Combined Disclosure Statement and Plan. Absent such releases, the Settlement Parties would not have agreed to the terms of the Global Resolution and the Holders of Allowed Claims would receive a diminished (or, in some cases, no) recovery on account of such Claims.

**IV.     SUMMARY OF TREATMENT OF CLAIMS
AND ESTIMATED RECOVERIES**

**A.     Summary of Treatment of Claims and Equity Interests and Estimated Recoveries**

The following chart provides a summary of treatment of each Class of Claims and Equity Interests (other than Administrative Expense Claims, Priority Tax Claims and Intercompany Claims) and an estimate of the recoveries of each Class.[9] The treatment provided

---

[9] These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by Creditors in proofs of claim or otherwise. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases

in this chart is for informational purposes only and is qualified in its entirety by Article VII of the Combined Disclosure Statement and Plan.

| Class | Estimated Allowed Claims | Treatment / Voting Status | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1 – Remaining Prepetition Secured Claims | $ | Impaired / Entitled to Vote | [___]% |
| Class 2 - Other Secured Claims | $ | Unimpaired / Deemed to Accept | 100% |
| Class 3 - Priority Non-Tax Claims | $ | Unimpaired / Deemed to Accept | 100% |
| Class 4 – General Unsecured Claims | $ | Impaired / Entitled to Vote | [___]% |
| Class 5 – Equity Interests in P&MC Holding | N/A | Impaired / Deemed to Reject | 0% |
| Class 6 – Equity Interests in Debtors Other than P&MC Holding | N/A | Unimpaired / Deemed to Accept | Reinstated |

## V.    <u>CONFIRMATION AND VOTING PROCEDURES</u>

### A.    <u>Confirmation Procedure</u>

1.    Confirmation Hearing

On November [●], 2019, the Bankruptcy Court entered an Order [Docket No. ●] (the "<u>Conditional Approval and Procedures Order</u>") conditionally approving the Combined Disclosure Statement for solicitation purposes only and authorizing the Debtors to solicit the Combined Disclosure Statement and Plan. The Confirmation Hearing has been scheduled for [●], 2019 at [●].m. (ET)] at the Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801 to consider (i) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

2.    Procedure for Objections

---

and objections to such Claims have not been fully litigated. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

Any objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Combined Disclosure Statement and Plan must be made in writing and filed with the Bankruptcy Court and served on (a) the Debtors' counsel, (i) Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, DE 19801 (Attn: Daniel J. DeFranceschi (defranceschi@rlf.com)) and (ii) Akin Gump Strauss Hauer & Feld LLP, 2001 K Street N.W., Washington, D.C. 20006 (Attn: Scott Alberino (salberino@akingump.com) and Joanna Newdeck (jnewdeck@akingump.com)); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (Attn: Bradford J. Sandler (bsandler@pszjlaw.com)); and (c) counsel to the DIP Agent and the Prepetition Agent, Moore & Van Allen PLLC, 100 N. Tryon St., Suite 4700, Charlotte, NC 28202, Attn: David L. Eades, Esq. (davideades@mvalaw.com) and Luis M. Lluberas, Esq. (luislluberas@mvalaw.com); and (iv) the United States Trustee, 844 King Street, Suite 2207, Lockbox #35, Wilmington, DE 19801 (Attn: Linda J. Casey, Esq., linda.casey@usdoj.gov), in each case, by no later than **[●], 2019 at 4:00 p.m. (ET).  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.**

3.      Requirements for Confirmation

The Bankruptcy Court will confirm the Combined Disclosure Statement and Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, the Combined Disclosure Statement and Plan (i) must be accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, the Combined Disclosure Statement and Plan must not "discriminate unfairly" against and be "fair and equitable" with respect to such Class; and (ii) must be feasible.  The Bankruptcy Court must also find that:

a.      the Combined Disclosure Statement and Plan has classified Claims and Equity Interests in a permissible manner;

b.      the Combined Disclosure Statement and Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

c.      the Combined Disclosure Statement and Plan has been proposed in good faith.

4.      Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires the Combined Disclosure Statement and Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such class.  The Combined Disclosure Statement and Plan creates separate Classes to deal respectively with secured Claims, unsecured Claims and Equity Interests.  The Debtors believe that the Combined Disclosure Statement and Plan's classifications place substantially similar Claims or Equity Interests in the same Class and thus, meet the requirements of section 1122 of the Bankruptcy Code.

5.      Impaired Claims or Equity Interests

39

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes impaired by the Combined Disclosure Statement and Plan and receiving a payment or Distribution under the Combined Disclosure Statement and Plan may vote on the Combined Disclosure Statement and Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be impaired if the Combined Disclosure Statement and Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests treated in such Class.  The Holders of Claims not impaired by the Combined Disclosure Statement and Plan are deemed to accept the Combined Disclosure Statement and Plan and do not have the right to vote on the Combined Disclosure Statement and Plan.  The Holders of Claims or Equity Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Combined Disclosure Statement and Plan are deemed to reject the Combined Disclosure Statement and Plan and do not have the right to vote.  Finally, the Holders of Claims or Equity Interests whose Claims or Equity Interests are not classified under the Combined Disclosure Statement and Plan are not entitled to vote on the Combined Disclosure Statement and Plan.

6.       Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Combined Disclosure Statement and Plan). Because the Combined Disclosure Statement and Plan proposes a liquidation of all of the Debtors' assets, for purposes of this test, the Debtors have analyzed the ability of the Plan Administrator to meet its obligations under the Combined Disclosure Statement and Plan.   Based on the Debtors' analysis, the Plan Administrator will have sufficient assets to accomplish its tasks under the Combined Disclosure Statement and Plan.   Therefore, the Debtors believe that the liquidation pursuant to the Combined Disclosure Statement and Plan will meet the feasibility requirements of the Bankruptcy Code.

7.       Eligibility to Vote on the Combined Disclosure Statement and Plan

Unless otherwise Ordered by the Bankruptcy Court, only Holders of Allowed Claims in Classes 1 and 4 may vote on the Combined Disclosure Statement and Plan.  Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order, in order to vote on the Combined Disclosure Statement and Plan, you must hold an Allowed Claim in Classes 1 or 4, or be the Holder of a Claim in either such Class that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

8.       Solicitation Notice

All Holders of Allowed Claims in Class 1 and 4 will receive (i) notice of the Confirmation Hearing on the Combined Disclosure Statement and Plan (the "Confirmation Notice"), (ii) a form of ballot and (iii) a letter from the Committee urging the Holders of Allowed General Unsecured Claims to vote to accept the Combined Disclosure Statement and Plan.  All other Creditors and parties in interest not entitled to vote on the Combined Disclosure Statement and Plan will only receive a copy of the Confirmation Notice.

9.       Procedure/Voting Deadlines

In order for your ballot to count, you must either (1) complete an electronic ballot at http://www.kccllc.net/PMC or (2) complete, date, sign and properly mail, courier or personally deliver a paper ballot (please note that envelopes are not included with the ballot) to the Claims and Noticing Agent at the following address: Perkins & Marie Callender's Claims Processing Center, c/o Kurtzman Carson Consultants LLC, 222 N Pacific Coast Highway, Suite 300, El Segundo, CA 90245.  BALLOTS SENT BY FACSIMILE TRANSMISSION OR E-MAIL ARE NOT ALLOWED AND WILL NOT BE COUNTED.

Ballots must be submitted electronically, or the Claims and Noticing Agent must RECEIVE physically original ballots by mail or overnight delivery, on or before [●], 2019 at **4:00 p.m. (prevailing Eastern Time)** (the "Voting Deadline").   Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a ballot is submitted electronically or the Claims and Noticing Agent receives your original paper ballot.

Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Disclosure Statement and Plan.

10.       Acceptance of the Combined Disclosure Statement and Plan

As a Creditor, your acceptance of the Combined Disclosure Statement and Plan is important. In order for the Combined Disclosure Statement and Plan to be accepted by an impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each impaired Class of Claims) must vote to accept the Combined Disclosure Statement and Plan.  At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Disclosure Statement and Plan. The Debtors urge that you vote to accept the Combined Disclosure Statement and Plan.  ***The Committee supports the Combined Disclosure Statement and Plan and urges Holders of Class 4 Claims to accept the Combined Disclosure Statement and Plan.***  A letter from the Committee expressing its support for the Combined Disclosure Statement and Plan is included in the solicitation package you received.  **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY SUBMIT YOUR BALLOT.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

11.       Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Combined Disclosure Statement and Plan for all purposes, including for purposes of determining acceptance of the Combined Disclosure Statement and Plan by such Class under Section 1129(a)(8) of the Bankruptcy Code.

41

## VI.    TREATMENT OF UNCLASSIFIED CLAIMS

### A.    Administrative Expense Bar Date

Requests for payment of Administrative Expense Claims (other than 503(b)(9) Claims, which are subject to the General Bar Date, Professional Claims and the Claims of Governmental Units arising under section 503(b)(1)(B), (C) or (D) of the Bankruptcy Code) must be filed no later than the Administrative Expense Bar Date.  Unless otherwise Ordered by the Court, Holders of Administrative Expense Claims (other than the Holders of 503(b)(9) Claims, Professional Claims and the Claims of Governmental Units arising under section 503(b)(1)(B), (C) or (D) of the Bankruptcy Code) that do not file requests for the allowance and payment thereof on or before the Administrative Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtors or their Estates.

### B.    Administrative Expense Claims

Except to the extent that any Entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the Effective Date or seven (7) Business Days after the entry of a Final Order Allowing such Administrative Expense Claim, or as soon thereafter as is practicable.  Such payments to Holders of Allowed Administrative Expense Claims shall be paid by the Plan Administrator from the Administrative and Priority Claim Reserve.  Objections to Administrative Expense Claims must be filed and served on the Plan Administrator and the requesting party no later than 120 days after the later of the Effective Date and any filing of such Claim or of a motion for approval thereof, unless such objection deadline is extended by order of the Bankruptcy Court upon the motion of the Plan Administrator with the consent of the Prepetition Agent (the "Administrative Expense Claim Objection Deadline").  Nothing in this Plan shall extend or be deemed to extend the deadline of November 4, 2019 previously fixed by the Bar Date Order for filing claims under section 503(b)(9) of the Bankruptcy Code.

### C.    DIP Credit Agreement Claims

The DIP Credit Agreements Claims will be paid in full in Cash and satisfied upon the closing of the Sales.  Holders of DIP Credit Agreement Claims shall not receive any Distributions under the Combined Disclosure Statement and Plan.

### D.    Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim, if any, shall receive in full satisfaction of such Allowed Priority Tax Claim (a) payment in Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the Effective Date or within seven (7) Business Days after such Allowed Priority Tax Claim becomes an Allowed Claim, whichever is later, or as soon thereafter as is practicable; or (b) Cash in an amount agreed to by the Plan Administrator and such Holder.  Such payments to Holders of Allowed Priority Tax Claims shall be paid by the Debtors (or the Plan Administrator, as applicable) from the Administrative and Priority Claim Reserve.

E.    **Professional Claims**

1.    *Payment of Professional Claims*

All Professionals seeking allowance by the Bankruptcy Court of a Professional Claim shall be paid in full in Cash in such amounts as are approved by the Bankruptcy Court upon (i) the later of (x) the Effective Date and (y) fourteen (14) days after the date upon which the order relating to the allowance of any such Allowed Professional Claim is entered or (ii) such other terms as may be mutually agreed upon between the holder of such Professional Claim and the Debtors or the Plan Administrator, as applicable.

To the extent that funds held in the Professional Fee Reserve are insufficient to satisfy the amount of Allowed Professional Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied by payment by the Plan Administrator from the Administrative and Priority Claim Reserve.

2.    *Professional Fee Reserve*

As soon as practicable after Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Reserve.  The Professional Fee Reserve shall be maintained in trust for the Professionals and, as to any excess Cash as described below, for the Prepetition Secured Parties.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Allowed Professional Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Reserve as set forth herein. Once payments on account of such Allowed Professional Claims have been made in full, any such excess Cash remaining in the Professional Fee Reserve shall be considered Remaining Estate Assets and shall be distributed to the Prepetition Agent for Distribution to the Holders of Allowed Remaining Prepetition Secured Claims as provided for herein.

3.    *Allocation and Estimation of Professional Claims*

Professionals providing services to the Debtors shall reasonably estimate their unpaid Professional Claims against the Debtors relating to the period prior to and through the Effective Date and shall deliver such estimate to the Debtors by two (2) Business Days prior to the Effective Date; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.

4.    *Timing for Filing Professional Claims*

All requests for compensation or reimbursement of Professionals retained in these Chapter 11 Cases for services performed and expenses incurred prior to the Effective Date shall be filed and served on:  (i) the Debtors, c/o Perkins and Marie Callender's, LLC, 6075 Poplar Avenue, Suite 800, Memphis, Tennessee 38119-4709, Attn: Andy Whiteley; (ii) counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Daniel J. DeFranceschi, Esq. (defranceschi@rlf.com), and

Akin Gump Strauss Hauer & Feld LLP, 2001 K Street N.W., Washington, D.C. 20006, Attn: Scott L. Alberino, Esq. (salberino@akingump.com) and Joanna F. Newdeck, Esq. (jnewdeck@akingump.com); (iii) counsel to the DIP Agent and the Prepetition Agent, Moore & Van Allen PLLC, 100 N. Tryon St., Suite 4700, Charlotte, North Carolina 28202, Attn: David L. Eades, Esq. (davideades@mvalaw.com) and Luis M. Lluberas, Esq. (luislluberas@mvalaw.com); (iv) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Bradford J. Sander, Esq. (bsandler@pszjlaw.com) and Colin R. Robinson, Esq. (crobinson@pszjlaw.com); and (v) the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Linda J. Casey, Esq. (linda.casey@usdoj.gov); and (vi) such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other Order of the Court, by no later than forty-five (45) days after the Effective Date, unless otherwise agreed by the Debtors or the Plan Administrator, as applicable; provided, however, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court Order, pursuant to the Ordinary Course Professional Order.  Objections to any Professionals Claim must be filed and served on the Plan Administrator and the requesting party no later than sixty-five (65) days after the Effective Date, unless otherwise ordered by the Court (the "Professional Claims Objection Deadline").

5.      *Post-Effective Date Fees and Expenses*

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the Plan Administrator Agreement, the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to, or action, Order, or approval of, the Court.

F.      **Intercompany Claims**

All Intercompany Claims shall be disallowed pursuant to this Combined Disclosure Statement and Plan and shall be cancelled as of the Effective Date.

G.      **Payment of Statutory Fees.**

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Plan Administrator shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Notwithstanding the limited substantive consolidation of the Debtors called for in the Combined Disclosure Statement and Plan, each and every one of the Debtors shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

44

## VII.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS; ESTIMATED RECOVERIES

Equity Interests and Claims, other than Administrative Expense Claims, Priority Tax Claims and Intercompany Claims, are classified for all purposes, including voting, confirmation and Distribution pursuant to the Combined Disclosure Statement and Plan, as follows:

| Class | Type | Status Under Plan | Voting Status |
|---|---|---|---|
| 1 | Remaining Prepetition Secured Claims | Impaired | Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Equity Interests in P&MC Holding | Impaired | Deemed to Reject |
| 6 | Equity Interests in Debtors other than P&MC Holding | Unimpaired | Deemed to Accept |

## VIII.    TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.    Treatment of Claims

1.    *CLASS 1 – REMAINING PREPETITION SECURED CLAIMS*

a.    Classification

Class 1 consists of the Remaining Prepetition Secured Claims.

b.    Allowance

Holders of Class 1 Claims shall have an Allowed Remaining Prepetition Secured Claim in an amount not less than the amount indicated in the Plan Supplement.

c.    Impairment and Voting

45

Class 1 is impaired by the Combined Disclosure Statement and Plan.  The Holders of Class 1 Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

            d.      <u>Treatment</u>

Holders of Allowed Remaining Prepetition Secured Claims shall receive their *Pro Rata* share of the Remaining Estate Assets.  On the Effective Date, Holders of Allowed Remaining Prepetition Secured Claims shall receive their *Pro Rata* share of the Remaining Estate Assets that constitute Cash (excluding the Residual Secured Cash).  Additional Distributions on account of the Remaining Estate Assets shall be made to Holders of Allowed Remaining Prepetition Secured Claims by the Plan Administrator after the Effective Date upon such Remaining Estate Assets being reduced to Cash, or as otherwise provided for herein, on such Distribution Date(s) as may be determined by the Plan Administrator, in consultation with the Prepetition Agent; <u>provided</u>, <u>however</u>, that any Residual Secured Cash from each applicable Wind Down Sub Account shall be distributed as set forth in section X.G.2 herein.

        2.      *CLASS 2 – OTHER SECURED CLAIMS*

            a.      <u>Classification</u>

Class 2 consists of all Other Secured Claims, if any.

            b.      <u>Impairment and Voting</u>

Class 2 is Unimpaired by the Combined Disclosure Statement and Plan.  Holders of Class 2 Claims are deemed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.  The Debtors do not believe there are any Other Secured Claims.

            c.      <u>Treatment</u>

Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practical after, the Effective Date or the date such Claim becomes an Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, as the Debtors or the Plan Administrator, as applicable, determines, (i) Cash in an amount equal to such Allowed Other Secured Claim or (ii) such other treatment that renders such Holder's Allowed Other Secured Claim unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

        3.      *CLASS 3 – PRIORITY NON-TAX CLAIMS*

            a.      <u>Classification</u>

Class 3 consists of Priority Non-Tax Claims.

            b.      <u>Impairment and Voting</u>

Class 3 is unimpaired by the Combined Disclosure Statement and Plan.  Holders of Allowed Priority Non-Tax Claims are conclusively presumed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c.    Treatment

Except to the extent that a Holder of a Priority Non-Tax Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Allowed Priority Non-Tax Claim.

4.    *CLASS 4 – GENERAL UNSECURED CLAIMS*

a.    <u>Classification</u>

Class 4 consists of General Unsecured Claims.

b.    <u>Impairment and Voting</u>

Class 4 is impaired by the Combined Disclosure Statement and Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c.    <u>Treatment</u>

Holders of Allowed General Unsecured Claims shall receive the following:

(i)    unless and until the Deficiency Threshold Trigger occurs, each Holder of an Allowed General Unsecured Claim (that is not an Allowed Deficiency Claim) shall receive a share of each Distribution of the GUC Plan Consideration *Pro Rata* with other Holders of Allowed General Unsecured Claims (that are not Allowed Deficiency Claims); and

(ii)    upon and after the occurrence of the Deficiency Threshold Trigger, each Holder of an Allowed General Unsecured Claim (including Allowed Deficiency Claims) shall receive a share of each further Distribution of GUC Plan Consideration *Pro Rata* with other Holders of Allowed General Unsecured Claims (including Allowed Deficiency Claims).

5.    *CLASS 5 – EQUITY INTERESTS IN P&MC HOLDING*

a.    <u>Classification</u>

47

Class 5 consists of the Equity Interests in P&MC Holding.

      b.      <u>Impairment and Voting</u>

Class 5 is impaired by the Combined Disclosure Statement and Plan. Class 5 shall be deemed to have voted to reject the Combined Disclosure Statement and Plan.

      c.      <u>Treatment</u>

On the Effective Date, all Equity Interests issued by P&MC Holding (including any and all options or rights to exercise warrants or options or to otherwise acquire any Equity Interests in P&MC Holding) shall be cancelled and one new membership interest in P&MC Holding shall be issued to the Plan Administrator who shall hold such membership interest for the benefit of the Holders of such former Equity Interests consistent with their former economic entitlements. Each Holder of an Equity Interest in P&MC Holding shall neither receive nor retain any property or interest in property on account of such Equity Interests; <u>provided</u>, <u>however</u>, that in the event all Allowed Claims have been satisfied in accordance with the Bankruptcy Code and the Combined Disclosure Statement and Plan, Holders of Equity Interests in P&MC Holding may receive a *Pro Rata* Distribution of any remaining assets of the Debtors. It is not expected that any Distributions will be made to Holders of Equity Interests in P&MC Holding.

      6.      *CLASS 6 – EQUITY INTERESTS IN DEBTORS OTHER THAN P&MC HOLDING*

      a.      <u>Classification</u>

Class 6 consists of the Equity Interests in the Debtors other than P&MC Holding.

      b.      <u>Impairment and Voting</u>

Class 6 is unimpaired by the Combined Disclosure Statement and Plan. Holders of Class 6 Equity Interests are conclusively presumed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

      c.      <u>Treatment</u>

Except as may otherwise be provided in the Combined Disclosure Statement and Plan, the Equity Interests in Class 6 will be reinstated in their entirety.

**B.**      <u>**Modification of Treatment of Claims and Equity Interests**</u>

The Debtors or the Plan Administrator, as applicable, reserves the right to modify the treatment of any Allowed Claim in any manner adverse only to the Holder of such Claim at any time after the Effective Date upon the consent of the Holder of the Claim whose Allowed Claim, as the case may be, is being adversely affected.

48

C.    **Cramdown and No Unfair Discrimination**

In the event that any impaired Class of Claims or Equity Interests rejects the Combined Disclosure Statement and Plan or is deemed to have rejected the Combined Disclosure Statement and Plan, the Debtors hereby request, without any delay in the occurrence of the Confirmation Hearing or Effective Date, that the Bankruptcy Court confirm the Combined Disclosure Statement and Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Combined Disclosure Statement and Plan shall constitute a motion for such relief.

Confirming the Combined Disclosure Statement and Plan under such a circumstance is what is known as a "cramdown". Among other things, a "cramdown" is appropriate where the Bankruptcy Court finds that it does not unfairly discriminate against the objecting classes and is fair and equitable with respect to those objecting classes. A plan unfairly discriminates against a class if another class of equal rank in priority will receive greater value under the plan than the nonaccepting class without reasonable justification. A plan is fair and equitable if no claim or interest junior to the objecting class shall receive or retain any claim or interest under the plan.

## IX.    **PROVISIONS REGARDING THE PLAN ADMINISTRATOR**

A.    **Appointment of the Plan Administrator**

On the Effective Date, a Plan Administrator, who shall be selected by (i) the Committee, in consultation with the Debtors and the Prepetition Agent, if Class 4 votes to accept the Plan or (ii) the Debtors, in consultation with the Committee and the Prepetition Agent, if Class 4 votes to reject the Plan, shall be appointed and thereafter serve in accordance with this Combined Disclosure Statement and Plan. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. As soon as practicable after the Voting Deadline, as part of the Plan Supplement, the Debtors shall file with the Bankruptcy Court a notice identifying the Plan Administrator and, if the Plan Administrator is deemed an "insider", as defined pursuant to section 101(31) of the Bankruptcy Code, the material terms of the Plan Administrator's compensation.

B.    **Rights and Powers of the Plan Administrator**

The Plan Administrator shall, in addition to any powers and authority specifically set forth in other provisions of the Combined Disclosure Statement and Plan, be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Combined Disclosure Statement and Plan, (ii) establish, as necessary, disbursement accounts for the deposit and distribution of all amounts distributed under the Combined Disclosure Statement and Plan, (iii) make Distributions in accordance with the Combined Disclosure Statement and Plan, (iv) object to Claims, as appropriate, (v) employ and compensate professionals to represent it with respect to its responsibilities, (vi) assert any of the Debtors' claims, Causes of Action, rights of setoff, or other legal or equitable defenses, and (vii) exercise such other powers as may be vested in the Plan Administrator by order of the

49

Bankruptcy Court, pursuant to the Combined Disclosure Statement and Plan, or as deemed by the Plan Administrator to be necessary and proper to implement the provisions hereof. The Plan Administrator may take any and all actions which it deems reasonably necessary or appropriate to defend against any Claim, including, without limitation, the right to: (a) exercise any and all judgment and discretion with respect to the manner in which to defend against or settle any Claim, including, without limitation, the retention of professionals, experts and consultants; and (b) enter into a settlement agreement or agreements without Bankruptcy Court-approval. Upon the later of the Effective Date and the appointment of the Plan Administrator, the Debtors will have no other officers, directors or managers.

## C.    Post Effective Date Expenses of the Plan Administrator

The Plan Administrator shall receive reasonable compensation for services rendered pursuant to the Combined Disclosure Statement and Plan without further Court order. In addition, the amount of reasonable fees and expenses incurred by the Plan Administrator on or after the Effective Date (including, without limitation, reasonable attorney and professional fees and expenses) may be paid without further Court order. The Plan Administrator shall be paid from the Plan Administrator GUC Reserve or Plan Administrator Other Reserve, as further set forth herein and in the Plan Administrator Agreement. Any amounts remaining in the Plan Administrator GUC Reserve at the closing of the Chapter 11 Cases shall be distributed to Class 4 Holders of Allowed General Unsecured Claims, as set forth in section VIII.A.4 herein. Any amounts remaining in the Plan Administrator Other Reserve at the closing of the Chapter 11 Cases shall be distributed to Class 1 Holders of Remaining Prepetition Secured Claims as set forth in section VIII.A.1 herein.

As may be more fully set forth in the Plan Administrator Agreement, the Plan Administrator GUC Activities shall be funded from the Plan Administrator GUC Reserve; all such other fees, costs and expenses of the Plan Administrator shall be funded form the Plan Administrator Other Reserve.

## D.    Plan Administrator Agreement

A form of the Plan Administrator Agreement shall be filed as part of the Plan Supplement. Among other things, the Plan Administrator Agreement shall (i) set forth procedures, reasonably acceptable to the Debtors, the Prepetition Agent, and the Committee, to ensure that the Plan Administrator appropriately allocates and records its fees and expenses such that such fees and expenses are properly allocated among the Plan Administrator GUC Reserve and the Plan Administrator Other Reserve, (ii) set forth reporting procedures by which the Deficiency Threshold Trigger shall be calculated and reported to the Prepetition Agent, (iii) set forth the procedures and/or restrictions, if any, that the Plan Administrator must observe in order to fund any Supplemental Plan Administrator GUC Reserve, (iv) set forth the procedures for providing the Prepetition Agent a report of any non-Cash Assets that that Plan Administrator identifies as Remaining Estate Assets; to the extent such non-Cash Assets are identified, the Plan Administrator and the Prepetition Agent shall work cooperatively to put in place procedures, reasonably acceptable to the Plan Administrator and the Prepetition Agent, to monetize such non-Cash Assets or turn over such non-Cash Assets to the Prepetition Agent for the benefit of the Holders of the Allowed Prepetition Remaining Secured Claims, and (v) set forth quarterly

50

reporting requirements to be provided to the Prepetition Agent with respect to the Wind Down Sub Accounts setting forth the balance of each Wind Down Sub Account.   The Plan Administrator Agreement may include other reasonable and customary provisions consistent with the Plan, including provisions for indemnification of the Plan Administrator and its agents and professionals payable from, *e.g.*, the Plan Administrator Other Reserve and Plan Administrator GUC Reserve, as applicable.

## X.   PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE COMBINEDDISCLOSURE STATEMENT AND PLAN

### A.   Method of Payment

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Combined Disclosure Statement and Plan shall be made by check drawn on a domestic bank or an electronic wire.

### B.   Objections to and Resolution of Claims

The Plan Administrator shall have the right to file objections and/or motions to estimate any and all Claims after the Effective Date.  The Plan Administrator shall have the authority to compromise, settle, otherwise resolve or withdraw any objections, without approval of the Bankruptcy Court.  The Plan Administrator shall further have the authority to resolve and settle any and all Claims without approval of the Bankruptcy Court.

### C.   Claims Objection Deadline

Except as otherwise set forth in Articles VI.B and VI.E above with respect to Administrative Expense Claims and Professionals Claims, the Plan Administrator, and any other party in interest to the extent permitted pursuant to section 502(a) of the Bankruptcy Code, shall file and serve any objection to any Claims no later than the Claims Objection Deadline; provided, however, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the Plan Administrator.

### D.   No Distribution Pending Allowance

Notwithstanding any other provision of the Combined Disclosure Statement and Plan, no payment or Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by this Combined Disclosure Statement and Plan.

### E.   Claims Reserve

On any date that Distributions are to be made under the terms of the Combined Disclosure Statement and Plan, the Plan Administrator shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto.  Such Cash or property, as the case may be, shall be held in trust for the

51

benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

## F.    Timing of Distributions

Unless otherwise provided herein, on each Distribution Date, each Holder of an Allowed Claim shall receive such Distributions that this Combined Disclosure Statement and Plan provide for Allowed Claims in accordance with Article III hereof.  In the event that any payment or act under this Combined Disclosure Statement and Plan is required to be made or performed on a date that it not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  The Plan Administrator shall have no obligation to recognize any transfer of Claims or Equity Interests occurring on or after the Confirmation Date.

## G.    Special Provisions Related to Distributions of Certain Remaining Estate Assets and Residual Secured Cash to Holders of Remaining Prepetition Secured Claims

1.    On or as soon as reasonably practicable after the Effective Date, the Debtors or the Plan Administrator, as applicable, shall settle up any unpaid treasury management obligations to Regions Bank, with the balance of the Regions Security Deposit being remitted to the Prepetition Agent for distribution to the Holders of Allowed Remaining Prepetition Secured Claims.

2.    The Residual Secured Cash is comprised of any Cash that remains in each of the Wind Down Sub Accounts after funding the applicable Allowed Claims and Distributions provided for under this Combined Plan and Disclosure Statement and related pre-Effective Date expenses payable in accordance herewith and post-Effective Date expenses payable in accordance with, and as may be limited by, the Plan Administrator Agreement.  Once Distributions for such Allowed Claims and payment of reasonable and documented expenses and other amounts properly payable from such applicable Wind Down Sub Account have been made in full, any such excess Cash remaining in such Wind Down Sub Account shall be considered Residual Secured Cash and shall, as promptly as practicable, be distributed by the Plan Administrator to the Prepetition Agent for Distribution to the Holders of Allowed Remaining Prepetition Secured Claims as provided for herein and in the Plan Administrator Agreement.

3.    On the Effective Date, by operation of the Plan, all of the Debtors' rights, title and interest in the Prepetition Letters of Credit and each of the insurance policies and contracts existing or outstanding in connection therewith, including without limitation, any refunds, repayments or proceeds in respect thereof, whenever accrued or realized, shall be absolutely assigned and transferred to the Prepetition Agent, for the benefit of the Prepetition Lenders. The Debtors, or the Post-Effective Date Debtors, shall execute and deliver, or to cause to be executed and delivered, all such instruments and documents as may reasonably be requested by the Prepetition Agent to effectuate the assignment of any of the Debtors' rights, title and interest with respect to the Prepetition Letters of Credit and the related insurance policies and contracts.

RLF1 22091466v.11

**H.**    **Delivery of Distributions**

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (1) at the addresses set forth on the respective proofs of Claim Filed by such holders; (2) at the addresses set forth in any written notices of address changes delivered to the Plan Administrator after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim is filed and the Plan Administrator has not received a written notice of a change of address; provided, however, that Distributions in respect of Claims of the Prepetition Secured Parties shall be made payable to the Prepetition Agent for distribution in accordance with the Prepetition Credit Agreement.

If the Distribution to the Holder of any Claim is returned to the Plan Administrator as undeliverable, no further distribution shall be made to such Holder unless and until the Plan Administrator is notified in writing of such Holder's then current address. Undeliverable Distributions shall remain in the possession of the Plan Administrator until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution.

The Plan Administrator shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions; provided, however, nothing contained in the Combined Disclosure Statement and Plan shall require the Plan Administrator to locate any Holder of an Allowed Claim.

**I.**    **Unclaimed Distributions**

Any Cash or other property to be distributed under the Combined Disclosure Statement and Plan shall revert to the Plan Administrator or the Debtors, as applicable, if it is not claimed by the Entity on or before the Unclaimed Distribution Deadline.  If such Cash or other property is not claimed on or before the Unclaimed Distribution Deadline, the Distribution made to such Entity shall be deemed to be reduced to zero.

**J.**    ***De Minimis* Distributions**

The Plan Administrator shall not distribute Cash to the Holder of an Allowed Claim in an impaired Class if the amount of Cash to be distributed on account of such Claim is less than $50.00 in the aggregate. Any holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than $50.00 in the aggregate will be forever barred from asserting its Claim for such distribution against the Plan Administrator or its property.  Any Cash not distributed pursuant to this Article X of the Combined Disclosure Statement and Plan will be the property of the Estates.

**K.**    **Setoff**

The Debtors or the Plan Administrator, as the case may be, retain the right, subject to any applicable notice provisions under applicable law, to reduce any Claim by way of setoff in accordance with their books and records.

**L.**    **Postpetition Interest**

Interest shall not accrue on any prepetition Claims, and no Holder of a prepetition Claim shall be entitled to interest accruing on or after the Filing Date.  No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of secured Claims under section 506(b) of the Bankruptcy Code.

## M.    Allocation of Distributions Between Principal and Interest

For Distributions in respect of Allowed General Unsecured Claims (other than Allowed Remaining Deficiency Claims), to the extent that any such Allowed Claim entitled to a Distribution under the Combined Disclosure Statement and Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest. Distributions in respect of Allowed Prepetition Secured Claims and Allowed Remaining Deficiency Claims shall be allocated as set forth in the Prepetition Credit Agreement.

## N.    No Creditor to Receive More than Payment in Full.

Notwithstanding any other provision hereof, no creditor shall receive more than full payment of its applicable Allowed Claim including any interest, costs or fees that may be payable with respect thereto under or pursuant to the Plan.

## O.    Compliance with Tax Requirements

In connection with the Plan and all Distributions hereunder, to the extent applicable, the Plan Administrator is authorized to take any and all actions that may be necessary or appropriate to comply with all Tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions pursuant to the Plan shall be subject to any such withholding and reporting requirements, as more fully set forth in Plan section XVI.J.

## XI.    IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED DISCLOSURE STATEMENT AND PLAN

## A.    Means for Implementation of the Combined Disclosure Statement and Plan

In addition to the provisions set forth elsewhere in the Combined Disclosure Statement and Plan, the following shall constitute the means for implementation of the Combined Disclosure Statement and Plan:

1.    Limited Substantive Consolidation.  The Combined Disclosure Statement and Plan provides for the limited substantive consolidation of the Debtors' Estates, but solely for the purposes of this Combined Disclosure Statement and Plan, including voting on this Combined Disclosure Statement and Plan by the Holders of Claims and making any Distributions to Holders of Claims.  Specifically, on the Effective Date, (i) all assets and liabilities of the Debtors will, solely for voting and Distribution purposes, be treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) any Claims filed or to be filed in the Chapter 11 Cases will be deemed single Claims against all of the Debtors, (iv) all guarantees of any Debtor of the payment, performance,

54

or collection of obligations of any other Debtor shall be eliminated and canceled, (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates, and (vi) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors. Holders of Allowed Claims entitled to Distributions under this Combined Disclosure Statement and Plan shall be entitled to their share of assets available for Distribution to such Claim without regard to which Debtor was originally liable for such Claim.  Except as set forth herein, such limited substantive consolidation shall not (other than for purposes related to this Combined Disclosure Statement and Plan) affect the legal and corporate structures of the Debtors.

2.     Funding of Liabilities and Distributions.  Allowed Claims (other than Prepetition Secured Claims) and any amounts necessary to wind down the Debtors' Estates shall be paid from the Wind Down Fund, subject to the limitations and qualifications described herein.

3.     Corporate Action; Effectuating Documents; Further Transactions.   On the Effective Date, all matters and actions provided for under the Combined Disclosure Statement and Plan that would otherwise require approval of the directors and officers, or members or managers of the Debtors shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the directors and officers, members and managers of the Debtors.  The Debtors or the Plan Administrator, as applicable, are authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Disclosure Statement and Plan.

4.     Direction to Parties.  From and after the Effective Date, the Plan Administrator may apply to the Bankruptcy Court for an order directing any necessary party to execute or deliver or to join in the execution of delivery of any instruments required to effect a transfer of property contemplated by or necessary to effectuate this Plan, and to perform any other act that is necessary for the consummation of this Combined Disclosure Statement and Plan, pursuant to section 1142(b) of the Bankruptcy Code.

5.     Title to Accounts.  Title to all of the Debtors' bank, brokerage and other accounts shall vest in the Post-Effective Date Debtors, effective as of the Effective Date, without any further order of the Bankruptcy Court or further action on the party of any Person or Entity.  On and after the Effective Date, all such accounts shall be deemed to be accounts in the name of the Post-Effective Date Debtors without any further action by any Person or Entity or any further order of the Bankruptcy Court.

6.     Exemption from Certain Taxes.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the

55

payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming and assigning any contract, lease or sublease; (3) any transaction authorize by this Combined Disclosure Statement and Plan; (4) any sale of an Asset by the Plan Administrator in furtherance of the Plan, including but not limited to any sale of personal or real property and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Plan.

## XII.    EXCULPATION, RELEASES AND INJUNCTIONS

**A.    Exculpation**. The Exculpated Parties shall not have or incur, and are hereby released from, any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability to one another or to any Holder of any Claim or Equity Interest, or any other party-in-interest, or any of their respective Related Parties, for any act or omission originating or occurring on or after the Filing Date through and including the Effective Date in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Cases, the settlement of Claims or renegotiation of Executory Contracts and leases, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be Distributed under this Combined Disclosure Statement and Plan, except for their willful misconduct or gross negligence or any obligations that they have under or in connection with this Combined Disclosure Statement and Plan or the transactions contemplated in this Combined Disclosure Statement and Plan. Nothing herein shall prevent any Exculpated Party from asserting as a defense to any claim of fraud, willful misconduct or gross negligence that they reasonably relied upon the advice of counsel with respect to their duties and responsibilities under the Combined Disclosure Statement and Plan or otherwise.

**B.    Releases By the Debtors. Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, their Estates, and each of the Debtors' successors and assigns, shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, void and extinguish the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Cases, the settlement of Claims or renegotiation of Executory Contracts and leases, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be distributed under this Combined Disclosure Statement and Plan.**

56

**C.      Third Party Releases.    Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, void and extinguish the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability, for any act or omission (i) that took place prior to the Filing Date relating to and/or in connection with any of the Debtors, and (ii) in connection with, relating to, or arising out of the Chapter 11 Cases, the Sales, the negotiation and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Cases, the settlement of Claims or renegotiation of Executory Contracts and leases, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be Distributed under this Combined Disclosure Statement and Plan.**

**D.      Injunctions Relating to Releases.    Effective as of the Effective Date, all Persons that hold, have held or may hold a claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability of any nature whatsoever, that is released pursuant to this Combined Disclosure Statement and Plan, shall be permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such released claims, Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum, (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order, (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any lien, (iv) setting off (except to the extent such setoff was exercised prior to the Filing Date), seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Person released under this Combined Disclosure Statement and Plan, and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Combined Disclosure Statement and Plan or the Confirmation Order.**

RLF1 22091466v.11

**E.      Injunctions to Protect Estate Assets.  Except as expressly otherwise provided in the Combined Disclosure Statement and Plan, including Section XVI.C hereof, or to the extent necessary to enforce the terms and conditions of the Combined Disclosure Statement and Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Entities who have held, hold or may hold Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against the Debtors, the Debtors' Estates, the Debtors' successors, the Post-Effective Date Debtor, the Plan Administrator or any of their property on account of any such Claims or Equity Interests: (i) commencing or continuing, in any manner or in any place, any action, Cause of Action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or Order; (iii) creating, perfecting, or enforcing any Lien; (iv) asserting a setoff (except to the extent such setoff was exercised prior to the Filing Date), right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors; and (v) commencing or continuing, in any manner or in any place, any action, Cause of Action or other proceeding that does not comply with or is inconsistent with the provisions of the Combined Disclosure Statement and Plan.**

## XIII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts (including any unexpired leases) that are (i) not assumed before the Effective Date, (ii) not subject to a pending motion to assume as of the Effective Date or (iii) pending assumption or rejection, pursuant to the terms of the Huddle House Asset Purchase Agreement, as agreed to by the applicable counterparty, the Debtors and buyer, will be deemed rejected.  The Confirmation Order shall constitute an order approving such rejection as of the Effective Date.  To the extent there are any Executory Contracts that are not assumed or rejected as of the Effective Date, the Plan Administrator shall have authority to assume or reject such Executory Contracts post-Effective Date in its discretion or, to the extent applicable, pursuant to the terms of the Huddle House Asset Purchase Agreement.

**B.      Deadline for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Combined Disclosure Statement and Plan**

If the rejection by the Debtors of an Executory Contract (including any  unexpired lease) pursuant to the Combined Disclosure Statement and Plan gives rise to a Claim, a proof of claim must be filed with the Claims and Noticing Agent at Perkins & Marie Callender's, LLC Claims Processing Center, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245, by no later than twenty (21) days after service of the notice of the Effective Date. Any proofs of Claim not filed and served within such time period will be forever barred from assertion against the Debtors and their Estates.  Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and unexpired leases shall be treated as General Unsecured Claims under the Combined Disclosure Statement and Plan.  For the avoidance of doubt, any Claims arising from the rejection of an Executory Contract (including any unexpired lease) pursuant to a separate motion are subject to the Rejection Bar Date.

58

## C.   Debtors' Insurance Policies

Nothing in the Combined Disclosure Statement and Plan alters the rights and obligations of the Debtors (and their Estates) and the Debtors' insurers (and third-party claims administrators) under the Debtors' insurance policies or modifies the coverage or benefits provided thereunder or the terms or conditions thereof or diminishes or impairs the enforceability of the Debtors' insurance policies.

## XIV.   CONDITIONS TO THE EFFECTIVE DATE

### A.   Conditions Precedent to the Effective Date

The Combined Disclosure Statement and Plan shall not become effective unless and until the following conditions shall have been satisfied or waived:

1.   The Confirmation Order shall have become a Final Order, and shall be acceptable to the Debtors.

2.   The Plan Administrator shall be duly appointed, qualified and acting in that capacity.

### B.   Establishing the Effective Date

The calendar date to serve as the Effective Date shall be a Business Day of, on or promptly following the satisfaction or waiver of all conditions to the Effective Date, which date will be selected by the Debtors, after reasonable consultation with the Prepetition Agent and the Committee. On or within two (2) Business Days of the Effective Date, the Debtors shall file and serve a notice of occurrence of the Effective Date.  Such notice shall contain, among other things, the Administrative Expense Bar Date, the deadline by which Professionals must file and serve any Professional Claims and the deadline to file a proof of claim relating to damages from the rejection of any Executory Contract (including any unexpired lease) pursuant to the terms of the Combined Disclosure Statement and Plan.

### C.   Effect of Failure of Conditions

If each condition to the Effective Date has not been satisfied or duly waived within forty-five (45) days after the Confirmation Date, then upon motion by any party in interest, made before the time that each of the conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Debtors before any Order granting such relief becomes a Final Order.  If the Confirmation Order is vacated pursuant to this section, the Combined Disclosure Statement and Plan shall be deemed null and void in all respects and nothing contained herein shall (A) constitute a waiver or release of any Claims by or against the Debtors, or (B) prejudice in any manner the rights of the Debtors.

### D.   Waiver of Conditions to Confirmation and Effective Date

59

Each of the conditions to the Effective Date may be waived, in whole or in part, by the Debtors, without notice or an Order of the Bankruptcy Court.

## XV.    **RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, following the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of the Combined Disclosure Statement and Plan are carried out.  The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Combined Disclosure Statement and Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1.    To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

2.    To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

3.    To issue such Orders in aid of execution and consummation of the Combined Disclosure Statement and Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

4.    To consider any amendments to or modifications of the Combined Disclosure Statement and Plan, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

5.    To hear and determine all requests for compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code;

6.    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Combined Disclosure Statement and Plan;

7.    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors or the Plan Administrator for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

8.    To hear any other matter not inconsistent with the Bankruptcy Code;

9.    To enter a final decree closing the Chapter 11 Cases;

10.    To ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Combined Disclosure Statement and Plan;

11.    To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may

60

be pending on the Effective Date;

12.    To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Combined Disclosure Statement and Plan, except as otherwise provided herein;

13.    To determine any other matters that may arise in connection with or related to the Combined Disclosure Statement and Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Combined Disclosure Statement and Plan or the Disclosure Statement;

14.    To hear any disputes and determine any other matters that may arise in connection with or related to the Sale Orders or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Sale Orders;

15.    To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

16.    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

17.    To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the General Bar Date, the Governmental Unit Bar Date, the Rejection Bar Date, the Administrative Expense Bar Date, and/or the conditional or final hearing on the approval of the Combined Disclosure Statement and Plan for the purpose of determining whether a Claim, or Equity Interest is released, satisfied and/or enjoined hereunder or for any other purpose; and

18.    To resolve any other matter or for any purpose specified in the Combined Disclosure Statement and Plan, the Confirmation Order, or any other document entered into in connection with any of the foregoing.

## XVI.    **MISCELLANEOUS PROVISIONS**

### A.    **Books and Records**

As set forth in each Asset Purchase Agreement, each party to the applicable Asset Purchase Agreement shall provide the other parties thereto (and their respective representatives, which, for the avoidance of doubt, shall include the Plan Administrator) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, solely to the books and records acquired pursuant to such Asset Purchase Agreement as of the closing date of the Sale so as to enable buyer and the applicable Debtors to prepare tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of governmental authorities, and to prosecute and defend legal actions or for other like purposes, including Claims, objections and resolutions, and with respect

61

to the Debtors, to wind up their bankruptcy estates. If any party desires to dispose of any such records, such party shall, thirty (30) days prior to such disposal, provide the other party with a reasonable opportunity to remove such records to be disposed of at the removing party's expense.

On the Effective Date, the Debtors' books and records that remain with the Estates as of the Effective Date shall be transferred to the Plan Administrator. Subject to the terms of the Asset Purchase Agreements, the Plan Administrator shall be free, in its discretion to abandon, destroy, or otherwise dispose of the books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other or further Order.

## B.     Revesting of Debtors' Assets

Except as otherwise provided herein, any assets that are property of the Debtors' Estates on the Effective Date including, without limitation, any Causes of Action, shall revest in the Post-Effective Date Debtors on the Effective Date. Thereafter, subject to the terms of the Combined Plan and Disclosure Statement, the Post-Effective Date Debtors (through the Plan Administrator) may operate pursuant to the terms of the Plan Administrator Agreement and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or Bankruptcy Court approval. Except as specifically provided in the Combined Disclosure Statement and Plan or the Confirmation Order, as of the Effective Date, all property of the Debtors shall be free and clear of any liens, Claims, encumbrances and interests of any kind.

## C.     Termination of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105 or 362 or otherwise, and extant on the Confirmation Date, shall remain in full force and effect.

## D.     Amendment or Modification of the Combined Disclosure Statement and Plan

Alterations, amendments or modifications of the Combined Disclosure Statement and Plan may be proposed in writing by the Debtors, at any time before the Confirmation Date, provided that the Combined Disclosure Statement and Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. Additionally, after the Confirmation Date, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein. No amendments or modifications that adversely affect the Class 1 Holders shall be made without the consent of the Prepetition Agent (acting at the direction of Required Prepetition Lenders) and no amendments or modifications that adversely affect the Class 4 Holders shall be made without the consent of the Committee, in each case which consent shall not be unreasonably withheld, conditioned or delayed.

E.    **Severability**

In the event the Bankruptcy Court determines, before the Confirmation Date, that any provision in the Combined Disclosure Statement and Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the Holder or Holders of such Claims or Equity Interest as to which the provision is determined to be invalid, void or unenforceable.  The invalidity, voidability or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Combined Disclosure Statement and Plan.

F.    **Revocation or Withdrawal of the Combined Disclosure Statement and Plan**

The Debtors reserve the right to revoke or withdraw the Combined Disclosure Statement and Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Combined Disclosure Statement and Plan before the Confirmation Date, then the Combined Disclosure Statement and Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtors or Plan Administrator or to prejudice in any manner the rights of either of the Debtors or Plan Administrator in any further proceedings involving the Debtors.

G.    **Binding Effect**

The Combined Disclosure Statement and Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims, and the Holders of Equity Interests, and their respective successors and assigns.

H.    **Notices**

All notices, requests and demands to or upon the Plan Administrator or the Debtors, as applicable, to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as shall be set forth in the notice of the Effective Date.

I.    **Governing Law**

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to the Combined Disclosure Statement and Plan provides otherwise, the rights and obligations arising under the Combined Disclosure Statement and Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

J.    **Withholding and Reporting Requirements**

In connection with the consummation of the Combined Disclosure Statement and Plan, the Debtors and Plan Administrator shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  Notwithstanding

63

the above, each Holder of an Allowed Claim that is to receive a Distribution under the Combined Disclosure Statement and Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.  The Debtors and the Plan Administrator have the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to any disbursing party for payment of any such tax obligations.  The Debtors or Plan Administrator may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim complete and return a Form W-8, W-9 or a similar tax form, as applicable to each such Holder.  If the Debtors or Plan Administrator make such a request and the Holder fails to comply before the date that is 90 days after the request is made, such Holder shall be deemed to have forfeited rights to all Distributions and the amount of such forfeited Distributions shall irrevocably revert to the Debtors and any Claim in respect of such Distribution shall be disallowed and forever barred from assertion against the Debtors or their respective property.

## K.    **Headings**

Headings are used in the Combined Disclosure Statement and Plan for convenience and reference only, and shall not constitute a part of the Combined Disclosure Statement and Plan for any other purpose.

## L.    **Exhibits/Schedules**

All exhibits and schedules to the Combined Disclosure Statement and Plan, including the Plan Supplement, are incorporated into and are a part of the Combined Disclosure Statement and Plan as if set forth in full herein.

## M.    **Filing of Additional Documents**

On or before substantial consummation of the Combined Disclosure Statement and Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Disclosure Statement and Plan.

## N.    **No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Combined Disclosure Statement and Plan shall be deemed as an admission by any Entity with respect to any matter set forth herein.

## O.    **Successors and Assigns**

The rights, benefits and obligations of any Person or Entity named or referred to in the Combined Disclosure Statement and Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

## P.    **Reservation of Rights**

64

Except as expressly set forth herein, the Combined Disclosure Statement and Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Combined Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Combined Disclosure Statement and Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors, Holders of Claims or Equity Interest before the Effective Date.

## Q.   **Implementation**

The Debtors shall take all steps, and execute all documents, including appropriate releases, necessary to effectuate the provisions contained in this Combined Disclosure Statement and Plan.

## R.   **Inconsistency**

In the event of any inconsistency among the Combined Disclosure Statement and Plan and any other instrument or document created or executed pursuant to the Combined Disclosure Statement and Plan, the provisions of the Combined Disclosure Statement and Plan shall govern.

## S.   **Dissolution of Debtors**

Upon the closing of a Chapter 11 Case, such applicable Debtor shall be deemed dissolved under applicable law without the need for filing any documents.

## T.   **Dissolution of the Committee**

Upon the occurrence of the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals and agents shall be released from any duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code (except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) applications for allowance and payment of Professional Claims, and (iii) any pending motions or motions for other actions seeking enforcement of implementation of the provisions of the Combined Disclosure Statement and Plan).

## U.   **Termination of the Plan Administrator**

After the Chapter 11 Cases are closed and the Plan Administrator has completed all of the tasks necessary in order to fully and completely wind down, dissolve and/or terminate the Debtors and to otherwise comply with its obligations under the terms of the Combined Disclosure Statement and Plan, the Plan Administrator shall have fully completed its duties under the Combined Disclosure Statement and Plan and thereby shall be fully released and discharged of its duties and obligations to carry out the terms of the Combined Disclosure Statement and Plan.

RLF1 22091466v.11

## V.     Compromise of Controversies

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, Distribution and other benefits provided under the Combined Disclosure Statement and Plan, the provisions of this Combined Disclosure Statement and Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Combined Disclosure Statement and Plan and in these Chapter 11 Cases. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Combined Disclosure Statement and Plan and the Chapter 11 Cases, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates and all Holders of Claims and Equity Interests against the Debtors.

## W.     Request for Expedited Determination of Taxes

The Debtors and the Plan Administrator shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Filing Date through the Effective Date.

Dated:  October [●], 2019          Perkins & Marie Callender's, LLC (for itself
       Wilmington, Delaware          and on behalf of its debtor affiliates)

By: */s/ draft*               
          Jeffrey D. Warne
          President and Chief Executive Officer