IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> PANCAKES & PIES, LLC, et al.¹ <br><br> Post-Effective Date Debtor. | Chapter 11 <br><br> Case No. 19-11743 (JTD) <br><br> **Related D.I.: 858** |

**OBJECTION TO MOTION OF THE PLAN ADMINISTRATOR FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AND LOCAL RULE 2004-1 DIRECTING THE PRODUCTION OF DOCUMENTS BY <u>UNITED HEALTHCARE SERVICES, INC.</u>**

United HealthCare Services, Inc. ("UHSI") hereby submits this objection (the "Objection") to the *Motion of the Plan Administrator for Entry of an Order Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1 Directing the Production of Documents by United Healthcare Services, Inc.* [D.I. 858] (the "Motion") filed by MorrisAnderson & Associates, Ltd., as plan administrator (the "Plan Administrator") for the Chapter 11 Plan of Liquidation of the above-captioned debtors and debtors in possession.

**PRELIMINARY STATEMENT**

The Motion seeks a breathtakingly broad set of documents and data from UHSI. In particular, the Plan Administrator is seeking virtually every document and byte of data related to the adjudication and payment of thousands claims under Pancakes & Pies, LLC *aka* Perkins & Marie Callender's, Inc.'s (the "Debtor's") self-funded Health Plan (defined below) over a four year period from 2015 to 2019. Such a document request would cause an undue burden on UHSI because it would require it to gather a significant amount of data, much of which has been archived,

---

¹ The Post-Effective Date Debtor is and the last four digits of its taxpayer identification number are Pancakes and Pies, LLC (2435). The mailing address for the Post-Effective Date Debtor is Pancakes & Pies, LLC c/o MorrisAnderson & Associates, Ltd., 55 West Monroe Street, Suite 2350, Chicago, Illinois 60603.

10501153

and would require UHSI to locate and produce the underlying contracts with each and every facility or provider that submitted such a claim and any communication with such facility or provider related to those claims.

There is, however, an alternative that avoids this undue burden and meets the purported needs of the Plan Administrator in a proportional and appropriate manner – an audit. Indeed, despite its misgivings concerning the Plan Administrator's chosen auditor and its methodology in selecting a sample set, UHSI has agreed to conduct an audit, even though the contractual time period to request an audit has passed. After working for weeks to develop the process to conduct such an audit, the Plan Administrator abruptly about-faced and filed the instant Motion.

The Motion should be denied because the Plan Administrator has not established good cause because the undue burden of the proposed discovery can be avoided through the alternative proposed by UHSI of an audit. Indeed, in a somewhat similar circumstance, Judge Shannon in *In re RS Legacy Corporation* required a liquidating trustee to pursue an audit first before engaging in expensive and burdensome document discovery under Rule 2004. Moreover, even if this Court were to grant the Motion, it should be clarified that UHSI retains all of its rights under Fed. R. Civ. P. 45, including cost-shifting, and that any of the highly confidential data and information that would be the subject of such requests, including PHI (defined below) and UHSI's highly confidential, commercial information, must be protected pursuant to an appropriate protective order.

In support of its Objection, UHSI respectfully states as follows:

I.   **FACTUAL BACKGROUND**

   A.   **The ASA**

   1.   UHSI and the Debtor were parties to an Administrative Services Agreement under Contract No. 717778, with an effective date of January 1, 2010, as amended from time to time (the "ASA"). A copy of the ASA is attached as Exhibit C to the Motion. Under the ASA, UHSI provided claims administration services, in exchange for various fees, related to the Debtor's self-funded health plan (the "Health Plan") through which the Debtor provided health insurance benefits to its employees and their eligible dependents. *See* ASA, § 4.1.

   2.   UHSI was not the Plan Administrator of the Health Plan. *See* ASA, § 2.1. UHSI's duties under the ASA solely comprised of claims administration duties, as set forth in the ASA. *See* ASA, §§ 2.1, 4.1, 5.1.

   3.   Pursuant to § 10.1 of the ASA, UHSI keeps records relating to services provided under the ASA for as long as it is required to do so by law.

   4.   Under § 10.3 of the ASA, "[d]uring the term of the [ASA], and at any time within six (6) months following its termination, [the Debtor] or a mutually agreeable entity may audit [UHSI] once each calendar year to determine whether [USHI] [is] fulfilling the terms of this [ASA]."

   5.   Section 10.3 of the ASA sets forth agreed procedures governing the performance of an audit, including the following: (i) the audit may be conducted only by the Debtor or a mutually agreeable entity; (ii) prior to the commencement of the audit, UHSI must receive a signed, mutually agreeable confidentiality agreement; (iii) the place, time, type, duration, and frequency of the audit must be reasonable and agreed to by UHSI; (iv) all audits will be limited to information relating to the calendar year in which the audit is conducted, and/or the immediately

preceding calendar year;[2] (v) the scope and methodology of an audit of UHSI's transaction processing services must be consistent with generally acceptable auditing standards, including a statistically valid random sample or other acceptable audit technique as approved by UHSI; and (vi) a copy of the audit report must be provided to UHSI within thirty days after it is received.

**B.    The Bankruptcy Case**

6.    On August 5, 2019 (the "Petition Date"), the Debtor and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

7.    As of the Petition Date, the Debtors had a workforce of approximately 5,379 employees. (*See* D.I. 11, ¶ 6.) As of the Petition Date, approximately 880 of the Debtors' employees and their dependents obtained medical insurance and prescription drug coverage through the Health Plan, approximately 800 employees and their dependents obtained dental insurance coverage through the Health Plan, and approximately 700 employees and their dependents obtained vision insurance coverage through the Health Plan. (*See id.*, ¶ 24.)

8.    As of the Petition Date, the Debtors estimated paying approximately $175,000 on average per week on account of claims administered under the Health Plan. (*See id.*, ¶ 26.)

9.    The Debtors elected to terminate the ASA effective October 22, 2019, and chose to have UHSI administer a fourteen (14) month run-out commencing immediately after termination, during which time UHSI processed and paid valid claims under the Health Plan for services rendered before the termination date. Run-out terminated on December 31, 2020.

---

[2] The limitation to performing audits once a year and no later than 6 months after termination, and limiting such audits to the current or immediately preceding calendar years is an important bargained for limitation because as time goes by it becomes more expensive and burdensome for UHSI to retrieve pertinent claims data.

4

10. Between 2015 and 2019, UHSI processed and paid thousands of claims to hundreds of providers (if not more) in connection with the Debtor's Health Plan.

11. Despite the opportunity to do so, neither the Debtors nor the Plan Administrator performed any contractual audit(s) while the ASA was in place or during the six month period following termination.

### C. The Dispute and the Parties' Agreement to Conduct an Audit.

12. By email dated June 1, 2021 (the "June 1 Email"), sent on behalf of the Plan Administrator, UHSI was informed that the Plan Administrator is "considering having a contingency firm audit the historic payments made for employee healthcare benefits", which would require, among other things, "at least the last 5 years of employee claim detail." The June 1 Email asked if UHSI would be able to provide the data requested by the Plan Administrator.

13. As the Plan Administrator was seeking an audit of claims payment and the time period to conduct an audit had elapsed under the ASA, UHSI advised the Plan Administrator that it would be unable to satisfy the request.

14. Thereafter, by email dated August 6, 2021, the Plan Administrator, through its counsel, sent UHSI a draft *Motion of the Plan Administrator for Entry of an Order Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1 Directing the Production of Documents by United Healthcare Services, Inc.* (the "Proposed Rule 2004 Motion") seeking UHSI's production of, in effect, every document and communication in UHSI's possession related to UHSI's administration of the Health Plan during the time period of August 5, 2015 through and including August 4, 2019. The Proposed Rule 2004 Motion sought "documents" and "communications" (both terms being defined extremely broadly) relating to payment of medical claims and benefits under the Debtor's

Health Plan and "documents" and "communications" relating to rebates, discounts or other financial incentives concerning medical claims and benefits under the Debtor's Health Plan.

15.     Through its counsel, UHSI responded to the Plan Administrator by letter dated August 20, 2021 (the "August 20 Letter"), and explained that the nature and purpose of the Plan Administrator's request was to audit UHSI's services, which is governed by § 10.3 of the ASA. UHSI again explained that under the ASA, the time period to conduct an audit had elapsed. UHSI further noted that the document requests appended to the Proposed Rule 2004 Motion were extremely broad in scope and would impose an undue burden on UHSI that would be disproportionate to the needs of the Plan Administrator. UHSI explained to the Plan Administrator that for the period at issue (between 2014 and the termination of run-out administration under the ASA), UHSI processed thousands of claims lines in connection with the Debtors' Health Plan and the Plan Administrator's request would require UHSI to compile fields of electronic data for each one of these claim lines, as well as collect related paper documentation for such claims. The time and cost to UHSI associated with such an endeavor would be considerable.

16.     UHSI further explained that the potential cost to UHSI would be further increased because certain claims data is no longer housed within UHSI's live system and is archived. The August 20 Letter informed the Plan Administrator that UHSI retains eighteen (18) months of claim payment data from the date of the claim's adjudication in its live system, and UHSI's system archives claims data thereafter. UHSI explained that obtaining the archived data would greatly increase the time and cost associated with locating claim information for all claim payment data adjudicated prior to 18 months.

17.     Notwithstanding UHSI's concerns and the expiration of the contractual period to perform an audit under the ASA, in an effort to work collaboratively with the Plan Administrator

and propose a resolution that would accomplish the Plan Administrator's apparent goal in a more proportionate and targeted manner, UHSI offered to allow the Plan Administrator to perform an audit of a statistically valid random sample of 400 claims in accordance with the terms and procedures set forth in the ASA. As UHSI explained to the Plan Administrator in the August 20 Letter, the audit procedures set forth in the ASA ensure that confidential information is protected and that a qualified auditor is receiving a statistically valid random sample of claims to ensure meaningful results without causing an undue burden.

18.     The August 20 Letter outlined the following summary of the proposed contractual audit terms for the Plan Administrator:

- The audit may be conducted only by the counterparty to the ASA (if qualified to do so) or a mutually agreeable entity.

- Prior to the commencement of the audit, [UHSI] must receive a signed, mutually agreeable confidentiality agreement.

- The place, time, type, duration, and frequency of the audit must be reasonable and agreed to by [UHSI].

- Given the limitations of data available on [UHSI]'s live system, [UHSI]'s ability to audit claims is limited to the 2019 and 2020 calendar years.

- The scope and methodology of an audit of [UHSI]'s transaction processing services must be consistent with generally acceptable auditing standards, including a statistically valid random sample of 400 claims dating back to 2019 or other acceptable audit technique as approved by [UHSI].

- A copy of the audit report must be provided to [UHSI] within thirty days after it is received by the Plan Administrator.

19.     By letter from its counsel dated August 25, 2021, the Plan Administrator responded to UHSI, agreeing to work within UHSI's audit proposal, but subject to the requirements in bold outlined below:

- The audit may be conducted only by the counterparty to the ASA (if qualified to do so) or a mutually agreeable entity.  **(SFUR would need to be approved, subject to any review by its advisors and the Plan Administrator and its advisors.)**

- Prior to the commencement of the audit, [UHSI] must receive a signed, mutually agreeable confidentiality agreement.  **AGREED**

- The place, time, type, duration, and frequency of the audit must be reasonable and agreed to by [UHSI].  **(SFUR shall conduct the audit at their offices)**

- Given the limitations of data available on [UHSI]'s live system, [UHSI]'s ability to audit claims is limited to the 2019 and 2020 calendar years.  **AGREED, provided that the Plan Administrator reserves the right to search claims beyond 2019 and 2020 in the event SFUR's audit reveals questionable transactions and overpayments**

- The scope and methodology of an audit of [UHSI]'s transaction processing services must be consistent with generally acceptable auditing standards, including a statistically valid random sample of 400 claims dating back to 2019 or other acceptable audit technique as approved by [UHSI].  **(SFUR shall pick the 400 from the claims universe based on SFUR's filtering process.)**

- A copy of the audit report must be provided to [UHSI] within thirty days after it is received by the Plan Administrator.  **AGREED**

20.    In its August 25 letter, the Plan Administrator also requested that the parties set up a call to further discuss the logistics of the resolution.

21.    The Plan Administrator and its counsel, counsel for UHSI, and a representative from SFUR and its counsel met by video conference on August 31, 2021.  During the August 31 call, counsel for UHSI informed the parties that UHSI remained willing to offer the Plan Administrator an audit of claims for the 2019 and 2020 calendar years; however, given the Plan Administrator's interest in using SFUR as the auditor and UHSI's lack for familiarity with SFUR's auditing ability, UHSI would need further information on SFUR's experience in the industry and methodology.  SFUR requested that the inquiry be made in writing, to which UHSI agreed.

22.    During the August 31 call, counsel for UHSI also provided information regarding the structure of UHSI's audits.  Counsel for UHSI explained that the claims data set would include

over 100 electronically available "hardened data fields" that UHSI provides to audit firms and that there is no ability for data set customization.  UHSI's counsel also noted that although the Plan Administrator has reserved the right to request claims data beyond the 2019 and 2020 calendar year, UHSI's system auto-archives certain electronically available claims data after a period of time, which impedes UHSI ability to effectively pull claims data beyond 2019 to support an audit.

23. By email correspondence dated September 3, 2021, to follow up on SFUR's request for UHSI's questions in writing, counsel for UHSI sent SFUR three questions.  UHSI requested (i) a written summary of SFUR's experience in the industry of completing claims accuracy reviews, (ii) specific information on the team that would conduct the review, including their knowledge of industry medical claim practices and capabilities to determine claim adjudication accuracy, and (iii) SFUR's methodology for selecting the universe of 400 claims to be reviewed.

24. Counsel for UHSI received SFUR's response on September 13, 2021.  SFUR's response included the names and resumes of two individuals who SFUR indicated would conduct the audit and a response that SFUR's methodology was proprietary.

25. Upon its review of the information provided by SFUR, UHSI had significant concerns regarding SFUR's capability to conduct an external claim accuracy review or audit.  First, UHSI was unable to confirm that either of the two individuals who were designated to conduct the audit have experience conducting claim accuracy audits for purposes of affirming claim transactional outcome accuracy in accordance with benefit plan provisions.  Second, with regard to its methodology for selecting the universe of 400 claims to be reviewed, because SFUR indicated that is uses a proprietary methodology rather than selecting a statistically valid random sample of claims, UHSI had no way of confirming that SFUR's methodology will result in an

accurate representation of the larger population of claims in the way that a statistically valid random sample allows for accuracy.

26. Although UHSI had concerns regarding SFUR's auditors' capability to conduct the audit and SFUR's methodology for selecting the universe of 400 claims to be reviewed, due to the Plan Administrator's request to proceed with SFUR, UHSI agreed to proceed with SFUR as the auditor. Consequently, by email dated October 14, 2021 to the Plan Administrator's counsel and SFUR's counsel, counsel to UHSI communicated UHSI's concerns but willingness to move forward with SFUR. In the October 14 email, counsel to UHSI communicated additional detail regarding the audit requirements and next steps, including the need for a protective order, which counsel to UHSI noted would be circulated by UHSI shortly.

**D.    The Rule 2004 Motion.**

27. On October 18, 2021, the Plan Administrator filed the Motion [D.I. 858], requesting an order from this Court compelling UHSI's production of documents and communications pursuant to Federal Rule of Bankruptcy Procedure ("Rule") 2004. The Document Requests[3] appended to the Motion are identical to those set forth in the Proposed Rule 2004 Motion the Plan Administrator sent UHSI on August 6, 2021. *See* Motion, Ex. B.

28. Exhibit B to the Motion sets forth the Document Requests. *See id.* Exhibit B states that the Document Requests cover all claims that exceed the amount of $5,000.00 during a time period of August 5, 2015 through and including August 4, 2019, and seeks the following:

> 1. Documents and communications, including, without limitation, any accounting records, data compilations, or business records, relating to payments of medical claims and benefits under the Debtors' Medical Plans made to any physician, medical or dental professional or facility, healthcare provider, or pharmacy, including, but not limited, to (i) patient names and claim numbers; (ii) the date and place of service; (iii) names of the healthcare providers; (iv) addresses of the healthcare providers; (v) tax

---

[3] Unless otherwise stated, capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

10501153

identification numbers of the healthcare providers; (vi) national provider identifier numbers of the healthcare providers; (vii) diagnosis codes; (viii) the total charges, eligible amounts, ineligible amounts, and deductibles; (ix) any coinsurance amounts; (x) amounts paid; and (xi) check numbers.

2. Documents and communications, including, without limitation, any accounting records, data compilations, or business records, relating to rebates, discounts or other financial incentives concerning medical claims and benefits under the Debtors' Medical Plans, including, but not limited, to (i) patient names and claim numbers; (ii) the date and place of service; (iii) names of the healthcare providers and drug manufacturers; (iv) addresses of the healthcare providers and drug manufacturers; (v) tax identification numbers of the healthcare providers and drug manufacturers; (vi) national provider identifier numbers of the healthcare providers and drug manufacturers; (vii) diagnosis codes; (viii) the total charges, eligible amounts, ineligible amounts, deductibles, and discounts or other financial incentives; (ix) any co-insurance amounts; (x) amounts paid; and (xi) check numbers.

*See id.*

29. Like the Proposed Rule 2004 Motion, the terms "documents" and "communications" are defined extremely broadly in the Document Requests. "Document" is defined to include, without limitation, all originals, copies, non-identical copies and drafts of the following items, whether printed or recorded or reproduced by hand, including but not limited to letters, correspondence, other communications in any form, telexes, memoranda, records, summaries of personal conversations or interviews, minutes or records or notes of meetings or conferences, note pads, notebooks, postcards, "Post-It" notes, stenographic notes, notes, notebooks, opinions or reports of financial advisors or consultants, opinions or reports of experts, projections, financial or statistical statements or compilations, contracts, agreements, appraisals, analyses, purchase orders, confirmations, publications, articles, books, pamphlets, circulars, microfilm, microfiche, reports, studies, logs, surveys, diaries, calendars, appointment books, maps, charts, graphs, bulletins, photostats, speeches, data sheets, pictures, photographs, illustrations, blueprints, films, drawings, plans, tape recordings, videotapes, disks, diskettes, data tapes or

11

readable computer-produced interpretations or transcriptions thereof, email, text messages, voice mail messages, interoffice communications, advertising, packaging and promotional materials and any other writings, papers and tangible things of whatever description whatsoever, including but not limited to any information contained in any computer, server, mainframe, or other storage device (including (i) information on or in computer memory, (ii) information on or in computer or network backup files, and (iii) information which has been "deleted" or "erased" but is recoverable) whether located onsite or at an off-site facility, within your possession, custody or control.  *See* Motion, Ex. B, Definitions, ¶ 6.

30. "Communication" is defined to include, without limitation, any meeting, conversation, discussion, conference, correspondence, message, or other written or oral transmission, exchange, or transfer of information in any form between two or more persons, including in person or by telephone, facsimile, telex, email, document, text message or other medium.  *See id.*, ¶ 4.

31. The Motion further states that "[t]he Plan Administrator reserves its right to seek additional documents based on any information that may be revealed as a result of the 2004 Document Requests."  *See* Motion ¶ 16.

## II.   OBJECTION

### A.   The Plan Administrator Failed to Show Good Cause for an Order Under Rule 2004.

32. The Motion should be denied because Plan Administrator has failed to satisfy its burden of showing good cause for entry of an order under Rule 2004.

33. "[T]he one seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks." *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998); *see In re Countrywide Home Loans, Inc.,* 384 B.R. 373 (Bankr. W.D. Pa. 2008)

("when a creditor objects the UST must meet a threshold standard of 'good cause' before she will be permitted to conduct examinations and require the production of documents pursuant to Rule 2004."). "The burden of showing good cause is an affirmative one that is not satisfied merely by showing that justice would not be impeded by production of the documents." *In re Drexel Burnham Lambert Group. Inc.*, 123 B.R. 702, 712 (Bankr. E.D.N.Y. 1991). "[G]ood cause requires a showing that the examination sought is necessary to establish the claim of the party seeking the examination, or the denial of such request would cause the proposed examiner undue hardship or injustice." *In re Express One Int'l, Inc.,* 217 B.R. at 217. "[I]f the cost and disruption to the examinee attendant to a requested examination outweigh the benefits to the examiner, the request should be denied." *Id*.

34.     The Plan Administrator has failed to establish that a Rule 2004 examination is necessary to establish any claims or that denial of its request would cause undue hardship or injustice to the Plan Administrator. Moreover, the cost and disruption to USHI attendant to the Plan Administrator's requested examination far outweighs any purported benefit to the Plan Administrator, particularly where there is a more practical option. The possibility to audit a sample of claims is a less burdensome alternative that would avoid undue hardship to UHSI, while at the same time test whether there are any possible claims of the estate. Accordingly, the Motion must be denied.

> *1.     The Plan Administrator has failed to establish that the Rule 2004 examination is necessary to establish its claim or that denial of its request would cause undue hardship or injustice.*

35.     The Motion states that the "Document Requests are intended to provide a more complete picture and will provide the Plan Administrator the requisite facts needed to determine whether potential causes of action exist against United Healthcare and/or the Providers." Motion,

10501153

¶ 18.  A Rule 2004 examination is not necessary to determine whether potential causes of action exist against UHSI and/or the Providers because the Plan Administrator has alternative means to obtain the requisite facts it needs – an audit.

36. Clearly, the Plan Administrator's objective is to audit UHSI's claim administration under the ASA.  This can be accomplished by the Plan Administrator—like it is done by all of UHSI's customers—pursuant to the audit provisions of the ASA.

37. Despite the termination of audit rights under the ASA, UHSI has offered to allow the Plan Administrator to perform an audit under § 10.3 of the ASA to determine whether UHSI fulfilled the terms of the ASA.  As set forth above, UHSI and the Plan Administrator have already engaged in extensive discussions regarding the proposed audit and auditor, and UHSI stands ready to move forward with working with the auditor (SFUR) in connection with the audit.  Indeed, UHSI communicated its agreement to move forward to the Plan Administrator prior to the filing of the Motion (notwithstanding its concerns about SFUR's ability to do such an audit and methodology in selecting the sample).

38. As the offered audit by UHSI presents an available option outside of the Document Requests, a denial of the Plan Administrator's request under Rule 2004 would not cause undue hardship or injustice to the Plan Administrator.

> **2. *The cost and disruption to USHI attendant to the Plan Administrator's requested examination far outweighs any purported benefit to the Plan Administrator.***

39. Although cloaked in the guise of two requests, the Document Requests essentially seek the production of every document and byte of data concerning the administration of the Health

Plan over a four year period.[4]  Therefore, if the Motion is granted, UHSI, a non-party, would be required to produce a breathtaking volume of data and documents, which place a significant and undue burden on UHSI in the form of extensive costs and disruption.  The costs and disruption to USHI associated with responding to the Document Requests far outweighs any benefit to the Plan Administrator.

40. As noted above, the Health Plan covered almost one thousand employees (not including their dependents), with claim volume which the Debtor estimated to be $175,000 on average per week as of the time of the bankruptcy filing.  *See* D.I. 6, ¶ 26.  Given the extremely broad definitions of "documents" and "communication", the Plan Administrator's request would require UHSI to compile every single bit of data and information for each one of the claims administered and paid by UHSI.

41. The information sought by the Plan Administrator is not stored in a single location from which it could be easily assembled.  Rather, the information related to a claim and its adjudication is stored in various data sources.  Such claims related information is stored on UHSI's live system for approximately eighteen months from the date of the claim's adjudication, and after that time, the data is archived.

42. Because all information and documentation regarding the claims administered by UHSI is stored in various data sources, there is no way to use an automated process to simply obtain all "documents" and "communications", as the terms are defined in the Motion, related to each claim and its adjudication history.  Instead, to provide all "documents" and "communications" for each of the thousands of claims for review, UHSI will have to manually obtain and review

---

[4] Additionally, despite the already excessive nature of the Plan Administrator's proposed requests, the Motion further states that "[t]he Plan Administrator reserves its right to seek additional documents based on any information that may be revealed as a result of the [] Document Requests."  *See id.*

information from various data sources. The time and cost to UHSI associated with such an endeavor would be considerable and disproportionate to the needs of the case given the availability of an audit.

43. Further, the Document Requests purported condition that UHSI solely produce "documents" and "communication" related to all claims that exceed the amount of $5,000.00 in no way reduces UHSI's burden. By contrast, it increases the administrative burden and expense on UHSI and creates further disruption to UHSI's business as it requires an individualized review of each claim by dollar amount to meet the Plan Administrator's request.

44. In addition, the four-year scope of the Document Requests will create an undue burden on UHSI. Given the fact that the applicable period involves time periods stretching back to 2015, it is highly likely that a significant amount of the sought documents and data are in archival storage systems for which it is particularly costly to UHSI to recover. UHSI retains 18 months of claim payment data from the date of the claim's adjudication in its live system and archives claims data thereafter. Obtaining the archived data would greatly increase the time and cost associated with locating claim information for all claim payment data adjudicated prior to 18 months ago. This concern was communicated to the Plan Administrator by UHSI in the parties' discussions regarding time period associated with the audit. It was the primary reason why UHSI requested that the parties agree that the audit only extend back to 2019.

45. Based on the voluminous amount of production sought and the fact that the Plan Administrator has not performed any audit that would even call into question UHSI's performance under the ASA, the purported benefit to the Plan Administrator could not outweigh the burden and strain that would be placed on UHSI. As a non-party, UHSI should be entitled to protection against these unduly burdensome disruptions and significant expenses. By contract, the offered audit

ensures that the Plan Administrator will obtain meaningful results without causing an undue burden on UHSI.

46. To require UHSI to devote this significant effort simply because the Plan Administrator refuses to take advantage of the offered audit, that the Plan Administrator previously agreed to, is highly unjust and puts a significant strain on UHSI, which it did not bargain for when negotiating the ASA. "The expansive nature of Rule 2004 should not be permitted to exact prejudice or injustice on the subpoenaed party." *In re Mattera*, No. 05-39171, 2007 WL 1813763, at *2 (Bankr. D.N.J. June 13, 2007).

**B.   The Motion is Improperly Attempting to Circumvent Fed. R. Bankr P. 9016 and Fed. R. Civ. P. 45.**

47. Additionally, the Motion's proposed order purports to immediately compel production of the sought records within 30 days of entry of the order. This requested language improperly cuts-off UHSI's rights under Fed. R. Bankr P. 9016 and Fed. R. Civ. P. 45, and failing to show good cause, the Motion's demand for production of the sought records within 30 days is inconsistent with the procedures governing a Rule 2004 examination.

48. If this Court were to grant a Rule 2004 examination, which it should not, Rule 2004(c) provides that "the production of documents . . . may be compelled as provided in Rule 9016." Fed. R. Bankr. P. 9016, in turn, provides that Fed. R. Civ. P. 45 applies in cases under the Bankruptcy Code. Fed. R. Bankr. P. 9016; *see In re Cont'l Forge Co., Inc.*, 73 B.R. at 1007 ("We note that Bankruptcy Rule 9016 makes Rules 45 of the Federal Rules of Civil Procedure applicable to bankruptcy cases under the Code.") Rule 45 provides that "party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). The recipient of such

subpoena can move to quash due to, *inter alia*, privilege or undue burden, or otherwise object. *See* Fed. R. Civ. P. 45(d)(2)(b) and 45(d)(3).

49. By requesting that the Court compel production of the information in Exhibit B of the Motion, the Motion is improperly trying to circumvent Fed. R. Civ. P. 45. Thus, even if the Court were to grant relief under Rule 2004, all the Plan Administrator would be entitled to do is serve a subpoena on UHSI under Fed. R. Civ. P. 45.

50. Moreover, a non-party required to produce documents is protected against significant expense under Fed. R. Civ. P. 45. Therefore, to the extent the Court grants the Motion in any respect, UHSI reserves its rights to seek reimbursement for its internal costs, as well as attorneys' fees and costs associated with complying with any Document Requests.

    **C.**    **The Confidentiality of the Records Sought Must Be Protected.**

51. Many of the records sought in the Motion are highly confidential. Much of the sought claims data and records contain "protected health information" that is protected under the Health Insurance Portability and Accountability Act. In addition, the Motion seeks UHSI's highly confidential and proprietary business information, including records relating to reimbursement rates, fee schedules, and similar information. If this information became publicly available to facilities, providers, and/or UHSI's competitors, it would cause UHSI significant injury. Therefore, to the extent the Court grants the Motion in any respect, which it should not, this Court should strictly limit the disclosure of any such information, documents or records through an appropriate protective order.

### D. UHSI's Proposed Alternative.

52. As an alternative to granting the relief requested in the Motion, UHSI requests an order of the Court denying the request for a Rule 2004 examination and encouraging the Plan Administrator engage in the audit proposed by UHSI.

53. As set forth above, the cost and disruption to USHI attendant to the Plan Administrator's requested examination will be substantial. When taking into account the four-year scope of the proposed Document Requests, almost one thousand employees covered under the Health Plan (not including their dependents), the thousands of claims that would have been submitted in connection with the Health Plan during that time period, and the hundreds, if not thousands, of providers and facilities that submitted such claims, there is no question that the Document Requests are enormously and unduly burdensome and would be extremely time consuming and cost-prohibitive for UHSI. The potential cost is further increased because certain claims data is no longer housed within UHSI's live system and is archived, and obtaining the archived data would greatly increase the time and cost associated with locating claim information for all archived claim payment data.

54. When faced with a somewhat similar issue, this Court recognized the burden on UHSI and the availability of an audit under the ASA as a reasonable alternative. In *In re RS Legacy Corporation, et al.*, without prejudice to the liquidating trustee's right to later return to the Court to seek further relief under Rule 2004 or otherwise, the Honorable Brendan L. Shannon required the liquidating trustee to first endeavor to conduct an audit under the terms of the administrative services agreement in place with UHSI. *See In re RS Legacy Corporation, et al.*, Case No. 15-10197 (BLS), D.I. 4304, at 80:21-86:13.

55. In line with this Court's ruling in *In re RS Legacy Corporation, et al.*, UHSI believes that an order denying a Rule 2004 examination at this time, but encouraging the Plan Administrator to conduct an audit in accordance with the terms agreed to by the parties is the best outcome here. It is counterproductive to engage in costly and unwieldy discovery that is disproportionate to the needs of the Plan Administrator when an alternative is available through the audit process proposed by UHSI.

### III. CONCLUSION

WHEREFORE UHSI respectfully requests that the Court enter an order (i) denying the Motion; and (ii) granting other relief as justice requires.

Dated: November 1, 2021
Wilmington, Delaware

BAYARD, P.A.

*/s/ Gregory J. Flasser*
Evan T. Miller (No. 5364)
Gregory Flasser (No. 6154)
600 N. King Street, Suite 400
P.O. Box 25130
Wilmington, DE 19899
Tel: (302) 429-4226
Fax: (302) 658-6395
Email: emiller@bayardlaw.com
         gflasser@bayardlaw.com

and

Latonia C. Williams, Esq.
Eric S. Goldstein, Esq.
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, CT 06103
Tel: (860) 251-5037
Fax: (860) 251-5218
E-mail: lwilliams@goodwin.com
           egoldstein@goodwin.com

*Counsel for United HealthCare Services, Inc.*

10501153